EDWARDS ANGELL PALMER & DODGE LLP
Andrew P. Fishkin (AF7571)
Steven M. Lucks (SL2711)
750 Lexington Avenue
New York, New York 10022
(212) 308-4411
*Attorneys for Plaintiff Alliance Continental Leasing LLC*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLIANCE CONTINENTAL LEASING LLC, | : Case No. 08 CV 1027 (JSR) |
| Plaintiff, | |
| v. | |
| PRIMA CHARTER Sp. z. o. o., | **DECLARATION OF STEVEN M. LUCKS IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| Defendant. | |

I, Steven M. Lucks, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.     I am a member of the bar of the State of New York, and I have been admitted to the U.S. District Court for the Southern District of New York and am permitted to appear in this action. I am an associate with the firm of Edwards Angell Palmer & Dodge LLP, attorneys for Plaintiff Alliance Continental Leasing LLC, and I am fully familiar with this proceeding as well as the specific matters set forth herein. I make this declaration in opposition to Defendant Prima Charter Sp. z. o. o.'s ("Prima") motion to dismiss.

2.    Attached as Exhibit A is a true and correct copy of Alliance's Lease Proposal that was accepted by Prima on April 18, 2007.

3.    Attached as Exhibit B is a true and correct copy of Alliance's Purchase Letter of Intent to AeroTurbine, Inc. ("AeroTurbine"), dated June 14, 2007, enclosing an executed Purchase and Sale Agreement to purchase a 1998 B757-236 aircraft (the "Aircraft") from AeroTurbine.

4.    Attached as Exhibit C is a true and correct copy of a Lease Commitment dated June 26, 2007 that Alliance sent Prima outlining the parameters under which Alliance would lease the Aircraft to Prima.

5.    Attached as Exhibit D is a true and correct copy of a Lease Proposal for the Aircraft, which Prima accepted on or about July 27, 2007.

6.    Attached as Exhibit E is a true and correct copy of the Aircraft Lease Agreement that Alliance sent Prima for execution following Prima's acceptance of the Lease Proposal and payment of the $250,000 cash retainer deposit under it.

7.    Attached as Exhibit F is a true and correct copy of the version of the Aircraft Lease Agreement that Prima executed and returned to Alliance after it had made certain revisions to ¶5.1.

8.    Attached as Exhibit G is a true and correct copy of the final version of the Aircraft Lease Agreement that Alliance revised to properly reflect the parties' agreement and the fact that Prima had not paid the $750,000 security deposit owed under the Lease Agreement.

Dated: New York, New York
       March 27, 2008

                                        STEVEN M. LUCKS (SL2711)

296933

- 2 -

**EXHIBIT A**

18/04 2007 14:24 FAX +48225002581    Case 2:08-cv-01027-JSR    Document 12-2    FISCHER AIR POLSKA    Filed 03/27/2008    Page 2 of 6    ☒002

From: ALLIANCE CONTINENTAL HLDGS    GR0013307021938    04/16/2007 16:36 #308 P.001/005



# Alliance Continental
HOLDINGS GROUP, INC

LEASE PROPOSAL PREPARED FOR: FASOPS MADRID Mandated Agent for
**PRIMA CHARTER**
BOEING 757-200 Series Aircraft
Serial Numbered: _26143 &26144_

LESSOR:    Banking/ Institutional Assignee to ACL.

LESSEE:    PRIMA CHARTER.

AIRCRAFT;    Two Boeing 757-200 (the "Aircraft") each with two attached PW 2040 power plants. The Aircraft is described generally.

DELIVERY
CONDITION:    The Aircraft shall be delivered in the following condition:

"As-is-where-is"

Nubbed and sanded and painted white.

The Lessor shall cause the aircraft to have installed, an ENHANCED GROUND PROXIMATEY WARNING SYSTEM, and Anti-hijacking Cockpit door.

The Aircraft shall be EASA compliant. If the Aircraft for what ever reason, are unable to meet EASA compliance, than the Lessee, shall afford the Lessor ample opportunity to substitute the aircraft with other like kind, make and model aircraft, and or deliver the subject aircraft, with required compliance.

The Aircraft will be 120 min ETOPS compliant.

The Passenger Cabins will be in 216 PAX, 3 Galleys and 4 Lavatories configuration.

Each of the attached power plants on the respective aircraft shall have not more then 500 flight hours and 250 flight cycles accumulated since its last shop visit for ESV2 performance restoration. At Lessee's Cost, Lessee shall have the right to carry out a video bore scope inspection of the full gas path of the Engines and to observe a full systems functional and operational check (power assurance) of the Engines, and Inspection of the magnetic chip detectors of the Engines.

At Lessee's Cost, Lessee shall have the right to carry out the airplanes acceptance physical inspection before delivery. Such inspection will contain agreed scope of visual checks and systems operational checks. Any defects or malfunctions found during such inspection shall be rectified at Lessor's expense prior to delivery.

The APU shall be in a serviceable condition.

All LLPs shall have a remaining life of at least 5000 cycles in accordance with the overhaul and maintenance manual of the engine manufacturer / landing gear manufacturer (as applicable).

.commercialagreespecaceptteverperutish.com

6715 Tippecanoe Rd. • Building A, Suite 202 • Canfield, Ohio 44406 USA
Phone 001-330-702-1930 • Fax 001-330-702-1938



All other "hard time" components (except those referred to in the next sentence) shall have a remaining life of at least 1000 hours, 1000 cycles or 12 months (whichever is limiting) to the next required overhaul, shop visit, inspection or replacement in accordance with the OAMP. If a "hard time" component has a time to overhaul interval, shop visit interval or inspection or replacement interval of less than 1000 hours, 1000 cycles or 12 months, then the component shall have at least 40% life remaining to their next overhaul, SV, inspection or replacement

All components that are "on condition" or "condition monitored" shall be in serviceable condition with at least 1000 flight hours, 1000 flight cycles and 12 months remaining to the MTBF. Each OC/CM part which has an MTBF of less than 1000 flight hours, 1000 flight cycles or 12 months (whichever is limiting) shall have at least 50% of its hours/cycles/calendar time (whichever is limiting) remaining to its MTBF.

Lessee shall have the right to review all maintenance reports, pilot reports and Aircraft systems functional check reports to ensure full serviceability status of each component. Any defects or deficiencies affecting the airworthiness of the Aircraft shall be rectified at Lessor's expense prior to delivery.

The Aircraft shall be delivered to the Lessee with a valid FAA airworthiness certificate and/or an Export Airworthiness Certificate and shall be in a condition, and with full supporting documentation, to allow a qualified owner to apply for and receive a Certificate of airworthiness for JAR operations and a Polish certificate of registration.

The Aircraft Maintenance Status will refer to MPD Jan 2007, including CPCP Tasks integration into Chapters 7 (Zonal) and 8 (Structures), with no outstanding reference to the Tasks.

The Aircraft will be delivered to Lessee fresh from the subsequent "C" check. The scope (list of tasks) of this C-Check will be available to PC in advance.

The Aircraft AD Status will allow the Aircraft operation within 90 days after Delivery.

The Passenger Cabins will be in 203-216 PAX, 3 Galleys and 4 Lavatories configuration.

COMMENCEMENT:    The Lease Term shall commence on or about June 1st, 2007 with delivery of the initial aircraft. The Second aircraft lease and delivery shall commence approximately thirty (30) days thereafter. The Lessor shall give the Lessee at least ten days notification as to the commencement of the lease.

LEASE TERM:    The term of the lease shall be Sixty (60) months from the date of delivery.

LEASE RENTALS:    The Lease Rentals for the Aircraft shall be in US Dollars, net and payable monthly in advance. The Lease Rentals shall be fixed for the term of the lease.

OPERATING COSTS:    This offer is on the basis of a net lease and Lessee shall be responsible for all costs associated with the delivery, possession, insurance, operation, maintenance (including airworthiness directive and service bulletin compliance) and use of the Aircraft including taxes and duties of any kind including withholding tax and value added tax but excluding net income taxes payable by Lessor to the relevant tax authorities in Lessor's country of incorporation.

MAINTENANCE:    The Aircraft shall be maintained at the expense of Lessee, in accordance with Lessee's maintenance program, which must meet the requirements of Boeing Maintenance Planning Data Document (MPD). The Aircraft shall be maintained by a maintenance

organization acceptable to Lessor, holding an at least EASA Part 145 certificate of approval. The Lessor shall receive a copy of the approved Maintenance Schedule prior to delivery of the Aircraft to enable full verification that the Maintenance Schedule complies in total with the Boeing (MPD).

**MAINTENANCE PAYMENTS:**

The Lessee shall pay the Lessor on the 15th day of the month Maintenance Payments for the Aircraft and the Engines for the actual flight hours and cycles utilized in the preceding month. The Maintenance Reserves shall be all inclusive, at a rate suggested by the manufacturers program costs.

**RETURN CONDITION:**

The Aircraft shall be re-delivered in the following condition:

Clean;

Serviceable;

Nubbed and sanded and painted white.

The Aircraft shall be delivered to the Lessee with a valid airworthiness certificate and/or an Export Airworthiness Certificate and shall be in a condition, and with full supporting documentation, to allow a qualified owner to apply for and receive a FAA Certificate of airworthiness for Part 121 operations and a FAA certificate of registration.

**DELIVERY AND RETURN CONDITION :**

In the event that on delivery to Lessee the Aircraft condition does not conform to any of the requirements of "Delivery Condition," Section D 1(a) (cleanliness), 1(e) (Lessor's specification), and provided such nonconformance does not impair the airworthiness of the Aircraft, Lessee shall accept delivery and shall be given relaxation with regard to that item (or items) to the same extent at the time of re-delivery to Lessor.

**INSURANCE:**

Lessee will bear all risks of loss or damage to the Aircraft in a form acceptable to Lessor (including any assignment thereof), using brokers and insurers acceptable to Lessor, Lessee will at all times maintain :

> Comprehensive liability, bodily injury and property damage insurance (including AVN 52D and excess war and allied perils third party liability insurance) that is not less than USD 500 million per occurrence; and All-risk hull insurance (including the Engines or parts removed from the Aircraft), war risks and allied perils insurance (including

confiscation and confiscation by government of registry) in the amount the greater of fair market value or USD 20.0 million. .

If the insurance is subject to re-insurance the re-insurance will contain a satisfactory cut-through clause and will be assigned to the Lessor.

**SUBLEASE:**

The Lessee will not sublease the Aircraft without the prior written consent of the Lessor. If the Lessee seeks the consent of the Lessor to any proposed sublease, the Lessee agrees to reimburse Lessor for all costs incurred in assessing and/or implementing the proposed sublease.

| | |
|---|---|
| **SECURITY:** | Upon execution of the formal lease agreements, Lessee will pay Lessor a security deposit in cash equal to $630,000. USD per Aircraft. Such Security shall remain in place throughout the term of the lease. |
| **MONTHLY RENTAL:** | The Monthly Rental amount shall be $210,000.00 USD per Aircraft. |
| **REGISTRATION:** | Throughout the Lease Term the Aircraft may remain on Polish register, subject to compliance with paragraph entitled "Lessor/Lender Protection" below. |
| **LESSOR / LENDER PROTECTION:** | This proposal is subject to the ability of the Lessor to properly and adequately register and record the ownership, lease and any mortgage interests in the Aircraft. Lessee shall be responsible for all fees and expenses associated with such recordation and registration and for perfecting and maintaining such recordation and registration throughout the Lease term. In addition, the Lessor shall require from the Polish Civil Aviation Authority, a written certification, that in the event of a default of any kind, by the Lessee, the Aviation Authority will immediately de-register the aircraft for removal from that jurisdiction. |
| **AIRCRAFT AND ENGINE WARRANTIES:** | Any remaining manufacturers' warranties shall be assigned (with the consent of the relevant manufacturer) or otherwise be made available to the Lessee. |
| **PLACE OF DELIVERY:** | Victorville CA, USA, or other determination nominated by the Lessor. |
| **PLACE OF REDELIVERY:** | At an airport in Europe as nominated by Lessor. |
| **PRECONDITIONS:** | This offer by Alliance Continental Leasing, LLC to lease the Aircraft is subject to continuing Aircraft availability and Alliance Continental Leasing, LLC Board approval (which shall include but not be limited to a satisfactory credit assessment, and compliance by the Lessee) as to which Alliance Continental Leasing, LLC shall advise the Lessee by no later than 60business days following receipt of Lessee's acceptance and deposit (Refer paragraph entitled "Acceptance"). |
| **VALIDITY PERIOD:** | This offer and the accompanying deposit(s)confirmation, is valid until April 20th, 2007. You may return by fax to 001-330-702-1938 No further extension will be provided. |
| **BANKING DETAILS:** | The non-refundable retainer deposit payable hereunder is to be paid to our account at: |

Key Bank N.A.

5712 Market Street

Youngstown, Ohio 44512

ABA/ Routing Number: 041001039

SWIFT CODE: KEY US 33

ACCT. Number: 352291003189

Further Credit To: Attorney Robert J. Rohrbaugh II Esq.

All funds due from Lessee shall be in immediately available US Dollars, clear of any and all taxes and deductions.

| | |
|---|---|
| **ACCEPTANCE:** | This proposal may be accepted by written acknowledgment from Lessee in the space provided below that the terms and conditions hereof are acceptable to Lessee. Lessor must receive such acceptance by Lessee within the validity period specified above. |

Upon acceptance of the terms and conditions hereof, the payment of a cash retainer deposit of USD $250,000.USD USD Per Aircraft, shall be due immediately and must be received by Lessor within Five business days of such acceptance. The deposit payable hereunder shall be non-refundable except as expressly provided herein. Thereafter the Lessor and the Lessee shall complete definitive lease contracts within a period of 60 days or by such later date as may be agreed by the Lessor.

Upon the execution of definitive lease contracts the deposit Received by Lessor will be credited against the first rental due on delivery of the Aircraft.

In the event that Alliance Continental Leasing, LLC does not approve the transaction (in accordance with paragraph entitled "Preconditions" above) the security deposits shall be returned to the Lessee, upon receipt of Lessee's bank account details. In the event the aircraft does not meet the compliance requirements, and or the Lessor is unable to provide a substitute aircraft, of like kind make and model, than the deposit shall become fully refundable, less any accumulated expenditures..

CONFIDENTIALITY:   The parties hereto, agree not divulge the content of this document, or any other Documentation related to the transaction proposed herein.

GOVERNING LAW:   This lease proposal shall be construed in accordance with the laws of the State of Delaware and the United States of America alone, and without regard to its conflict of law rules, shall govern the interpretation of this agreement, including all rules or codes, which apply to engaging such transactions.

Please review this agreement. If the foregoing is in accord with your agreement and understanding, please execute and return the enclosed copy of this letter, along with the required retainer, in the amount of $250,000.USD, per aircraft.

LEASE PROPOSAL MADE BY

Alliance Continental Leasing, LLC

Name:   John C. Green C.E.O.

Title:   Managing Director/ CEO

Date:   04-05-2007

PROPOSAL ACCEPTED BY

PRIMA CHARTER

Name:   ADAM LYCHOWANIEC

Title:   President/ Director

Date: APRIL 18, 2007

K Symonik.
BOARD MEMBER

Prima Charter Sp. z o.o.
02-146 Warszawa, ul. 17 Stycznia 56
NIP 522-27-53-949

**<u>EXHIBIT B</u>**



**Alliance Continental**
HOLDINGS GROUP, INC.

*Via Facsimile (305) 590-2606*

June 14th, 2007

Mr. Michael Mullen
Senior Vice President Technical Administration
AeroTurbine, Inc.
2323 N.W. 82nd Street
Miami Florida 33122

RE: Purchase Letter of Intent (B757-236)

Dear Mike,

Please find our attached "revised" offering to acquire the 1988 B757-236 Aircraft. Per our communications, it is understood, that time is of the essence, and therefore, we would, with your permission, advise our end user to make the necessary arrangements to view the aircraft and records accordingly, on the dates notated.

I will be on the road tomorrow, (Friday 6/15/2007), but reachable via my mobile number (330)-718-0567. I look forward to making this happen in the time frame noted.

Best regards,

John C. Green Managing Director – C.E.O.
Alliance Continental Leasing Ltd.

Cc: file

6715 Tippecanoe Rd. • Building A, Suite 202 • Canfield, Ohio 44406 USA
Phone 001-330-702-1930 • Fax 001-330-702-1938

Alliance Capital Group, Inc
Alliance Continental Leasing, LLC
Commercial Aerospace Capital Corporation
Alliance Aerospace Capital Ltd

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("Agreement") made as of this _____ day of June, 2007 by and between AeroTurbine, Inc. 2323 N.W. 82nd Street, Miami Florida, 33122. ("Seller") and ALLIANCE CONTINENTAL LEASING, LLC Creekside Professional Centre, 6715 Tippecanoe Road, Building A, Suite 202, Canfield, Ohio 44406 ("Buyer").

### WITNESSETH:

WHEREAS, pursuant to Agreement, Seller owns all of the beneficial interest in and to one (1) Boeing 757-236EM, Reg. No. N28AT, Serial Number 24121 together with two (2) Rolls Royce model RB211-535E4-37 engines Serial Numbers: 30646 and 30660, inclusive of all related documents, records, Aircraft logs, flight, engineering and maintenance manuals, drawings, certifications, inspection and modification records, technical records and other technical data relating thereto, and subject to the Lease (as defined herein) and other documents provided to Buyer prior to closing (collectively the "Aircraft"); and

WHEREAS, Seller desires to sell all of its right, title and interest in and to the Aircraft including all of its right, title and interest ("Seller's Interest") and Buyer desires to purchase Seller's Interest in on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. Sale and Purchase. Subject to the terms and conditions set forth herein, on the Closing Date (as hereinafter defined), Seller shall sell, convey, transfer and assign the Seller's Interest to Buyer and Buyer agrees to purchase the Seller's Interest and to pay the Purchase Price for Seller's Interest.

2. Closing Date, Purchase Price and Payment. The Closing shall occur on or before June 29th, 2007 (the "Closing Date"). The "Purchase Price" for Seller's Interest shall be in the total aggregate amount of Twelve Million Three Hundred Fifty Thousand Dollars ($16,500,000.00), conditioned upon final negotiations, and payable at closing, with or without agreed deductions.

All sums payable as part of the Purchase Price shall be made by wire transfer, to the escrow account at Aero-Space Reports. Buyer agrees that it shall be responsible for and will pay any sales, use or other taxes imposed by any state or local governmental body on the sale and purchase of Seller's Interest hereunder. Seller and Buyer agree to use reasonable efforts to minimize any sales, use or other taxes, which may become due as a result of the sale of Seller's Interest.

3. Disclaimer. SELLER'S INTEREST INCLUDING ALL OF SELLER'S RIGHT, TITLE AND INTEREST IN AND TO THE AIRCRAFT SHALL BE DELIVERED TO BUYER "AS-IS, WHERE-IS" AT THE TIME THE PAYMENT IS REQUIRED BY PARAGRAPH

1

1. HEREOF IS MADE ON THE CLOSING DATE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO THE COMPLETENESS, ACCURACY OR CORRECTNESS OF ANY MAINTENANCE LOGS OR RECORDS RELATING TO THE AIRCRAFT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN PARAGRAPH 7 HEREIN, SELLER DOES NOT MAKE ANY WARRANTIES, GUARANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, WITH REGARD TO THE SELLER'S INTEREST INCLUDING BUT NOT LIMITED TO, AIRWORTHINESS, CONDITION, DESIGN, OR MANUFACTURE OF THE AIRCRAFT, AND BUYER WAIVES ALL REMEDIES, WARRANTIES OR LIABILITIES, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, AGAINST SELLER WITH RESPECT TO THE SELLER'S INTEREST AND THE AIRCRAFT, INCLUDING BUT NOT LIMITED TO (1) ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS, (2) ANY IMPLIED WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, (3) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY IN TORT, WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF SELLER, ACTUAL OR IMPLIED, WITH RESPECT TO THE OPERATION OF THE AIRCRAFT AND (4) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY FOR LOSS OF OR DAMAGE TO THE AIRCRAFT, FOR LOSS OF USE, REVENUE OR PROFIT WITH RESPECT TO THE AIRCRAFT, FOR ANY LIABILITY OF SUCH PERSONS TO ANY THIRD PARTY, OR FOR ANY OTHER DIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES.

4. Inspection. Buyer shall have the right to a customary physical inspection of the Aircraft and associated records prior to the close of business on June 22nd, 2007. Buyer shall have a right to complete a boroscope inspection of the engines. The Aircraft and associated records shall be tendered to Buyer for inspection at a mutually agreed location. Buyer shall notify Seller in writing by the close of business June 25th, 2007 that the inspection of the Aircraft and the associated records has been satisfactorily completed or Buyer shall terminate this Agreement in accordance with the provisions of Paragraph 5 below only if the inspection reveals material deficiencies in excess of $100,000 in the Aircraft not set forth in the specifications previously provided to Buyer or known to Buyer.

5. Conditions Precedent.

(a) The obligations of Seller under this Agreement are subject, at the sole option of Seller, to the satisfaction in Seller's sole opinion, unless waived by Seller in its sole discretion, at or prior to the Closing of the following:

(i) the representations and warranties of Buyer made herein are true and correct in all material respects as of the Closing Date as though such representations and warranties were made at and as of such date.

(ii) Buyer shall have paid to Seller the Purchase Price as provided for herein.

2

(b) The obligations of Buyer under this Agreement are subject, at the sole option of Buyer, to the satisfaction in Buyer's sole opinion, unless waived by Buyer in its sole discretion, at or prior to the Closing (unless otherwise noted) of the following:

(i) the representations and warranties of Seller made herein are true and correct in all material respects as of the Closing Date, as though such representations and warranties were made at and as of such date.

(ii) Buyer's Board shall have approved of the transactions contemplated by this Agreement on or before June 26th, 2007.

(iii) Buyer qualifies as a "Transferee" as set forth in subparagraph (a)(iii) above or if Buyer does not so qualify Buyer has used its best efforts to obtain the consent of Owner Trustee and Lessee to the transaction contemplated hereby.

(iv) No total loss or destruction of the Aircraft occurs prior to the Closing Date.

(v) Seller shall have executed and delivered the Bill of Sale and Assignment substantially in the form attached hereto as Exhibit "A".

7. Representations and Warranties of Seller. Seller represents and warrants to Buyer that:

(a) as of the Closing Date, Seller's Interest shall not be subject to any mortgage, lien, claim, security interest, pledge, charge or other encumbrances other than the interest of Lessee pursuant to the Lease and the documents previously provided to Buyer.

(b) the execution, delivery and performance of this Agreement by Seller is within its corporate powers, has been duly authorized by all necessary corporate action, does not contravene its charter or by-laws or law or any contractual restriction binding on or affecting it.

(c) no further authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body (other than the FAA, if applicable) is required for the due execution, delivery and performance by it of this Agreement.

(d) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable in accordance with the terms hereof except to the extent limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally or by general equitable principles.

8. Representations and Warranties of Buyer. Buyer represents and warrants to Seller that:

3

(a) the execution, delivery and performance of this Agreement by Buyer is within its corporate powers, has been duly authorized by all necessary corporate action, does not contravene its charter or by-laws or law or any contractual restriction binding on or affecting it.

(b) no further authorization or approval or other action by, and no notice to any filing with any governmental authority or regulatory body (other than the FAA, if applicable) is required for the due execution, delivery and performance by it of this Agreement.

(c) this Agreement constitutes a legal, valid and binding obligation of Buyer, enforceable in accordance with the terms hereof except to the extent limited by bankruptcy, insolvency or similar laws affecting creditors' rights generally or by general equitable principles.

(d) Buyer is qualified as a Transferee under Section 9.1.1 of the Participation Agreement and has performed all things required thereunder to so qualify.

The representations and warranties set forth in Paragraphs 7 and 8 above shall survive the Closing under this Agreement.

9. Indemnity.

(a) The Buyer shall indemnify and hold harmless on an after-tax basis each of the Seller and its officers, employees, servants or agents from and against any and all liabilities, obligations, costs, expenses (including, without limitation, reasonable fees and expenses of legal counsel), losses, damages, penalties, judgments, claims, actions and suits of whatsoever kind and nature (collectively "Losses") of or against the Seller or any of its officers, employees, servants or agents which shall result from (i) the incorrectness of any representation or the breach of any warranty made by the Buyer in this Agreement, (ii) the breach by the Buyer of any of its covenants or agreements contained in this Agreement, of (iii) the use or operation of the Aircraft at any time after the Closing Date, except to the extent that any such Losses shall (A) result from the negligence or misconduct of the party seeking indemnification or any of its officers, employees, servants of agents, or (B) represent a tax or loss of tax benefits.

(b) Seller shall indemnify and hold harmless on an after-tax basis each of the Buyer and its officers, employees, servants or agents from and against any and all liabilities, obligations, costs, expenses (including, without limitation, reasonable fees and expenses of legal counsel), losses, damages, penalties, judgments, claims, actions, suits of whatsoever kind and nature (collectively "Losses") of or against Buyer or any of its officers, employees, servants or agents which shall result from (i) the incorrectness of any representation or breach of any warranty by the Seller in this Agreement, (ii) the breach by Seller of any of its covenants or obligations contained in this Agreement, except to the extent any such Losses shall (A) result from the negligence or misconduct of the party seeking indemnification or any of its officers, employees, servants or agents, or (B) represents a tax or loss of tax benefits.

4



10. Miscellaneous.

(a) At Closing, Seller will execute and deliver to Buyer a Bill of Sale and Assignment in substantially the form attached hereto as Exhibit "A". Each of the parties hereto agrees to execute and deliver such additional documents, agreements, certificates and undertakings that may reasonably be requested by the other party to effectuate the purposes of this Agreement.

(b) Any notices permitted or required hereunder shall be in writing and shall be given by hand delivery, courier, regular, overnight mail, facsimile transmission or electronic mail to the party to receive such notice at the address set forth on the signature page hereof and shall be deemed to have been given when received.

(c) This Agreement shall be governed by, and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by, the laws of the State of New York, without any reference to any conflict of law provisions thereof. In the event of any legal proceedings arising out of or relating to this Agreement, Seller and Buyer agree and consent to service of process by any means allowed by law, including but not limited to mail delivery or any other manner of service which provided for actual receipt and return of service an/or any other method or procedure allowed by law. Process may be served upon any officer, director, employee or agent of the parties, or any other individual authorized by law. THE PARTIES HERETO HEREBY WAIVE THE RIGHT TO TRIAL BY JURY AS TO ANY CLAIMS ARISTING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

(d) Either party may, by written notice executed by their duly authorized officers, waive any right or power accruing to it hereunder but no delay or failure on the part of either party hereto to exercise any right or remedy shall operate as a waiver thereof, any right or remedy shall not preclude other or further exercise thereof or the exercise of any other right or remedy. The waiver of either party of performance of any term, covenant or condition of this Agreement in a particular instance shall not constitute a waiver of any subsequent breach or preclude such party from thereafter demanding performance thereof in accordance with the terms hereof.

(e) The headings of the Paragraphs herein are for convenience only and shall not affect the construction hereof.

(f) No term or provision of this Agreement may be changed or waived orally, but only by an instrument in writing signed by both parties hereto.

(g)Any provision of this Agreement that may be prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability in such jurisdiction only, without invalidating the remaining provisions hereof in such jurisdiction and without invalidating any of the provisions hereof in any other jurisdiction.

5

(h) This Agreement, together with any Exhibits attached hereto, is the complete and exclusive agreement of the parties hereto with respect to the subject matter hereof and incorporates and supersedes all prior oral and written communications, proposals, agreements, representations, statements, negotiations and undertakings with respect to the purchase and sale of Seller's Interest and shall not in any manner be supplemented, amended or modified except by a written instrument executed on behalf of the parties hereto by their duly authorized representatives and executed of even date herewith or subsequent thereto.

(i) Each party shall bear its own expenses in connection with this transaction, including costs of counsel and other fees and expenses associated therewith, provided, however that Buyer shall be responsible for any sales taxes, transfer taxes or other taxes or fees arising out of the transaction contemplated hereby.

(j) This Agreement may be executed in counterparts, all of such executed counterparts together constituting one and the same Agreement. Signatures transmitted by facsimile shall be sufficient to constitute execution by the parties hereto.

(k) The parties agree to keep the terms and conditions of this Agreement confidential except as reasonably necessary or required, to auditors, regulators, the courts and similarly situated persons or entities.

(l) Time is of the Essence with regard to the performance of all obligations hereunder.

(m) This Agreement shall be binding upon the parties hereto and their respective successors and assigns.

11. Insurance. Following the Closing, subject to the commercial availability of suitable insurance policies, the Buyer hereby agrees to use commercially reasonable efforts to include the Seller as an additional insured on all liability insurances related to the Aircraft for one year after the Closing Date. Buyer shall supply Seller with a certificate of insurance when requested by Seller from time to time.

12. Subject To. Buyer acknowledges that in purchasing the Seller's Interest it takes such interest subject to the Trust Agreement, the Participation Agreement and the Lease and any and all related documents.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first written above.

**SELLER**                    *AeroTurbine, Inc.*
                              2323 N.W. 82nd Avenue
                              Miami Florida 33122


                              By: _____
                              Name: Michael Mullen
                              Title: Senior Vice President – Tech. Administrator
                              Fax: (305) 590-2606
                              Email: mmullen@aeroturbine.com

**BUYER**                     *ALLIANCE CONTINENTAL LEASING, LLC*
                              6715 Tippecanoe Road
                              Building A, Suite 202
                              Canfield, OH 44406


                              By: _____
                              Name: John C. Green
                              Title: Managing Director – C.E.O.
                              Fax: (330) 702-1398
                              Email: jcg@commercialaerospacecapitalcorporation.com

7

**EXHIBIT C**

**Alliance Continental**
HOLDINGS GROUP, INC.

June 26th, 2006

MR. Adam Wychowaniec President & CEO
Mr. Krystof Pawel Szymanski VP Tech Engineering
PRIMA Charters Sp. Z. o. o.
02-146 Warszawa, ul. 17 Stycznia 56

## LEASE COMMITMENT

Dear Gentlemen,

Thank you, for your consideration of ACL in providing your B757-200 operating lease requirements. We believe that ACL, will be enabled to provide the utmost benefit to your operations. Outlined below, please find the parameters Alliance Continental Leasing, LLC, will extend and lease this Aircraft to your company.

Based upon certain credit criteria, financial convents, and our review findings, we feel several factors exist in determining the monthly rental rate. In those finds we review operating radius, region, and historical fiscal data. In lieu of the previous accident history, we believe several positive aspects and favorable rulings provide our group certain assurances that the market served, is captivated by Prima Charters.

In consideration of this precipitated charter market, and base of operations, Alliance Continental Leasing, LLC, is comfortable in extending the following approved terms, as presented by its Board of Equities Advisors, and Risk Assessment Providers.

The Terms herein are as follows;

| | |
|---|---|
| **LESSEE:** | PRIMA Charters |
| **GUARANTORS:** | PRIMA Charters and its Board Members. |
| **LESSOR:** | Alliance Continental Leasing LLC or its Assignees. |
| **AIRCRAFT MAKE AND MODEL:** | Boeing B757-236 PAX  Serial Number 24121 |
| **PURPOSE:** | Commercial Passenger and Freight transportation. |
| **TYPE:** | Operating Lease. |
| **MONTHLY RENTAL PAYMENT:** | Two Hundred Fifteen Thousand Dollars and 00/100 US, ($215,000.00 USD), monthly in advance. |
| **FEES:** | Two percent, (2.0%) of the gross lease amount will be earned upon issue of this term sheet, Payable incrementally as follows; (2.0%) due upon signature acceptance of this Commitment. |
| **LEASE TERM:** | Forty Eight (48) Months, with two, twenty four month extensions. |
| **SECURITY DEPOSIT:** | Corporate Guarantee by the Lessee and its Principals, unconditional and unlimited with A monetary deposit of $750,000.00 USD, and due upon signature of this agreement, and governed by the terms and conditions of the Letter Of Intent dated June 26th, 2007. |

jcg@commercialaerospacecapitalcorporation.com

6715 Tippecanoe Rd. • Building A, Suite 202 • Canfield, Ohio 44406  USA
Phone 001-330-702-1930 • Fax 001-330-702-1938

Alliance Capital Group, Inc
Alliance Continental Leasing, LLC
Commercial Aerospace Capital Corporation
Alliance Aerospace Capital Ltd

**REPORTING REQUIREMENTS:**
➢ Lessee and Guarantor will provide annual tax returns and bi-annual financial statements.
➢ Acceptable hull and liability coverage at specified limits, to be provided by an insurance
➢ Provider of AA rating or better, naming Alliance Continental Leasing, LLC. as loss payee.
➢ Evidence of financial and depository relationship, with institutional banking entity with US Correspondent Agreement.

**ADDITIONAL REQUIREMENTS:**
➢ Articles of formation of the Lessee and its subsidiaries.
➢ Tax identification of Guarantor.
➢ Patriot Act compliance and cross check.
➢ Pilot resume(s)
➢ Director of operations.
➢ Proof of Insurance, naming ACL or its assignee as loss payee.
➢ Name and contact information of Chief Operating Officer.
➢ Name and contact information of Chief Financial Officer.
➢ Full Disclosure of all other Aircraft currently operated.
➢ Full Disclosure of all Aircraft, Owned outright unencumbered by liens or mortgages.
➢ Lease Agreement between PRIMA Charters and Tour Operators.

This offer to extend an operating lease will be in effect until the date specified. Please sign the acceptance section and return via fax, with a hard copy to follow by Friday, June 29th, 2007.

ACL, is committed to building long term customer relationships through mutual solid relationships. If you have any questions or need additional information, please contact us. We look forward to the extended opportunity to work with you and your company.

Sincerely,

John Q. Green
Managing Director
Chief Executive Officer

Accepted by: _____    Title_____    Date_____2007
        Authorized Signatory of PRIMA Charters Sp. Z.o o.

Witnessed by: _____    Title_____    Date_____2007

Print Name of Witness_____

**EXHIBIT D**

**Alliance Continental**
HOLDINGS GROUP, INC.

## LEASE PROPOSAL PREPARED FOR:
### PRIMA CHARTER S.p. Zo.o
02-146 Warszawa, ul. 17 Stycznia 56

BOEING 757-236 Series Aircraft
Serial Numbered: 24121
Power Plants Serial Numbered: 30646 and 30660

LESSOR:              Banking/ Institutional / Trust / Assignee to ACL.

LESSEE:              PRIMA CHARTER, Warsaw Poland

AIRCRAFT:            Two Boeing 757-200 (the "Aircraft") with two attached Rolls Royce RB 211-535E4-37
                     power plants. The Aircraft is described generally.

DELIVERY
CONDITION:           The Aircraft shall be delivered in the following condition:

"As-is-where-is"

Nubbed and sanded and painted white.

The Lessor shall cause the aircraft to have installed, an ENHANCED GROUND
PROXIMATEY WARNING SYSTEM, and Anti-hijacking Cockpit door.

The Aircraft shall be 120 minute ETOPS Certified and EASA compliant. If the Aircraft for
whatever reason, ise unable to meet EASA compliance, than the Lessee, shall afford the
Lessor ample opportunity to substitute the aircraft with other like kind, make and model
aircraft, and or deliver the subject aircraft, with required compliance.

Each of the attached power plants on the respective aircraft shall have a minimum
remaining of 1000 flight hours and or 1000 flight cycles accumulated since its last shop
visit for ESV2 performance restoration. At Lessee's Cost, Lessee shall have the right to
carry out a video bore scope inspection of the full gas path of the Engines and to observe
a full systems functional and operational check (power assurance) of the Engines, and
inspection of the magnetic chip detectors of the Engines.

The APU shall be in a serviceable condition.

All LLPs shall have a remaining life of at least 1000 cycles in accordance with the
overhaul and maintenance manual of the engine manufacturer / landing gear
manufacturer (as applicable).

All other "hard time" components (except those referred to in the next sentence) shall
have a remaining life of at least 1000 hours, 1000 cycles or 12 months (whichever is
limiting) to the next required overhaul, shop visit, inspection or replacement in
accordance with the OAMP. If a "hard time" component has a time to overhaul interval,
shop visit interval or inspection or replacement interval of less than 1000 hours, 1000
cycles or 12 months, then the component shall have at least 40% life remaining to their
next overhaul, SV, inspection or replacement

jcg@commercialaerospacecapitalcorporation.com

Alliance Capital Group, Inc.
Alliance Continental Leasing, LLC
Commercial Aerospace Capital Corporation
Alliance Aerospace Capital Ltd

All components that are "on condition" or "condition monitored" shall be in serviceable condition with at least 1000 flight hours, 1000 flight cycles and 12 months remaining to the MTBF. Each OC/CM part which has an MTBF of less than 1000 flight hours, 1000 flight cycles or 12 months (whichever is limiting) shall have at least 50% of its hours/cycles/calendar time (whichever is limiting) remaining to its MTBF.

Lessee shall have the right to review all maintenance reports, pilot reports and Aircraft systems functional check reports to ensure full serviceability status of each component. Any defects or deficiencies affecting the airworthiness of the Aircraft shall be rectified at Lessor's expense prior to delivery.

The Aircraft shall be delivered to the Lessee with a valid FAA airworthiness certificate and/or an Export Airworthiness Certificate and shall be in a condition, and with full supporting documentation, to allow a qualified owner to apply for and receive a Certificate of airworthiness for JAR operations and a Polish certificate of registration.

All FAA and airworthiness directives issued prior to the scheduled commencement date and which require inspection or terminating action, as the case may be, shall be accomplished. If there is no terminating action then the highest level of inspection or modification shall be accomplished.

COMMENCEMENT: The Lease Term shall commence on or about August 1st, 2007 with delivery of the initial aircraft. The Lessor shall give the Lessee at least ten days notification as to the commencement of the lease.

LEASE TERM: The term of the lease shall be Forty Eight (48) months from the date of delivery.

LEASE RENTALS: The Lease Rentals for the Aircraft shall be in US Dollars, net and payable monthly in advance. The Lease Rentals shall be fixed for the term of the lease.

OPERATING COSTS: This offer is on the basis of a net lease and Lessee shall be responsible for all costs associated with the delivery, possession, insurance, operation, maintenance (including airworthiness directive and service bulletin compliance) and use of the Aircraft including taxes and duties of any kind including withholding tax and value added tax but excluding net income taxes payable by Lessor to the relevant tax authorities in Lessor's country of incorporation.

MAINTENANCE: The Aircraft shall be maintained at the expense of Lessee, in accordance with Lessee's maintenance program, which must meet the requirements of Boeing On Aircraft Maintenance Planning report (BOAMP). The Aircraft shall be maintained by a maintenance organization acceptable to Lessor, holding an FAR and 121 certificate of approval. The Lessor shall receive a copy of the approved Maintenance Schedule prior to delivery of the Aircraft to enable full verification that the Maintenance Schedule complies in total with the Boeing OAMP.

MAINTENANCE
PAYMENTS: The Lessee shall pay the Lessor on the 15th day of the month Maintenance Payments for the Aircraft and the Engines for the actual flight hours and cycles utilized in the preceding month. The Maintenance Reserves shall be all inclusive, at a rate suggested by the manufacturers program costs.

RETURN CONDITION:     The Aircraft shall be re-delivered in the following condition:

Clean;

Serviceable;

Nubbed and sanded and painted white.

The Aircraft shall be delivered to the Lessee with a valid airworthiness certificate and/or an Export Airworthiness Certificate and shall be in a condition, and with full supporting documentation, to allow a qualified owner to apply for and receive a FAA Certificate of airworthiness for Part 121 operations and a FAA certificate of registration.

DELIVERY AND
RETURN CONDITION :    In the event that on delivery to Lessee the Aircraft condition does not conform to any of the requirements of "Delivery Condition," Section D 1(a) (cleanliness), 1(e) (Lessor's specification), and provided such nonconformance does not impair the airworthiness of the Aircraft, Lessee shall accept delivery and shall be given relaxation with regard to that item (or items) to the same extent at the time of re-delivery to Lessor.

INSURANCE:     Lessee will bear all risks of loss or damage to the Aircraft in a form acceptable to Lessor (including any assignment thereof), using brokers and insurers acceptable to Lessor, Lessee will at all times maintain :

> Comprehensive liability, bodily injury and property damage insurance (including AVN 52D and excess war and allied perils third party liability insurance) that is not less than USD 500 million per occurrence; and All-risk hull insurance (including the Engines or parts removed from the Aircraft), war risks and allied perils insurance (including

confiscation and confiscation by government of registry) in the amount the greater of fair market value or USD 21.0 million.

If the insurance is subject to re-insurance the re-insurance will contain a satisfactory cut-through clause and will be assigned to the Lessor.

SUBLEASE:     The Lessee will not sublease the Aircraft without the prior written consent of the Lessor. If the Lessee seeks the consent of the Lessor to any proposed sublease, the Lessee agrees to reimburse Lessor for all costs incurred in assessing and/or implementing the proposed sublease.

SECURITY:     Upon execution of the formal lease agreements, Lessee will pay Lessor a security deposit in cash equal to $750,000. USD. Such Security shall remain in place throughout the term of the lease.

MONTHLY RENTAL:     The Monthly Rental amount shall be $215,000.00 USD per Aircraft.

REGISTRATION:     Throughout the Lease Term the Aircraft may remain on Polish register, subject to compliance with paragraph entitled "Lessor/Lender Protection" below.

LESSOR / LENDER
PROTECTION:     This proposal is subject to the ability of the Lessor to properly and adequately register and record the ownership, lease and any mortgage interests in the Aircraft. Lessee shall be responsible for all fees and expenses associated with such recordation and registration and for perfecting and maintaining such recordation and registration throughout the Lease term. In addition, the Lessor shall require from the Polish Civil Aviation Authority, a written certification, that in the event of a default of any kind, by the

Lessee, the Aviation Authority will immediately de-register the aircraft for removal from that jurisdiction.

AIRCRAFT
AND ENGINE
WARRANTIES:             Any remaining manufacturers' warranties shall be assigned (with the consent of the relevant manufacturer) or otherwise be made available to the Lessee.

PLACE OF DELIVERY:      Goodyear AZ, USA, or other determination nominated by the Lessor.

PLACE OF
REDELIVERY:             At Dublin Ireland..

PRECONDITIONS:          This offer by Alliance Continental Leasing, LLC to lease the Aircraft is subject to continuing Aircraft availability and Alliance Continental Leasing, LLC Board approval (which shall include but not be limited to a satisfactory credit assessment, and compliance by the Lessee) as to which Alliance Continental Leasing, LLC shall advise the Lessee by no later than 60business days following receipt of Lessee's acceptance and deposit (Refer paragraph entitled "Acceptance").

VALIDITY PERIOD:        This offer and the accompanying deposit(s)confirmation, is valid until April 20th, 2007. You may return by fax to 001-330-702-1938 No further extension will be provided.

BANKING DETAILS:        The non-refundable retainer deposit payable hereunder is to be paid to our account at:

J.P. CHASE
New York, NY
ABA/ Routing Number: CHASU533
Beneficiary: Home Savings and Loan Company
ACCT. Number: 363166384
Further Credit To: Alliance Continental Holdings Inc.
ACCT. Number: 021666568

All funds due from Lessee shall be in immediately available US Dollars, clear of any and all taxes and deductions.

ACCEPTANCE:             This proposal may be accepted by written acknowledgment from Lessee in the space provided below that the terms and conditions hereof are acceptable to Lessee. Lessor must receive such acceptance by Lessee within the validity period specified above.

Upon acceptance of the terms and conditions hereof, the payment of a cash retainer deposit of USD **$250,000**.USD USD shall be due immediately and must be received by Lessor within Five business days of such acceptance. The deposit payable hereunder shall be non-refundable except as expressly provided herein. Thereafter the Lessor and the Lessee shall complete definitive lease contracts within a period of 60 days or by such later date as may be agreed by the Lessor.

Upon the execution of definitive lease contracts the deposit Received by Lessor will be credited against the first rental due on delivery of the Aircraft.

In the event that Alliance Continental Leasing, LLC does not approve the transaction (in accordance with paragraph entitled "Preconditions" above) the security deposits shall be returned to the Lessee, upon receipt of Lessee's bank account details. In the event the aircraft does not meet the compliance requirements, and or the Lessor is unable to

provide a substitute aircraft, of like kind make and model, than the deposit shall become fully refundable, less any accumulated expenditures..

CONFIDENTIALITY:   The parties hereto, agree not divulge the content of this document, or any other Documentation related to the transaction proposed herein.

GOVERNING LAW:   This lease proposal shall be construed in accordance with the laws of the State of Delaware and the United States of America alone, and without regard to its conflict of law rules, shall govern the interpretation of this agreement, including all rules or codes, which apply to engaging such transactions.

Please review this agreement. If the foregoing is in accord with your agreement and understanding, please execute and return the enclosed copy of this letter, along with the required retainer, in the amount of **$250,000.USD,** per aircraft.

LEASE PROPOSAL MADE BY                           PROPOSAL ACCEPTED BY

Alliance Continental Leasing, LLC                 PRIMA CHARTER Fischer Air Polska

Name:   John C. Green C.E.O.                      Name :

Title:   Managing Director/ CEO                   Title :   President/ Director

Date:   06-26-2007                                Date :

From:ALLIANCE CONTINENTAL HLDGS  GR0013307021938          07/26/2007 16:18 #034 P.005/005

GOVERNING LAW:        This lease proposal shall be construed in accordance with the laws of the State of
Delaware and the United States of America alone, and without regard to its conflict of law
rules, shall govern the interpretation of this agreement, including all rules or codes, which
apply to engaging such transactions.

        Please review this agreement. If the foregoing is in accord with your agreement and understanding, please
execute and return the enclosed copy of this letter, along with the outstanding portions of deposits, and fees due under
the noted terms and conditions of the Lease Commitment / Approval, not later than the close of business July 27th,
2007.

        This agreement has been made in accordance with the primary Letter of Intent accepted, signed, and dated April
18th, 2007. This shall confirm ACL has identified the aircraft serial numbered MSN: 24121, for the purpose of a lease
to Prima Charters.

LEASE PROPOSAL MADE BY                    PROPOSAL ACCEPTED BY

Alliance Continental Leasing, LLC          PRIMA CHARTER Fischer Air Polska



Name:    John C. Green C.E.O.               Name :    ADAM LYCHOWSKI VLEC

Title:    Managing Director/ CEO            Title :    President/ Director

Date:    07-26-2007                         Date :    27.07.2007

                                            KRZYSZTOF SZYMANSK,
                                            BOARD MEMBER
                                            27.07.2007

RECEIVED
JUL 30 2007

**EXHIBIT E**

**AIRCRAFT LEASE AGREEMENT**

DATED AS OF

AUGUST _____, 2007

BETWEEN

**ALLIANCE CONTINENTAL LEASING LLC**

AND

**PRIMA CHARTER S. P. Z O O.**

Boeing B757-236
Manufacturers Serial No. 24121

Polish Registration No. _____ _____

## AIRCRAFT LEASE AGREEMENT MSN: 24121

**THIS AIRCRAFT LEASE AGREEMENT** is made as of August _____, 2007

**BETWEEN**:

(1)    **ALLIANCE CONTINENTAL LEASING LLC**, a limited liability company under the laws of the State of Delaware ("**Lessor**"); and

(2)    PRIMA CHARTER S. P. Z. O O. with its principal place of business at ul. 17 Stycznia 56, 02-146 Warsaw, Poland ("**Lessee**").

**WHEREAS**:

(A)    Lessor desires to lease the Aircraft to Lessee; and

(B)    Lessee desire to lease the Aircraft from Lessor,

**IT IS AGREED** as follows:

## 1.    INTERPRETATION

### 1.1    Definitions

In this Lease capitalised words and expressions have the meanings set out for them in Part 1 or Part 2 of **Schedule 1**.

### 1.2    Construction

(a)    In this Lease, unless otherwise stated, a reference to:

   (i)    "Lessor," "Lessee," or any other Person includes any of their successors and assignees;

   (ii)    plural concepts shall include the singular and vice versa;

   (iii)    any document shall include any changes to that document and any replacement for it;

   (iv)    a Section or a Schedule is a reference to a section of or a schedule to this Lease;

   (v)    any Regulation shall include any changes to that Regulation and any replacement for it;

   (vi)    an obligation of a Person refers to any obligation that Person has under or in relation to this Lease or any Other Agreement; and

   (vii)    "includes," "including," "include" or similar terms shall not be construed as limiting and shall mean "including, without limitation,".

(b)    Headings to Sections in this Lease are not intended to affect their meaning.

## 2.    REPRESENTATIONS AND WARRANTIES

### 2.1    Lessee's Representations and Warranties

Lessee makes the representations and warranties set out in Section 1.1 of **Schedule 2**. Lessee understands that these statements must be true, both when this Lease is signed and on the Delivery Date.

### 2.2    Lessor's Representations and Warranties

Lessor makes the representations and warranties set out in Section 1.2 of **Schedule 2**. Lessor understands that these statements must be true, both when this Lease is signed and on the Delivery Date.

## 3.    CONDITIONS PRECEDENT

### 3.1    Conditions Precedent

Lessee will provide each of the Conditions Precedent in a timely fashion. Lessor need not deliver and start the leasing of the Aircraft under this Lease unless each of the Conditions Precedent is satisfied.

### 3.2    Waiver

If any Condition Precedent is not satisfied on the Delivery Date and Lessor (in its absolute discretion) nonetheless agrees to deliver the Aircraft to Lessee and to start the leasing of the Aircraft, Lessee will ensure that such Condition Precedent is fulfilled within 15 days after the Delivery Date, and Lessor may treat as an Event of Default the failure of Lessee to do so.

## 4.    COMMENCEMENT

### 4.1    Leasing

(a)    Lessor shall notify Lessee as soon as possible of the Scheduled Delivery Date. Subject to Section 4.4, Lessor will lease the Aircraft to Lessee and Lessee will take the Aircraft on lease for the Term.

(b)    If (i) Lessee is unwilling or unable to accept delivery of the Aircraft on the Rent Commencement Date, or Lessee fails to fulfill any Condition Precedent on or before such date, and (ii) the Aircraft meets the Delivery Condition Requirements, then Lessee shall be obliged to pay Rent on and from the Rent Commencement Date, but, subject to Section 3.2, Lessor shall have no obligation to deliver possession of the Aircraft to Lessee unless and until Lessee fulfils all Conditions Precedent and accepts delivery of the Aircraft under this Lease.

(c)    Lessee will be responsible for all risks associated with the use and operation of the Aircraft and any loss of or damage to the Aircraft from the Delivery Date until the Return Occasion.

### 4.2    Procedure before Delivery

Lessor and Lessee will follow the Pre-Delivery Procedure.

2007-08-07
**Prima Charters S.P. Z o o.**

## 4.3    Delivery and Acceptance

After the Pre-Delivery Procedure has been carried out and so long as the Aircraft meets the Delivery Condition Requirements:

(a)    Lessor will offer to deliver the Aircraft to Lessee at the Delivery Location;

(b)    Lessee will accept the Aircraft.  Lessee must also provide evidence of its acceptance by signing the Certificate of Acceptance and delivering it to Lessor; and

(c)    Lessee's acceptance of the Aircraft shall be regarded as absolute, unconditional and irrevocable.

## 4.4    Delayed Delivery

If an Unforeseen Event happens and, as a result, Delivery takes place after the Scheduled Delivery Date or does not happen:

(a)    Lessor will not be responsible for any Losses Lessee suffers resulting from the delay or from the non-delivery of the Aircraft;

(b)    Lessee will not, except in the circumstances described in Section 4.4 (c), be entitled to terminate this Lease or to reject the Aircraft when it is offered for Delivery because of the delay; and

(c)    if the Aircraft has not been offered for Delivery, in accordance with Section 4.3, by the Final Delivery Date, either party may terminate this Lease by serving notice on the other party within ten days following that Final Delivery Date, if such date is extended 30 days or greater, beyond the scheduled time frame.  Upon delivery of that notice all obligations of each party under this Lease will end, except that Lessor will repay to Lessee an amount equal to the Deposit paid by Lessee.

## 5.    PAYMENTS

## 5.1    Deposit

Lessee shall pay Lessor a Security Deposit, equal to $750,000.00 USD. And a mainetenace reserve deposit the equivalent of $150,000.00 USD.

## 5.2    Rental Periods

The first Rental period will start 30 days after the Rent Commencement Date. Each subsequent Rental Period will start on the date immediately following the last day of the previous Rental Period.    Each Rental Period will end on the date immediately before the numerically corresponding day in the next month, except that:

(a)    if there is no numerically corresponding day in that month, it will end on the last day of that month; and

(b)    if a Rental Period would otherwise overrun the Expiry Date, it will end on the Expiry Date.

- 3 -

## 5.3    Rent

(a)    **Time of Payment**: Lessee will pay to Lessor or its order Rent in advance on each Rent Date. Lessor must receive value for the payment on the Rent Date. If a Rental Period begins on a non-Business Day, the Rent payable in respect of that Rental Period shall be paid on the Business Day immediately before that day.

(b)    **Amount**: The Rent payable in respect of each Rental Period during the Term will be $215,000.00 USD monthly in advance.

## Supplemental Rent

(c)    **Amount**: Lessee will pay Supplemental Rent, at the rates referred to below, to Lessor in relation to each calendar month (or part of a month) of the Term, on the fifteenth day following the end of that calendar month, (except that the last payment of Supplemental Rent during the Term shall be paid on the Expiry Date):

| | |
|---|---|
| Airframe Supplemental Rent: | (C) Check Rate: $_____ for each Flight Hour |
| APU Supplemental Rent: | $35.00 for each Flight Hour |
| Engine Supplemental Rent: | $210.00 for each Engine Flight Hour |
| Engine LLP Supplemental Rent: | $145.00 for each Engine Cycle |
| Landing Gear Supplemental Rent: | $3,850.00 for each calendar month,Cycle. |

(d)    **Adjustment**: The Supplemental Rent rates shall be adjusted after the Delivery Date not more frequently than annually (with any such adjustment having retroactive application as appropriate to reflect the provisions of paragraphs (ii) to (iv) below) based on the following:

(i)    **Annual Supplemental Rent Adjustment**: by the Annual Supplemental Rent Adjustment, compounded annually commencing on the first anniversary of the Delivery Date, as an agreed inflation adjustment.

(ii)    **Hour to Cycle Ratio Adjustment**: Lessor and Lessee acknowledge that the Engine Supplemental Rent rate and the Engine LLP Supplemental Rent rate are based upon the assumption that the Aircraft will operate on a 3 Flight Hours to one Cycle ratio (3:1) (the "**Assumed Ratio**"). If that assumption proves to be incorrect at any time during the Term based upon Lessee's actual operating experience during the previous 12 months, and the hour to cycle ratio differs from the Assumed Ratio by more than 0.1 during such 12 month period, Lessor shall have the right, upon written notice to Lessee, to adjust the Engine Supplemental Rent Rate and the Engine LLP Supplemental Rent Rate (in the case of a decrease in the ratio below the Assumed Ratio) and Lessor, upon written request from Lessee, will make that adjustment (in the case of an increase in the ratio above the Assumed Ratio).

Any adjustment shall be based on the following table. Actual hour to cycle ratios may fall outside the ratios identified in that table. In that case, the actual values shall be determined by extrapolating the closest observed intervals in the table.

2007-08-07
**Prima Charters S.P. Z o o.**

| Assumed Adjustment table: | Ratio | Hour Cycle Ratio: | 2 | 2.5 | 3 | 3.5 | 4 | 4.5 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Engine Suppleme ntal Rent: | $ | $ | $ | $ | $ | $ | | |

(iii) **Assumed Utilisation Adjustment**: Lessor and Lessee acknowledge that the Airframe Supplemental Rent rate, APU Supplemental Rent rate and Landing Gear Supplemental Rent rate are based upon the assumption that the Aircraft will operate on a utilization of 3600 Flight Hours per 12 month period (the "**Assumed Utilisation**"). If that assumption proves to be incorrect at any time during the Term based upon Lessee's actual operating experience during the previous 12 months such that the Assumed Utilisation is 110% or greater than Lessee's actual utilisation of the Aircraft, Lessor may make, and notify Lessee of, such adjustment as Lessor determines is necessary in its reasonable discretion to maintain the rates of Airframe Supplemental Rent, APU Supplemental Rent and Landing Gear Supplemental Rent at levels which accurately reflect the costs associated with obtaining relevant maintenance services at prevailing industry rates.

(iv) **Material Revision to Maintenance Programme**: If Lessee's Maintenance Programme is materially revised, Lessor may make, and notify Lessee of, such adjustment as Lessor determines is necessary in its reasonable discretion to maintain the Supplemental Rent at levels which accurately reflect the costs associated with obtaining relevant maintenance services at prevailing industry rates. Each notice shall specify the revised Supplemental Rent rates and the effective date of such revision and Lessee shall be bound by it. Lessee agrees to advise Lessor, in writing, promptly following any occurrence, which would result in the assumptions mentioned in paragraphs (ii) and (iii) above becoming incorrect at any time during the Term.

## 5.4 Payments

All payments by Lessee to Lessor under this Lease will be made for value on the due date in Dollars and in immediately available funds settled through the New York Clearing House System or such other funds as may for the time being be customary for the settlement in New York City of payments in Dollars by wire transfer to:

KEY Bank N.A.5712 Market Street, Youngstown, Ohio 44512, ABA/ ROUTING Number: 041001039, SWIFT CODE: KEY BUS 33, Account Number: 352291003180, for the account of Robert J. Rohrbaugh II Esq. For Alliance Continental Leasing LLC, or such other account as Lessor designates in writing from time to time, with a minimum 10 days advance notice of any such change or revision.

## 5.5 Withholding and Tax Credit

(a) **Withholding**: Lessee must not deduct any amount from any of its payments under this Lease, for or on account of any Taxes, unless it is required by Law to do so, in which case Lessee must:

(i)      deduct the minimum amount necessary to comply with the Law;

(ii)     pay Lessor an extra amount so that Lessor receives a net amount on the relevant payment date, that is equal to the amount that it would have received if the deduction had not been made. The amount of any such payment by Lessee shall be made taking into account the principles of Section 5.9 so that Lessor shall be in no worse position than it would have been if the deduction had not applied in the first place;

(iii)    pay the Tax to the relevant taxing authority according to the relevant Law; and

(iv)    obtain a receipt (if one is available) from the relevant taxing authority and give it to Lessor.

(b)    **Tax Credit**: If Lessor, in good faith, determines that it has realised a tax benefit (by way of deduction, credit or otherwise) as a result of any payment for which Lessee is liable under Section 5.5(a), 5.6(a), or 5.7(a). Lessor shall pay to Lessee as soon as practicable after the tax benefit has been realised (but not before Lessee has made all payments and indemnities to Lessor required under this Section), an amount which will ensure that (after taking account of the payment itself) Lessor is in no better and no worse position than it would have been if the deduction had not applied.

Nothing in this Section 5.5(b) shall:

(i)      interfere with the right of Lessor to arrange its tax affairs in whatever manner it thinks fit; or

(ii)     oblige Lessor to disclose any information relating to its tax affairs or any tax computations.

## 5.6   Tax Indemnity

(a)    Lessee will indemnify each Tax Indemnitee against all Relevant Taxes.

(b)    Lessee need not indemnify a Tax Indemnitee under this Section 5.7 to the extent that the Tax arises because of:

(i)      the deliberate misconduct or reckless behaviour of any Tax Indemnitee;

(ii)     a Tax liability any Tax Indemnitee would have had even if this Lease had not been entered into; or

(iii)    a Tax liability charged on Lessor's, Owner's or Financing Parties' income, profits or gains by any Government Entity in the Lessor Tax Jurisdiction, but excluding any Tax imposed by any Government Entity of any jurisdiction if and to the extent that such Tax results from (x) the use, operation, presence or registration of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax, or (y) the *situs* of organisation, any place of business or any activity of Lessee or any other Person having use, possession or custody of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax; or

(iv)     an imposition with respect to any period commencing or event occurring (x) prior to the Delivery Date or (y) after the Expiry Date and, in either case, unrelated to Lessor's dealings with Lessee or to the transactions contemplated by this Lease.

(c)     Lessee covenants that it will not take any action which would contrary to the ownership of the aircraft by the Lessor.

## 5.7     Value Added Tax

(a)     For the purposes of this Section 5.8:

(i)     "**VAT**" means value added tax and any goods and services, sales or turnover tax, imposition or levy of a like nature;

(ii)     "**supply**" includes anything on or in respect of which VAT is chargeable.

(b)     Lessee will pay to Lessor or the relevant taxing authority and indemnify Lessor against the amount of any VAT chargeable in respect of any supply for VAT purposes under this Lease. Lessee shall provide evidence to Lessor, if available, in respect of any payment it makes of such VAT. The amount of any such payment to Lessor shall be made taking into account the principles of Section 5.10.

(c)     Each amount stated as payable by Lessee under this Lease is exclusive of VAT (if any).

## 5.8     Tax Contest

If Lessee disputes the payment of any Taxes payable by Lessor or any Tax Indemnitee for which Lessee is responsible under this Lease, Lessor will consider with Lessee the taking of such action as Lessee may reasonably request at Lessee's expense to contest that payment, but neither Lessor nor any Tax Indemnitee will be obliged to take any such action (i) which Lessor or such Tax Indemnitee considers in its sole discretion may prejudice it; or (ii) which Lessor or such Tax Indemnitee considers does not have a reasonable prospect of success; or (iii) involves a sum of less than $10,000.

## 5.9     Indemnity Payments - After-Tax Basis

The amount of any payment made under Section 5.5(a) (ii) (*Withholding*), Section 5.6 (*Tax Indemnity*), Section 5.7 (*Value Added Tax*), Section 5.19(*Expenses*), Section 8.13 (*Title on an Equipment Change*), Section 10 (*Indemnity*), Section 11.1(c) (*Events of Loss*), Section 12.2 (*Non-Compliance*) or Section 13 (*Default*) must take into account the Tax treatment of the payment and of the Loss in respect of which the payment is claimed so that the Indemnitee is fully compensated, after that Tax treatment has been taken into account, for the Loss for which the relevant claim is made.

## 5.10     Lessor Obligations Following Expiry Date

Within five Business Days after:

(a)     redelivery of the Aircraft to Lessor in accordance with and in the condition required by this Lease; or

(b)     payment to Lessor of the Agreed Value following an Event of Loss after the Delivery
        Date;

(c)     termination of this Lease prior to the commencement of the Term in accordance with the
        provisions of this Lease; or in each case such later time as Lessor is satisfied that Lessee
        has irrevocably paid to Lessor all amounts which may then be due and owning under this
        Lease and the Other Agreements:

        (i)     Lessor will pay to Lessee the equivalent amount of the balance of the Deposit;
                and

        (ii)    Lessor will pay to Lessee the amount of any Rent received in respect of any
                period falling after the date of redelivery of the Aircraft or payment of the
                Agreed Value, as the case may be; and

## 5.11    Net Lease

This Lease is a net lease. Lessee's obligation to pay Rent and to perform all of its other
obligations is absolute and unconditional no matter what happens and no matter how fundamental
or unforeseen the event. Lessee shall not regard its obligations as ended, suspended or altered in
any way because of any defence, set-off, counterclaim, recoupment or other right of any kind or
of any other circumstance.

Nothing in this Section 5.11 will be construed to limit Lessee's right to institute separate legal
proceedings against Lessor in the event of Lessor's breach of this Lease or to limit Lessee's rights
and remedies against any other Person.

## 5.12    Further Provisions regarding Deposit

(a)     Lessee agrees that Lessor shall be entitled to commingle the Deposit with Lessor's
        general or other funds, Lessor will not hold any such funds as agent or on trust for Lessee
        or in any similar fiduciary capacity and Lessee's right to a refund of the Deposit amount
        is limited as set out in this Lease.

(b)     If Lessee fails to comply with any provision of this Lease or the Other Agreements, or
        any Event of Default shall have occurred and be continuing, in addition to all rights and
        remedies accorded to Lessor elsewhere in this Lease or under Law in respect of the
        Deposit, Lessor may immediately or at any time thereafter, without prior notice to
        Lessee, apply all or part of the Deposit in or towards the payment or discharge of any
        matured obligation owed by Lessee or any Lessee Affiliate under this Lease or the Other
        Agreements, in such order as Lessor sees fit, and/or exercise any of the rights of set-off
        described in Section 5.18 against all or part of the Deposit.

(c)     If Lessor exercises the rights described in Section 5.12(b) above, Lessee shall, following
        a demand in writing from Lessor, immediately restore the Deposit to the level at which it
        stood immediately prior to such exercise.

## 5.13    Guarantee

Lessee will on or prior to execution of this Lease provide Lessor with the duly executed
Guarantee.

## 5.14   Late Payment Interest

If Lessee fails to pay any amount payable under this Lease on the due date, Lessee will pay on demand from time to time to Lessor interest (both before and after judgement) on that amount, from the due date to the date of payment in full by Lessee to Lessor, at the Interest Rate. All such interest will be compounded monthly and calculated on the basis of the actual number of days elapsed in the month, assuming a 30 day month and a 360 day year.

## 5.15   Currency

(a)   Lessee must indemnify Lessor against any Loss Lessor suffers if:

   (i)   Lessor receives an amount relating to Lessee's obligations in a different currency from that in which payments should be made under this Lease; or

   (ii)   Lessee pays a judgment or claim in a different currency from that in which payments should be made under this Lease.

(b)   Lessee relinquishes any right to pay any amount under this Lease in a currency other than the currency shown in this Lease and the right of Lessor to be indemnified for currency loss shall survive and not merge into any judgment on the underlying claim.

## 5.16   Certificates

Save where expressly provided in this Lease, any certificate or determination by Lessor as to any rate of interest or as to any other amount payable under this Lease will, in the absence of manifest error, be presumed to be correct.

## 5.17   Appropriation

If any sum paid or recovered by Lessor in respect of the liabilities of Lessee under this Lease is less than the amount then due, Lessor may apply that sum to amounts due under this Lease in such proportions and order and generally in such manner as Lessor may determine at its sole discretion.

## 5.18   Set-off

(a)   In this sub-section, references to Lessee will also include Lessee Affiliates.

(b)   Lessor may set-off any debt owed by Lessee under this Lease or the Other Agreements against any debt Lessor owes Lessee, regardless of the place of payment or currency.

   If the debts are in different currencies, Lessor may convert either debt at the market rate of exchange available in New York. If the amount of a debt is unknown, Lessor may estimate the amount. Any difference between the estimated debt and the actual debt will be paid by either Lessor or Lessee, as appropriate, when the amount becomes known.

## 5.19   Expenses

Unless caused by a default by Lessor hereunder, whether or not the Aircraft is delivered to Lessee pursuant to this Lease, Lessee will pay to Lessor, on demand, all reasonable expenses (including professional fees and other costs) that Lessor has to pay:

(a) [in respect of the preparation and negotiation of the Lease and the Delivery of the Aircraft hereunder]

(b) to deal with any amendments, extensions, consents or waivers that are required in connection with this Lease (but excluding any expenses incurred by Lessor in connection with any change in the ownership or financing of the Aircraft);

(c) to act upon any advice and obtain assistance to perfect this Lease whether necessary or advisable in the State of Registry and under the Cape Town Convention; and

(d) in contemplation of, or otherwise in connection with, the enforcement or preservation of any of Lessor's rights under this Lease or in respect of the repossession of the Aircraft.

All amounts payable pursuant to this Section 5.19 will be paid in the currency in which they are incurred by Lessor.

## 5.20 Other Outgoings

Lessee will promptly pay all Taxes, other than any Taxes described in Section 5.7 (b), which it is required to pay and all other amounts of any nature imposed by any Government Entity with respect to the Aircraft and/or this Lease except to the extent that, in the reasonable opinion of Lessor, such payment is being contested in good faith by appropriate proceedings in respect of which adequate reserves have been provided by Lessee and non-payment of which does not give rise to any material likelihood of the Aircraft or any interest therein being sold, forfeited, seized, detained or otherwise lost or of any risk of criminal liability on the part of Lessor.

## 5.21 Purchase Option

(a) **Purchase Option**: Lessor hereby grants to Lessee the option to purchase the Aircraft on the Scheduled Expiry Date or on the day that is 90 days after the Delivery Date on the terms and subject to the conditions hereinafter set forth (the "**Purchase Option**"), and provided that the Lease has not been previously terminated, for an amount equal to the Purchase Option Price (which the parties agree is their estimate of what will be the fair market value of the Aircraft as of the applicable date) (the "**Option Date**"); provided that Lessor shall have received not less than six months nor more than 24 months' written notice prior to the Scheduled Expiry Date or not later than 90 days after the Delivery Date, as applicable (the "**Notice**") of Lessee's intention to exercise the Purchase Option, which Notice once given shall be irrevocable; and

(b) **Purchase Option Exercised**:

   (i) In the event the Notice is given, Lessee shall purchase the Aircraft and pay the Purchase Option Price to Lessor or as Lessor otherwise directs by wire transfer in immediately available Dollars on the Option Date. Upon Lessee making such payment on such date Lessor shall transfer to Lessee, pursuant to a bill of sale reasonably acceptable to Lessor and Lessee, full legal and beneficial title to the Aircraft free of all Lessor Liens at the time of such sale, but otherwise AS IS, WHERE IS and without recourse, representation or warranty of any kind;

   (ii) if the Purchase Option is exercised, Lessee need not comply with the return conditions required pursuant to Section 12 and Lessor's obligation to pay

> Maintenance Contributions pursuant to Section 7.2 shall continue in favour of Lessee.

(c)     **Purchase Option Cancelled**:

    (i)     if Lessee does not exercises the Purchase Option in accordance with Section 5.22(a) of this Lease or once exercised Lessee does not comply with its obligations in respect thereof , including to pay the Purchase Option Price of the Aircraft as provided above; or

    (ii)    in the event of the occurrence of an Event of Loss; or of the occurrence of an Event of Default during the Term with respect to which Lessor exercises any remedy provided in Section 13 of this Lease or that exists at the time the Notice is given or that exists on the Option Date,

the Purchase Option shall forthwith be cancelled without liability of any kind to Lessor under this Section 5.21 and in the event Notice of the exercise of the Purchase Option shall have been given prior to such cancellation, the sale of the Aircraft pursuant to such exercise shall likewise forthwith be cancelled. In addition, except when Lessee does not exercise the Purchase Option or in the case of cancellation due to an Event of Loss, Lessor shall be entitled to proceed against Lessee under the Lease or otherwise for breach of Lessee's obligation to purchase the Aircraft, and Lessor shall be free to sell or lease the Aircraft on or after the Expiry Date to any other Person on any terms acceptable to Lessor.

## 6.    MANUFACTURER'S WARRANTIES

(a)     So long as no Event of Default has occurred which is continuing, Lessor shall make available to Lessee during the Term the benefit of all manufacturers' warranties in relation to the repair or remedy of any defect in the Aircraft (including compensation for loss of use of the Aircraft) and other product support for the Aircraft to the extent that it is permitted to do so. Lessee will give Lessor prompt written notice of any warranty claim that is settled with Lessee on the basis of a cash payment.

(b)     If an Event of Default has occurred and is continuing, Lessor may immediately recover from Lessee the proceeds of any warranty claims previously paid to Lessee to the extent that such claims relate to any defect in the Aircraft not fully and completely rectified by Lessee before such Default and Lessor may:

    (i)     retain for its own account any such proceeds previously paid to Lessor which would have been remitted to Lessee under this Section 6 in the absence of such Event of Default; and

    (ii)    cause any proceeds of any pending claims to be paid to Lessor, rather than Lessee.

(c)     Unless Lessee exercises the Purchase Option, Lessee will take all steps as are necessary at the end of the Term to ensure that the benefit of any and all warranties (including those from manufacturers) relating to the Aircraft which have not expired is vested in Lessor.

## 7.    LESSOR'S COVENANTS

### 7.1    Quiet Enjoyment

So long as no Event of Default has occurred and is continuing, Lessor will not interfere with Lessee's right to quiet use and possession of the Aircraft during the Term.

### 7.2    Maintenance Contributions

Provided that Lessor has received all Supplemental Rent due under this Lease and that no Event of Default has occurred and is continuing, then Lessor will pay the following amounts to Lessee by way of contribution to the cost of maintenance of the Aircraft, upon receipt by Lessor, within 30 days after commencement of such maintenance and before the Expiry Date, of an invoice and supporting documentation reasonably satisfactory to Lessor evidencing performance of the following work by the Maintenance Performer:

(a)    **Airframe**: With respect to the Airframe, the completion, in accordance with this Lease, of the Airframe Structural Check, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Airframe Supplemental Rent paid under this Lease at the date such invoice less the aggregate amount previously paid by Lessor under this sub-section;

(b)    **Engine Life-Limited Parts**: With respect to life-limited Parts within any Engine, the performance, in accordance with this Lease, of any replacement or repair of those Parts, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Engine LLP Supplemental Rent paid in respect of that Engine under this Lease at the date of such invoice less (aa) any credit granted by the maintenance performer to Lessee in respect of any repairable life-limited Part which has been replaced (with such credit being calculated by reference to the then remaining life of such life-limited Part) and (bb) the aggregate amount previously paid in respect of that Engine by Lessor under this sub-section;

(c)    **Engine Refurbishment**: With respect to any Engine, the performance, in accordance with this Lease, of Engine Refurbishment in respect of that Engine the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Engine Supplemental Rent paid under this Lease in respect of that Engine at the date of such invoice less the aggregate amount previously paid in respect of that Engine by Lessor under this sub-section; not to exceed the known cost sharing formula covering costs which may over and above certain reserves, as noted Lessor 60% Lessee 40%.

(d)    **APU**: With respect to the APU, the performance, in accordance with this Lease, of all shop visits requiring APU removal and disassembly, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the APU Supplemental Rent paid under this Lease at the date of such invoice less the aggregate amount previously paid by Lessor under this sub-section; and

(e)    **Landing Gear**: With respect to the Landing Gear, the performance, in accordance with this Lease, of all work on the Landing Gear in the nature of overhaul and requiring removal and disassembly, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Landing Gear Supplemental Rent paid under this

Lease at the date of such invoice less the aggregate amount previously paid by Lessor under this sub-section;

**PROVIDED THAT** Lessor will not pay any contribution in respect of sub-paragraphs:

(A)    (a) to (e) above, for work arising as a result of accidents or incidents (whether or not eligible for recovery under Lessee's insurance), operational or maintenance mishandling or Airworthiness Directive work (unless otherwise entitled to Maintenance Contributions for scheduled maintenance as provided in (a) to (e) above); nor

(B) (b) and (c) above, for work arising as a result of foreign object damage, the removal, installation, maintenance and repair of QEC and/or any elective parts replacement.

## 8.    LESSEE'S COVENANTS

### 8.1    Duration

(a)    Lessee shall perform and comply with its undertakings and covenants in this Lease at all times during the Term. All such undertakings and covenants shall, except where expressly otherwise stated, be performed at the expense of Lessee.

(b)    Lessee will take such steps as are necessary to ensure that no Individual Representative or Lessee Affiliates acts in any manner inconsistent with Lessee's obligations under this Lease.

### 8.2    Information

Lessee will:

(a)    provide Lessor with a Technical Report for the Aircraft within seven days after the end of each calendar month throughout the Term;

(b)    promptly provide Lessor with the Financial Information;

(c)    promptly notify Lessor of any Event of Loss or of any event which is likely to result in an insurance claim in excess of the Damage Notification Threshold and details of any negotiations with insurers or insurance brokers relating to such claim;

(d)    immediately notify Lessor of any Default;

(e)    provide Lessor, upon request, with evidence that all Taxes and charges incurred by Lessee in connection with the Aircraft, its location and its operations, including those invoiced by airports and air traffic control authorities, have been paid in full;

(f)    provide Lessor with such other information concerning the location, condition, use and operation of the Aircraft or concerning the business or financial affairs of Lessee, as Lessor may from time to time reasonably request;

(g)    give Lessor not less than 30 days prior written notice as to the time and location of all Major Checks; and

- 13 -

(h)     notify Lessor, promptly, of the removal of any Engine off wing for a period of more than 72 hours or for the purpose of Engine Refurbishment.

## 8.3    Lawful and Safe Operation

Lessee will operate the Aircraft for commercial purposes from the Delivery Date until the Return Occasion from a base within the State of Registry or from such other base outside the State of Registry pursuant to a Permitted Sub-Lease or a wet-lease complying with Section 8.4 provided always that Lessee must not use or operate the Aircraft or allow the Aircraft to be used or operated:

(a)     in violation of any applicable Regulations or in a manner causing Lessor to be in violation of any applicable Regulations;

(b)     for any purpose for which the Aircraft was not designed or which is illegal;

(c)     to carry cargo which could reasonably be expected to damage the Aircraft;

(d)     in any circumstances or place where the Aircraft is not covered by the Insurance; or

(e)     for purposes of training, qualifying or re-confirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel, except if the use of the Aircraft for such purpose is not disproportionate to the use for such purpose of other aircraft of the same type operated by Lessee.

For the avoidance of doubt, as between Lessee and the Indemnitees, Lessee acknowledges and agrees that:

(i)     Lessee is solely responsible for the determination and implementation of all security measures and systems necessary or appropriate for the proper protection of the Aircraft (whether on the ground or in flight) against (a) theft, vandalism, hijacking, destruction, bombing, terrorism or similar acts, directly or indirectly affecting in any way the Aircraft or any part thereof, or any persons who (whether or not on board the Aircraft) may sustain any injury or damage as a result of any such acts, (b) the use of the Aircraft in any acts, including without limitation, those of destruction, bombing, terrorism or similar acts, and (c) the taking, theft or use of any products, chemicals, goods, or materials of any kind, form, or nature located on board the Aircraft or being transported via the Aircraft,

(ii)    Lessee's implementation of such security measures and systems is a material obligation of Lessee under this Lease, and that Lessor shall have absolutely no responsibility therefor, and

(iii)   Lessee, being in sole operational control of the Aircraft and being in the business of operating commercial aircraft, is uniquely in a position to identify and implement those maintenance and security measures as are necessary to comply with all applicable Regulations, and as are otherwise appropriate and that in doing so, Lessee has not relied upon, and shall not rely upon, any statement, act, or omission of Lessor.

**8.4    Subleasing**

(a)    At no time prior to the Return Occasion will Lessee sub-lease, wet-lease or otherwise give possession of the Aircraft to any Person except:

(i)    when the prior written consent of Lessor has been obtained, such consent not to be unreasonably withheld or delayed; or

(ii)    where the Aircraft is delivered to a manufacturer or maintenance facility for work to be done on it as required or permitted under this Lease; or

(iii)    pursuant to a sub-lease of the Aircraft to a sub-lessee to which Lessor consents in writing ("**Permitted Sub-Lessee**") pursuant to a sub-lease to which Lessor consents in writing (a "**Permitted Sub-Lease**"), which complies with the conditions set out in Section 8.4(b) and provided that no Default shall have occurred and be continuing at the commencement of such sub-lease; or

(iv)    with respect to an Engine or Part as permitted under Section 8.11.

However, where no Event of Default has occurred and is continuing, Lessee may wet lease or charter (including "Dump Lease" utilizing Lessee's pilot's), the Aircraft, provided such wet lease or charter constitutes an arrangement whereby Lessee agrees to furnish the Aircraft to a third party pursuant to which the Aircraft (a) shall be operated solely by regular employees of Lessee possessing all current certificates and licenses that are required by applicable Regulations, (b) shall be subject to insurance coverage complying with the Lease, (c) shall be maintained by Lessee in accordance with Lessee's Maintenance Programme and Lessee's normal maintenance practices, and (d) shall not be subject to any change in its State of Registry, and provided always that such arrangement does not extend beyond the Expiry Date and is expressly subordinated to this Lease and the rights of Lessor, Owner and any Financing Parties.

(b)    Lessee shall be permitted to sublease the Aircraft to a Permitted Sub-Lessee pursuant to a Permitted Sub-Lease which is reasonably acceptable to Lessor and which complies to Lessor's reasonable satisfaction with the following conditions, each of which shall be required to be satisfied in relation to any Permitted Sub-Lease prior to any sub-leasing pursuant to this Section:

(i)    **Notification**: upon execution hereof, provide a copy of the executed Permitted Sub-Lease in form acceptable to Lessor;

(ii)    **Term**: the term of the Permitted Sub-Lease shall not be capable of extending beyond the date falling three months before the scheduled Expiry Date;

(iii)    **Form**: the Permitted Sub-Lease shall, without limitation:

(aa)    not contain provisions inconsistent with the provisions of this Lease (but may impose additional or more stringent obligations on Sub-Lessee than are imposed on Lessee under this Lease);

(bb)    provide that no further subleases of the Aircraft by Permitted Sub-Lessee are permitted; and

(cc)      include provisions substantially identical to or having substantially the same effect as Sections 2.1, 5.6, 5.7, 5.8, 5.10, 5.12, 5.15, 5.16, 8, 9, 10, 13, 15.1, 15.8 and 16 and **Schedules 2** (Section 1.1), **7** and **9** of this Lease (but the Permitted Sub-Lease may impose additional or more stringent obligations on Permitted Sub-Lessee than are imposed on Lessee under this Lease);

(iv)      **Assignment and Subordination**: Lessee's rights under the Permitted Sub-Lease shall be assigned to Lessor as security for Lessee's obligations to Lessor. In any case the Permitted Sub-Lease shall provide that (aa) it is subject and subordinate to this Lease in all respects and the rights of Permitted Sub-Lessee thereunder are subject and subordinate in all respects to the rights of Lessor under this Lease; (bb) prior to delivery of the Aircraft to Permitted Sub-Lessee (as a condition precedent thereof), Permitted Sub-Lessee shall provide an acknowledgement to Lessor and Owner in a form reasonably satisfactory to Lessor, confirming its agreement to the assignment (if so required), this provision and that its rights to possession of the Aircraft under the Permitted Sub-Lease will terminate immediately upon the termination of this Lease, and that it will redeliver the Aircraft to Lessor, upon notification from Lessor that an Event of Default has occurred and that Lessor has, as a result thereof, terminated Lessee's right to possession of the Aircraft under this Lease ("**Subordination Acknowledgement**"); and (cc) Lessee may terminate the Permitted Sub-Lease following the occurrence of an Event of Default under this Lease where Lessor has terminated the leasing of the Aircraft under this Lease as a result thereof;

(v)      **Quiet Enjoyment**: the Permitted Sub-Lease shall provide that Permitted Sub-Lessee shall have the right to quiet enjoyment of the Aircraft for so long as no Event of Default has occurred under this Lease and/or no event of default or termination event (howsoever described) has occurred under the Permitted Sub-Lease;

(vi)      **Obligations of Lessee**: Lessee shall remain primarily liable under this Lease for the performance and observance of all its obligations to the same extent as if no Permitted Sub-Lease had been entered into. To the extent that Permitted Sub-Lessee properly performs an obligation under the Permitted Sub-Lease, Lessor agrees that such performance shall be regarded as discharging (to such extent) Lessee's corresponding obligation;

(vii)      **Insurance**: all insurance requirements under this Lease shall be complied with either by Lessee or by Permitted Sub-Lessee as if references in the insurance provisions of this Lease to "Lessee" were references to "Permitted Sub-Lessee" (and Lessee shall provide or cause Permitted Sub-Lessee to provide the insurance certificate and brokers' letter of undertaking to Lessor at least seven Business Days prior to the commencement of the Permitted Sub-Lease);

(viii)      **Registration**: there shall be no change in the registration of the Aircraft from the State of Registry;

(ix)      **Repossession Insurance**: if required by Lessor, repossession insurance shall be obtained by Lessor at Lessee's cost, provided that repossession insurance will not be required if the Habitual Base and State of Registry are not being changed at

2007-08-07
**Prima Charters S.P. Z o o.**

any time during the term of the Permitted Sub-Lease or if the proposed new Habitual Base and State of Registry are both within states which are now members of the European Union, the United States or Canada. If repossession insurance is required, the Permitted Sub-Lease must provide that, if any such repossession insurance cannot be obtained or renewed, an event will occur pursuant to which the Permitted Sub-Lease may be terminated upon notice by Lessor to Lessee or Permitted Sub-Lessee of an inability to procure repossession insurance;

(x)     **Legal Opinions**:  as a condition precedent to the effectiveness of the Permitted Sub-Lease, Lessee shall provide to Lessor the following legal opinions (at Lessee's or Permitted Sub-Lessee's expense) addressed to Lessor from counsel acceptable to Lessor: (x) a legal opinion in relation to the Permitted Sub-Lease in form and substance satisfactory to, and containing such other matters set out in **Schedule 8** requested by, Lessor and confirming further that the Subordination Acknowledgement is valid, binding and (except as limited by any equitable principles and applicable bankruptcy, insolvency, reorganisation, moratorium or similar laws affecting creditors' or lessors' rights generally) enforceable against Permitted Sub-Lessee; and (y) (without prejudice to Lessor's right to refuse consent to a change in the State of Registry) in the case of a Permitted Sub-Lease for which at any time during its term it is proposed that the Habitual Base or the State of Registry of the Aircraft will be different from the Habitual Base or State of Registry prior to the commencement of such Permitted Sub-Lease, then Lessee shall provide to Lessor an opinion in a form and from counsel reasonably acceptable to Lessor in the proposed state of the Habitual Base and/or the State of Registry of the Aircraft. Such opinion shall be to the effect, among other things, that Lessor's and Owner's interests in the Aircraft will be recognised under the laws of such country or countries;

(xi)    **Delivery of Legal Opinions:** The foregoing opinion or opinions (x) shall be forwarded promptly to Lessor at least five Business Days prior to the effective date of the Permitted Sub-Lease, and (y) may, if different opinions are required hereunder, be made by a single counsel qualified to render opinions in each such country;

(xii)   **Filings**:  Lessee shall co operate with Lessor (at no cost to Lessor) in connection with the execution and filing of any documents which are required or advisable to be executed and filed from time to time with any registry or authority in the Habitual Base, the State of Registry and State of Incorporation of Lessee or Permitted Sub-Lessee in order to protect the interests of Lessor and Owner in and to the Aircraft, this Lease or the Permitted Sub-Lease and/or to ensure the validity, enforcement or priority thereof;

(xiii)  **Expenses**:  Lessee will pay to Lessor on demand all reasonable out of pocket expenses (including legal, survey and other costs) payable or incurred by Lessor in connection with the review and approval of the documentation required pursuant to this Section;

## 8.5    Access

(a)    Lessee will permit Lessor's representative access to the Aircraft at any reasonable time. Unless a Default has occurred and is continuing, Lessor will give Lessee reasonable prior notice and will seek to ensure that it does not result in unreasonable disruption to the scheduled operation of the Aircraft. Lessee shall comply with the reasonable requests of Lessor's representative, including any request to travel on the flight deck of the Aircraft as an observer, subject to any applicable Regulations.

(b)    The cost of a visit shall be borne by Lessor unless (i) an Event of Default has occurred and is continuing or (ii) as a result of that visit, Lessee is found to be materially in default of its obligations under this Lease, when the cost shall be borne by Lessee.

(c)    No liability or obligation will be incurred by Lessor solely by reason of non-exercise by it of the rights referred to in this Section. For the avoidance of doubt, any viewing of the Aircraft by Lessor shall be for Lessor's information purposes only and there shall be no inference or implication therefrom that Lessee is in compliance with its obligations under this Lease.

## 8.6    Ownership; Property Interests; Related Matters

(a)    Lessee will:

(i)    fix and maintain Nameplates in a prominent position in the cockpit or cabin of the Aircraft and on each Engine stating:

"This Aircraft/Engine is owned by Alliance Continental Leasing, LLC and is leased to PRIMA CHARTER S. P. Z O O.. and may not be or remain in the possession of or be operated by, any other person without the prior written consent of Alliance Continental Leasing, LLC"; and

(ii)    take all reasonable steps to make sure that other relevant Persons know about the interests of Lessor as owner and lessor in the Aircraft.

(b)    Lessee will not:

(i)    represent that it is the owner of the Aircraft or that it has an economic interest (equivalent to ownership) in the Aircraft for Tax treatment or other purposes;

(ii)    take any action if it could put Lessor's rights at risk;

(iii)    represent to others that Lessor is associated with or responsible for the business activities and/or flight operations of Lessee; or

(iv)    allow the Aircraft or Lessor's interest in it to become or remain subject to any Security Interest (other than a Permitted Lien).

## 8.7   General

Lessee will:

(a)   preserve its corporate existence (other than in connection with a solvent merger acquisition reconstruction or reorganisation whereby the resulting entity will assume and be able to fully perform all of the Lessee's obligations under this Lease or otherwise on terms which shall have previously been approved in writing by Lessor);

(b)   maintain its business as a commercial airline or charter operator, and will maintain all rights, privileges, licenses and franchises material thereto or material to performing its obligations under this Lease;

(c)   ensure that the Habitual Base remains the habitual base of the Aircraft unless Lessor gives prior written consent to a change; and

(d)   not operate, maintain, insure or deal with the Aircraft in a manner which discriminates against the Aircraft, when compared with the manner in which Lessee operates, maintains, insures or deals with similar aircraft, engines or parts in Lessee's fleet.

## 8.8   Records

Lessee will keep the Aircraft Documents and Records:

(a)   in the English language;

(b)   according to best airline practice; and

(c)   so they meet the requirements of applicable Regulations, including FAR 91.417 (unless such standards conflict with Air Authority requirements) and Lessee's Maintenance Programme.

## 8.9   Protection

Lessee will:

(a)   keep the Aircraft registered with the Air Authority and, where applicable, comply with the Geneva Convention;

(b)   if permitted or advisable under the applicable Regulations of the State of Registry, record on each relevant register that Lessor is the owner of the Aircraft and, if such facilities exist (i) file this Lease (or particulars thereof) on the public record and (ii) file notices as to the interests of the Financing Parties;

(c)   make any changes to the registered particulars that may be necessary or advisable to take account of any change in the ownership or financing of the Aircraft, (to the extent consistent with this Lease), or of any modification to the Aircraft (such as the permanent replacement of any Engine or Part in accordance with this Lease) or of any change in applicable Regulations. Lessor will bear any costs incurred as a consequence of a change in ownership or financing of the Aircraft (unless such change follows a default on

Lessee's part, when Lessee shall bear those costs) and Lessee will bear any other costs incurred in complying with this Section; and

(d)    as soon as practicable (i) following the date on which the International Registry (as such term is defined in the Cape Town Convention) is implemented pursuant to the Cape Town Convention, precautionary registrations shall be made by Lessor and consented to by Lessee; and (ii) following the date on which there shall be brought into force any legislation or other provisions giving effect to the Cape Town Convention or otherwise relating to the recognition of rights in aircraft or aircraft engines in the State of Registry (the "**CTC Date**"), to the extent necessary or advisable (A) registrations shall be made by Lessor, and consented to by Lessee, so as to permit the interests created hereunder to be perfected as "international interests" under the Cape Town Convention, and (B) Lessor and Lessee shall amend, restate, revise, or otherwise adapt this Lease in such a manner as to permit the interests created hereunder to constitute "international interests" under the Cape Town Convention.  The new transaction documents shall retain the commercial agreements set forth herein modified only to ensure that an international interest is constituted.  The new transaction documents shall contain such additional provisions as may be necessary to enhance the enforceability of the commercial agreements of the parties under the Cape Town Convention to the greatest extent permitted under the Cape Town Convention.  Lessor and Lessee intend that the priority of any security interest granted pursuant to this Agreement shall not be prejudiced by any change made pursuant to this Section 8.9(d).  In the event that Lessor, acting reasonably, shall determine that an unacceptable risk of such prejudice to any such security interest will or is reasonably likely to arise as a result of any change made pursuant to this Section 8.9(d), this Lease shall remain in full force and effect, subordinated as to enforcement only, to any new documents which the parties may execute and deliver in order to effect application of the Cape Town Convention to the Aircraft.  The parties further agree that each international interest arising under the Cape Town Convention as a result of actions taken pursuant to this Section shall be registered in the International Registry as soon as possible following the Cape Town Convention taking effect in the State of Registry, and that such registration(s) shall be made by, or with the consent of, Lessor, or any duly authorized agent thereof, and shall be consented to by Lessee.  All reasonable costs and expenses arising as a result of actions taken pursuant to this Section 8.9(d), including but not limited to attorney's fees and registration fees, shall be for the account of Lessee.

## 8.10    Maintenance and Repair

Lessee will maintain, overhaul and repair the Aircraft, so that:

(a)    the Aircraft is kept in as good operating condition and repair as the condition of the Aircraft as at Delivery subject to fair wear and tear;

(b)    Lessee has a current certificate of airworthiness (issued by the Air Authority in the appropriate public transport category) for the Aircraft;

(c)    the Aircraft complies with all applicable Regulations including the standard stipulated by the Air Authority (and FAR Part 121, if not in conflict with Air Authority requirements) and the requirements of all Airworthiness Directives and all service bulletins designated by the State of Design as "mandatory", and to be carried out before the Return Occasion or within the AD Compliance Period; and

(d)    all maintenance is carried out according to Lessee's Maintenance Programme through the Maintenance Performer in at least the same manner and with at least the same care, including maintenance scheduling, modification status and technical condition, as is the case with respect to similar aircraft owned or otherwise operated by Lessee.  No change shall be made to Lessee's Maintenance Programme or the Maintenance Performer without first giving reasonable written notice to Lessor of such change.

## 8.11    Removal/Interchange of Engines and Parts

(a)    **General**:  Lessee must replace any Engine that has suffered an Engine Event of Loss in accordance with Section 8.11 (b) and any Part which is permanently removed from the Aircraft must be replaced in accordance with Section 8.11 (b). Any Engine or Part may be installed on another aircraft Lessee owns or leases in accordance with Section 8.11 (c). Lessee may temporarily install an engine or part in accordance with Section 8.11 (d). Lessee will ensure that any Engine or Part not installed on the Aircraft (or an aircraft permitted by Section 8.11 (c)) is properly and safely stored and insured and kept free of Security Interests (other than Permitted Liens).

(b)    **Permanent Replacement**:  If Lessee permanently replaces an Engine or Part:

   (i)    in the case of an Engine, it must be a Replacement Engine;

   (ii)    in the case of a Part, the replacement part must be an OEM approved Part, if available, be in good operating condition, be of the same (or better) value and utility, must not have been involved in an incident or accident, must not have been installed on an aircraft registered on a military aircraft register, must have as much useful life available until the next expected maintenance procedure and be of the same or a more advanced make and model and of the same interchangeable modification status as the Part it is replacing;

   (iii)    the Replacement Engine or replacement part must have become and remain, until replaced in accordance with this Section, the property of Owner free from Security Interests (other than Permitted Liens); and

   (iv)    Lessee must have full details of the source and maintenance records of the Replacement Engine or replacement part. In the case of replacement serialised parts, documentation shall have Back-To-Birth Traceability and in the case of serialised rotable parts, include a complete service history.

(c)    **Other Aircraft**:  An Engine or Part may be installed on an aircraft which Lessee owns or leases, where that other aircraft is insured to Lessor's satisfaction, if:

   (i)    no Event of Default has occurred and is continuing;

   (ii)    Lessee or a Permitted Sub-Lessee (if any) has operational control over the aircraft;

   (iii)    Lessor keeps the ownership of the Engine or Part concerned until replaced in accordance with this Section;

(iv)    the Engine or Part does not become subject to a Security Interest (other than a Permitted Lien); and

(v)    the Engine or Part is removed from the aircraft as soon as practicable but not later than the Expiry Date.

(d)    **Temporary Replacement**:  Lessee may install any engine or part on the Aircraft as a temporary replacement if:

(i)    no Event of Default has occurred and is continuing;

(ii)    as soon as reasonably practicable after an engine or part is installed on the Aircraft, but before the earlier of 120 days after such temporary replacement and the Expiry Date, Lessee removes that engine or part and replaces it with the original Engine or Part (or, in the case of a Part, by a part which is allowed by Section 8.11(b)); and

(iii)    the Insurance for the Aircraft is not affected.

(e)    **Title to Removed Engines or Parts**:  Any Engine or Part at any time removed from the Aircraft will remain the property of Lessor unless and until a replacement has been effected in accordance with Section 8.11 (b) and unless and until title in that replacement has passed to Lessor subject to this Lease, free of all Security Interests, whereupon title to the replaced Engine or Part will, provided no Event of Default has occurred and is continuing, pass to Lessee.

## 8.12    Equipment Changes

Lessee will not make any material modification or addition to the Aircraft (each an "**Equipment Change**"), except for an Equipment Change which:

(a)    is expressly permitted or required by this Lease; or

(b)    has the prior written approval of Lessor and does not diminish the condition or value of the Aircraft.

So long as no Event of Default has occurred and is continuing, Lessee may, subject to any applicable Regulation, remove or reverse any Equipment Change provided that this does not diminish the value or condition of the Aircraft assuming that such Equipment Change was never made.  Furthermore, Lessor may require Lessee to remove or reverse any Equipment Change prior to the Return Occasion so that, on the Expiry Date, the Aircraft is restored to the condition it was in prior to that Equipment Change.

## 8.13    Title on an Equipment Change

Title to any equipment that becomes a Part or an Engine after the Delivery Date (whether by way of replacement, as the result of an Equipment Change or otherwise) that become vested in Lessor solely by virtue of its attachment to the Airframe or an Engine and it shall then be subject to this Lease as if it were attached to the Aircraft at Delivery.  If so requested by Lessor, Lessee will provide a properly executed bill of sale or similar instrument to evidence the vesting of title to any such equipment, free and clear of all Security Interests, in Lessor.  After Lessor has

determined that Lessee has permanently replaced an Engine in accordance with Section 8.11(b) and this Section 8.13, or if Lessee is required to remove any Equipment Change as per Section 8.12, Lessor will, or will procure that Owner will, transfer to Lessee or will procure that Owner will transfer to Lessee all of Lessor's or Owner's, as the case may be, rights to the Engine that has been replaced or to the equipment that has been removed, and will provide or will procure that Owner provides a properly executed bill of sale or similar instrument to evidence the vesting of title to Lessee free and clear of all Lessor Liens.

## 8.14    CTC 1110 Provisions

Lessee (i) shall never take the position or assert that the protections of the CTC 1110 Provisions should not be available to Lessor in respect of the Aircraft including, without limitation, in the event of a proceeding under the BIA, CCAA or WRA, and (ii) is not aware of any reasons why such protections should not be so available to Lessor.

## 9.    INSURANCE

### 9.1    Insurance

Lessee in accordance with this Lease will maintain the Insurance in full force during the Term, and thereafter as expressly required in this Lease, which shall be in line with best industry practice for comparable operators and shall be through such brokers and with such insurers and having such deductibles and subject to such exclusions as may be approved by Lessor from time to time. The Insurance shall in any event meet the requirements set out in **Schedule 7** which may be amended from time to time by Lessor with the consent of the Lessee not to be unreasonably withheld or delayed, so that the scope and level of cover is maintained in line with best industry practice and the interests of Lessor and each Indemnitee are prudently protected.

### 9.2    Change

If at any time Lessor wishes to revoke its approval of any insurer, reinsurer, insurance or reinsurance, Lessor and/or its brokers will consult with Lessee and Lessee's brokers (as for the time being approved by Lessor) regarding whether that approval should be revoked to protect the interests of the parties insured. If, following such consultation, Lessor resonably considers that any change should be made, Lessee will then arrange or procure the arrangement of alternative cover reasonably satisfactory to Lessor.

### 9.3    Insurance Undertakings and Information:

Lessee will:

(a)     comply with the terms and conditions of each policy of Insurance and not do, consent or agree to any act or omission which:

     (i)      invalidates or may invalidate the Insurance; or

     (ii)     renders or may render void or voidable the whole or any part of any of the Insurance; or

     (iii)    brings any particular liability within the scope of an exclusion or exception to the Insurance;

- 23 -

(b)     not take out without the prior written approval of Lessor any insurance or reinsurance in respect of the Aircraft other than that which is required under this Lease unless relating solely to hull total loss, business interruption, profit commission and deductible risk;

(c)     commence renewal procedures at least 30 days prior to expiry of any of the Insurance and provide to Lessor:

  (i)     if requested by Lessor, a written status report of renewal negotiation 14 days prior to each expiry date;

  (ii)    fax confirmation of completion of renewal prior to each policy expiry date;

  (iii)   certificates of insurance (and where appropriate certificates of reinsurance), and broker's (and any reinsurance broker's) letter of undertaking in a form acceptable to Lessor in English, detailing the coverage and confirming the insurers' (and any reinsurers') agreement to the specified insurance requirements of this Lease within seven days after each renewal date;

(d)     on request, provide to Lessor copies of documents or other information evidencing the Insurance; and

(e)     provide any other insurance and reinsurance related information, or assistance, in respect of the Insurance as Lessor may reasonably require.

## 9.4     Failure to Insure

If Lessee fails to maintain the Insurance in compliance with this Lease, each of the Indemnitees will be entitled but not bound (without prejudice to any other rights of Lessor under this Lease):

(a)     to pay the premiums due or to effect and maintain insurance satisfactory to it or otherwise remedy Lessee's failure in such manner (including to effect and maintain an "owner's interest" policy) as it considers appropriate. Any sums so expended by it will become immediately due and payable by Lessee to Lessor together with interest thereon at the Interest Rate, from the date of expenditure by it up to the date of reimbursement by Lessee; and

(b)     at any time while such failure is continuing to require the Aircraft to remain at any airport or to proceed to and remain at any airport designated by it until the failure is remedied to its satisfaction.

## 10.     INDEMNITY

### 10.1     General

(a)     Lessee agrees to assume liability for and indemnifies each of the Indemnitees against and agrees to pay on demand Losses which an Indemnitee may suffer at any time whether directly or indirectly as a result of any act or omission in relation to:

  (i)     the ownership, operation, maintenance, repair, possession, transfer of ownership or possession, import, export, registration, storage, modification, leasing,

- 24 -

insurance, inspection, testing, design, sub-leasing, use, condition or other matters relating to the Aircraft; or

(ii)     any breach by Lessee of its obligations under this Lease.

(b)     Lessee need not indemnify any particular Indemnitee under this Section, to the extent the Loss is:

(i)     caused solely by the deliberate misconduct or reckless behaviour of any Indemnitee;

(ii)     caused solely by Lessor's breach of this Lease which does not result from an Event of Default;

(iii)     A Tax or other Loss covered pursuant to another indemnity provision of this Lease;

(iv)     caused solely by an event which occurs before the commencement of the Term (except where the Loss is suffered during the Term as a result of a pre-Delivery defect or fault in the manufacture, design, maintenance, repair, rebuilding, overhaul or modification of the Aircraft);

(v)     caused solely by an event which occurs after the proper redelivery of the Aircraft to Lessor hereunder and is not attributable to any act, omission, event or circumstance occurring prior to such redelivery; or

## 10.2   Duration

The indemnities contained in this Lease will continue in full force and effect following the Expiry Date notwithstanding any breach or repudiation by Lessor or Lessee of this Lease or any termination of the leasing of the Aircraft under this Lease.

## 11.   EVENTS OF LOSS

### 11.1   Events of Loss

(a)     If an Event of Loss occurs prior to Delivery, this Lease will immediately terminate and except as expressly stated in this Lease and/or under any Other Agreement, neither party will have any further obligation other than pursuant to Section 5.19, except that Lessor will return the Deposit to Lessee and, in respect of the Aircraft, release and return any Guarantee.

(b)     If an Event of Loss occurs after Delivery, Lessee will pay the Agreed Value to Lessor on or prior to the earlier of (i) 90 days after the Event of Loss and (ii) the date of receipt of insurance proceeds in respect of that Event of Loss.

(c)     Subject to the rights of any insurers and reinsurers or other third party, upon irrevocable payment in full to Lessor of the Agreed Value and all other amounts which then may be then due and owing to Lessor under this Lease, Lessor will, without recourse or warranty (except as to freedom from Lessor's Liens and other Security Interests attributal to the Lessor) transfer to Lessee all of Lessor's rights to the Aircraft, on an as-is where-is basis,

and will at Lessee's expense, execute and deliver or will procure that Owner executes and delivers such bills of sale and other documents and instruments as Lessee may reasonably request to evidence (on the public record or otherwise) such transfer, free and clear of all rights of Lessor and Lessor Liens. Lessee shall indemnify Lessor for all fees, expenses and Taxes incurred by Lessor in connection with any such transfer.

## 11.2 Requisition

During any requisition for use or hire of the Aircraft, any Engine or Part, which does not constitute an Event of Loss:

(a) the Rent and other charges payable under this Lease will not be suspended or abated either in whole or in part, and Lessee will not be released from any of its other obligations (other than operational obligations with which Lessee is unable to comply solely by virtue of the requisition); and

(b) so long as no Event of Default has occurred and is continuing, Lessee will be entitled to any hire paid by the requisitioning authority in respect of the Term. Lessee will, as soon as practicable after the end of any such requisition, cause the Aircraft to be put into the condition required by this Lease. Lessor will be entitled to all compensation payable by the requisitioning authority in respect of any change in the structure, state or condition of the Aircraft arising during the period of requisition, and Lessor will apply such compensation in reimbursing Lessee for the cost of complying with its obligations under this Lease in respect of any such change, but, if any Event of Default has occurred and is continuing, Lessor may apply the compensation or hire in or towards settlement of any amounts owing by Lessee under this Lease and/or under any Other Agreement.

## 12. RETURN OF AIRCRAFT

### 12.1 Return

On the Expiry Date or redelivery of the Aircraft pursuant to Section 13.2 or termination of the leasing of the Aircraft under this Lease, Lessee will, unless an Event of Loss has occurred, or Lessee has exercised its Purchase Option, redeliver the Aircraft and the Aircraft Documents and Records at Lessee's expense to Lessor at the Redelivery Location, in accordance with the procedures and in compliance with the conditions set out in **Schedule 6**, free and clear of all Security Interests (other than Lessor Liens) and in a condition suitable for immediate operation under FAR Part 121 or as otherwise agreed by Lessor and Lessee and, in any case, qualifying for and having a valid and fully effective certificate of airworthiness issued by the Air Authority. If requested by Lessor, Lessee shall thereupon cause the Aircraft to be deregistered by the Air Authority.

### 12.2 Non-Compliance

If at the time of Final Inspection Lessee has not fully complied with any of its obligations under this Lease (including **Schedule 6**), or Lessee fails to make the Aircraft available to Lessor on a timely basis for inspection and redelivery pursuant to Section 12.1 and **Schedule 6** (whether such failure is due to any act or omission of Lessee or any other circumstance whatsoever), the Term shall be extended until the time when the Aircraft has been redelivered to Lessor in full compliance with this Lease, for the sole purpose of enabling such non-compliance or failure to be promptly rectified and during such extension period:

- 26 -

(a)     Lessee shall not use the Aircraft in flight operations except those related directly to the re-delivery of the Aircraft to Lessor;

(b)     all Lessee's obligations and covenants under this Lease will remain in full force until Lessee so redelivers the Aircraft; and

(c)     Lessee shall pay Rent to Lessor at a rate per month equal to the amount of Rent payable in respect of the last scheduled Rental Period plus 15 per cent, calculated on a per diem basis.

Any such extension shall not prejudice Lessor's right to treat such non-compliance or failure as an Event of Default at any time, and to enforce such rights and remedies as may be available to Lessor in respect thereof under the terms of this Lease or applicable Law. Without limiting the generality of the foregoing, Lessee's Rent obligation under paragraph (c) above shall be without prejudice to Lessor's rights to terminate the letting of the Aircraft and to indemnification pursuant to Section 13.3.

Lessor may elect (either on first tender of the Aircraft by Lessee or at any time during the said extension period) to accept redelivery of the Aircraft notwithstanding non-compliance with Section 12.1 or **Schedule 6**, in which case Lessee will indemnify Lessor, and provide cash to Lessor (in an amount satisfactory to Lessor) as security for that indemnity in respect of the cost to Lessor of putting the Aircraft into the condition required by this Lease.

**12.3    Redelivery**

Upon redelivery Lessee will provide to Lessor all documents necessary to export the Aircraft from the Habitual Base and the State of Registry (including a valid and subsisting export license and certificate of airworthiness for export of the Aircraft to the U.S.A.) and required in relation to the deregistration of the Aircraft with the Air Authority.

**12.4    Acknowledgement**

Provided Lessee has complied with its obligations under Section 12 and **Schedule 6** of this Lease, following redelivery of the Aircraft by Lessee to Lessor at the Redelivery Location, Lessor will deliver to Lessee an acknowledgement confirming that Lessee has redelivered the Aircraft to Lessor in accordance with this Lease which acknowledgement shall be without prejudice to Lessor's accrued and continuing rights under this Lease, any Other Agreements or arising by Law.

**13.    DEFAULT**

**13.1    Events**

The occurrence of any of the Events of Default will constitute a repudiation (but not a termination) of this Lease by Lessee (whether the occurrence of any such Event of Default is voluntary or involuntary or occurs by operation of Law or pursuant to or in compliance with any judgement, decree or order of any court or any order, rule or regulation of any Government Entity).

## 13.2    Rights and Remedies

If an Event of Default occurs, Lessor may at its option (and without prejudice to any of its other rights under this Lease and/or otherwise), at any time thereafter (without notice to Lessee except as required under applicable Law):

(a)    accept such repudiation and by notice to Lessee and with immediate effect terminate the leasing of the Aircraft (but without prejudice to the continuing obligations of Lessee under this Lease), whereupon all rights of Lessee under this Lease shall cease; and/or

(b)    proceed by appropriate court action or actions to enforce performance of this Lease or to recover damages for the breach of this Lease; and/or

(c)    either:

    (i)    take possession of the Aircraft, for which purpose Lessor may enter any premises belonging to or in the occupation of or under the control of Lessee where the Aircraft may be located, or cause the Aircraft to be redelivered to Lessor at the Redelivery Location (or such other location as Lessor may require), and Lessor is hereby irrevocably by way of security for Lessee's obligations under this Lease appointed attorney for Lessee in causing the redelivery or in directing the pilots of Lessee or other pilots to fly the Aircraft to that airport and will have all the powers and authorisations necessary for taking that action; or

    (ii)    by serving notice require Lessee to redeliver the Aircraft to Lessor at the Redelivery Location (or such other location as Lessor may require).

## 13.3    Default Indemnity

If an Event of Default occurs, or the Aircraft is not delivered on the proposed Delivery Date by reason of failure of Lessee to satisfy any conditions to that delivery, Lessee will indemnify Lessor on demand against any Loss which Lessor may sustain or incur directly or indirectly as a result of such Event of Default or non-delivery, including:

(a)    any loss of profit suffered by Lessor because of Lessor's inability to place the Aircraft on lease with another lessee on terms as favourable to Lessor as this Lease, or because whatever use, if any, to which Lessor is able to put the Aircraft upon its return to Lessor, or the funds arising upon a sale or other disposal of the Aircraft, is not as profitable to Lessor as this Lease;

(b)    any amount of principal, interest, fees or other sums whatsoever paid or payable on account of funds borrowed in order to carry any unpaid amount;

(c)    any Loss which may be incurred in repaying funds raised to finance the Aircraft or in unwinding any swap, forward interest rate agreement or other financial instrument relating in whole or in part to Lessor's financing of the Aircraft; and

(d)    any Loss sustained or incurred by Lessor in or as a result of exercising any of its rights or remedies pursuant to Section 13.2 or as a result of Lessee's failure to redeliver the Aircraft on the date, at the place and in the condition required by this Lease.

2007-08-07
Prima Charters S.P. Z o o.

Lessor will use reasonable endeavours to mitigate such Losses, but (i) Lessor shall not be obliged to consult with Lessee concerning any proposed course of action or to notify Lessee of the taking of any particular action, and (ii) this provision is without prejudice to Lessor's rights under Section 13.4.

**13.4   Sale or Re-lease of Aircraft**

If an Event of Default occurs, Lessor may sell or re-lease or otherwise deal with the Aircraft at such time and in such manner and on such terms as Lessor considers appropriate in its absolute discretion, free and clear of any interest of Lessee, as if this Lease had never been entered into.

**13.5   Deregistration**

If an Event of Default occurs, Lessee will at the request of Lessor immediately take all steps necessary to effect deregistration of the Aircraft and its export from the country where the Aircraft is for the time being situated, and any other steps necessary to enable the Aircraft to be redelivered to Lessor in accordance with this Lease and Lessee hereby irrevocably and by way of security for its obligations under this Lease appoints (which appointment is coupled with an interest) Lessor as its attorney to execute and deliver any documentation and to do any act or thing required in connection with the foregoing.

**14.   TRANSFER**

**14.1   Lessee**

Lessee will not transfer any of its rights or obligations under this Lease, other than as expressly permitted herein or as Lessor may otherwise consent.

**14.2   Lessor**

Lessor may, without the consent of Lessee, transfer any of its rights or obligations under this Lease or any of its right, title or interest in and to the Aircraft, including pursuant to:

(a)   a sale and leaseback; or

(b)   a novation of this Lease together with a sale of the Aircraft; or

(c)   a secured loan financing.

Lessee agrees promptly to execute and deliver in connection with any transfer such documents and assurances (including a consent to the transfer) and to take such further action as Lessor may reasonably request to establish or protect the rights and remedies created or intended to be created in favour of the transferees in connection with any transfer.

**14.3   Conditions**

In connection with any such transfer by Lessor, as a condition to such transfer becoming effective:

(a)   **Quiet Enjoyment**: as a condition precedent to such transfer becoming effective, Lessor will procure that the transferee or any new owner of the Aircraft (save where such new owner is also the "Lessor" hereunder in accordance with section 14.3) or any new holder

of a mortgage over the Aircraft or any holder of an interest in the Aircraft (by way of security or otherwise), as the case may be, shall execute and deliver to Lessee a letter of quiet enjoyment in respect of Lessee's use and possession of the Aircraft in a form substantially similar to Lessor's covenant in Section 7.1 hereof and providing not less than 10 business days notificiation of any such transfer, and providing any necessary documentation privy to the Lessee under section 14.3;

(b)     **Costs**:  Lessor shall reimburse to Lessee its reasonable out-of-pocket expenses (including legal expenses) actually incurred in connection with co-operating with Lessor in relation to any such transfer referred to in this Section 14, provided that (i) such expenses are substantiated to Lessor's reasonable satisfaction and (ii) that no Default has occurred and is continuing;

(c)     **No Additional Cost**:  If at the time of any such assignment or transfer by Lessor there arises an obligation to make a payment to the assignee or transferee which exceeds the amount which Lessee would have been obliged to pay under the Lease to Lessor if no such assignment or transfer had taken place, then Lessee shall not be obliged to pay the amount of such excess; and

(d)     **No Alteration of Terms**:  The assignment or transfer shall not alter the economic terms and conditions of the Lease as they define Lessee's rights and obligations without the prior consent of Lessee, and Lessee's financial obligations hereunder shall not be increased nor shall Lessee's rights be reduced as a result of such assignment or transfer.

## 15.     MISCELLANEOUS

### 15.1    Illegality

If it is or becomes unlawful in any jurisdiction for Lessor to give effect to any of its obligations as contemplated by this Lease or to continue this Lease, Lessor may by notice in writing to Lessee terminate the leasing of the Aircraft under this Lease, such termination to take effect on the latest date (the "**Effective Date**") on which Lessor may continue such leasing and such obligations without being in breach of applicable Regulations, and Lessee will forthwith redeliver the Aircraft to Lessor in accordance with Section 12.  Without prejudice to the foregoing, Lessor will consult in good faith with Lessee up to the Effective Date as to any steps which may be taken (at no cost to Lessor) to restructure the transaction to avoid such unlawfulness, and will take any such steps commercially reasonable to assist the Lessee.

### 15.2    Waivers, Remedies Cumulative

The rights of Lessor under this Lease may be exercised as often as necessary, are cumulative and not exclusive of its rights under any Law; and may be waived only in writing and specifically. Delay by Lessor in exercising, or non-exercise of, any such right will not constitute a waiver of that right.

### 15.3    Delegation

Lessor may delegate to any Person all or any of the rights, powers or discretions vested in it by this Lease, and any such delegation may be made upon such terms and conditions and subject to such regulations (including power to sub-delegate) as Lessor in its absolute discretion thinks fit.

**15.4    Severability**

If a provision of this Lease is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)    the legality, validity or enforceability in that jurisdiction of any other provision of this Lease; or

(b)    the legality, validity or enforceability in any other jurisdiction of that or any other provision of this Lease.

**15.5    Remedy**

If Lessee fails to comply with any provision of this Lease, Lessor may, without being in any way obliged to do so or responsible for so doing and without prejudice to the ability of Lessor to treat such non-compliance as a Default, effect compliance on behalf of Lessee, whereupon Lessee shall become liable to pay immediately any sums expended by Lessor together with all costs and expenses (including legal costs) in connection with the non-compliance.

**15.6    Time of Essence**

The time stipulated in this Lease for all payments payable by Lessee and the prompt, punctual performance of Lessee's other obligations under this Lease are of the essence of this Lease.

**15.7    Notices**

All notices and other communications under, or in connection with, this Lease will, unless otherwise stated, be given in writing by hand delivery, mail, overnight courier service, facsimile or email (where such address is available). Any such notice or other communication is deemed effectively given when received by the recipient (or if receipt is refused by the intended recipient, when so refused).

The address, facsimile and email details for notices to Lessee and Lessor are as set out below or as otherwise advised by one party to the other in writing and in compliance with this Section 15.7 from time to time:

**If to Lessor:**

| | |
|---|---|
| Address: | **Alliance Continental Leasing, LLC** |
| | Creekside Professional Center |
| | 6715 Tippecanoe Road |
| | Building A, Suite 202 |
| | Canfield, Ohio 44406 |
| | USA |
| Attention: | John C. Green |
| | Managing Director/CEO |
| Facsimile: | (330) 702-1938 |
| Email: | jcg@commercialaerospacecapitalcorporation.com |

2007-08-07
Prima Charters S.P. Z o o.

| | | |
|---|---|---|
| with a copy to: | **Edwards Angell Palmer & Dodge LLP**<br>919 North Market Street<br>15th Floor<br>Wilmington, DE<br>19801 | |

Attention:

Facsimile:

**If to Lessee:**

| | |
|---|---|
| Address: | PRIMA CHARTER S.P. Z o o. |
| | Ul. 17 Stycznia 56 |
| | 02-146 Warsaw, Poland |
| Attention: | Filip Cias<br>Chief Financial Officer |
| Facsimile: | 011 48 22 500 28 81 |
| E-mail: | fillip.cias@primacharter.pl |
| | |
| With copy to: | **Chapman & Cutler LLP**<br>111 West Monroe Street |
| | Chicago, IL 60603 |
| Attention: | Thomas C. Lee Esq. |
| Facsimile: | (312) 516- 1880 |
| E-mail: | thomaslee@chapman.com |

## 15.8    Governing Law and Jurisdiction

(a)    This Lease in all respects shall be governed by, and construed in accordance with, the Laws of the State of Delaware.

(b)    The courts of Delaware, and the superceding laws of the United States of America are to have jurisdiction to settle any disputes arising out of or relating to this Lease. Lessee undertakes not to bring a claim against Lessor other than in the Delaware courts and to comply with any interim orders of the Delaware courts pending resolution of any dispute.

(c)    Without prejudice to any other mode of service, Lessee and Lessor each consent to the service of process relating to any such proceedings by delivery or prepaid mailing of a copy of the process to the address identified in Section 15.7 or by fax or prepaid mailing by air mail, certified or registered mail of a copy of the process to the fax number or address for notices.

    (d)    Each party:

        (i)    waives to the fullest permitted by Law any objection which it may now or hereafter have to the courts referred to in Section 15.8(b) above on grounds of inconvenient forum or otherwise as regards proceedings in connection with this Lease;

        (ii)    waives to the fullest extent permitted by Law any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Lease brought in the courts referred to in Section 15.8(b); and

        (iii)    agrees that a judgment, award or order of any court referred to in Section 15.8(b) in connection with this Lease is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction as if made by the highest court in that other jurisdiction and accordingly it will not seek to, nor be entitled to, contest and/or delay and/or obstruct registration or enforcement of any such judgment and/or award and/or order on grounds of public policy or otherwise.

    (e)    This Section 15 shall survive, continue to take full effect and not merge in any order or judgment and nothing in this Section 15.8 limits the right of each party to bring proceedings against the other party in connection with this Lease:

        (i)    in any other court of competent jurisdiction; or

        (ii)    concurrently in more than one jurisdiction.

    (f)    Each party irrevocably and unconditionally:

        (i)    agrees that if the other party brings legal proceedings against it or its assets in relation to this Lease no immunity from such legal proceedings (which will be deemed to include suit, attachment prior to judgement, other attachment, the obtaining of judgement, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

        (ii)    waives any such right of immunity which it or its assets now has or may in the future acquire;

        (iii)    waives any requirement, of any kind whatsoever, for the other party to provide any form of security in respect of the payment of any damages, costs, expenses or any other financial obligation resulting from the commencement or prosecution of proceedings or the making of or service of any order and Lessee undertakes (x) not to challenge the validity of any proceedings or the making of any orders without any requirement for the provision of such security (y) to advise any court upon the other party's request that it requires no such security and (z) to provide security itself for any third party claims arising out of or in connection with such proceedings and/or orders; and

        (iv)    consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against any property whatsoever (irrespective

of its use or intended use) of any order or judgement which may be made or
given in such proceedings.

## 15.9    Sole and Entire Agreement

This Lease is the sole and entire agreement between Lessor and Lessee in relation to the leasing
of the Aircraft, and supersedes all previous agreements, representations and understandings in
relation to that leasing. Any amendments to this Lease must be made in writing and signed on
behalf of Lessor and Lessee.

## 15.10   Counterparts

This Lease may be executed in two or more counterparts, each of which shall be deemed an
original, but all of which together shall constitute one and the same instrument. This Lease
Agreement shall not be considered in effect until originally signed copies have been duly
provided to the Lessor's escrow agent; Aero Space Reports, 6916 N.W. 112th Street, Oklahoma
City OK 73172, (facsimile notification 405-728-2336 ).

## 15.11   Language

All notices to be given under this Lease will be in English. All documents delivered to Lessor
pursuant to this Lease will be in English, or if not in English, will be accompanied by a certified
English translation. If there is any inconsistency between the English version of this Lease and
any version in any other language, the English version will prevail.

## 16.    DISCLAIMERS AND WAIVERS

LESSOR AND LESSEE AGREE THAT THE DISCLAIMERS, WAIVERS AND
CONFIRMATIONS SET OUT IN CLAUSES 16.1 TO 16.4 BELOW SHALL APPLY AT ALL
TIMES DURING THE TERM. LESSEE'S ACCEPTANCE OF THE AIRCRAFT IN
ACCORDANCE WITH CLAUSE 4.3 SHALL BE CONCLUSIVE EVIDENCE THAT LESSEE
HAS FULLY INSPECTED THE AIRCRAFT, THE ENGINES AND EVERY PART THEREOF
AND THAT THE AIRCRAFT, THE ENGINES, THE PARTS AND THE AIRCRAFT
DOCUMENTS AND RECORDS ARE TECHNICALLY ACCEPTABLE TO LESSEE AND
SATISFY THE DELIVERY CONDITION REQUIREMENTS AND ARE IN SUITABLE
CONDITION FOR DELIVERY TO AND ACCEPTANCE BY LESSEE.

## 16.1    Exclusion

THE AIRCRAFT IS TO BE LEASED AND DELIVERED HEREUNDER "AS IS, WHERE IS",
AND LESSEE AGREES AND ACKNOWLEDGES THAT, SAVE AS EXPRESSLY STATED
IN THE LEASE:

(A)    LESSOR WILL HAVE NO LIABILITY IN RELATION TO, AND LESSOR HAS NOT
AND WILL NOT BE DEEMED TO HAVE ACCEPTED, MADE OR GIVEN
(WHETHER BY VIRTUE OF HAVING DONE OR FAILED TO DO ANY ACT, OR
HAVING ACQUIRED OR FAILED TO ACQUIRE ANY STATUS UNDER OR IN
RELATION TO THE LEASE OR OTHERWISE), ANY CONDITIONS,
WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH
RESPECT TO, THE AIRCRAFT OR ANY ENGINE OR PART OR ANY SERVICES
PROVIDED BY LESSOR UNDER THE LEASE, INCLUDING THE DESCRIPTION,

- 34 -

AIRWORTHINESS, COMPLIANCE WITH SPECIFICATIONS, OPERATION, MERCHANTABILITY, QUALITY, FREEDOM FROM INFRINGEMENT OF PATENT OR OTHER PROPRIETARY RIGHTS, FITNESS FOR ANY PARTICULAR USE OR PURPOSE, VALUE, DURABILITY, DATE PROCESSING, CONDITION, OR DESIGN, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP, THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR AS TO ANY OTHER MATTER WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE) WITH RESPECT TO THE AIRCRAFT, ANY ENGINE OR ANY PART OR ANY SERVICES PROVIDED BY LESSOR UNDER THE LEASE; AND

(B)     LESSOR SHALL NOT HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER TO LESSEE (WHETHER ARISING IN CONTRACT OR IN TORT, AND WHETHER ARISING BY REFERENCE TO NEGLIGENCE, MISREPRESENTATION OR STRICT LIABILITY OF LESSOR OR OTHERWISE) FOR:

(i)     ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY THE AIRCRAFT OR ANY ENGINE OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH;

(ii)    THE USE, OPERATION OR PERFORMANCE OF THE AIRCRAFT OR ANY RISKS RELATING THERETO;

(iii)   ANY INTERRUPTION OF SERVICE, LOSS OF BUSINESS OR ANTICIPATED PROFITS OR ANY OTHER DIRECT, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE; OR

(iv)    THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF THE AIRCRAFT, ANY ENGINE OR ANY PART.

## 16.2    Waiver

LESSEE HEREBY WAIVES, AS BETWEEN ITSELF AND THE LESSOR, ALL ITS RIGHTS IN RESPECT OF ANY CONDITION, WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, ON THE PART OF LESSOR PERTAINING TO THE AIRCRAFTY AND ALL CLAIMS AGAINST LESSOR HOWSOEVER AND WHENEVER ARISING AT ANY TIME IN RESPECT OF OR OUT OF ANY OF THE MATTERS REFERRED TO IN CLAUSE 16.1.

## 16.3    Disclaimer Of Consequential Damages

LESSEE AGREES THAT IT SHALL NOT BE ENTITLED TO RECOVER, AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER, LOST PROFITS OR REVENUES OR CONSEQUENTIAL DAMAGES AS A RESULT OF ANY BREACH OR ALLEGED BREACH BY LESSOR OF ANY OF THE AGREEMENTS CONTAINED IN THE LEASE.

## 16.4  Confirmation

LESSEE CONFIRMS THAT IT IS FULLY AWARE OF THE PROVISIONS OF THIS CLAUSE 16 AND ACKNOWLEDGES THAT RENT AND OTHER AMOUNTS PAYABLE UNDER THE LEASE HAVE BEEN CALCULATED BASED ON ITS PROVISIONS.

## 17.  BROKERS AND OTHER THIRD PARTIES

### 17.1  No Brokers

Each of the parties hereby represents and warrants to the other that it has not paid, agreed to pay or caused to be paid directly or indirectly in any form, any commission, percentage, contingent fee, brokerage or other similar payments of any kind, in connection with the establishment or operation of this Lease, to any Person (other than fees payable to legal advisers).

### 17.2  Indemnity

Each party agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including reasonable legal fees) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon this Lease or the Aircraft, if such claim, suit, damage, cost or expense arises out of any breach by the indemnifying party, its employees or agents of Section 17.1.

## 18.  BENEFIT OF THIRD PARTIES

**18.1**  Any Indemnitee may enforce the terms of Section 10 (*Indemnity*) in accordance with the provisions of this Lease.

**18.2**  Any Tax Indemnitee may enforce the terms of Section 5.7 (*Tax Indemnity*) in accordance with the provisions of this Lease.

## 19.  CTC 1110 PROVISIONS COMPLIANCE

Notwithstanding any provision herein or elsewhere contained to the contrary, it is understood and agreed among the parties hereto that the transactions contemplated by this Agreement and the other Relevant Documents are expressly intended to be, shall be and should be construed so as to be, entitled to the full benefits of the CTC 1110 Provisions, as amended from time to time, and any successor provisions thereto.

**IN WITNESS** whereof the parties hereto have executed this Lease on the date shown at the beginning of the document.


**ALLIANCE CONTINENTAL LEASING LLC**

By:    _____

Name:    _____

Title:    Managing Director & C.E.O.


**PRIMA CHARTER Fischer Air Polska**

By:    _____

Name:    _____

Title:    President & C.E.O.



By:    _____

Name:    _____

Title:  Chief Financial Officer

**SCHEDULE 1**
**DEFINITIONS**

The following words and expressions have the respective meanings set out below:

**AD Compliance Period** means the 60 days after the Return Occasion.

**Air Authority** means the civil aviation authority (howsoever described) of the State of Registry.

**Aircraft** means Aircraft and Engines identified in **Annex A** to this **Schedule 1** (which term includes, where the context admits, a separate reference to all Engines, Parts and Aircraft Documents and Records).

**Aircraft Documents and Records** means the documents, data and records identified in the list attached to the Certificate of Acceptance, and any other documents and records required in connection with Lessee's obligations under Section 8.8, and all additions, renewals, revisions and replacements from time to time made to any of the foregoing in accordance with this Lease.

**Airframe Structural Check** means a heavy maintenance visit which shall include but not be limited to accomplishment of a [1C,/ S1C/ 3C/ S3C/ 4C/ S4C] Check, all greater or lesser checks, passenger cabin refurbishment (including lavatories and galleys) and strip and repainting of the complete fuselage, empennage, wings and pylons. Where relevant, the workscope and intervals (calendar and/or hourly) shall not be less than those prescribed by the then current Manufacturer's Maintenance Planning Document block maintenance program..

**Airframe Supplemental Rent** is defined in Section 5.4(a).

**Airframe** means the Aircraft, excluding the Engines and Aircraft Documents and Records.

**Airworthiness Directive** means an airworthiness directive issued by the State of Design or the State of Registry.

**Agreed Value** means $21,000,000 or such other greater amount as Lessor may from time to time notify to Lessee to reflect an amount equal to 110% of the current market value of the Aircraft.

**Annual Supplemental Rent Adjustment** means 4.25%.

**APU** means the auxiliary power unit installed on the Aircraft on the Delivery Date and any replacement auxiliary power unit installed on the Aircraft and title to which is transferred to Owner in accordance with this Lease.

**APU Supplemental Rent** is defined in Section 5.4(a).

**Assumed Ratio** is defined in Section 5.4(b)(ii).

**Assumed Utilisation** is defined in Section 5.4(b)(iii).

**Back-To-Birth Traceability** means with certified documentation available identifying precisely where, when and with which aircraft operator the expired life and previous maintenance in relation to the relevant item occurred since that item was new.

0

**Bill of Sale** means the aircraft bill of sale conveying all right, title and interest in and to the Aircraft from Lessee, or seller, to Lessor, as buyer, pursuant to the Purchase Agreement.

**Business Day** means any day other than a Saturday, Sunday or other day on which banking institutions in New York, New York or are authorized or required by Law to be closed.

**"C" Check** means a "C" check in accordance with Lessee's Maintenance Programme and the Manufacturer's Maintenance Planning Document each in effect on the relevant date.

**Cape Town Convention** means the *Convention on International Interests in Mobile Equipment* and *Protocol Thereto on Matters Specific to Aircraft Equipment*, concluded in Cape Town, South Africa on 16 November 2001.

**CCAA** means the *Companies' Creditors Arrangement Act* (Canada).

**Certificate of Acceptance** means a certificate of acceptance in the form of Part 1 or Part 2, as applicable, of **Schedule 5**.

**Conditions Precedent** means the conditions specified in **Schedule 3**.

**CPCP** means corrosion prevention and control programme.

**CSO** means Cycles or Engine Cycles, as applicable, since overhaul.

**CTC Act** means the *International Interests in Mobile Equipment (Aircraft Equipment) Act*, S.C. 2005, Ch. 3.

**CTC Location** means the location where Lessee is "situated" for the purposes of the Cape Town Convention.

**CTC 1110 Provisions** means the amendments to the CCAA, BIA and WRA contained in Sections 11 to 18 of the CTC Act.

**Cycle** means one take-off and landing of the Aircraft.

**Damage Notification Threshold** means \$250,000.

**Deductible Amount** means \$100,000.

**Default** means any Event of Default or any event or circumstance which, with the giving of notice and/or lapse of time and/or determination of materiality and/or fulfilment of any other condition, would constitute an Event of Default.

**Defect** means any defect or non-conformity with the Delivery Condition Requirements notified by Lessee to Lessor during the Pre-Delivery Procedure.

**Delivery** means delivery of the Aircraft by Lessor to Lessee under this Lease.

**Delivery Condition Requirements** means the requirements identified in **Schedule 4** provided that such requirements are solely a description of the condition in which the Aircraft must be in order for Lessee to be obligated to accept the Aircraft under this Lease.

**Delivery Date** means the date on which Delivery occurs.

**Delivery Location** means over international waters or such other location as Lessor and Lessee may mutually agree in writing.

**Deposit** means $750,000.00 USD Security Deposit.

**Dollars** and **$** means the lawful currency of the United States of America.

**Engine** means, whether or not installed on the Aircraft:

(a) each engine of the manufacture and model specified in this Lease for the Aircraft which Lessor offers to Lessee for Delivery with the Airframe on the Delivery Date, such Engines being described as to serial numbers on the Certificate of Acceptance; and

(b) any Replacement Engine, with effect from the time when title thereto has passed to Owner in accordance with this Lease;

and in each case includes all modules and Parts, including QEC, from time to time belonging to or installed in that engine but excludes any properly replaced engine title to which should have passed to Lessee pursuant to this Lease.

**Engine Cycle** means operation of an Engine on an aircraft from and including a take-off to and including the landing of that aircraft.

**Engine Event of Loss** means the occurrence, with respect to an Engine only, whether or not installed on the Airframe, of any of those events described in the definition of Event of Loss.

**Engine Flight Hour** means each hour or part thereof an Engine is operated, elapsing from the moment the wheels of an aircraft on which such Engine is installed leave the ground until the wheels of such aircraft next touch the ground.

**Engine LLP Supplemental Rent** means, in respect of the life-limited Parts for each Engine, the amount defined in Section 5.4(a) for each Engine Cycle operated by that Engine.

**Engine Refurbishment** means, with respect to any Engine, the complete visual inspection and repair as necessary in accordance with the shop manual of the combustion section of such Engine in an engine repair/overhaul station, including, complete unstacking of the high pressure turbine and low pressure turbine (including both high and low compressors); complete visual inspection, de-blading of discs as required; visual inspections of all discs; verification that all snap diameters on discs are within limits; inspection of all blades for proper chord dimensions and cracking; repair or replacement of all blades below minimums; inspection and repair of stators as necessary; blade-up of discs using new lock plates; assembly of rotors in the turbine; balance of all rotors; and installation of rotors in the Engine.

**Engine Supplemental Rent** means in respect of each Engine, the amount defined in Section 5.4(a) for each Engine Flight Hour (or fraction thereof) operated by that Engine.

**Engine Thrust Setting** means _____ pounds.

**Equipment Change** has the meaning given in Section 8.12.

**Eurocontrol** means the European Organisation for the Safety of Air Navigation.

**Event of Default** means any event or condition specified in **Schedule 9**.

**Event of Loss** means with respect to the Aircraft (including for the purposes of this definition the Airframe):

- (a) the actual or constructive, compromised, arranged or agreed total loss of the Aircraft;

- (b) the Aircraft being destroyed, damaged beyond economic repair or permanently rendered unfit for normal use for any reason whatsoever;

- (c) the Aircraft being requisitioned for title, or title to the Aircraft being otherwise compulsorily acquired by the government of the State of Registry or any other authority; or

- (d) the Aircraft being hijacked, stolen, confiscated, seized, detained or requisitioned for use or hire for (i) a period of more than 60 days (or 90 days in the case of requisition for use or hire by the government of the State of Registry) or (ii) if a shorter period, such number of days as ends on the Expiry Date.

**Expiry Date** means the Original Scheduled Expiry Date or if earlier (i) the date when Lessor acting in accordance with the provisions of this Lease, terminates the leasing of the Aircraft to Lessee under this Lease, or (ii) subject to the provisions of Section 11.1 and 11.2, the date when Lessor receives the Agreed Value together with any other amounts then due and unpaid under this Lease and the Other Agreements following an Event of Loss; provided that if the Term is extended pursuant to Section 12.2, the Expiry Date shall be extended to the date when the Aircraft has been redelivered to Lessor in full compliance with this Lease;

**FAA** means the Federal Aviation Administration of the United States of America and any successor thereof.

**FAA Location** means the location of Lessee's agent for the service of FAA process to it as a foreign air carrier.

**FAR** means the *Federal Aviation Regulations* set out in Title 14 of the *United States Code of Federal Regulations*, as amended and modified from time to time.

**FAR Part 121** means Part 121 of the FAR, as amended or modified from time to time.

**Final Delivery Date** means the date that is 30 days after the Scheduled Delivery Date.

**Financial Indebtedness** means any indebtedness in respect of:

- (a) moneys borrowed or raised;

- (b) any liability under any debenture, bond, note, loan stock, acceptance, documentary credit or other security;

- (c) the acquisition cost of any asset to the extent payable before or after the time of acquisition or possession; or

- (d) any guarantee, indemnity or similar assurance against financial loss of any person in respect of the above.

_____ 2007-08-07

**Final Inspection** has the meaning given in Section 1.1 of **Schedule 6**.

**Financial Information** means:

(a) if requested by Lessor, the consolidated management accounts of Lessee (in Dollars, and comprising a balance sheet and profit and loss statement and cash flow forecasts) in English prepared for the most recent previous financial quarter certified by a qualified financial officer of Lessee as being true and correct; and

(b) as soon as available, but not in any event later than 120 days after the last day of each financial year of Lessee, its audited consolidated balance sheet in English as of such day and its audited consolidated profit and loss statement for the year ending on such day (each in Dollars).

**Financing Parties** means the Person or Persons from time to time notified by Lessor to Lessee as providing finance to Lessor or Owner in respect of its acquisition, ownership or leasing of the Aircraft, whether by way of superior lease, loan or otherwise.

**Flight Hour** means each hour or part thereof elapsing from the moment the wheels of the Aircraft leave the ground on take off until the wheels of the Aircraft next touch the ground.

**GAAP** means generally accepted accounting principles as in effect from time to time and consistently applied as set out in the Handbook of the American Institute of Certified Accountants.

**Geneva Convention** means the *Convention for the International Recognition of Rights in Aircraft*, signed (ad referendum) at Geneva, Switzerland, on August 19, 1948, and amended from time to time, but excluding the terms of any adhesion thereto or ratification thereof containing reservations to which the United States of America does not accede.

**Government Entity** means (a) any national government, political subdivision thereof, or local jurisdiction therein; (b) any instrumentality, board, commission, court, or agency of any of the above, however constituted; or (c) any association, organisation, or institution of which any of the above is a member or to whose jurisdiction any thereof is subject or in whose activities any of the above is a participant.

**Habitual Base** means Poland or, subject to the prior written consent of Lessor, any other country or countries in which the Aircraft is for the time being habitually based.

**Indemnitee** means Lessor, the Financing Parties and each of their respective successors and assigns, shareholders, subsidiaries, affiliates, partners, contractors, directors, officers, representatives, servants, agents and employees.

**Insolvent** means in relation to any relevant Person that such Person:

(a) cannot or is deemed by applicable Law to be insolvent or unable to pay its debts;

(b) stops trading or threatens to stop trading;

(c) goes into liquidation or is wound up in any jurisdiction (other than a solvent re organisation which Lessor approves in writing); or its directors or one or more creditors applies to the court for an administration order or winding up order;

(d)     goes into administrative receivership or administration, has a receiver appointed over any of its assets or is the subject of any similar proceedings in any country;

(e)     proposes a voluntary arrangement or scheme of arrangement to creditors; or

(f)     enters into any process or scheme for the benefit of creditors as a whole under which their rights are suspended or affected.

**Insurance** means insurance in respect of the Aircraft in form and substance satisfactory to Lessor, and includes any insurance and reinsurance required by Section 9 and **Schedule 7**.

**Interest Rate** means Citibank, N.A.'s prime rate plus five percent (5%) per annum.

**Landing Gear** means the landing gear assembly of the Aircraft excluding any rotable components.

**Landing Gear Supplemental Rent** means in respect of the Landing Gear, the amount defined in Section 5.4(a) for each Flight Hour operated with the Landing Gear installed.

**Law** means and includes (a) any statute, decree, constitution, regulation, order, judgement or other directive of any Government Entity; (b) any treaty, pact, compact or other agreement to which any Government Entity is a signatory or party; (c) any judicial or administrative interpretation or application of any Law described in (a) or (b) above; and (d) any amendment or revision of any Law described in (a), (b) or (c) above.

**Lease** means this Lease Agreement for the Aircraft and any Schedules, supplements, amendments, modifications or side letter agreements related to this Lease executed contemporaneously with or subsequently to this Lease.

**Lessee Affiliate** means any Subsidiary of Lessee.

**Lessee's Maintenance Programme** means the Maintenance Programme, as at the date of this Lease, specifically approved by the Air Authority for Lessee's maintenance of the Aircraft.

**Lessor Lien** means any Security Interest whatsoever from time to time created by Lessor in connection with the financing of the Aircraft and any other Security Interest in the Aircraft which results from acts of or claims against Lessor not related to the transactions contemplated by or permitted under this Lease.

**Lessor Tax Jurisdiction** means the U.S.A.

**Losses** means any cost, expense (including the fees and expenses of professional advisers), financial liability, damage or financial loss of any kind, whether direct or indirect.

**Maintenance Contributions** means all amounts payable by Lessor pursuant to Section 7.2.

**Maintenance Performer** means Lessee or such Person as is approved and internationally recognised by the Air Authority and, until the OC Date, the FAA, to perform maintenance and/or modification services on commercial aircraft and/or commercial aircraft engines, which Person shall be agreed by Lessor and Lessee to ensure that such Person has recognised standing and experience, suitable facilities and suitable equipment to perform such services on aircraft and/or engines of the same model as the Aircraft or, in the case of engines, the Engines.

**Maintenance Programme** means an Air Authority approved maintenance programme for the Aircraft in accordance with the Manufacturer's and/or OEM's specifications, requirements, service bulletins, planning documents, maintenance manuals and documents and encompassing scheduled maintenance (including block maintenance), condition-monitored maintenance, and/or on-condition maintenance of the Airframe, Engines and Parts, including servicing, testing, preventive maintenance, repairs, structural inspections, system checks, overhauls, approved modifications, service bulletins, engineering orders, Airworthiness Directives and corrosion control inspections and treatments.

**Major Checks** means any "C" Check, multiple "C" Check or heavier check (including structural inspections and CPCP) suggested for commercial aircraft of the same model as the Aircraft by Manufacturer (however denominated) as set out in Lessee's Maintenance Programme.

**Manufacturer** means The Boeing Company (or if the context requires, Rolls Royce for an Engine).

**Manufacturer's Maintenance Planning Document** means the recommended maintenance programme for the Aircraft issued by the Manufacturer.

**Minimum Airframe Life Limited Component Flight Hours** means 1000 Flight Hours.

**Minimum Airframe Life Limited Component Cycles** means 500 Cycles.

**Minimum APU Limit** means 500 Cycles.

**Minimum Component Calendar Life** means six months or 12 months, whichever is limiting.

**Minimum Component Cycles** means 500 Cycles or 12 months, whichever is greater.

**Minimum Component Flight Hours** means 1000 Flight Hours.

**Minimum Engine Cycles** means 500 Cycles.

**Minimum Engine LLP Cycles** means 1000 Cycles.

**Minimum Engine Flight Hours** means 500 Flight Hours.

**Minimum Landing Gear Calendar Time** means six months.

**Minimum Landing Gear Cycles** means 500 Cycles.

**Minimum Landing Gear Flight Hours** means 500 Flight Hours.

**Minimum Liability Coverage** means $50,000,000.

**Nameplates** means the fireproof plates to be installed on the Aircraft in accordance with Section 8.6(a).

**OEM** means, in relation to any Part, the original equipment manufacturer of such Part.

**Original Scheduled Expiry Date** means either (i) the date which is 48 months after the Delivery Date or (ii) the day preceding the numerically corresponding day to the Rent Commencement Date 'X' number of months after the Rent Commencement Date where 'X' shall be the actual number of months specified under "Duration of Term" in the **Aircraft Lease Agreement**. If either such date in (i) or (ii) above does

not fall on a day that is a Business Day, then the Original Scheduled Expiry Date shall be the immediately preceding Business Day

**Other Agreement** means any aircraft lease agreement or other agreement from time to time entered into between Lessor (or any Subsidiary, associate or affiliate of Lessor) and Lessee (or any Subsidiary, associate or affiliate of Lessee).

**Owner** means Lessor or any permitted transferee from Lessor as notified to Lessee.

**Part** means, whether or not installed on the Aircraft:

(a)     any component, module, furnishing or equipment (other than a complete Engine) furnished with the Aircraft on the Delivery Date; and

(b)     any other component, module, furnishing or equipment (other than a complete Engine), with effect from the time when title thereto has passed to Owner pursuant to this Lease;

but excludes any such items title to which should have passed to Lessee pursuant to this Lease.

**Permitted Lien** means:

(a)     any lien for Taxes not assessed or, if assessed, not yet due and payable, or being contested in good faith by appropriate proceedings;

(b)     any lien of a repairer, mechanic, carrier, hangar-keeper or other similar lien arising in the ordinary course of business by operation of Law in respect of obligations which are not overdue or are being contested in good faith by appropriate proceedings;

(c)     any Lessor Lien; and

(d)     the rights of others under any Permitted Sub-Lease to the extent expressly permitted under Section 8.4;

but only if (in the case of both (a) and (b)) (i) adequate reserves have been provided by Lessee for the payment of such Taxes or obligations; and (ii) such proceedings, or the continued existence of the lien, do not give rise to any risk of the sale, forfeiture, seizure, detention or other loss of the Aircraft or any interest therein or of criminal liability on Lessor or Owner.

**Permitted Sub-Lease** means the sub-lease of the Aircraft to a Permitted Sub-Lessee as provided for pursuant to Section 8.4.

**Person** means any individual person, any form of corporate or business association, trust, Government Entity, or organisation or association of which any of the above is a member or a participant.

**Pre-Delivery Procedure** means the procedure leading to Delivery as specified in **Schedule 4**.

**PPSA Location** means the "location" of Lessee for the purpose of any applicable *Personal Property Security Act* or similar legislation in the State of Registry.

**Purchase Option Price** means US $17,350,000.00 on the date equal to 90 days from the date of Delivery, (*Delivery Date*), and US $ 11,680,000.00 calculated to be the effect price at the time of expiry of the lease agreement.

_____ 2007-08-07

**QEC** means quick engine change kit.

**Redelivery Check** means a heavy maintenance visit which shall include but not be limited to accomplishment of a block Check, all lesser checks, passenger cabin refurbishment (including lavatories and galleys) and strip and repainting of the complete fuselage, empennage, wings and pylons. Where relevant, the workscope and intervals (calendar and/or hourly) shall not be less than those prescribed by the then current Manufacturer's Maintenance Planning Document block maintenance program..

**Redelivery Location** means Dublin Ireland or such other location as may be agreed in writing by Lessor and Lessee.

**Regulations** means any Law or regulation (including any internal corporate regulation), official directive or recommendation, mandatory requirement or contractual undertaking which applies to Lessee or the Aircraft and any Law or regulation, official directive or recommendation or mandatory requirement which applies to Lessor.

**Relevant Documents** means this Lease and any ancillary documents related thereto.

**Relevant Taxes** are those Taxes which any Tax Indemnitee may suffer or incur, whether directly or indirectly and which arise as a result of: (i) the ownership, operation maintenance, repair, possession, transfer of ownership or possession, import, export, registration, storage, modification, leasing, insurance, inspection, testing, design, sub leasing, use condition or other matters relating to or attributable to the Aircraft, Lessee or this Lease, or any rent, receipts, insurance proceeds, income or other amounts arising therefrom; or (ii) any breach by Lessee of its obligations.

**Rent** means all amounts payable pursuant to Section 5.3.

**Rental Period** means each period ascertained in accordance with Section 5.2.

**Rent Commencement Date** means the date on which Lessor properly offers the Aircraft for Delivery to Lessee under Section 4.3(a).

**Rent Date** means the first day of each Rental Period.

**Replacement Engine** means an engine of the same manufacturer and model, or at Lessee's option an engine of an improved model and having equivalent or better value, utility, modification status, time elapsed since hot section refurbishment, cold section refurbishment, reduction gear overhaul, life limited part utility and remaining equivalent warranty status as the Engine it replaces under Section 8.11, and is otherwise of an equivalent value and utility and suitable for installation and use on the Airframe without impairing the value or utility of the Airframe and compatible with the remaining installed Engine(s).

**Required EGT Margin** means sufficient EGT Margin to attain minimum hours and cycles on wing.

**Return Occasion** means the date on which the Aircraft is redelivered to Lessor in accordance with Section 12.

**Scheduled Delivery Date** means August,_____2007 .

**Security Interest** means any mortgage, charge, pledge, lien, encumbrance, assignment, hypothecation, right of seizure, right of detention, right of set-off or any other agreement or arrangement having the effect of conferring security.

**Short Form** means the short form lease agreement substantially in the form of **Schedule 12**.

**SLOATL** means sea level outside air temperature limit.

**SRM** means Manufacturer's structural repair manual.

**State of Incorporation** means Delaware, USA.

**State of Design** means the state having jurisdiction over the Person responsible for the type design of the Aircraft or any Engine or Part.

**State of Registry** means the Poland.

**Subsidiary** means:

     (a)     in relation to any reference to accounts, any company whose accounts are consolidated with the accounts of Lessee in accordance with accounting principles generally accepted under accounting standards of the State of Incorporation;

     (b)     for any other purpose, an entity from time to time:

          (i)     of which another has direct or indirect control or owns directly or indirectly more than 50 percent of the voting share capital; or

          (ii)     which is a direct or indirect subsidiary of another under the Laws of the jurisdiction of its incorporation.

**Supplemental Rent** means, as applicable, all amounts payable under this Lease in respect of each of Airframe Supplemental Rent, Engine Supplemental Rent, Engine LLP Supplemental Rent, APU Supplemental Rent and Landing Gear Supplemental Rent.

**Taxes** means any and all present and future taxes, duties, withholdings, levies, assessments, imposts, fees and other governmental charges of all kinds (including any value added, goods and services or similar tax and any stamp, documentary, license, registration or similar fees or tax), together with any penalties, fines, surcharges and interest thereon and any additions thereto.

**Tax Indemnitees** means Lessor and any Financing Party.

**Technical Report** means a monthly report of the Flight Hours, Cycles, Engine Flight Hours and Engine Cycles operated by the Airframe and Engines in respect of each calendar month in the form required by Lessor.

**Term** means the period commencing on the Delivery Date and ending on the Expiry Date.

**TSO** means time (Flight Hours or Engine Flight Hours, as applicable) since overhaul.

**Unforeseen Event** means:

     (a)     war, civil disturbance or act of any Government Entity;

     (b)     natural disaster;

(c)     unexpected shortage of labour, materials or facilities affecting the Aircraft;

(d)     any Defect;

(e)     labour disputes;

(f)     breach of contract by any Person or other failure to deliver or redeliver the Aircraft by any Person (whether or not a breach) other than Lessor with possession or control of the Aircraft or any purchase agreement for the Aircraft terminating prior to Delivery;

(g)     delays Lessor cannot control in obtaining the Aircraft or any equipment or services for the Aircraft; or

(h)     any other cause beyond the control of Lessor.

**WRA** means the *Winding-up and Restructuring Act*, R.S.C. 1985, Ch. c.W-11, as amended.

## ANNEX A TO SCHEDULE 1

**Aircraft:**            Boeing B757-222

**MSN:**

**Registration No.:**

**Engines:**

**ESNs:**            **No. 1:**            **No. 2:**

## SCHEDULE 2
## REPRESENTATIONS AND WARRANTIES

1.1     **Lessee's Representations and Warranties**

Lessee's representations and warranties to Lessor are as follows:

(a)     **Status**: It has been properly formed as a company with limited liability and has since been maintained according to all Regulations applicable to Lessee.

(b)     **Non-Conflict**: In entering into this Lease and carrying out its obligations, it does not contravene or breach any Regulation applicable to Lessee.

(c)     **Power and Authority**: It has the authorisations it needs to enter into this Lease and to carry out its obligations, and it has the power to enter into the Relevant Documents.

(d)     **Legal Validity**: Its obligations under this Lease are legal, valid and binding and enforceable in accordance with their terms.

(e)     **No Event of Default**: No Event of Default has occurred and is continuing or would occur because of Delivery.

(f)     **Litigation**: It is not involved in any litigation or other dispute which could affect its financial condition or its ability to carry out its obligations in any material way.

(g)     **Accounts**: Its audited accounts most recently delivered to Lessor:

     (i)     have been prepared according to GAAP; and

     (ii)    fairly represent the financial condition of Lessee as at the date to which they were drawn up and since that date there has been no material change in Lessee's ability to carry out its obligations or its financial condition.

(h)     **Full Disclosure**: Neither its audited accounts referred to in paragraph (g) nor any other document provided to Lessor by Lessee for the purposes of this Lease contains any untrue statement or leaves out any important fact which could make any of them misleading.

(i)     **Material Adverse Change**: there has been no material adverse change in the financial condition of Lessee and Lessee Affiliates since the date to which the accounts most recently provided to Lessor on or prior to the Delivery Date were drawn up.

(j)     **PPSA Location**: Lessee's PPSA Location is in the Country of Poland..

(k)     **FAA Location**: Lessee's FAA Location is located at_____.

(l)     **CTC Location**: Lessee' s CTC Location is in Warsaw Poland.

(m)     **CTC 1110 Provisions**: The transactions contemplated by the Relevant Documents comply with the requirements contained in the CTC 1110 Provisions as currently

**PRIMA CHARTER Draft**

enacted for Lessor to be entitled to the protection of the CTC 1110 Provisions in connection with its right to take possession of the Aircraft in the event of a proceeding under the BIA, CCAA or WRA in which the Borrower is a debtor, except as such provisions may be limited by equitable principles or applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity.

1.2.   **Lessor' s Representations and Warranties**

Lessor' s representations and warranties to Lessee are as follows:

(a)   **Status**: It has been properly formed as a company with limited liability and has since been maintained according to all Regulations applicable to Lessor.

(b)   **Non-Conflict**: In entering into this Lease and carrying out its obligations, it does not contravene or breach any Regulation applicable to Lessor.

(c)   **Power and Authority**: It has the authorisations it needs to enter into this Lease and to carry out its obligations, and it has the power to enter into the Relevant Documents.

(d)   **Legal Validity**: Its obligations under this Lease are legal, valid and binding and enforceable in accordance with their terms.

## SCHEDULE 3
## CONDITIONS PRECEDENT

On or before the Scheduled Delivery Date, Lessee shall comply with the Conditions Precedent set out below by ensuring that Lessor receives the following documents and by taking the actions described below, in each case in a manner satisfactory to Lessor. All documents delivered to Lessor pursuant to this **Schedule 3** will be in English, or if not in English, will be accompanied by a certified English translation:

### 1.    Payments

All sums due to Lessor under this Lease on or before the Delivery Date, including the first payment of Rent, must have been received by Lessor;

### 2.    Documents

(a)    **Opinion**: an original, signed opinion substantially in the form of **Schedule 8** will be issued on the Delivery Date by independent legal counsel acceptable to Lessor in the State of Registry, the Habitual Base and the State of Incorporation;

(b)    **Approvals/ Filings**: evidence of the issue of the Aircraft certificate of registration, a copy of the Application for Registration for the Aircraft pursuant to this Lease, together with any other approvals, licenses and consents which may be required in relation to, or in connection with the performance by Lessee of any of its obligations under this Lease. In addition, Lessee shall satisfy Lessor that all filings, registrations, recordings and other actions have been or will be taken which are necessary or advisable to ensure Lessor, the validity, effectiveness and enforceability of this Lease and to protect the property rights of Lessor, Owner and any Financing Parties in the Aircraft, any Engine or any Part, and this Lease, if applicable;

(c)    **Import**: evidence that any required import license and all customs formalities relating to the import of the Aircraft into the Habitual Base have been obtained or complied with and that the import of the Aircraft into the Habitual Base is exempt from Taxes (it being acknowledged that some filings can only be made upon Lessee's import of the Aircraft into the State of Registry) or that such Taxes have been paid;

(d)    **Licenses**: copies of Lessee's air transport license, air operator's certificates for Aircraft of the type of the Aircraft, and all other licenses, certificates and permits required by Lessee in relation to, or in connection with, the operation of the Aircraft;

(e)    **Air Traffic Control**: a letter from Lessee addressed to Eurocontrol and each other relevant air traffic control or airport authority pursuant to which Lessee authorises the addressee to issue to Lessor from time to time, a statement of account of all sums due by Lessee to the authority in respect of all aircraft (including the Aircraft) operated by Lessee;

(f)    **Power of Attorney**: the Power of Attorney substantially in the form of **Schedule 10** duly executed by Lessee and notarised and legalised;

(g)    **Letter of Credit**: (if applicable) the Letter of Credit;

(h)    **Insurance**: certificates of insurance and an undertaking and opinion (in respect of the United States Government indemnity for war risks) from Lessee's insurance broker and other evidence

satisfactory to Lessor, that Lessee is taking the required steps to ensure due compliance with the provisions of this Lease as to Insurance with effect on and after the Delivery Date;

(i)     **Certificate of Acceptance**:  the Certificate of Acceptance, dated and fully completed, and executed by Lessor and Lessee;

(j)     **Guarantee**: (if applicable) the Guarantee, duly executed and delivered by the Guarantor, and a legal opinion or legal opinions of independent legal counsel acceptable to Lessor in respect of the Guarantee in form and substance acceptable to Lessor and its legal counsel;

(k)     **Short Form Lease**:  the Short Form, which shall be entered into by Leasee and Leasor solely for the purposes of registering the Aircraft with the Air Authority;

(l)     **Confirmation of Interested Parties**:  a confirmation of interested parties, in form reasonably acceptable to Lessor, which shall be deposited by Lessee with the Air Authority; and

(m)     **Purchase Agreement.**  The Purchase Agreement and Bill of Sale must have been duly executed and delivered and all right, title and interest in and to the Aircraft transferred to Lessor;

together with such other documents as Lessor may reasonably request.

**3.     Truthfulness and No Default**

(a)     **Representations/Warranties**: the representations and warranties of Lessee in **Schedule 2** shall be correct, and would be correct if repeated on Delivery; and

(b)     **No Default**: no Default shall have occurred and be continuing on Delivery or might result from the leasing of the Aircraft to Lessee under this Lease.

**4.     CTC 1110 Provisions**

Lessor is entitled to the benefits contained in the CTC 1110 Provisions available to a lessor who leases aircraft objects in connection with its right to take possession of the Aircraft in the event of a proceeding under the BIA, CCAA or WRA in which Lessee is a debtor (which evidence may be provided in a legal opinion issued to Lessor by Lessee or its counsel).

## SCHEDULE 4
## PRE-DELIVERY PROCEDURES AND DELIVERY CONDITION REQUIREMENTS

1.     **Licenses**

(a)     It is the responsibility of Lessee to obtain all licenses, permits or approvals necessary to export or transport the Aircraft from the Delivery Location.

(b)     Lessor will provide Lessee with any required data and information related to the Aircraft or Lessor that it has for the purposes of obtaining any such licenses, permits or approvals.

2.     **Inspection**

(a)     Subject to any applicable lease agreement or purchase agreement, Lessee shall inspect the Aircraft (including a demonstration flight which shall be undertaken for the benefit of Lessee with up to two representatives of Lessee on the Aircraft as observers) to ensure that the Aircraft fulfils the Delivery Condition Requirements.

(b)     If Lessee's inspection of the Aircraft shows that the Aircraft does not fulfil the Delivery Condition Requirements, Lessor will correct any Defects and make the Aircraft available for re-inspection by Lessee provided that, in Lessor's reasonable opinion, it is not impracticable or prohibitively expensive to correct the Defect.

(c)     If Lessor notifies Lessee that it does not intend to correct the Defect, either party may terminate this Lease. In the event of such a termination, without prejudice to the indemnity under paragraph 3 below, Lessor shall return the Deposit to Lessee and return to Lessee or cancel any Letter of Credit issued under this Lease.

(d)     Lessee shall carry out the inspections contemplated by **Schedule 11** (Passenger Cabin Interior Standard) and Lessor shall procure that any replacements, repairs or repainting required in accordance with that Schedule shall be effected at Lessor's cost prior to Delivery. If any such task is not accomplished by Lessor prior to Delivery and such failure does not affect the airworthiness or operation of the Aircraft, then such task shall be performed by Lessee subsequent to the Delivery Date, at a time convenient to Lessee, and Lessor shall reimburse Lessee for its actual costs incurred in performing such task subject to a receipt by Lessor of an invoice from Lessee in relation to such costs. For the purposes of this paragraph (d) only, references in that Schedule to "Maintenance Manual" shall be deemed to refer to the previous operator's maintenance manual.

If the Aircraft has been purchased from Lessee (or a Lessee Affiliate) and is to be leased back to Lessee, the provisions of this Section 2 shall not apply to the leasing of the Aircraft.

3.     **Indemnity**

Lessee is responsible for and will indemnify each Indemnitee against all Losses arising from death or injury to any observer, representative or any employee of Lessee in connection with the inspection of the Aircraft whether or not such Losses arise out of or are attributable to any act or omission, negligent or otherwise, of any Indemnitee.

**SCHEDULE 5**
**CERTIFICATE OF ACCEPTANCE**

This Certificate of Acceptance is delivered, on the date set out below by _____ ("**Lessee**") to _____ ("**Lessor**") pursuant to the Aircraft Lease Agreement dated _____ between Lessor and Lessee (the "**Lease**"). The capitalized terms used in this Certificate shall have the meaning given to such terms in this Lease unless otherwise indicated.

**DETAILS OF ACCEPTANCE**

Lessee hereby confirms to Lessor that Lessee has at [                    ] o'clock on this _____ day of _____, at _____ , technically accepted the following, in accordance with the provisions of this Lease:

Boeing 757-236 Aircraft, Manufacturer's Serial Number: 24121

Engines:

Engine Number                    Manufacturer's Serial Number

1.                                          ; and

2.                                          ; and

Fuel Status: _____ lbs; and

APU:  Manufacturer's Serial Number _____ ;

Loose Equipment Check List: in accordance with the list signed by Lessor and Lessee and attached hereto.

Aircraft Documents and Records: in accordance with the list signed by Lessor and Lessee and attached hereto.

**HOURS AND CYCLES DATA (as of Delivery Date)**

**Airframe:**

Date of accomplishment of last Airframe Structural Check:

Number of Flight Hours since last Airframe Structural Check:

Number of Cycles since last Airframe Structural Check:

"C" Check (or Equivalent)

Interval: _____ _____ Hours

Time Since: _____ _____ Hours

**Landing Gear Overhaul:**

Number of Cycles/Flight Hours Since Last Overhaul:

Left Gear: _____ Cycles since new

Date of accomplishment of last Overhaul: N/A first overhaul is at _____ Cycles

Right Gear: _____ Cycles since new

Date of accomplishment of last Overhaul: N/A first overhaul is at _____

Nose Gear: _____ Cycles since new

Date of accomplishment of last Overhaul: N/A first overhaul is at _____ Cycles

Interval:

Left Gear: _____ Cycles

Right Gear: _____ Cycles

Nose Gear: _____ Cycles

Centre Gear: N/A

**Engines:**

Number of Engine Flight Hours Since Last Engine Refurbishment:

S/N _____ : N/A Hours

S/N _____ : N/A Hours

Time (Engine Flight Hours) Since New:

S/N _____ : ____ Hours

S/N _____ : ____ Hours

Engine Cycles Since New:

S/N _____ : _____ Cycles

S/N _____ : _____ Cycles

Hot Section Inspection:

Interval: Not Hard timed – Time since last Engine Shop Visit

Time Since (S/N _____) : _____ Hours

**0**
**PRIMA CHARTER Draft**

Time Since (S/N _____) : _____ Hours

Time Remaining to First Restriction:

Engine S/N: Hours: _____   Restriction: _____

Cycles: _____   Restriction: High Pressure Compressor

Engine S/N:

Hours: _____   Restriction: _____

Cycles: _____   Restriction: High Pressure Compressor

Average Cycles in Life Limited Parts (see attached Schedule): _____

**Auxiliary Power Unit**:

Number of APU Hours since Last Heavy Shop Visit:

_____ hours   Date accomplished _____

Hot Section Inspection:

Interval: _____ Hours

Time Since: _____ Hours

**Interior Equipment:**

LOPA – _____ First Class/ _____ Economy

Emergency drawing – attached _____

Galley Equipment:

**ACCEPTANCE**:

Lessee hereby confirms that the Aircraft, Engines, Parts and Aircraft Documents and Records are technically acceptable to it, satisfy all of the Delivery Condition Requirements and are in the condition for delivery and acceptance as required under this Lease.

**IN WITNESS WHEREOF**, Lessee and Lessor have, by their duly authorised representative, executed this Certificate of Acceptance on the date in paragraph 1 above.

| **LESSEE: Prima Charters S.P. Z o o.** | **LESSOR: Alliance Continental Leasing LLC** |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |

5-3

## SCHEDULE 6
## PROCEDURES AND OPERATING CONDITION AT REDELIVERY

On the Return Occasion the Aircraft (subject to fair ordinary wear and tear of a kind and to an extent consistent with similar aircraft engaged in commercial airline operations) will be redelivered to Lessor by Lessee in accordance with the procedures, and in any event in the condition, set out below. For the avoidance of doubt, any damage assessment and/or rectification criteria used in assessing the redelivery condition shall be as prescribed in the Manufacturer's maintenance manual and/or the SRM, as appropriate. Any damage outside the scope of the SRM shall require Manufacturer recommendation and FAA 8110-3 certification or the equivalent certification by the civil aviation authority of the State of Design.

### 1.1    Final Inspection

Immediately prior to the Return Occasion, Lessee will make the Aircraft available to Lessor for inspection ("**Final Inspection**") in order to verify that the condition of the Aircraft complies with this Lease. The Final Inspection will include, and be long enough to permit Lessor to:

(a)    inspect the Aircraft Documents and Records;

(b)    inspect the Aircraft (including an examination of all compartments and bays and Lessee shall open or remove panels as reasonably required by Lessor or Owner), uninstalled Parts and the APU (including a complete video borescope inspection of the APU);

(c)    inspect the Engines, including (i) a complete video borescope inspection of (A) the low pressure and high pressure compressors and (B) turbine area, including combusters and (ii) engine condition runs (including full take-off power engine run-up undertaken in accordance with the performance test in the manufacturer's maintenance manual (with the Engines not exceeding corrected limits for all parameters using temperature corrected charts and power assurance runs); and

(d)    observe a two hour demonstration flight at Lessee's cost (with Lessor's and Owner's representatives as on-board observers).

Furthermore, Lessee acknowledges that a purchaser or the next operator of the Aircraft may need to inspect the Aircraft, the Engines and the Aircraft Documents and Records prior to redelivery and Lessee hereby agrees to cooperate reasonably at all times during the Term with Lessor, Owner and/or such purchaser or such next operator in order to coordinate, assist and grant access for such inspections and/or meetings as necessary

Lessor (or Owner as the case may be) is responsible for and will indemnify Lessee against all Losses arising from the death or injury to any observer or any employee of Lessor (or Owner) in connection with the inspection of the Aircraft under this Section 1.1 whether or not such Losses arise out of or are attributable to any act or omission, negligent or otherwise of Lessee.

## 1.2 General Condition

The Aircraft will:

(a) be thoroughly cleaned immediately prior to redelivery and will be in the same configuration as at Delivery subject to any post-Delivery modifications, repairs or maintenance to the Aircraft which are permitted or required by this Lease;

(b) have installed the full complement of equipment, parts, accessories, furnishings and loose equipment as when originally delivered to Lessee (and, in addition, shall include any post-Delivery modifications, repairs or maintenance which are required or permitted by this Lease) and as normally installed in the Aircraft for continued regular service and the Aircraft (including the Aircraft Documents and Records) shall be in a condition suitable for immediate operations under JAR-Ops 1 or FAR Part 121, without waiver or restriction; and if any of the engines or parts tendered for redelivery with the Aircraft is not one of the Engines or Parts referred to in the Certificate of Acceptance or a Replacement Engine installed pursuant to Section 8.11 (a) following an Engine Event of Loss in respect of an Engine, Lessor shall have no obligation to accept such engine or part unless Lessee furnishes to Lessor all the documents and evidence in respect of such engine or part in accordance with Section 8.11 (b), as if such engine were a Replacement Engine or such part were a replacement Part and otherwise complies with such Section 8.11(b) with respect thereto;

(c) have in existence a valid and effective certificate of airworthiness ( and if required by Lessor, a valid and effective certificate of airworthiness for export to the U.S.A.) with respect to the Aircraft issued by the Air Authority. In the case of an certificate of airworthiness for export such certificate shall not be issued any earlier than 10 days prior to the Return Occasion;

(d) comply with the Manufacturer's original specifications as at the Delivery Date, except as modified during the Term in accordance with the Manufacturer's service bulletins or letters, Airworthiness Directives, Air Authority approved data (all of which should have supporting State of Design approval) or otherwise as permitted or required by this Lease;

(e) have undergone, immediately prior to redelivery, the Redelivery Check so that all Airframe and structural inspections, including but not limited to CPCP inspections falling due within the "C" Check interval as defined in the Manufacturer's Maintenance Planning Document (if, and to the extent that, Lessee's Maintenance Programme does not comply with the requirements of the Manufacturer's Maintenance Planning Document), have been accomplished in accordance with Lessee's Maintenance Programme and the Manufacturer's Maintenance Planning Document. Lessee shall not utilise fleet sampling as a means to negate a requirement to accomplish structural inspection tasks on the Aircraft;

(f) have had accomplished all outstanding Airworthiness Directives affecting that model of Aircraft requiring compliance during the Term or within the AD Compliance Period; for this purpose, compliance shall be by terminating action if:

   (i) Lessee has complied by terminating action for other aircraft of the same model and series then operated by Lessee; or

   (ii) the latest date permitted by such Airworthiness Directive for required compliance by terminating action falls within the AD Compliance Period;

In no event shall there be any time extensions, waivers, deviations or alternative means of compliance with any Airworthiness Directives or other regulations that are non-transferable by Lessee;

(g)     have installed all applicable vendors' and manufacturers' service bulletin kits received free of charge by Lessee related to the Aircraft and to the extent not installed, those kits will be furnished free of charge to Lessor;

(h)     be freshly painted white, such painting to include the fuselage, empennage, wings, pylons, cowlings and flight controls which shall be re-placarded and painted in accordance with standard industry practice, including any required re-balancing of flight controls and required re-weighing or recalculation of the Aircraft or the Aircraft weight;

(i)      have all signs and decals clean, secure and legible;

(j)      meet the same noise standard as when delivered (e.g. if delivered compliant with Stage 3, then to be returned at least Stage 3 noise compliant) without waiver or restriction;

(k)     have no open, deferred, continued, carry over, or placarded maintenance items or watch items and all log book discrepancies shall be cleared;

(l)      have had all repairs and damage requiring repetitive inspections or future upgrading repaired to a permanent repair standard such that future repetitive inspections or upgrading shall not be required; and

(m)    have all its systems serviceable and fully operational for their intended functions in accordance with the Manufacturer's maintenance manual specifications.

## 1.3     Components

(a)     Each Flight Hour and Cycle controlled Hard Time Component (other than the APU itself – but including components of the APU) shall have not less than the Minimum Component Flight Hours and/or the Minimum Component Cycles (whichever is more restrictive) of life remaining to the next scheduled removal, in accordance with Lessee's Maintenance Programme (or the Manufacturer's Maintenance Planning Document to the extent that Lessee's Maintenance Programme does not comply with the Manufacturer's Maintenance Planning Document) and shall be supported by documentation certifying date of installation, TSO and CSO with a JAR Form 1 or FAA form 8130-3 or Air Authority equivalent; in this Section "Hard Time Component" means any component which has a limited on-wing life in accordance with Lessee's Maintenance Programme and which can have life fully restored through appropriate maintenance;

(b)     Each calendar-limited component including safety equipment will have not less than its Minimum Component Calendar Life remaining to the next scheduled removal in accordance with Lessee's Maintenance Programme or the Manufacturer's Maintenance Planning Document (to the extent that Lessee's Maintenance Programme does not comply with the Manufacturer's Maintenance Planning Document) and shall be supported by documentation indicating date of installation and by appropriate certification documentation indicating date of manufacture (where applicable) and date of overhaul in the form of JAA form 1 or FAA Form 8130-3 or Air Authority equivalent, as applicable;

(c)     Each "on-condition" and "condition-monitored" component will be serviceable and those components installed on the Aircraft within the last 24 months shall be supported by documentation certifying date of installation and authorised release certificate such as JAA Form 1 or FAA form 8130-3 or Air Authority equivalent;

(d)     The installed components as a group will have an average of total flight time since new of not more than that of the Airframe; and

(e)     Each Airframe Life-Limited Component will have not less than the Minimum Airframe Life Limited Component and the Minimum Airframe Life Limited Component Cycles remaining to next scheduled removal and will be supported by certification documentation necessary to demonstrate Back-To-Birth Traceability; for this purpose "Airframe Life-Limited Component" means a component with an ultimate life which cannot be restored through appropriate maintenance.

## 1.4    Engines

Each Engine will be installed on the Aircraft and comply with the following:

(a)     Each Engine will have not less than Minimum Engine Flight Hours and Minimum Engine Cycles expected life remaining to the next expected removal and the life limited Parts shall have not less than the Minimum Engine LLP Cycles release life remaining. The expected life remaining will be determined by the inspection and checks accomplished by Lessor in accordance with this Lease including the following:

    (i)     full borescope inspection;

    (ii)    analysis of trend data;

    (iii)   SLOATL assessment or minimum last 10 qualifying flights (excluding the first flight of the day);

    (iv)    maximum power assurance ground runs;

    (v)     technical log analysis for a minimum of the previous 3 months of operation;

    (vi)    previous shop visit assessment (if applicable);

all in accordance with Manufacturer's maintenance manual.

(b)     Following the demonstration flight provided for by Section 1.1(d) of this **Schedule 6**, each Engine shall have just completed at the Redelivery Location a complete video inspection of all Engine gas path modules, which inspection shall be performed at Lessor's expense and a power assurance run (performed at Lessee's expense) in accordance with Lessee's Maintenance Programme or Manufacturer's maintenance manual. Any defects discovered which exceed the Engine manufacturer's in-service limits shall be corrected at Lessee's expense. Lessee shall cause such borescope inspections to be performed and to be recorded on videotape by an agency selected by Lessor and shall provide Lessor with a copy of such videotape on the Return Occasion. No Engine shall be on "watch" for any reason requiring any special or out of sequence inspection. Each such Engine shall comply with the operations specification of Lessee without

waiver or exceptions. All items beyond the Engine manufacturer's in-service limits shall be repaired;

(c)     Each Engine Life-Limited Part will have not less than the Minimum Engine LLP Cycles remaining in accordance with the manufacturer's then current limitations for the part number in question, and will be supported by certification documentation necessary to demonstrate Back-To-Birth Traceability; for this purpose "Life Limited Part" means a component with an ultimate life which cannot be restored through appropriate maintenance approved by the State of Design of the manufacturer;

(d)     Each Engine will have not less than the Minimum Engine Cycles and the Minimum Engine Flight Hours before any defect, condition or restriction requires any inspection, testing, repair or replacement in accordance with the Engine manufacturer's maintenance manual limits;

(e)     Each Engine will be in a condition to operate at a maximum rated take-off power at sea level under corner point or flat rate conditions and with the Required EGT Margin; and

(f)     Each Engine shall be rated at the Engine Thrust Setting and all redelivery conditions of this Section 1.4 are based on such Engine Thrust Setting.

## 1.5     Fuselage, Windows and Doors

(a)     The fuselage will be free of dents and abrasions exceeding the limits specified in the Manufacturer's maintenance manual or SRM;

(b)     Cockpit windows will be free of delamination exceeding the limits specified in the Manufacturer's maintenance manual or SRM;

(c)     Cabin windows will be substantially free of blemishes and crazing and will be properly sealed;

(d)     Doors will be free moving, correctly rigged and be fitted with serviceable seals; and

(e)     Lessee will supply a dent and scratch survey with specific locations on the Return Occasion that encompasses all previously accomplished repairs and damage.

## 1.6     Wings and Empennage

Leading edges will be free from damage in excess of the limits specified in the Manufacturer's maintenance manual or SRM and unpainted surfaces will be polished.

## 1.7     Interior and Cockpit

Lessor may carry out the inspections contemplated by **Schedule 11** (Passenger Cabin Interior Standard). Lessee shall ensure that any replacements, repairs or repainting required in accordance with that Schedule (as at the Return Occasion) are effected at Lessee's cost. (For the purposes of this Section 1.7 only, references in that Schedule to "Maintenance Manual" shall be deemed to refer to Lessee's Maintenance Programme Manual)

## 1.8     Landing Gear; Wheels and Brakes

(a)     The Landing Gear and wheel wells will be clean, free of leaks and repaired as necessary;

(b)     Each installed Landing Gear shall have no more Cycles accumulated than the Airframe and, in any event, shall have not less than the Minimum Landing Gear Flight Hours and the Minimum Landing Gear Cycles and the Minimum Landing Gear Calendar Time to the next scheduled overhaul or removal, as the case may be, in accordance with the then current Manufacturer's Maintenance Planning Document; and

(c)     The wheels and brakes will have not less than half of their useful life remaining.

## 1.9     Return of APU

The APU shall have just completed a borescope inspection and shall meet all air outputs and temperature limitations under load in accordance with Lessee's Maintenance Programme and the Manufacturer's maintenance manual, and any defects discovered in such inspection, which exceed the APU manufacturer's in-service limits, shall be corrected at Lessee's expense. The APU shall not exceed the Minimum APU Limit.

## 1.10     Corrosion

(a)     The Aircraft shall be in compliance with the Manufacturer's CPCP requirements. All CPCP inspections which would normally be accomplished while access is provided during structural inspection in accordance with Lessee's Maintenance Programme during the Term shall have been accomplished;

(b)     The entire fuselage will be substantially free from corrosion and will be adequately treated in accordance with Lessee's corrosion prevention programme and the Manufacturer's Maintenance Planning Document; and

(c)     Fuel tanks will be free from contamination and corrosion and a tank treatment programme will be in effect during any period of storage.

## 1.11     Fuel

At redelivery, Lessor will pay to Lessee or Lessee will pay to Lessor (as the case may require) a cash adjustment in respect of the difference in fuel on board at Delivery versus redelivery, at the then prevailing cost of fuel at the Redelivery Location.

## 1.12     Maintenance Programme

(a)     Prior to the Return Occasion and upon Lessor's or Owner's request, Lessee will provide Lessor or Owner or its agent reasonable access to Lessee's Maintenance Programme and the Aircraft Documents and Records in order to facilitate the Aircraft's integration into any subsequent operator's fleet; and

(b)     Upon redelivery of the Aircraft, Lessee will, if requested by Lessor or Owner to do so, provide a certified true current and complete copy of Lessee's Maintenance Program to Lessor or Owner. Lessor and any Person to whom Lessor grants access to Lessee's Maintenance Programme shall agree that it will not disclose the contents of Lessee's Maintenance Programme to any other Person except to the extent necessary to monitor Lessee's compliance with this Lease and/or to bridge the maintenance programme for the Aircraft from Lessee's Maintenance Programme to another programme after the Return Occasion.

### 1.13    Aircraft Documents and Records

At redelivery Lessee will return the following Aircraft Documents and Records to Lessor:

### A.    Certificates

A001    Certificate of Airworthiness

A002    Certificate of Registration

A003    C of A for Export (if applicable)

A004    Noise Limitation Certificate (AFM page)

A007    Aircraft deregistration confirmation

A008    Burn Certificates – Cabin Interiors – as follows:

Certification of compliance with the fire blocking requirements as outlined in FAR / JAR Part 25 including:

- Seat cushions*

- Back rest cushions*

- Dress covers*

- Carpets

- Curtains

- Interior Surfaces (if refurbished)

\* Including "in combination" burn certification

### B.    Aircraft Maintenance Status Summaries

B001    Certified current Time in Service (Flight Hours and Cycles) and maintenance status

B002    Certified status of Airworthiness Directives ("ADs") including method of compliance

B003    Certified status of Service Bulletin ("SB") Status

B004    Certified status of SSI

B005    Certified status of CPCP (if applicable)

B006    Certified inventory of Hard Time Components (Fitted listing)

B007    Certified inventory of OC/CM Components (Fitted listing)

B008    Certified status of all non-SB and Major Modifications/STCs including acceptable State of Manufacture Certification

B009    Certified status of Check/Inspection History  and  Current Status of Checks

B010    List of Deferred Maintenance Items

B011    List of Out of Phase Checks, Special Requirements, Time Limited Repairs (if any).

B012    Aircraft Accident and Incident Report.

B013    Structural repairs and damage (including Dent and Buckle Chart).

## C.    Aircraft Maintenance Records

C001    Technical Logs (Minimum of 2 years)

C002    A Checks - Last complete cycle of A Checks (or equivalent)

C003    "C" Checks - Last Complete cycle of "C" Checks (or equivalent)

C004    All Major Checks

C005    CPCP Tasks (if applicable)

C006    Periodic Tasks

C007    Dirty Finger Print Certification – ADs

C008    Dirty Finger Print Certification – SBs

C009    Dirty Finger Print Certification – All other modification

C010    Last Weight Report including Schedule

C011    Compass Swing Report

C012    Last Test Flight Report

C013    Certified ETOPS compliance report (if applicable) (not applicable)

C014    Dirty Finger Print certification - All Structural repairs/structural damage

C015    Details of State of Manufacture certification basis – All non-SRM Structural repairs

C016    Aircraft Log Book(s) if applicable

## D.    Configuration Status

D001    Approved and certified LOPA

D002    Galley Drawings/Component OHM

6-8

D003    Emergency Equipment Drawing/Listing

D004    Loose Equipment Inventory

D005    Inventory Listing of Avionic installed Units.

**E.    Aircraft Historical Records**

E001    C of A (Export) from State of Manufacture

E002    Manufacturer's AD Report

E003    Manufacturer's Inspection Report, Initial Equipment list

E004    Manufacturer's repair/alteration report

E005    Manufacturer's SB Report

E006    Service Difficulty Reports (if any)

E007    Aircraft Historical Log

E008    Last Flight Data Recorder Read-Out and Corrections

E009    Weighing report

**F.    Engine Records**

F001    Certified Statement of Status of Each Engine

F002    AD Compliance Report and Compliance Documents                          .

F003    Manufacturer's Modifications and SB Status

F004    In-house Modifications (if applicable)

F005    Certified Life Limited Part ("**LLP**") Listing

F006    Certified listing of installed units

F007    Manufacturer Delivery Document

F008    Complete copies of all historical engine/module Shop Visit Reports

F009    State of Manufacture LLP Traceability

F010    Conditioning Monitoring Report

F011    Engine Log Book/Master Records of Installation/Removals

F012    Last Borescope Report, including video if available

F013    Test Cell Run Report

F014    Last On-Wing Ground Run

F015    Certified Statement that Engines are not involved in an Accident

F016    Approved Release to Service Certification for installed rotables

F017    Approved ETOPS compliance report (if applicable)

**G.    APU**

G001    Certified Statement on Status of APU (if applicable)

G002    Certified SB Compliance Report/AD Status Report

G003    Approved Release to Service Certification for installed units

G004    APU Log Book/Master Record of Installation/Removals

G005    Complete copies of all APU Shop Visit Reports and Reason for Removal

G006    Statement of APU Hours to Aircraft Flying Hours

G007    LLP Status and Full Traceability to birth

G008    APU Borescope Report

G009    Last On-Wing/Health Check Data sheets (if applicable)

G010    Last Test Cell Run

G011    Approved ETOPS compliance report

**H.    Component Records**

H001    Approved Release to Service Certification for Hard Time Components

H002    Approved Release to Service Certification for OC/CM Components

**I.    Landing Gear**

I001    Approved Release to Service Certification for major assemblies on each Gear

I002    Approved LLP Listings for each Gear (with full Back-To-Birth Traceability)

I003    Last Shop Visit Report (Overhaul)

**J.    Manuals**

All Manufacturer's Manuals delivered with the Aircraft under this Lease updated to the latest revision standard (applicable as at the Return Occasion) as may be reasonably requested by Lessor

**Microfilm: CD-Rom**

J001    WDM

J002    IPC

J003    Maintenance Manual

J004    Schematics Not Available

J005    Hook Up Listing Not Available

**K.      Miscellaneous**

K001    Maintenance Programme Specifications (Operator's)

K002    Reference Material for Interpretation of Status Summaries, or cross-reference for Part Numbers

## SCHEDULE 7
## INSURANCE REQUIREMENTS

### 1.1    Types of Insurance

The Insurance required to be maintained are as follows:

(a)    **Hull All Risks** of loss or damage while flying and on the ground with respect to the Aircraft on an agreed value basis for the Agreed Value and with a deductible not exceeding the Deductible Amount, or such other amount agreed by Lessor from time to time;

(b)    **Hull War and Allied Perils**, being such risks excluded from the Hull All Risks Policy to the fullest extent available from the leading international insurance markets, including confiscation and requisition by the State of Registry for the Agreed Value;

(c)    **All Risks (including War and Allied Risk** except when on the ground or in transit other than by air) property insurance on all Engines and Parts when not installed on the Aircraft on an "agreed value" basis for their full replacement value and including engine test and running risks;

(d)    **Aircraft Third Party, Property Damage, Passenger, Baggage, Cargo and Mail and Airline General Third Party (including Products) Legal Liability** for a combined single limit (bodily injury/property damage) of an amount not less than the Minimum Liability Coverage for the time being for any one occurrence (but in respect of products and personal injury liability, this limit may be an aggregate limit for any and all losses occurring during the currency of the policy).    War and Allied Risks cover is to be maintained from leading international insurance markets in the scope provided by AVN 52D as in effect on the date of this Common Terms Agreement and shall be for an amount not less than the greater of (i) the Minimum Liability Coverage and (ii) the amount carried by Lessee in respect of similar aircraft owned or otherwise operated by Lessee

### 1.2    Terms of Hull and Spares Insurance

All required hull and spares insurance, so far as it relates to the Aircraft, will:

(a)    **Additional Insureds**: name Lessor, any intermediate lessor (if any), and Owner and their respective successors and assigns as additional insureds for their respective rights and interests;

(b)    **Settlement of Losses**: provide that any loss will be settled jointly with Lessor and Lessee, and will be payable in Dollars to Lessor, for the account of all interests;

(c)    **50/50 Provision**: if separate Hull "all risks" and "war risks" insurance are arranged, include a 50/50 provision in accordance with market practice (AVS. 103 is the current London market language);

(d)    **No Option to Replace**: confirm that the insurers are not entitled to replace the Aircraft in the event of an insured Event of Loss.

7-1

## 1.3    Terms of Liability Insurance

All required liability insurance will:

(a)    **Additional Insureds**: include each Indemnitee, as additional insureds for its respective rights and interests, warranted, each as to itself only, no operational interest;

(b)    **Severability**: include a severability of interests clause which provides that the insurance, except for the limit of liability, will operate to give each insured the same protection as if there was a separate policy issued to each insured; and

(c)    **Primary Policy**: contain a provision confirming that the policy is primary without right of contribution and the liability of the insurers will not be affected by any other insurance of which Lessor, each Indemnitee or Lessee have the benefit so as to reduce the amount payable to the additional insureds under such policies.

## 1.4    Terms of All Insurance

All Insurance will:

(a)    **Best Industry Practice**: be in accordance with best industry practice of persons operating similar aircraft in similar circumstances;

(b)    **Dollars**: provide cover denominated in Dollars and any other currencies that Lessor may reasonably require in relation to liability insurance;

(c)    **Worldwide**: operate on a worldwide basis subject to such limitations and exclusions as Lessor may agree;

(d)    **Breach of Warranty**: provide that, in relation to the interests of each of the additional assureds, the Insurance will not be invalidated by any act or omission by Lessee, or any other person other than the respective additional assureds seeking protection and shall insure the interests of each of the additional assureds regardless of any breach or violation by Lessee, or any other person other than the respective additional assured seeking protection of any warranty, declaration or condition, contained in such Insurance;

(e)    **Subrogation**: provide that the insurers will hold harmless and waive any rights of recourse or subrogation against the additional insureds. Upon indemnification of an additional insured under the Insurance, the insurers may, with the consent of such additional insured (such consent not to be unreasonably withheld) exercise subrogation rights;

(f)    **Premiums**: provide that the additional insureds will have no obligation or responsibility for the payment of any premiums due (but reserve the right to pay the same should any of them elect so to do) and that the insurers will not exercise any right of set-off or counter-claim in respect of any premium due against the respective interests of the additional insureds other than outstanding premiums relating to the Aircraft, any Engine or Part the subject of the relevant claim;

(g)    **Cancellation/Change**: provide that the Insurance will continue unaltered for the benefit of the additional insureds for at least 30 days after written notice by registered mail or

7-2

receipted fax transmission of any cancellation, change, event of non-payment of premium or instalment thereof has been sent by insurer(s) to Lessor, or where an insurance broker is appointed to the insurance broker who shall promptly send on such notice to Lessor, except in the case of war risks for which 7 days (or such lesser period as is or may be customarily available in respect of war risks or allied perils) will be given, or in the case of war between the 5 great powers or nuclear peril for which termination is automatic;

(h)     **Reinsurance**: if reinsurance is required for the Insurance to be acceptable under this Lease, including without limitation, the requirements of Section 9 and **Schedule 7**, such reinsurance will:

   (i)      be on the same terms as the original insurance and will include the provisions of this Schedule;

   (ii)     provide that notwithstanding any bankruptcy, insolvency, liquidation, dissolution or similar proceedings of or affecting the reinsured that the reinsurers' liability will be to make such payments as would have fallen due under the relevant policy of reinsurance if the reinsured had (immediately before such bankruptcy, insolvency, liquidation, dissolution or similar proceedings) discharged its obligations in full under the original insurance policies in respect of which the then relevant policy of reinsurance has been effected; and

   (iii)    contain a "cut-through" clause in the following form (or otherwise satisfactory to Lessor):

"The Reinsurers and the Reinsured hereby mutually agree that in the event of any claim arising under the reinsurance in respect of a total loss or other claim where as provided by the Aircraft Lease Agreement dated August,____ 2007   and made between Alliance Continental Leasing LLC and PRIMA CHARTER such claim is to be paid to the person named as sole loss payee under the primary insurance, the Reinsurers will in lieu of payment to the Reinsured, its successors in interest and assigns pay to the person named as sole loss payee under the primary insurance effected by the Reinsured that portion of any loss due for which the Reinsurers would otherwise be liable to pay the Reinsured (subject to proof of loss), it being understood and agreed that any such payment by the Reinsurers will (to the extent of such payment) fully discharge and release the Reinsurers from any and all further liability in connection therewith"; subject to such provisions not contravening any Law of the State of Incorporation; and

(i)     **Initiating Claims**: contain a provision entitling any Indemnitee to initiate a claim under any policy in the event of the refusal or failure of Lessee to do so; and

(j)     **Indemnities**: accept and insure the indemnity provisions of this Lease to the extent of the risks covered by the policies.

## 1.5     Deductibles

Lessee shall be responsible for any and all deductibles under the Insurance.

## 1.6     Application of Insurance Proceeds

The Insurance will be endorsed to provide for payment of proceeds as follows:

7-3

(a)    **Event of Loss**: all insurance payments received as the result of an Event of Loss occurring during the Term will be paid to Lessor, who will pay the balance of those amounts to Lessee after deduction of all amounts which may be or become payable by Lessee to Lessor under this Lease and the Other Agreements (including under Section 11.1(b));

(b)    **Exceeding Damage Notification Threshold**: all insurance proceeds related to any property, damage or loss to the Aircraft, any Engine or any Part occurring during the Term not constituting an Event of Loss and in excess of the Damage Notification Threshold will be paid to Lessor and applied in payment (or to reimburse Lessee) for repairs or replacement property upon Lessor being satisfied that the repairs or replacement have been effected in accordance with this Lease. Any balance remaining may be retained by Lessor;

(c)    **Below Damage Notification Threshold**: insurance proceeds in amounts below the Damage Notification Threshold may be paid by the insurer directly to Lessee;

(d)    **Liability Proceeds**: all insurance proceeds in respect of third party liability will, except to the extent paid by the insurers to the relevant third party, be paid to Lessor to be paid directly in satisfaction of the relevant liability or to Lessee in reimbursement of any payment so made; and

(e)    **Default**: notwithstanding the foregoing paragraphs, if at the time of the payment of any such insurance proceeds a Default has occurred and is continuing, all such proceeds will be paid to or retained by Lessor to be applied toward payment of any amounts which may be or become payable by Lessee in such order as Lessor may elect.

To the extent that insurance proceeds are paid to Lessee, Lessee agrees to comply with the foregoing provisions and apply or pay over such proceeds as so required, holding them in trust in the meantime.

## 1.7    **Government Support.**

(a)    Lessor temporarily waives the requirement of this Agreement to maintain third party war risks and allied perils legal liability insurance with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, but such waiver shall be effective only to the extent and for so long as (w) the Government of United States of America provides to Lessee the Government Indemnity (as defined below) with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, in form reasonably acceptable to Lessor, against the scope of risks covered under London Form AVN52C as it existed on September 1, 2001, (x) the amount of coverage under the Government Indemnity against such risks with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, when added to the amount of insurance against such risks maintained by Lessee in accordance with AVN52D or equivalent endorsements, with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, shall be at least equal to the amount of such insurance against such risks that would be required by this Agreement in the absence of this waiver, (y) the insurance maintained by Lessee against such risks with respect to the Aircraft, the Airframe and the Engines and other related equipment and components otherwise complies with the provisions of this Agreement; and (z) prior to any termination of, or reduction in the scope of risks covered by, or reduction in the

7-4

amounts of coverage under, the Government Indemnity, Lessee provides to Lessor insurance certificates in form reasonably acceptable to Lessor demonstrating compliance with the requirements of this Agreement.  Solely for purposes of section (w) of the preceding sentence, Lessor confirms that the Government Indemnity constitutes an indemnity reasonably acceptable to Lessor, but only if and for so long as the Government Indemnity remains in force and either:

    (i)     In accordance with the availability on commercially reasonable terms of the insurance product described in such Schedule (it being understood that any such variation shall be reasonably acceptable to Lessor and shall not modify the other requirements of this Agreement or Lessee's obligation to comply therewith); or

    (ii)    a declaration, reasonably acceptable to Lessor, on behalf of the Government of the United States of America, as contemplated by the definition of "commercially available" in the Schedule to the Government Indemnity remains in effect unvaried (except as to the amount).

(b)     For the purposes of this Section 1.7 **"Government Indemnity"** means for the purposes of declaring the definition of "commercially available" respecting aviation war risk liability coverage.

## 1.8    Confiscation by State of Registry.

Lessor temporarily waives the requirement of this Agreement to maintain cover for confiscation and requisition by the State of Registry, but only if and for so long as the Aircraft remains registered in _____ and such cover is not available at commercially reasonable premium rates, in the opinion of Lessor acting reasonably.

## SCHEDULE 8
## FORM OF LEGAL OPINION

**[Insert]**

8-1

## SCHEDULE 9
## EVENTS OF DEFAULT

Each of the following events or conditions constitutes an Event of Default:

(a)     **Non-payment**: Lessee fails to make any payment under this Lease on the due date;

(b)     **Insurance**: Lessee fails to comply with any provision of Section 9 or **Schedule 7**, or any insurance required to be maintained under this Lease is cancelled or terminated, or a notice of cancellation is given in respect of any such insurance;

(c)     **Breach**: Lessee fails to comply with any other provision of this Lease not referenced in this **Schedule 9** and, if such failure is in the opinion of Lessor capable of remedy, the failure continues for 10 days after written notice from Lessor to Lessee;

(d)     **Representation**: any representation or warranty made (or deemed to be repeated) by Lessee in or pursuant to this Lease or in any document or certificate or statement is or proves to have been incorrect in any material respect when made or deemed to be repeated;

(e)     **Cross-Default**:

(i)     any Financial Indebtedness of Lessee or any Lessee Affiliate is not paid when due;

(ii)    any such Financial Indebtedness becomes due or capable of being declared due prior to the date when it would otherwise have become due;

(iii)   the security for any such Financial Indebtedness becomes enforceable; or

(iv)    any event of default or termination event, howsoever described, occurs under any Other Agreement or any lease, hire purchase, conditional sale or credit sale agreement of Lessee or any Lessee Affiliate.

(f)     **Approvals**: any consent, authorisation, license, certificate or approval of or registration with or declaration to any Government Entity in connection with this Lease, including:

(i)     any authorisation required by Lessee to obtain and transfer freely Dollars (or any other relevant currency) out of any relevant country;

(ii)    any authorisation required by Lessee to authorise, or in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of this Lease or the performance by Lessee of its obligations under this Lease;

(iii)   the registration of the Aircraft or the Aircraft's certificate of airworthiness; or

(iv)    any airline license or air transport license required by Lessee;

is modified in a manner unacceptable to Lessor or is withheld, or is revoked, suspended, cancelled, withdrawn, terminated or not renewed, or otherwise ceases to be in full force;

9-1

(g)    **Insolvency**:

Lessee or any Lessee Affiliate is or becomes Insolvent;

(h)    **Disposal**: Lessee or any Lessee Affiliate disposes, conveys or transfers or threatens to dispose, convey or transfer all or a material part of its assets (other than a disposal or transfer in the ordinary course of business for full commercial value) and, in Lessor's reasonable opinion, such disposal, conveyance or transfer has or is likely to have a material adverse effect on Lessee's ability to perform its obligations under this Lease or Lessee or any Lessee Affiliate, liquidates or dissolves or consolidates or merges with any other Person (whether by one or a series of transactions, related or not) and in the case of a Lessee Affiliate, such liquidation, dissolution, consolidation or merger has or is likely to have, in Lessor's reasonable opinion, a material adverse effect on Lessee's ability to perform its obligations under this Lease;

(i)    **Rights and Remedies**: Lessee or any other Person claiming by or through Lessee challenges the existence, validity, enforceability or priority of the rights of Lessor as lessor or of Owner as owner or the Financing Parties as financing parties in respect of the Aircraft;

(j)    **Change of Control**: any single person, or group of persons acquires control of Lessee without the previous consent in writing of Lessor;

(k)    **Delivery**: Lessee fails to comply with its obligation under Section 4 to accept delivery of the Aircraft and/or fails to fulfil the Conditions Precedent to delivery of the Aircraft within the time periods allowed;

(l)    **Adverse Change**: any event or series of events occurs which, in the reasonable opinion of Lessor, might have a material adverse effect on the financial condition or operations of Lessee or Lessee Affiliates or on the ability of Lessee to comply with its obligations under this Lease or, if applicable, on the ability of Guarantor to comply with its obligations under the Guarantee;

(m)    **Guarantee**: If a Guarantee is required under this Lease,

(i)    any representation or warranty made by Guarantor is or proves to have been incorrect in any material respect when made or deemed to be repeated or Guarantor fails to make any payment or comply with any other obligation under the Guarantee when due;

(ii)    the Guarantee ceases to be in full force or, for any reason, ceases to be the legal, valid and binding obligation of Guarantor; or

(iii)    any of the events listed in paragraphs (f) or (g) above occurs in respect of Guarantor (and for purposes of this paragraph(s), references in those paragraphs to Lessee shall be deemed to be references to Guarantor);

(n)    **Redelivery**: Lessee fails to return the Aircraft to Lessor on the Expiry Date in accordance with Section 12;

(o)    **Eurocontrol**: Eurocontrol (or any authority on their behalf) or any other authority notifies Lessor or Owner that there are Eurocontrol charges or other navigation, landing, airport or similar charges due from Lessee, and such charges remain outstanding for a period of 30 days from the date of such notice; provided that (i) no Event of Default shall arise under this paragraph (p) for so long as such charges are being contested in good faith and by appropriate proceedings, an adequate bond has been provided and such proceedings do not involve any danger of the seizure, detention, interference with use or operation or sale, forfeiture or loss of the Aircraft; and (ii) such 30 day period shall not apply if there is any risk of seizure, detention, interference with use or operation or sale, forfeiture or loss of the Aircraft;

(o)    **Litigation**: a judgment of a court for the payment of money in an amount equal to $250,000 or more is rendered against Lessee and the same remains unpaid for a period of 30 days, unless during such period, execution of such judgment shall have been effectively stayed by agreement of the parties involved or by court order or such judgment shall have been adequately bonded;

(p)    **Unlawful**: it is or becomes unlawful for Lessee to perform any of its obligations under this Lease, or this Lease is or becomes wholly or partly invalid or unenforceable; or

(q)    **Suspension of Payments**: Lessee announces generally or advises Lessor that Lessee (i) is declaring a moratorium on or suspension of any payments in respect of its Financial Indebtedness or aircraft or engine lease obligations or (ii) does not intend to pay all or any portion of a payment of Rent that is not yet due or which has become due but in respect of which the cure period has not expired under this Lease or of any rent or other amount payable under any Other Agreement that is not yet due or which has become due but in respect of which any applicable cure period has not expired under such Other Agreement. This Event of Default shall not in any way limit any and all rights or remedies otherwise available to Lessor under applicable Law in respect of any repudiation by Lessee of this Lease, or notification or declaration by Lessee that it does not intend to perform any or all of its obligations under this Lease.

## SCHEDULE 10
## FORM OF POWER OF ATTORNEY

This irrevocable Power of Attorney is issued on _____ 2007 by _____ ("**Company**") in favour of _____ ("**Lessor**") in part consideration and as a precondition and security for, the lease to the Company of the Aircraft described below, by Alliance Continental Leasing, LLC.

**Aircraft**: Boeing B757-222 **serial number(s)**: 0

Accordingly and by way of security, the Company hereby IRREVOCABLY APPOINTS severally any and each Vice President of Alliance Continental Leasing, LLC from time to time as its true and lawful attorney (each an "**Attorney**") to sign, execute and to do and perform for the Company and in its name or otherwise to deliver any documents, instruments or certificates with such amendments thereto (if any) which the Company could do in connection with the Aircraft.

In particular, but without limitation, any such Attorney may:

- obtain deregistration of the Aircraft from its register of aircraft maintained by the applicable aviation authority;

- complete any documentation for and take any steps to export the Aircraft; and

- obtain from any aviation authority (including Eurocontrol) and/or any airport and government department, details of any amounts due from the Company whether related to the Aircraft or any other aircraft operated by the Company;

and generally, any Attorney may do all acts and things, execute, file and deliver all documents (under seal or under hand, as apt) as may be requested or required to give effect to (or incidental to or in furtherance of) the above.

Each Attorney has full power and authority to substitute and appoint in his/her place another person to exercise as attorney of the Company any or all the powers and authorities hereby conferred and to revoke any such appointment from time to time and to substitute or appoint any other in the place of such attorney as the Attorney concerned shall from time to time think fit.

The Company undertakes from time to time and at all times to (a) indemnify each Attorney against all costs, claims, expenses and liabilities howsoever incurred by each Attorney in connection herewith and (b) ratify and confirm whatsoever the Attorney shall lawfully do or cause to be done by virtue of this Power of Attorney.

This Power of Attorney is governed by the laws of the State of Delaware.

**LESSOR:**

By _____
Name:
Title:

10-1                                                                          _____ 0

## SCHEDULE 11
## PASSENGER CABIN INTERIOR STANDARD

### Introduction

The maintenance, repair and component manual requirements of the relevant manufacturer must be complied with at all times in respect of any repairs, replacements or repainting undertaken in the cabin interior of the Aircraft. Any repairs incorporated outside of those already approved in such manuals must have the approval of the relevant manufacturer and regulatory authority prior to the release of the Aircraft from the relevant maintenance facility.

Repairs to cabin interior decorative finishes (including seat tables) which do not restore the surface finish to an acceptable standard requires replacement of the specific item.

The adherence to the FAR / JAR material flammability requirements must be maintained at all times.

### A. FLIGHT DECK

| 01 | Lining/Instrument Panels | Inspect all flight deck panels and carry out necessary repairs in accordance with the manufacturer's maintenance manual (the "**Maintenance Manual**"). |
|----|--------------------------|---------------------------------------------------------------------------------------------------|
| 02 | Seat Inspection | Carry out detailed visual inspection of flight deck seat structure, harness, fittings, linings, and coverings. Carry out detailed visual inspection of the flight deck seat rails Carry out a seat operational check in accordance with the Maintenance Manual. |
| 03 | Seat Repair | Carry out flight deck seat repairs in accordance with the Component Maintenance Manual. Replace worn seat covers/damaged foams. |
| 04 | Seat Painting | Following any required repainting ensure paint condition is to a uniform shading standard. |
| 05 | Footrest Anti-Slip Cover Replacement | Renew anti-slip protection on pilot and co-pilot footrests/rudder pedals (as applicable). |
| 06 | Floor Covering | Inspect floor covering and replace worn/torn/stained segments. |
| 07 | Door Inspection | Carry out detailed visual inspection of the flight deck door.  Check for cracks, missing or damaged Parts. Check for correct door operation and locking function. |
| 08 | Door Repair | Carry out all required repairs in accordance with the Maintenance Manual. |
| 09 | Flight Deck Area Paint | Inspect the paint condition of the following: : All lining panels : Instrument panels : CB panels : Door. Following any required repainting, ensure paint condition is to a uniform shading standard. |

## B. ENTRANCE AREAS

| 01 | Door/Frame Lining Inspection | Carry out a detailed visual inspection of door and doorframe linings. Check for cracks, missing or damaged Parts. Pay particular attention to the door and door lining pressure seals. |
|----|------------------------------|----------------------------------------------------------------------|
| 02 | Door/Frame Lining Repair | Repair or replace damaged or missing parts in accordance with the Maintenance Manual |
| 03 | Door/Frame Lining Painting | Inspect paint condition of all lining panels. Following any required repainting ensure paint condition is to a uniform shading standard. Replace damaged placards. |
| 04 | Doorframe Structure Painting | Prepare and repaint doorframe structure from all exits. |
| 05 | Entrance Area Ceiling Panel Inspection | Carry out a detailed visual inspection of entrance area ceiling panels. Check for cracks, missing or damaged Parts. |
| 06 | Entrance Area Ceiling Panel Repair | Carry out repair or replacement of damaged or missing Parts in accordance with the Maintenance Manual. |
| 07 | Entrance Area Ceiling Panel Painting | Inspect paint condition of all ceiling panel outer surfaces. Following any required repainting ensure paint condition is to a uniform shading standard. |
| 08 | Entrance Area Floor Coverings | Carry out a detailed visual inspection of entrance area floor coverings. Replace damaged, worn and stained segments. |
| 09 | Fwd Airstairs (As Applicable) | Replace worn stairway anti slip material. |
| 10 | Ventral Stairway Tunnel Inspection (DC-9/MD80 series/ B727 aircraft only) | Carry out a detailed visual inspection of the ventral stairway lining panels for damaged and missing Parts. |
| 11 | Ventral Stairway Tunnel Repair (DC-9/MD80 series/ B727 aircraft only) | Carry out all required repairs according to the Maintenance Manual. Replace worn stairway anti slip material. |
| 12 | Ventral Stairway Tunnel Painting (DC-9/MD80 series/ B727 aircraft only) | Inspect paint condition of all panel outer surfaces. Following any required repainting ensure paint condition is to a uniform shading standard. |

## C. SEATS

| 01 | Attendant Seats Inspection | Carry out a detailed visual inspection of the attendant seats for: :Structure : Structural attachments : Lining / Fairing panels : Foams : Dress covers : Seatbelts. |
|----|-----------------------------|----------------------------------------------------------------------|
| 02 | Attendant Seats Repair | Carry out all required repairs in accordance with the Component Maintenance Manual. Replace worn seat covers/damaged foams. Ensure fire blocking labels on cushion and seat backs are present and |

11-2

| | | in good legible condition. |
|---|---|---|
| 03 | Attendant Seats Structure/Lining Panel Painting | Inspect paint condition of seat structure/lining surfaces. Following any required repainting, ensure paint condition is to a uniform shading standard. |
| 04 | Passenger    Seats Inspection | Carry out a detailed visual inspection of the passenger seats: : Structure/Structural attachments : Lining/Fairing panels/Armrest caps : Foams/Dress covers : Seatbelts : Ashtrays/Ashtray Blanking caps (as applicable) : Ensure seatback break overload within recommended limits : Seatbacks locked out bordering the overwing exits access aisles |
| 05 | Passenger Seats Tray Tables Hinged, In-arm and Plug-In (As Applicable) | Carry out a detailed visual inspection of the passenger seat tray tables: : Cracked surfaces/Stains/Damaged trim/Disbonding : Secure hinge arms/No excessive side play/Freedom of movement : Positive locking in the stowed position : Table level horizontally in the down position. |
| 06 | Passenger Seats Repair | Carry out all required repairs in accordance with the Component Maintenance Manual. Replace worn seat covers/damaged foams. Ensure fire blocking labels on cushion and seat backs are present and in good legible condition. |
| 07 | Passenger Seats Structure/Lining Panel Painting | Inspect paint condition of seat structure/lining surfaces. Following any required repainting ensure paint condition is to a uniform shading standard. |

## D. GALLEYS AND STOWAGE UNITS

| 01 | Galley Inspection | Carry out a detailed visual inspection of galley and stowage compartments for: : Structural integrity : Corrosion – particularly of floor attachment fittings (If accessible) : Contamination : Missing or damaged Parts : Perform an operational test on all doors, spring flaps, guides, latches and worktop lights in accordance with the Component Maintenance Manual. |
|---|---|---|
| 02 | Galley Wall Laminate Bulkhead Covering Inspection (As Applicable) | Carry out a detailed visual inspection of the galley and stowage compartment laminates and bulkhead covering for: : Cracking : Scratches/Disbonding/Discoloration/Stains : Tearing of Material covering. |
| 03 | Galley Repair | Carry out repairs. Replace or renew damaged or missing Parts. All work to be performed in accordance with the Component Maintenance Manual. |
| 04 | Galley Painting | Inspect paint condition of galley surfaces. Following any required repainting ensure paint condition is to a uniform shading standard. |

11-3

| 05 | Galley Ovens - Deep Cleaning | Carry out deep cleaning of all galley ovens and oven inserts |
|----|------------------------------|--------------------------------------------------------------|
| 06 | Galley Ovens/Coffee Makers/Water Boilers | Carry out a detailed visual inspection of these installations and ensure all units are fully operational per the Maintenance Manual. |
| 07 | Galley Floor Coverings | Carry out a detailed visual inspection of galley area floor coverings. Replace damaged, worn and stained segments. |

## E. LAVATORIES

| 01 | Lavatory Inspection | Carry out a detailed visual inspection of all lavatories for: <br> : Structural integrity <br> : Corrosion – particularly of floor attachment fittings (if accessible) <br> : Contamination <br> : Missing or damaged Parts <br> : Proper sealing of all waste bin compartments <br> : Perform an operational test on all doors and waste bin <br> : compartment spring flaps for correct operation and locking in accordance with the Component Maintenance Manual. |
|----|---------------------|--------------------------------------------------------------|
| 02 | Lavatory – Bulkheads Ceiling Panels Sink Unit Panels Toilet Unit Fairing Panels | Carry out a detailed visual inspection of the lavatory bulkheads and panel coverings for: <br> : Cracking <br> : Scratches <br> : Disbonding <br> : Discoloration/Stains <br> : Tearing of Material covering. |
| 03 | Lavatory Floor Pan /Floor covering (As Applicable) | Carry out a detailed visual inspection of the lavatory floor pan / floor covering for satisfactory condition. Replace/repair as applicable. |
| 04 | Lavatory Mirrors | Carry out a detailed visual inspection of the lavatory mirrors for: <br> : Cracking <br> : Scratches <br> : Disbonding <br> : Discoloration. |
| 05 | Lavatory Repair | Carry out repair or replacement of damaged or missing Parts in accordance with the Component Maintenance Manual. |
| 06 | Lavatory Painting | Following any required repainting ensure paint condition is to a uniform shading standard. |
| 07 | Lavatory Lights and Return to Seat Indication | Carry out an operational check on all lavatory lights. Ensure Return to Seat indication lettering is complete, illuminating properly. |
| 08 | Toilet and Washbasin Bowls | Ensure washbasin and toilet bowl surfaces are clean and free of damage. Polished surfaces should be free of discoloration. |

## F. PASSENGER CABIN LININGS AND FURNISHINGS

| 01 | Sidewall Panel Inspection | Carry out a detailed visual inspection of the cabin sidewall panels for: |
|----|---------------------------|--------------------------------------------------------------|

11-4

| | | |
|---|---|---|
| | | : Cracked surfaces |
| | | : Damaged parts |
| | | : Surface discoloration |
| | | : Cleanliness |
| | | : Lower sidewall covering material for torn and worn areas. |
| 02 | Sidewall Panel - Window Pane And Scratch Panel | Carry out a detailed visual inspection of the window panes and scratch panels for: : Scratches : Loss of ultraviolet protection film (If applicable) Thoroughly clean inner pane and scratch panel. |
| 03 | Sidewall Panel - Window Sun Blinds | Carry out a detailed visual inspection of the window sun blinds for:- : Creasing : Torn surfaces : Cleanliness and discoloration : Check blind operation for full and free movement. |
| 04 | Sidewall Panel Repair | Carry out repair or replacement of damaged or missing Parts in accordance with the Maintenance Manual. |
| 05 | Floor Level Air Inlet Grill | Carry out a detailed visual inspection of all grills for damage and security. Repair / Replace damaged Parts. |
| 06 | Ceiling Panel Inspection | Carry out a detailed visual inspection of all ceiling panels for: : Damaged or missing Parts : Discoloration : Paint condition. |
| 07 | Ceiling Panel Repair | Carry out repair or replacement of damaged or missing Parts in accordance with the Maintenance Manual. |
| 08 | Ceiling Panel Painting | Following any required repainting ensure paint condition is to a uniform shading standard. |
| 09 | Floor Carpet Inspection | Carry out a detailed visual inspection of all floor carpets for: : Stains : Tearing : Worn Areas : Proper Fit : Uniform Shading. Ensure Landing Gear lock inspection cut-out panels are properly located and identified (if applicable). |
| 10 | Cabin Ceiling and Sidewall Lights | Carry out a detailed visual inspection of the ceiling and sidewall light covers for evidence of burn marks and discoloration. Ensure that all lights are operating correctly and that all florescent tubes are of the same colour (light intensity). |

## G. OVERHEAD BINS

| | | |
|---|---|---|
| 01 | Bin Inspection | Carry out a detailed visual inspection of the overhead bin interior and exterior structure for the following: : Cracked/torn surfaces : Missing/damaged Parts : Surface discoloration : Paint condition |

|    |                                              | : Cleanliness.                                                                                                                                                                                                                              |
|----|----------------------------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 02 | Bin Door Inspection                          | Carry out a detailed visual inspection of the overhead bin doors for the following:- <br> : Cracked/torn surfaces <br> : Surface distortion <br> : Missing/damaged Parts <br> : Surface discoloration <br> : Paint condition <br> : Cleanliness. |
| 03 | Bin Door Operation                           | Perform an operational check on the overhead bin doors for the following: <br> : Correct fit <br> : Positive damper snubbing <br> : Positive locking.                                                                                            |
| 04 | Bin and Bin Door Repair                      | Carry out repair or replacement of damaged or missing Parts in accordance with the Maintenance Manual.                                                                                                                                         |
| 04 | Bin Painting                                 | Following any required repainting ensure paint condition is to a uniform shading standard.                                                                                                                                                      |
| 05 | Bin Filler Strip Inspection (As Applicable)  | Carry out a detailed visual inspection on bin filler strips for damage.                                                                                                                                                                        |
| 06 | Bin Filler Strip Painting (As Applicable)    | Following any required repainting ensure paint condition is to a uniform shading standard with surrounding bin panels.                                                                                                                          |
| 07 | Passenger Service Units (PSU) Inspection     | Carry out a detailed visual inspection of the following passenger service units components for condition and correct operation:- <br> : Air louvers <br> : Call buttons <br> : Reading lights <br> : No Smoking/Fasten Seat Belt lights.        |

## H. MISCELLANEOUS

|    |                                                                  |                                                                                                                                                                                                                                                                                 |
|----|------------------------------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 01 | Passenger Cabin Placards                                         | Inspect all cabin interior placards. <br> Replace all placards that are damaged or with illegible lettering. <br> Ensure that all seat row number decals are correctly positioned on the overhead bin structure.                                                                     |
| 02 | Seat Rail Covers                                                 | Ensure that all seat rail covers are the correct fit and colour throughout the cabin.                                                                                                                                                                                             |
| 03 | Flight Deck and Passenger Cabin Emergency Equipment              | Ensure that all required emergency equipment is located and secured in accordance with the approved Location Chart. <br> Ensure all required equipment location decals/placards are correctly positioned. <br> Ensure all 'Next due date' labels on Emergency Equipment are clearly legible. |
| 04 | Emergency Escape Floor Path Marking                              | Ensure that installed system is fully operational including all Emergency Exit lights. <br> Ensure all light covers are free from stains and cracking. <br> Also the track capping strips (If applicable) are fitting correctly with no gaps or exposed wiring.                         |

11-6

| 05 | Emergency Exit Photoluminescent Signs (If Installed) | Check for required level of luminescence and validity of expiry date. |
|----|-------------------------------------------------------|------------------------------------------------------------------------|

**SCHEDULE 12**
**FORM OF SHORT FORM LEASE AGREEMENT**

**AIRCRAFT LEASE AGREEMENT (SHORT FORM) MSN:24121**

**THIS SHORT FORM LEASE** (this "**Lease**") is made as of August_____, 2007,

**BETWEEN:**

(1)    Alliance Continental Leasing LLC, a corporation existing under the laws of Delaware ("**Lessor**"); and

(2)    PRIMA CHARTER S.P. Z o o., a corporation existing under the laws of _____ ("**Lessee**").

**WHEREAS:**

(A)    The Aircraft (as defined below) is the subject of an Aircraft Lease Agreement entered into between Lessor and Lessee dated as of _____ (the "**Lease**");

(B)    The Aircraft is described in this Lease as follows:

    One Boeing B757-222

    Manufacturer's Serial Number: 0

    Registration Marks: _____

    (the "**Aircraft**"); and

(C)    The terms of this Lease provide for the lease of the Aircraft to Lessee by Lessor in exchange for payments of rent and all other amounts due as specified in this Lease,

**NOW, THEREFORE,** for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**1.**    The term of this Lease will commence on _____ and shall terminate on _____, or otherwise in accordance with this Lease.

**2.**    The Aircraft shall be in the legal custody and control of Lessee during the term of this Lease.

**3.**    Lessee shall be responsible for the airworthiness and maintenance of the Aircraft during the term of this Lease.

**4.**    Lessor does not and will not provide, directly or indirectly, any flight crew to operate the Aircraft.

**5.**    Lessee shall be responsible for insuring the Aircraft for such limits and coverage as shall be required by law from time to time.

**6.**    Subleasing of the Aircraft is permitted, subject to the provisions of this Lease.

7.   This Lease may be cancelled prior to its scheduled termination date following the occurrence of an Event of Default (as defined in this Lease) and Lessor providing a notice to Lessee terminating this Lease, or in other circumstances contemplated in this Lease.

8.   This Short Form Lease is subject in all respects to the terms and conditions of this Lease, it being acknowledged that this Lease does not contradict the conditions contained in this Short Form Lease.

9.   This Short Form Lease is delivered pursuant to the requirements for registration of the Aircraft in the Polish Civil Aircraft Register in accordance with the terms and conditions of this Lease.

**IN WITNESS** whereof, the parties hereto have executed this Lease as of the date first written above.

**Alliance Continental Leasing LLC**          **PRIMA CHARTER S.P. Z o o.**


By: _____          By: _____ _____

Name: _____          Name: _____

Title: _____          Title: _____

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTERPRETATION | 1 |
| 2. | REPRESENTATIONS AND WARRANTIES | 1 |
| 3. | CONDITIONS PRECEDENT | 1 |
| 4. | COMMENCEMENT | 1 |
| 5. | PAYMENTS | 1 |
| 6. | MANUFACTURER'S WARRANTIES | 1 |
| 7. | LESSOR'S COVENANTS | 1 |
| 8. | LESSEE'S COVENANTS | 1 |
| 9. | INSURANCE | 1 |
| 10. | INDEMNITY | 1 |
| 11. | EVENTS OF LOSS | 1 |
| 12. | RETURN OF AIRCRAFT | 1 |
| 13. | DEFAULT | 1 |
| 14. | TRANSFER | 1 |
| 15. | MISCELLANEOUS | 1 |
| 16. | DISCLAIMERS AND WAIVERS | 1 |
| 17. | BROKERS AND OTHER THIRD PARTIES | 1 |
| 18. | BENEFIT OF THIRD PARTIES | 1 |
| 19. | CTC 1110 PROVISIONS COMPLIANCE | 1 |

C:\Documents and Settings\LAgrantf\Local Settings\Temp\dvtempb6c\dveD2-dvmD3.tmp\Alliance Aircraft Lease Agreement.DOC

## TABLE OF CONTENTS

SCHEDULE 1 DEFINITIONS

SCHEDULE 2 REPRESENTATIONS AND WARRANTIES

SCHEDULE 3 CONDITIONS PRECEDENT

SCHEDULE 4 PRE-DELIVERY PROCEDURES AND DELIVERY CONDITION

SCHEDULE 5 CERTIFICATE OF ACCEPTANCE

SCHEDULE 6 PROCEDURES AND OPERATING CONDITION AT REDELIVERY

SCHEDULE 7 INSURANCE REQUIREMENTS

SCHEDULE 8 FORM OF LEGAL OPINION

SCHEDULE 9 EVENTS OF DEFAULT

SCHEDULE 10 FORM OF POWER OF ATTORNEY

SCHEDULE 11 PASSENGER CABIN INTERIOR STANDARD

SCHEDULE 12 PRO FORMA VAT 60A FORM

SCHEDULE 13 FORM OF LETTER OF CREDIT

SCHEDULE 14 FORM OF AIRCRAFT LEASE AGREEMENT

SCHEDULE 15 FORM OF SHORT FORM LEASE AGREEMENT

C:\Documents and Settings\LAgrantf\Local Settings\Temp\dvtempb6c\dveD2 dvmD3.tmp\Alliance Aircraft Lease Agreement.DOC

WARNING: This section retains the original formatting, including headers and footers, of the main document. If you delete the section break above this message, any special formatting, including headers and footers for the Table of Contents/Authorities section will be lost.

If you delete the section break above the Table of Contents/Authorities, you will overwrite the headers and footers of the main document with Table of Contents/Authorities headers and footers.

To delete the Table of Contents/Authorities, begin your selection at the section break above the TOC/TOA section and continue through the end of this message.

**EXHIBIT F**

EXECUTION VERSION

## AIRCRAFT LEASE AGREEMENT

DATED AS OF

AUGUST 8, 2007

BETWEEN

## ALLIANCE CONTINENTAL LEASING LLC

AND

## PRIMA CHARTER SP. Z O. O.

Boeing B757-200ER
Manufacturers Serial No. 24121

Polish Registration No. SP-FVD

2007-08-07

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | INTERPRETATION | 1 |
| 2. | REPRESENTATIONS AND WARRANTIES | 1 |
| 3. | CONDITIONS PRECEDENT | 1 |
| 4. | COMMENCEMENT | 1 |
| 5. | PAYMENTS | 1 |
| 6. | MANUFACTURER'S WARRANTIES | 1 |
| 7. | LESSOR'S COVENANTS | 1 |
| 8. | LESSEE'S COVENANTS | 1 |
| 9. | INSURANCE | 1 |
| 10. | INDEMNITY | 1 |
| 11. | EVENTS OF LOSS | 1 |
| 12. | RETURN OF AIRCRAFT | 1 |
| 13. | DEFAULT | 1 |
| 14. | TRANSFER | 1 |
| 15. | MISCELLANEOUS | 1 |
| 16. | DISCLAIMERS AND WAIVERS | 1 |
| 17. | BROKERS AND OTHER THIRD PARTIES | 1 |
| 18. | BENEFIT OF THIRD PARTIES | 1 |



**EXECUTION VERSION**

## AIRCRAFT LEASE AGREEMENT MSN: 24121

**THIS AIRCRAFT LEASE AGREEMENT** is made as of August 8, 2007

**BETWEEN:**

(1)     **Alliance Continental Leasing LLC**, a limited liability company under the laws of the State of Delaware ("**Lessor**"); and

(2)     **Prima Charter Sp. z o. o.**, with its principal place of business at ul. 17 Stycznia 56, 02-146 Warsaw, Poland ("**Lessee**").

**WHEREAS:**

(A)     Lessor desires to lease the Aircraft to Lessee; and

(B)     Lessee desire to lease the Aircraft from Lessor.

**IT IS AGREED** as follows:

1.     **INTERPRETATION**

**1.1     Definitions**

> In this Lease capitalised words and expressions have the meanings set out for them in **Schedule 1.**

**1.2     Construction**

> (a)     In this Lease, unless otherwise stated, a reference to:
>
> > (i)     "Lessor," "Lessee," or any other Person includes any of their successors and assignees;
> >
> > (ii)     plural concepts shall include the singular and vice versa;
> >
> > (iii)     any document shall include any changes to that document and any replacement for it;
> >
> > (iv)     a Section or a Schedule is a reference to a section of or a schedule to this Lease;
> >
> > (v)     any Regulation shall include any changes to that Regulation and any replacement for it;
> >
> > (vi)     an obligation of a Person refers to any obligation that Person has under or in relation to this Lease or any Other Agreement; and
> >
> > (vii)     "includes," "including," "include" or similar terms shall not be construed as limiting and shall mean "including, without limitation,".
>
> (b)     Headings to Sections in this Lease are not intended to affect their meaning.



## 2.    REPRESENTATIONS AND WARRANTIES

### 2.1    Lessee's Representations and Warranties

Lessee makes the representations and warranties set out in Section 1.1 of **Schedule 2**. Lessee understands that these statements must be true, both when this Lease is signed and on the Delivery Date.

### 2.2    Lessor's Representations and Warranties

Lessor makes the representations and warranties set out in Section 1.2 of **Schedule 2**. Lessor understands that these statements must be true, both when this Lease is signed and on the Delivery Date.

## 3.    CONDITIONS PRECEDENT

### 3.1    Conditions Precedent

Lessee will provide each of the Conditions Precedent in a timely fashion. Lessor need not deliver and start the leasing of the Aircraft under this Lease unless each of the Conditions Precedent is satisfied.

### 3.2    Waiver

If any Condition Precedent is not satisfied on the Delivery Date and Lessor (in its absolute discretion) nonetheless agrees to deliver the Aircraft to Lessee and to start the leasing of the Aircraft, Lessee will ensure that such Condition Precedent is fulfilled within 15 days after the Delivery Date, and Lessor may treat as an Event of Default the failure of Lessee to do so.

## 4.    COMMENCEMENT

### 4.1    Leasing

(a)    Lessor shall notify Lessee as soon as possible of the Scheduled Delivery Date. Subject to Section 4.4, Lessor will lease the Aircraft to Lessee and Lessee will take the Aircraft on lease for the Term.

(b)    If (i) Lessee is unwilling or unable to accept delivery of the Aircraft on the Rent Commencement Date, or Lessee fails to fulfill any Condition Precedent on or before such date, and (ii) the Aircraft meets the Delivery Condition Requirements, then Lessee shall be obliged to pay Rent on and from the Rent Commencement Date, but, subject to Section 3.2, Lessor shall have no obligation to deliver possession of the Aircraft to Lessee unless and until Lessee fulfils all Conditions Precedent and accepts delivery of the Aircraft under this Lease.

(c)    Lessee will be responsible for all risks associated with the use and operation of the Aircraft and any loss of or damage to the Aircraft from the Delivery Date until the Return Occasion.

### 4.2    Procedure before Delivery

Lessor and Lessee will follow the Pre-Delivery Procedure.

2007-08-07
Prima Charters Sp. z o. o.

**4.3    Delivery and Acceptance**

After the Pre-Delivery Procedure has been carried out and so long as the Aircraft meets the Delivery Condition Requirements:

(a)    Lessor will offer to deliver the Aircraft to Lessee at the Delivery Location;

(b)    Lessee will accept the Aircraft. Lessee must also provide evidence of its acceptance by signing the Certificate of Acceptance and delivering it to Lessor; and

(c)    Lessee's acceptance of the Aircraft shall be regarded as absolute, unconditional and irrevocable.

**4.4    Delayed Delivery**

If an Unforeseen Event happens and, as a result, Delivery takes place after the Scheduled Delivery Date or does not happen:

(a)    neither Lessor nor Lessee will be responsible for any Losses that the other party may suffer resulting from the delay or from the non-delivery of the Aircraft;

(b)    Lessee will not, except in the circumstances described in Section 4.4 (c), be entitled to terminate this Lease or to reject the Aircraft when it is offered for Delivery because of the delay: and

(c)    if the Aircraft has not been offered for Delivery, in accordance with Section 4.3, by the Final Delivery Date, either party may terminate this Lease by serving notice on the other party within ten days following that Final Delivery Date. Upon delivery of that notice all obligations of each party under this Lease will end, except that Lessor will repay to Lessee an amount equal to the Deposited Amounts.

**5.    PAYMENTS**

**5.1    Deposit**

Each of Lessee and Lessor acknowledges that Lessee was required to pay, and has previously paid, to Lessor: (a) a security deposit equal to the Deposit; and (b) a maintenance reserve deposit in the amount of $150,000.00 (collectively with the Deposit, the **"Deposited Amounts"**).

**5.2    Rental Periods**

The first Rental Period will start 30 days after the Rent Commencement Date. Each subsequent Rental Period will start on the date immediately following the last day of the previous Rental Period.    Each Rental Period will end on the date immediately before the numerically corresponding day in the next month, except that:

(a)    if there is no numerically corresponding day in that month, it will end on the last day of that month; and

(b)    if a Rental Period would otherwise overrun the Expiry Date, it will end on the Expiry Date.



2007-08-07
Prima Charters Sp. z o. o.

#### 5.3    Rent

(a)    **Time of Payment**:  Lessee will pay to Lessor or its order Rent in advance on each Rent Date. Lessor must receive value for the payment on the Rent Date. If a Rental Period begins on a non-Business Day, the Rent payable in respect of that Rental Period shall be paid on the Business Day immediately before that day.

(b)    **Amount**:  The Rent payable in respect of each Rental Period during the Term will be $215,000.00 and will be payable monthly in advance.

**Supplemental Rent**

(c)    **Amount**:  Lessee will pay Supplemental Rent, at the rates referred to below, to Lessor in relation to each calendar month (or part of a month) of the Term, on the fifteenth day following the end of that calendar month, (except that the last payment of Supplemental Rent during the Term shall be paid on the Expiry Date):

| | |
|---|---|
| Airframe Supplemental Rent: | (C) Check Rate:  $28.00 for each Flight Hour |
| APU Supplemental Rent: | $35.00 for each Flight Hour |
| Engine Supplemental Rent: | $210.00 for each Engine Flight Hour |
| Engine LLP Supplemental Rent: | $145.00 for each Engine Cycle |
| Landing Gear Supplemental Rent: | $3,850.00 for each calendar month. |

(d)    **Adjustment**:  The Supplemental Rent rates shall be adjusted after the Delivery Date not more frequently than annually (with any such adjustment having retroactive application as appropriate to reflect the provisions of paragraphs (ii) to (iv) below) based on the following:

(i)    **Annual Supplemental Rent Adjustment**:  by the Annual Supplemental Rent Adjustment, compounded annually commencing on the first anniversary of the Delivery Date, as an agreed inflation adjustment.

(ii)    **Hour to Cycle Ratio Adjustment**:  Lessor and Lessee acknowledge that the Engine Supplemental Rent rate and the Engine LLP Supplemental Rent rate are based upon the assumption that the Aircraft will operate on a 3 Flight Hours to one Cycle ratio (3:1) (the "**Assumed Ratio**"). If that assumption proves to be incorrect at any time during the Term based upon Lessee's actual operating experience during the previous 12 months, and the Flight Hour to Cycle ratio differs from the Assumed Ratio by more than 0.1 during such 12 month period, Lessor shall have the right, upon written notice to Lessee, to adjust the Engine Supplemental Rent Rate and the Engine LLP Supplemental Rent Rate (in the case of a decrease in the ratio below the Assumed Ratio) and Lessor, upon written request from Lessee, will make that adjustment (in the case of an increase in the ratio above the Assumed Ratio).

Any adjustment shall be based on the following table. Actual Flight Hour to Cycle ratios may fall outside the ratios identified in that table. In that case, the actual values shall be determined by extrapolating the closest observed intervals in the table.

2007-08-07
Prima Charters Sp. z o. o.

| Assumed Ratio Adjustment table: | Flight Hour Cycle Ratio: | 2 | 2.5 | 3 | 3.5 | 4 |
|---|---|---|---|---|---|---|
| | Engine Suppleme ntal Rent: | $220 | $215 | $21 0 | $205 | $200 |
| | Engine LLP Suppleme ntal Rent: | $145 | $145 | $14 5 | $145 | $145 |

(iii) **Assumed Utilisation Adjustment:** Lessor and Lessee acknowledge that the Airframe Supplemental Rent rate, APU Supplemental Rent rate and Landing Gear Supplemental Rent rate are based upon the assumption that the Aircraft will operate on a utilization of 3600 Flight Hours per 12 month period (the "**Assumed Utilisation**"). If that assumption proves to be incorrect at any time during the Term based upon Lessee's actual operating experience during the previous 12 months such that the Assumed Utilisation is 110% or greater than Lessee's actual utilisation of the Aircraft, Lessor may make, and notify Lessee of, such adjustment as Lessor determines is necessary in its reasonable discretion to maintain the rates of Airframe Supplemental Rent, APU Supplemental Rent and Landing Gear Supplemental Rent at levels which accurately reflect the costs associated with obtaining relevant maintenance services at prevailing industry rates.

(iv) **Material Revision to Maintenance Programme:** If Lessee's Maintenance Programme is materially revised, Lessor may make, and notify Lessee of, such adjustment as Lessor (in its discretion, acting reasonably) determines is necessary to maintain the Supplemental Rent at levels which accurately reflect the costs associated with obtaining relevant maintenance services at prevailing industry rates. Each notice shall specify the revised Supplemental Rent rates and the effective date of such revision and Lessee shall be bound by it. Lessee agrees to advise Lessor, in writing, promptly following any occurrence, which would result in the assumptions mentioned in paragraphs (ii) and (iii) above becoming incorrect at any time during the Term.

## 5.4 Payments

All payments by Lessee to Lessor under this Lease will be made for value on the due date in Dollars and in immediately available funds settled through the New York Clearing House System or such other funds as may for the time being be customary for the settlement in New York City of payments in Dollars by wire transfer to:

KEY Bank N.A., 5712 Market Street, Youngstown, Ohio 44512, ABA/ ROUTING Number: 041001039, SWIFT CODE: KEY BUS 33, Account Number: 352291003180, for the account of Robert J. Rohrbaugh II Esq. For Alliance Continental Leasing LLC, or such other account as

2007-08-07
Prima Charters Sp. z o. o.

Lessor designates in writing from time to time, with a minimum of 10 days' advance notice of any such change or revision.

## 5.5   Withholding and Tax Credit

(a)   **Withholding**: Lessee must not deduct any amount from any of its payments under this Lease, for or on account of any Taxes, unless it is required by Law to do so, in which case Lessee must:

    (i)   deduct the minimum amount necessary to comply with the Law;

    (ii)   pay Lessor an extra amount so that Lessor receives a net amount on the relevant payment date, that is equal to the amount that it would have received if the deduction had not been made. The amount of any such payment by Lessee shall be made taking into account the principles of Section 5.9 so that Lessor shall be in no worse position than it would have been if the deduction had not applied in the first place;

    (iii)   pay the Tax to the relevant taxing authority according to the relevant Law; and

    (iv)   obtain a receipt (if one is available) from the relevant taxing authority and give it to Lessor.

(b)   **Tax Credit**: If Lessor, in good faith, determines that it has realised a tax benefit (by way of deduction, credit or otherwise) as a result of any payment for which Lessee is liable under Section 5.5(a), 5.6(a), or 5.7(b). Lessor shall pay to Lessee as soon as practicable after the tax benefit has been realised (but not before Lessee has made all payments and indemnities to Lessor required under this Section), an amount which will ensure that (after taking account of the payment itself) Lessor is in no better and no worse position than it would have been if the deduction had not applied.

Nothing in this Section 5.5(b) shall:

    (i)   interfere with the right of Lessor to arrange its tax affairs in whatever manner it thinks fit; or

    (ii)   oblige Lessor to disclose any information relating to its tax affairs or any tax computations.

## 5.6   Tax Indemnity

(a)   Lessee will indemnify each Tax Indemnitee against all Relevant Taxes.

(b)   Lessee need not indemnify a Tax Indemnitee under this Section 5.6 to the extent that the Tax arises because of:

    (i)   the deliberate misconduct or reckless behaviour of any Tax Indemnitee;

    (ii)   a Tax liability any Tax Indemnitee would have had even if this Lease had not been entered into; or

2007-03-07
Prima Charters Sp. z o. o.

(iii)    a Tax liability charged on any Tax Indemnitee's income, profits or gains by any Government Entity, but excluding any Tax imposed by any Government Entity of any jurisdiction if and to the extent that such Tax results from (x) the use, operation, presence or registration of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax, or (y) the *situs* of organisation, any place of business or any activity of Lessee or any other Person having use, possession or custody of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax; or

(iv)    an imposition with respect to any period commencing or event occurring (x) prior to the Delivery Date or (y) after the Expiry Date and, in either case, unrelated to Lessor's dealings with Lessee or to the transactions contemplated by this Lease.

(c)    Lessee covenants that it will not take any action which would be contrary to the ownership of the aircraft by the Lessor.

## 5.7    Value Added Tax

(a)    For the purposes of this Section 5.8:

    (i)    "VAT" means value added tax and any goods and services, sales or turnover tax, imposition or levy of a like nature;

    (ii)    "supply" includes anything on or in respect of which VAT is chargeable.

(b)    Lessee will pay to Lessor or the relevant taxing authority and indemnify Lessor against the amount of any VAT chargeable in respect of any supply for VAT purposes under this Lease. Lessee shall provide evidence to Lessor, if available, in respect of any payment it makes of such VAT. The amount of any such payment to Lessor shall be made taking into account the principles of Section 5.9.

(c)    Each amount stated as payable by Lessee under this Lease is exclusive of VAT (if any).

## 5.8    Tax Contest

If Lessee disputes the payment of any Taxes payable by Lessor or any Tax Indemnitee for which Lessee is responsible under this Lease, Lessor will consider with Lessee the taking of such action as Lessee may reasonably request at Lessee's expense to contest that payment, but neither Lessor nor any Tax Indemnitee will be obliged to take any such action (i) which Lessor or such Tax Indemnitee considers in its sole discretion may prejudice it; or (ii) which Lessor or such Tax Indemnitee considers does not have a reasonable prospect of success; or (iii) involves a sum of less than $10,000.

## 5.9    Indemnity Payments - After-Tax Basis

The amount of any payment made under Section 5.5(a) (ii) (*Withholding*), Section 5.6 (*Tax Indemnity*), Section 5.7 (*Value Added Tax*), Section 5.19 (*Expenses*), Section 8.13 (*Title on an Equipment Change*), Section 10 (*Indemnity*), Section 11.1(c) (*Events of Loss*), Section 12.2 (*Non-Compliance*) or Section 13 (*Default*) must take into account the Tax treatment of the payment and of the Loss in respect of which the payment is claimed so that the Indemnitee is fully

2007-08-07
Prima Charters Sp. z o. o.

compensated, after that Tax treatment has been taken into account, for the Loss for which the relevant claim is made.

**5.10    Lessor Obligations Following Expiry Date**

Within five Business Days after:

(a)    redelivery of the Aircraft to Lessor in accordance with and in the condition required by this Lease; or

(b)    payment to Lessor of the Agreed Value following an Event of Loss after the Delivery Date;

(c)    termination of this Lease prior to the commencement of the Term in accordance with the provisions of this Lease; or in each case such later time as Lessor is satisfied that Lessee has irrevocably paid to Lessor all amounts which may then be due and owing under this Lease and the Other Agreements:

    (i)    Lessor will pay to Lessee the equivalent amount of the balance of the Deposit; and

    (ii)    Lessor will pay to Lessee the amount of any Rent received in respect of any period falling after the date of redelivery of the Aircraft or payment of the Agreed Value, as the case may be.

**5.11    Net Lease**

This Lease is a net lease. Lessee's obligation to pay Rent and to perform all of its other obligations is absolute and unconditional no matter what happens and no matter how fundamental or unforeseen the event. Lessee shall not regard its obligations as ended, suspended or altered in any way because of any defence, set-off, counterclaim, recoupment or other right of any kind or of any other circumstance.

Nothing in this Section 5.11 will be construed to limit Lessee's right to institute separate legal proceedings against Lessor in the event of Lessor's breach of this Lease or to limit Lessee's rights and remedies against any other Person.

**5.12    Further Provisions regarding Deposit**

(a)    Lessee agrees that Lessor shall be entitled to commingle the Deposit with Lessor's general or other funds, Lessor will not hold any such funds as agent or on trust for Lessee or in any similar fiduciary capacity and Lessee's right to a refund of the Deposit amount is limited as set out in this Lease.

(b)    If Lessee fails to comply with any provision of this Lease or the Other Agreements, or any Event of Default shall have occurred and be continuing, in addition to all rights and remedies accorded to Lessor elsewhere in this Lease or under Law in respect of the Deposit, Lessor may immediately or at any time thereafter, without prior notice to Lessee, apply all or part of the Deposit in or towards the payment or discharge of any matured obligation owed by Lessee or any Lessee Affiliate under this Lease or the Other

- 8 -

Agreements, in such order as Lessor sees fit, and/or exercise any of the rights of set-off described in Section 5.18 against all or part of the Deposit.

(c)    If Lessor exercises the rights described in Section 5.12(b) above, Lessee shall, following a demand in writing from Lessor, immediately restore the Deposit to the level at which it stood immediately prior to such exercise.

### 5.13   [Reserved]

### 5.14   Late Payment Interest

If Lessee fails to pay any amount payable under this Lease on the due date, Lessee will pay on demand from time to time to Lessor interest (both before and after judgement) on that amount, from the due date to the date of payment in full by Lessee to Lessor, at the Interest Rate. All such interest will be calculated on the basis of the actual number of days elapsed in the month, assuming a 30 day month and a 360 day year.

### 5.15   Currency

(a)    Lessee must indemnify Lessor against any Loss Lessor suffers if:

    (i)    Lessor receives an amount relating to Lessee's obligations in a different currency from that in which payments should be made under this Lease; or

    (ii)    Lessee pays a judgment or claim in a different currency from that in which payments should be made under this Lease.

(b)    Lessee relinquishes any right to pay any amount under this Lease in a currency other than the currency shown in this Lease and the right of Lessor to be indemnified for currency loss shall survive and not merge into any judgment on the underlying claim.

### 5.16   Certificates

Save where expressly provided in this Lease, any certificate or determination by Lessor as to any rate of interest or as to any other amount payable under this Lease will, in the absence of manifest error, be presumed to be correct.

### 5.17   Appropriation

If any sum paid or recovered by Lessor in respect of the liabilities of Lessee under this Lease is less than the amount then due, Lessor may apply that sum to amounts due under this Lease in such proportions and order and generally in such manner as Lessor may determine at its sole discretion.

### 5.18   Set-off

(a)    In this sub-section, references to Lessee will also include Lessee Affiliates.

(b)    Lessor may set-off any debt owed by Lessee under this Lease or the Other Agreements against any debt Lessor owes Lessee, regardless of the place of payment or currency.

- 9 -

2007-08-07
Prima Charters Sp. z o. o.

If the debts are in different currencies, Lessor may convert either debt at the market rate of exchange available in New York. If the amount of a debt is unknown, Lessor may estimate the amount. Any difference between the estimated debt and the actual debt will be paid by either Lessor or Lessee, as appropriate, when the amount becomes known.

## 5.19    Expenses

Unless caused by a default by Lessor hereunder, whether or not the Aircraft is delivered to Lessee pursuant to this Lease, Lessee will pay to Lessor, on demand, all reasonable expenses (including professional fees and other costs) that Lessor has to pay:

(a)     to deal with any amendments, extensions, consents or waivers that are required in connection with this Lease (but excluding any expenses incurred by Lessor in connection with any change in the ownership or financing of the Aircraft or any amendment, extension, consent or waiver requested by Lessor other than when an Event of Default has occurred and is continuing);

(b)     to act upon any advice and obtain assistance to perfect this Lease whether necessary or advisable in the State of Registry and under the Cape Town Convention; and

(c)     in contemplation of, or otherwise in connection with, the enforcement or preservation of any of Lessor's rights under this Lease or in respect of the repossession of the Aircraft.

All amounts payable pursuant to this Section 5.19 will be paid in the currency in which they are incurred by Lessor.

## 5.20    Payment of Taxes

Lessee will promptly pay all Taxes, other than any Taxes described in Section 5.6(b), and other charges imposed by any Governmental Entity with respect to the Aircraft and/or this Lease, except to the extent that: (a) such Tax or other charge is being contested, in good faith, by appropriate proceedings promptly instituted and diligently conducted and if adequate reserves (as may be required for Lessee to be in conformity with any national accounting standards applicable to it under the laws of the Republic of Poland); and (b) the failure to pay such Tax or charge could not reasonably be expected to result in an Event of Default.

## 5.21    Purchase Option

(a)     **Purchase Option**: Lessor hereby grants to Lessee the option to purchase the Aircraft on the Scheduled Expiry Date or on the day that is 90 days after the Delivery Date on the terms and subject to the conditions hereinafter set forth (the "**Purchase Option**") for an amount equal to the Purchase Option Price (which the parties agree is their estimate of what will be the fair market value of the Aircraft as of the applicable date) (the "Option Date"); provided that the Purchase Option shall not be available if: (i) the Lease has previously been termination; or (ii) Lessor has not received written notice (the "Notice") of Lessee's election to exercise the Purchase Option (A) in the case of the Purchase Option pertaining to the Option Date occurring on the Scheduled Expiry Date, not less than six months nor more than 24 months' written notice prior to the Scheduled Expiry Date; or (B) in the case of the Purchase Option pertaining to the Option Date occurring on the day that is 90 days after the Delivery Date, not later than 60 days after the Delivery Date. The failure of Lessee to exercise the Purchase Option with respect to the



- 10 -

Option Date occurring on the day that is 90 days after the Delivery Date shall not, by itself, prevent Lessee from exercising the Purchase Option with respect to the Option Date occurring on the Scheduled Delivery Date.  Once a Notice is given, Lessee's Purchase Option is irrevocable.

(b)     **Purchase Option Exercised:**

(i)     In the event a Notice is given, Lessee shall purchase the Aircraft and pay the Purchase Option Price to Lessor or as Lessor otherwise directs by wire transfer in immediately available Dollars on the Option Date.  Upon Lessee making such payment on such date Lessor shall transfer to Lessee, pursuant to a bill of sale reasonably acceptable to Lessor and Lessee, full legal and beneficial title to the Aircraft free of all Lessor Liens at the time of such sale, but otherwise AS IS, WHERE IS and without recourse, representation or warranty of any kind (other than as to the absence of Lessor's Liens), and cooperate with Lessee's reasonable requests to deregister, terminate, cancel or rescind any registrations, recordations or filings previously made in relation to Lessor's title to the Aircraft or rights under the Lease; and

(ii)    if the Purchase Option is exercised, Lessee need not comply with the return conditions required pursuant to Section 12 and Lessor's obligation to pay Maintenance Contributions pursuant to Section 7.2 shall continue in favour of Lessee.

(c)     **Purchase Option Cancelled:**

(i)     If Lessee does not exercise the Purchase Option in accordance with Section 5.21(a) of this Lease or once exercised Lessee does not comply with its obligations in respect thereof, including its obligation to pay the Purchase Option Price of the Aircraft as provided above; or

(ii)    in the event of the occurrence of an Event of Loss; or of the occurrence of an Event of Default during the Term with respect to which Lessor exercises any remedy provided in Section 13 of this Lease or that exists at the time the Notice is given or that exists on the Option Date,

then the Purchase Option shall forthwith be cancelled without liability of any kind to Lessor under this Section 5.21 and in the event Notice of the exercise of the Purchase Option shall have been given prior to such cancellation, the sale of the Aircraft pursuant to such exercise shall likewise forthwith be cancelled.

6.     **MANUFACTURER'S WARRANTIES**

(a)     So long as no Event of Default has occurred which is continuing, Lessor shall make available to Lessee during the Term the benefit of all manufacturers' warranties in relation to the repair or remedy of any defect in the Aircraft (including compensation for loss of use of the Aircraft) and other product support for the Aircraft to the extent that it is permitted to do so.  Lessee will give Lessor prompt written notice of any warranty claim that is settled with Lessee on the basis of a cash payment.

- 11 -

(b)     If an Event of Default has occurred and is continuing, Lessor may immediately recover from Lessee the proceeds of any warranty claims previously paid to Lessee to the extent that such claims relate to any defect in the Aircraft not fully and completely rectified by Lessee before such Event of Default and Lessor may:

    (i)     retain for its own account any such proceeds previously paid to Lessor which would have been remitted to Lessee under this Section 6 in the absence of such Event of Default; and

    (ii)    cause any proceeds of any pending claims to be paid to Lessor, rather than Lessee.

(c)     Unless Lessee exercises the Purchase Option, Lessee will take all steps as are necessary at the end of the Term to ensure that the benefit of any and all warranties (including those from manufacturers) relating to the Aircraft which have not expired is vested in Lessor.

## 7.    LESSOR'S COVENANTS

### 7.1    Quiet Enjoyment

So long as no Event of Default has occurred and is continuing, Lessor will not interfere (and will not permit any Person claiming through Lessor to interfere) with Lessee's right to quiet use and possession of the Aircraft during the Term.

### 7.2    Maintenance Contributions

Provided that Lessor has received all Supplemental Rent due under this Lease and that no Event of Default has occurred and is continuing, Lessor will pay the following amounts to Lessee (by way of contribution to the cost of maintenance of the Aircraft) not later than 30 calendar days (but in any event prior to the Expiry Date) after delivery by Lessee to Lessor of an invoice and supporting documentation reasonably satisfactory to Lessor evidencing performance of the following work by the Maintenance Performer:

(a)     **Airframe**: With respect to the Airframe, the completion, in accordance with this Lease, of the Airframe Structural Check, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Airframe Supplemental Rent paid under this Lease at the date such invoice less the aggregate amount previously paid by Lessor under this sub-section;

(b)     **Engine Life-Limited Parts**: With respect to life-limited Parts within any Engine, the performance, in accordance with this Lease, of any replacement or repair of those Parts, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Engine LLP Supplemental Rent paid in respect of that Engine under this Lease at the date of such invoice less (aa) any credit granted by the maintenance performer to Lessee in respect of any repairable life-limited Part which has been replaced (with such credit being calculated by reference to the then remaining life of such life-limited Part) and (bb) the aggregate amount previously paid in respect of that Engine by Lessor under this sub-section; provided that, notwithstanding the foregoing, the cost of the maintenance with respect to life-limited Parts within any Engine shall be borne, in accordance with a cost-sharing formula previously agreed to between Lessor and Lessee, sixty percent (60%) by Lessor and forty percent (40%) by Lessee;

- 12 -

(c)   **Engine Refurbishment**: With respect to any Engine, the performance, in accordance with this Lease, of Engine Refurbishment in respect of that Engine the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Engine Supplemental Rent paid under this Lease in respect of that Engine at the date of such invoice less the aggregate amount previously paid in respect of that Engine by Lessor under this sub-section; provided that, notwithstanding the foregoing, the cost of the Engine Refurbishment shall be borne, in accordance with a cost-sharing formula previously agreed to between Lessor and Lessee, sixty percent (60%) by Lessor and forty percent (40%) by Lessee;

(d)   **APU**: With respect to the APU, the performance, in accordance with this Lease, of all shop visits requiring APU removal and disassembly, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the APU Supplemental Rent paid under this Lease at the date of such invoice less the aggregate amount previously paid by Lessor under this sub-section; and

(e)   **Landing Gear**: With respect to the Landing Gear, the performance, in accordance with this Lease, of all work on the Landing Gear in the nature of overhaul and requiring removal and disassembly, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Landing Gear Supplemental Rent paid under this Lease at the date of such invoice less the aggregate amount previously paid by Lessor under this sub-section;

**PROVIDED THAT** Lessor will not pay any contribution in respect of sub-paragraphs:

(A)   (a) to (e) above, for work arising as a result of accidents or incidents (whether or not eligible for recovery under Lessee's insurance), operational or maintenance mishandling or Airworthiness Directive work (unless otherwise entitled to Maintenance Contributions for scheduled maintenance as provided in (a) to (e) above); nor

(B)   (b) and (c) above, for work arising as a result of foreign object damage, the removal, installation, maintenance and repair of QEC and/or any elective parts replacement.

## 8.   **LESSEE'S COVENANTS**

### 8.1   **Duration**

(a)   Lessee shall perform and comply with its undertakings and covenants in this Lease at all times during the Term. All such undertakings and covenants shall, except where expressly otherwise stated, be performed at the expense of Lessee.

(b)   Lessee will take such steps as are necessary to ensure that no Lessee Affiliate acts in any manner inconsistent with Lessee's obligations under this Lease.

### 8.2   **Information**

Lessee will:

(a)   provide Lessor with a Technical Report for the Aircraft within seven days after the end of each calendar month throughout the Term;

- 13 -



(b)     promptly provide Lessor with the Financial Information;

(c)     promptly notify Lessor of any Event of Loss or of any event which is likely to result in an insurance claim in excess of the Damage Notification Threshold and details of any negotiations with insurers or insurance brokers relating to such claim;

(d)     immediately notify Lessor of any Default;

(e)     provide Lessor, upon request, with evidence that all Taxes and charges incurred by Lessee in connection with the Aircraft, its location and its operations, including those invoiced by airports and air traffic control authorities, have been paid in full;

(f)     provide Lessor with such other information concerning the location, condition, use and operation of the Aircraft or concerning the business or financial affairs of Lessee, as Lessor may from time to time reasonably request;

(g)     give Lessor not less than 30 days prior written notice as to the time and location of all Major Checks; and

(h)     notify Lessor, promptly, of the removal of any Engine off wing for a period of more than 72 hours or for the purpose of Engine Refurbishment.

### 8.3     Lawful and Safe Operation

Lessee will operate the Aircraft for commercial purposes from the Delivery Date until the Return Occasion from a base within the State of Registry or from such other base outside the State of Registry pursuant to a Permitted Sub-Lease or a wet-lease complying with Section 8.4 provided always that Lessee must not use or operate the Aircraft or allow the Aircraft to be used or operated:

(a)     in violation of any applicable Regulations or in a manner causing Lessor to be in violation of any applicable Regulations;

(b)     for any purpose for which the Aircraft was not designed or which is illegal;

(c)     to carry cargo which could reasonably be expected to damage the Aircraft;

(d)     in any circumstances or place where the Aircraft is not covered by the Insurance; or

(e)     for purposes of training, qualifying or re-confirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel, except if the use of the Aircraft for such purpose is not disproportionate to the use for such purpose of other aircraft of the same type operated by Lessee.

For the avoidance of doubt, as between Lessee and the Indemnitees, Lessee acknowledges and agrees that:

(i)     Lessee is solely responsible for the determination and implementation of all security measures and systems necessary or appropriate for the proper protection of the Aircraft (whether on the ground or in flight) against (a) theft, vandalism, hijacking, destruction, bombing, terrorism or similar acts, directly or indirectly

- 14 -

affecting in any way the Aircraft or any part thereof, or any persons who (whether or not on board the Aircraft) may sustain any injury or damage as a result of any such acts, (b) the use of the Aircraft in any acts, including without limitation, those of destruction, bombing, terrorism or similar acts, and (c) the taking, theft or use of any products, chemicals, goods, or materials of any kind, form, or nature located on board the Aircraft or being transported via the Aircraft,

(ii)    Lessee's implementation of such security measures and systems is a material obligation of Lessee under this Lease, and that Lessor shall have absolutely no responsibility therefor, and

(iii)    Lessee, being in sole operational control of the Aircraft and being in the business of operating commercial aircraft, is uniquely in a position to identify and implement those maintenance and security measures as are necessary to comply with all applicable Regulations, and as are otherwise appropriate and that in doing so, Lessee has not relied upon, and shall not rely upon, any statement, act, or omission of Lessor.

**8.4    Subleasing**

(a)    At no time prior to the Return Occasion will Lessee sub-lease, wet-lease or otherwise give possession of the Aircraft to any Person except:

(i)    when the prior written consent of Lessor has been obtained, such consent not to be unreasonably withheld or delayed; or

(ii)    where the Aircraft is delivered to a manufacturer or maintenance facility for work to be done on it as required or permitted under this Lease; or

(iii)    pursuant to a sub-lease of the Aircraft to a sub-lessee to which Lessor consents in writing ("**Permitted Sub-Lessee**") pursuant to a sub-lease to which Lessor consents in writing (a "**Permitted Sub-Lease**"), which complies with the conditions set out in Section 8.4(b) and provided that no Default shall have occurred and be continuing at the commencement of such sub-lease; or

(iv)    with respect to an Engine or Part as permitted under Section 8.11.

However, where no Event of Default has occurred and is continuing, Lessee may wet lease or charter (including a "dump lease" utilizing Lessee's pilots but not its cabin attendants) the Aircraft, provided that such wet lease or charter constitutes an arrangement whereby Lessee agrees to furnish the Aircraft to a third party pursuant to which the Aircraft (aa) shall be operated solely by regular employees of Lessee possessing all current certificates and licenses that are required by applicable Regulations, (bb) shall be subject to insurance coverage complying with this Lease, (cc) shall be maintained by Lessee in accordance with Lessee's Maintenance Programme and Lessee's normal maintenance practices, and (dd) shall not be subject to any change in its State of Registry, and provided always that such arrangement does not extend beyond the Expiry Date and is expressly subordinated to this Lease and the rights of Lessor, Owner and any Financing Parties.

2007-08-07
Prima Charters Sp. z o. o.

(b)    Lessee shall be permitted to sublease the Aircraft to a Permitted Sub-Lessee pursuant to a Permitted Sub-Lease which is reasonably acceptable to Lessor and which complies to Lessor's reasonable satisfaction with the following conditions, each of which shall be required to be satisfied in relation to any Permitted Sub-Lease prior to any sub-leasing pursuant to this Section:

    (i)    **Notification**: upon execution hereof, provide a copy of the executed Permitted Sub-Lease in form acceptable to Lessor;

    (ii)    **Term**: the term of the Permitted Sub-Lease shall not be capable of extending beyond the date falling three months before the scheduled Expiry Date;

    (iii)    **Form**: the Permitted Sub-Lease shall, without limitation:

        (aa)    not contain provisions inconsistent with the provisions of this Lease (but may impose additional or more stringent obligations on Sub-Lessee than are imposed on Lessee under this Lease);

        (bb)    provide that no further subleases of the Aircraft by Permitted Sub-Lessee are permitted; and

        (cc)    include provisions substantially identical to or having substantially the same effect as Sections 2.1, 5.6, 5.7, 5.8, 5.10, 5.12, 5.15, 5.16, 8, 9, 10, 13, 15.1, 15.8 and 16 and **Schedules 2** (Section 1.1), 7 and 9 of this Lease (but the Permitted Sub-Lease may impose additional or more stringent obligations on Permitted Sub-Lessee than are imposed on Lessee under this Lease);

    (iv)    **Assignment and Subordination**: Lessee's rights under the Permitted Sub-Lease shall be assigned to Lessor as security for Lessee's obligations to Lessor. In any case the Permitted Sub-Lease shall provide that (aa) it is subject and subordinate to this Lease in all respects and the rights of Permitted Sub-Lessee thereunder are subject and subordinate in all respects to the rights of Lessor under this Lease; (bb) prior to delivery of the Aircraft to Permitted Sub-Lessee (as a condition precedent thereof), Permitted Sub-Lessee shall provide an acknowledgement to Lessor and Owner in a form reasonably satisfactory to Lessor, confirming its agreement to the assignment (if so required), this provision and that its rights to possession of the Aircraft under the Permitted Sub-Lease will terminate immediately upon the termination of this Lease, and that it will redeliver the Aircraft to Lessor, upon notification from Lessor that an Event of Default has occurred and that Lessor has, as a result thereof, terminated Lessee's right to possession of the Aircraft under this Lease ("**Subordination Acknowledgement**"); and (cc) Lessee may terminate the Permitted Sub-Lease following the occurrence of an Event of Default under this Lease where Lessor has terminated the leasing of the Aircraft under this Lease as a result thereof;

    (v)    **Quiet Enjoyment**: the Permitted Sub-Lease shall provide that Permitted Sub-Lessee shall have the right to quiet enjoyment of the Aircraft for so long as no Event of Default has occurred under this Lease and/or no event of default or termination event (howsoever described) has occurred under the Permitted Sub-Lease;

(vi)    **Obligations of Lessee**: Lessee shall remain primarily liable under this Lease for the performance and observance of all its obligations to the same extent as if no Permitted Sub-Lease had been entered into. To the extent that Permitted Sub-Lessee properly performs an obligation under the Permitted Sub-Lease, Lessor agrees that such performance shall be regarded as discharging (to such extent) Lessee's corresponding obligation;

(vii)   **Insurance**: all insurance requirements under this Lease shall be complied with either by Lessee or by Permitted Sub-Lessee as if references in the insurance provisions of this Lease to "Lessee" were references to "Permitted Sub-Lessee" (and Lessee shall provide or cause Permitted Sub-Lessee to provide the insurance certificate and brokers' letter of undertaking to Lessor at least seven Business Days prior to the commencement of the Permitted Sub-Lease);

(viii)  **Registration**: there shall be no change in the registration of the Aircraft from the State of Registry;

(ix)    **Repossession Insurance**: if required by Lessor, repossession insurance shall be obtained by Lessor at Lessee's cost, provided that repossession insurance will not be required if the Habitual Base and State of Registry are not being changed at any time during the term of the Permitted Sub-Lease or if the proposed new Habitual Base and State of Registry are both within states which are now members of the European Union, the United States or Canada. If repossession insurance is required, the Permitted Sub-Lease must provide that, if any such repossession insurance cannot be obtained or renewed, Lessor may in its discretion acting reasonably terminate the Permitted Sub-Lease may be terminated upon notice to Lessee or Permitted Sub-Lessee;

(x)     **Legal Opinions**: as a condition precedent to the effectiveness of a Permitted Sub-Lease, Lessee shall, at the request of Lessor (which request shall be made only if reasonable under the circumstances) provide to Lessor the following legal opinions (at Lessee's or Permitted Sub-Lessee's expense) addressed to Lessor from counsel reasonably acceptable to Lessor: (x) a legal opinion in relation to the Permitted Sub-Lease in form and substance satisfactory to, and containing such other matters set out in **Schedule 8** requested by, Lessor and confirming further that the Subordination Acknowledgement is valid, binding and (except as limited by any equitable principles and applicable bankruptcy, insolvency, reorganisation, moratorium or similar laws affecting creditors' or lessors' rights generally) enforceable against Permitted Sub-Lessee; and (y) (without prejudice to Lessor's right to refuse consent to a change in the State of Registry) in the case of a Permitted Sub-Lease for which at any time during its term it is proposed that the Habitual Base or the State of Registry of the Aircraft will be different from the Habitual Base or State of Registry prior to the commencement of such Permitted Sub-Lease, then Lessee shall provide to Lessor an opinion in a form and from counsel reasonably acceptable to Lessor in the proposed state of the Habitual Base and/or the State of Registry of the Aircraft. Such opinion shall be to the effect, among other things, that Lessor's and Owner's interests in the Aircraft will be recognised under the laws of such country or countries;

(xi)    **Delivery of Legal Opinions**: The foregoing opinion or opinions (x) shall be forwarded promptly to Lessor (and, to the extent practicable, at least five

- 17 -

Business Days prior to the effective date of the Permitted Sub-Lease), and (y) may, if different opinions are required hereunder, be made by a single counsel qualified to render opinions in each such country;

(xii) **Filings**: Lessee shall co-operate with Lessor (at no cost to Lessor) in connection with the execution and filing of any documents which are required or advisable to be executed and filed from time to time with any registry or authority in the Habitual Base, the State of Registry and State of Incorporation of Lessee or Permitted Sub-Lessee in order to protect the interests of Lessor and Owner in and to the Aircraft, this Lease or the Permitted Sub-Lease and/or to ensure the validity, enforcement or priority thereof; and

(xiii) **Expenses**: Lessee will pay to Lessor on demand all reasonable out of pocket expenses (including legal, survey and other costs) payable or incurred by Lessor in connection with the review and approval of the documentation required pursuant to this Section.

## 8.5    Access

(a) Lessee will permit Lessor's representative access to the Aircraft at any reasonable time. Unless a Default has occurred and is continuing, Lessor will give Lessee reasonable prior notice and will seek to ensure that it does not result in unreasonable disruption to the scheduled operation of the Aircraft. Lessee shall comply with the reasonable requests of Lessor's representative, including any request to travel on the flight deck of the Aircraft as an observer, subject to any applicable Regulations.

(b) The cost of a visit shall be borne by Lessor unless (i) an Event of Default has occurred and is continuing or (ii) as a result of that visit, Lessee is found to be materially in default of its obligations under this Lease, when the cost shall be borne by Lessee.

(c) No liability or obligation will be incurred by Lessor solely by reason of non-exercise by it of the rights referred to in this Section. For the avoidance of doubt, any viewing of the Aircraft by Lessor shall be for Lessor's information purposes only and there shall be no inference or implication therefrom that Lessee is in compliance with its obligations under this Lease.

## 8.6    Ownership; Property Interests; Related Matters

(a) Lessee will:

(i) fix and maintain Nameplates in a prominent position in the cockpit or cabin of the Aircraft and on each Engine stating:

"This Aircraft/Engine is owned by Alliance Continental Leasing, LLC and is leased to Prima Charter Sp. z o. o. and may not be or remain in the possession of or be operated by, any other person without the prior written consent of Alliance Continental Leasing, LLC"; and

(ii) take all reasonable steps to make sure that other relevant Persons know about the interests of Lessor as owner and lessor in the Aircraft.

2007-08-07
Prima Charters Sp. z o. o.

(b)    Lessee will not:

    (i)    represent that it is the owner of the Aircraft or that it has an economic interest (equivalent to ownership) in the Aircraft for Tax treatment or other purposes;

    (ii)    take any action if it could put Lessor's rights at risk;

    (iii)    represent to others that Lessor is associated with or responsible for the business activities and/or flight operations of Lessee; or

    (iv)    allow the Aircraft or Lessor's interest in it to become or remain subject to any Security Interest (other than a Permitted Lien).

## 8.7    General

Lessee will:

(a)    preserve its corporate existence (other than in connection with a solvent merger acquisition reconstruction or reorganisation whereby the resulting entity will assume and be able to fully perform all of the Lessee's obligations under this Lease or otherwise on terms which shall have previously been approved in writing by Lessor);

(b)    maintain its business as a commercial airline or charter operator, and will maintain all rights, privileges, licenses and franchises material thereto or material to performing its obligations under this Lease;

(c)    ensure that the Habitual Base remains the habitual base of the Aircraft unless Lessor gives prior written consent to a change; and

(d)    not operate, maintain, insure or deal with the Aircraft in a manner which discriminates against the Aircraft, when compared with the manner in which Lessee operates, maintains, insures or deals with similar aircraft, engines or parts in Lessee's fleet.

## 8.8    Records

Lessee will keep the Aircraft Documents and Records:

(a)    in the English language;

(b)    according to best airline practice; and

(c)    so they meet the requirements of applicable Regulations, including FAR 91.417 (unless such standards conflict with Air Authority requirements) and Lessee's Maintenance Programme.

## 8.9    Protection

Lessee will:

(a)    keep the Aircraft registered with the Air Authority and, where applicable, comply with the Geneva Convention;

2007-08-07
Prima Charters Sp. z o. o.

(b)     if permitted or advisable under the applicable Regulations of the State of Registry, record on each relevant register that Lessor is the owner of the Aircraft and, if such facilities exist (i) file this Lease (or particulars thereof) on the public record and (ii) file notices as to the interests of the Financing Parties;

(c)     make any changes to the registered particulars that may be necessary or advisable to take account of any change in the ownership or financing of the Aircraft, (to the extent consistent with this Lease), or of any modification to the Aircraft (such as the permanent replacement of any Engine or Part in accordance with this Lease) or of any change in applicable Regulations. Lessor will bear any costs incurred as a consequence of a change in ownership or financing of the Aircraft (unless such change follows a default on Lessee's part, when Lessee shall bear those costs) and Lessee will bear any other costs incurred in complying with this Section; and

(d)     as soon as practicable following the date on which there shall be brought into force in the State of Registry any legislation or other provisions (i) giving effect to the Cape Town Convention or (ii) otherwise relating to the recognition of rights in the Aircraft or the Engines under the Cape Town Convention (the "CTC Date"), then, to the extent necessary or reasonably advisable (A) registrations shall be made by Lessor, and consented to by Lessee, so as to permit the interests created hereunder to be perfected as "international interests" under the Cape Town Convention, and (B) Lessor and Lessee shall amend, restate, revise, or otherwise adapt this Lease in such a manner as to permit the interests created hereunder to constitute "international interests" under the Cape Town Convention.    The new transaction documents shall retain the commercial agreements set forth herein modified only to ensure that an international interest is constituted. The new transaction documents shall contain such additional provisions as may be necessary to provide for the enforceability of the commercial agreements of the parties under the Cape Town Convention to the greatest extent permitted under the Cape Town Convention.  Lessor and Lessee intend that the priority of any security interest granted pursuant to this Agreement shall not be prejudiced by any change made pursuant to this Section 8.9(d).  In the event that Lessor, acting reasonably, shall determine that an unacceptable risk of such prejudice to any such security interest will or is reasonably likely to arise as a result of any change made pursuant to this Section 8.9(d), this Lease shall remain in full force and effect, subordinated as to enforcement only, to any new documents which the parties may execute and deliver in order to effect application of the Cape Town Convention to the Aircraft. The parties further agree that each international interest arising under the Cape Town Convention as a result of actions taken pursuant to this Section shall be registered in the International Registry as soon as possible following the Cape Town Convention taking effect in the State of Registry, and that such registration(s) shall be made by, or with the consent of, Lessor, or any duly authorized agent thereof, and shall be consented to by Lessee. All reasonable costs and expenses arising as a result of actions taken pursuant to this Section 8.9(d), including, but not limited to, reasonable attorney's fees and registration fees, shall be for the account of Lessee.

## 8.10  Maintenance and Repair

Lessee will maintain, overhaul and repair the Aircraft, so that:

(a)     the Aircraft is kept in as good operating condition and repair as the condition of the Aircraft as at Delivery subject to fair wear and tear;

2007-08-07
Prima Charters Sp. z o. o.



(b)    Lessee has a current certificate of airworthiness (issued by the Air Authority in the appropriate public transport category) for the Aircraft;

(c)    the Aircraft complies with all applicable Regulations including the standard stipulated by the Air Authority (and FAR Part 121, if not in conflict with Air Authority requirements) and the requirements of all Airworthiness Directives and all service bulletins designated by the State of Design as "mandatory", and to be carried out before the Return Occasion or within the AD Compliance Period; and

(d)    all maintenance is carried out according to Lessee's Maintenance Programme through the Maintenance Performer in at least the same manner and with at least the same care, including maintenance scheduling, modification status and technical condition, as is the case with respect to similar aircraft owned or otherwise operated by Lessee.  No change shall be made to Lessee's Maintenance Programme or the Maintenance Performer without first giving reasonable written notice to Lessor of such change.

## 8.11    Removal/Interchange of Engines and Parts

(a)    **General**:  Lessee must replace any Engine that has suffered an Engine Event of Loss in accordance with Section 8.11 (b) and any Part which is permanently removed from the Aircraft must be replaced in accordance with Section 8.11 (b). Any Engine or Part may be installed on another aircraft Lessee owns or leases in accordance with Section 8.11 (c). Lessee may temporarily install an engine or part in accordance with Section 8.11 (d). Lessee will ensure that any Engine or Part not installed on the Aircraft (or an aircraft permitted by Section 8.11 (c)) is properly and safely stored and insured and kept free of Security Interests (other than Permitted Liens).

(b)    **Permanent Replacement**:  If Lessee permanently replaces an Engine or Part:

   (i)    in the case of an Engine, it must be a Replacement Engine;

   (ii)    in the case of a Part, the replacement part must be an OEM approved Part, if available, be in good operating condition, be of the same (or better) value and utility, must not have been involved in an incident or accident, must not have been installed on an aircraft registered on a military aircraft register, must have as much useful life available until the next expected maintenance procedure and be of the same or a more advanced make and model and of the same interchangeable modification status as the Part it is replacing;

   (iii)    the Replacement Engine or replacement part must have become and remain, until replaced in accordance with this Section, the property of Owner free from Security Interests (other than Permitted Liens); and

   (iv)    Lessee must have full details of the source and maintenance records of the Replacement Engine or replacement part. In the case of replacement serialised parts, documentation shall have Back-To-Birth Traceability and in the case of serialised rotable parts, include a complete service history.

(c)    **Other Aircraft**:  An Engine or Part may be installed on an aircraft which Lessee owns or leases, where that other aircraft is insured to Lessor's satisfaction, if:

- 21 -

2007-08-07
Prima Charters Sp. z o. o.

(i)     no Event of Default has occurred and is continuing;

(ii)    Lessee or a Permitted Sub-Lessee (if any) has operational control over the aircraft;

(iii)   Lessor keeps the ownership of the Engine or Part concerned until replaced in accordance with this Section;

(iv)    the Engine or Part does not become subject to a Security Interest (other than a Permitted Lien); and

(v)     the Engine or Part is removed from the aircraft as soon as practicable but not later than the Expiry Date.

(d)   **Temporary Replacement:** Lessee may install any engine or part on the Aircraft as a temporary replacement if:

(i)     no Event of Default has occurred and is continuing;

(ii)    as soon as reasonably practicable after an engine or part is installed on the Aircraft, but before the earlier of 120 days after such temporary replacement and the Expiry Date, Lessee removes that engine or part and replaces it with the original Engine or Part (or, in the case of a Part, by a part which is allowed by Section 8.11(b)); and

(iii)   the Insurance for the Aircraft is not affected.

(e)   **Title to Removed Engines or Parts:** Any Engine or Part at any time removed from the Aircraft will remain the property of Lessor unless and until a replacement has been effected in accordance with Section 8.11 (b) and unless and until title in that replacement has passed to Lessor subject to this Lease, free of all Security Interests, whereupon title to the replaced Engine or Part will, provided no Event of Default has occurred and is continuing, pass to Lessee.

**8.12    Equipment Changes**

Lessee will not make any material modification or addition to the Aircraft (each an "**Equipment Change**"), except for an Equipment Change which:

(a)   is expressly permitted or required by this Lease; or

(b)   has the prior written approval of Lessor and does not diminish the condition or value of the Aircraft.

So long as no Event of Default has occurred and is continuing, Lessee may, subject to any applicable Regulation, remove or reverse any Equipment Change provided that this does not diminish the value or condition of the Aircraft assuming that such Equipment Change was never made. Furthermore, Lessor may require Lessee to remove or reverse any Equipment Change prior to the Return Occasion so that, on the Expiry Date, the Aircraft is restored to the condition it was in prior to that Equipment Change.

2007-03-07
Prima Charters Sp. z o. o.



**8.13    Title on an Equipment Change**

Title to any equipment that becomes a Part or an Engine after the Delivery Date (whether by way of replacement, as the result of an Equipment Change or otherwise) that becomes vested in Lessor as contemplated by or otherwise in accordance with the provisions of this Lease shall then be subject to this Lease as if it were attached to the Aircraft at Delivery. If so requested by Lessor, Lessee will provide a properly executed bill of sale or similar instrument to evidence the vesting of title to any such equipment, free and clear of all Security Interests other than Permitted Liens, in Lessor. After Lessor has determined that Lessee has permanently replaced an Engine in accordance with Section 8.11(b) and this Section 8.13, or if Lessee is required to remove any Equipment Change as per Section 8.12, Lessor will, or will procure that Owner will, transfer to Lessee or will procure that Owner will transfer to Lessee all of Lessor's or Owner's, as the case may be, rights to the Engine that has been replaced or to the equipment that has been removed, and will provide or will procure that Owner provides a properly executed bill of sale or similar instrument to evidence the vesting of title to Lessee free and clear of all Lessor Liens.

**9.    INSURANCE**

**9.1    Insurance**

Lessee in accordance with this Lease will maintain the Insurance in full force during the Term, and thereafter as expressly required in this Lease, which shall be in line with best industry practice for comparable operators and shall be through such brokers and with such insurers and having such deductibles and subject to such exclusions as may be approved by Lessor from time to time. The Insurance shall in any event meet the requirements set out in **Schedule 7** which may be amended from time to time by Lessor with the consent of the Lessee not to be unreasonably withheld or delayed, so that the scope and level of cover is maintained in line with best industry practice and the interests of Lessor and each Indemnitee are prudently protected.

**9.2    Change**

If at any time Lessor wishes to revoke its approval of any insurer, reinsurer, insurance or reinsurance, Lessor and/or its brokers will consult with Lessee and Lessee's brokers (as for the time being approved by Lessor) regarding whether that approval should be revoked to protect the interests of the parties insured. If, following such consultation, Lessor reasonably considers that any change should be made, Lessee will then arrange or procure the arrangement of alternative cover reasonably satisfactory to Lessor.

**9.3    Insurance Undertakings and Information:**

Lessee will:

(a)    comply with the terms and conditions of each policy of Insurance and not do, consent or agree to any act or omission which:

(i)    invalidates or may invalidate the Insurance; or

(ii)    renders or may render void or voidable the whole or any part of any of the Insurance; or

- 23 -



2007-08-07
Prima Charters Sp. z o. o.

      (iii)      brings any particular liability within the scope of an exclusion or exception to the Insurance;

(b)      not take out without the prior written approval of Lessor any insurance or reinsurance in respect of the Aircraft other than that which is required under this Lease unless relating solely to hull total loss, business interruption, profit commission and deductible risk;

(c)      commence renewal procedures at least 30 days prior to expiry of any of the Insurance and provide to Lessor:

      (i)      if requested by Lessor, a written status report of renewal negotiation 14 days prior to each expiry date;

      (ii)      written confirmation (which may be supplied by fax) of completion of renewal prior to each policy expiry date;

      (iii)      certificates of insurance (and where appropriate certificates of reinsurance), and broker's (and any reinsurance broker's) letter of undertaking in a form acceptable to Lessor in English, detailing the coverage and confirming the insurers' (and any reinsurers') agreement to the specified insurance requirements of this Lease within seven days after each renewal date;

(d)      on request, provide to Lessor copies of documents or other information evidencing the Insurance; and

(e)      provide any other insurance and reinsurance related information, or assistance, in respect of the Insurance as Lessor may reasonably require.

## 9.4    Failure to Insure

If Lessee fails to maintain the Insurance in compliance with this Lease, each of the Indemnitees will be entitled but not bound (without prejudice to any other rights of Lessor under this Lease):

(a)      to pay the premiums due or to effect and maintain insurance satisfactory to it or otherwise remedy Lessee's failure in such manner (including to effect and maintain an "owner's interest" policy) as it considers appropriate. Any sums so expended by it will become immediately due and payable by Lessee to Lessor together with interest thereon at the Interest Rate, from the date of expenditure by it up to the date of reimbursement by Lessee; and

(b)      at any time while such failure is continuing to require the Aircraft to remain at any airport or to proceed to and remain at any airport designated by it until the failure is remedied to its satisfaction.

## 10.    INDEMNITY

## 10.1    General

(a)      Lessee agrees to assume liability for and indemnifies each of the Indemnitees against and agrees to pay on demand Losses which an Indemnitee may suffer at any time whether directly or indirectly as a result of any act or omission in relation to:

2007-08-07
Prima Charters Sp. z o. o.

(i)     the ownership, operation, maintenance, repair, possession, transfer of ownership
or possession, import, export, registration, storage, modification, leasing,
insurance, inspection, testing, design, sub-leasing, use, condition or other matters
relating to the Aircraft; or

(ii)    any breach by Lessee of its obligations under this Lease.

(b)     Lessee need not indemnify any particular Indemnitee under this Section, to the extent the
Loss is:

(i)     caused solely by the deliberate misconduct or reckless behaviour of any
Indemnitee;

(ii)    caused solely by Lessor's breach of this Lease which does not result from an
Event of Default;

(iii)   a Tax or other Loss covered pursuant to another indemnity provision of this
Lease;

(iv)    caused solely by an event which occurs before the commencement of the Term
(except where the Loss is suffered during the Term as a result of a pre-Delivery
defect or fault in the manufacture, design, maintenance, repair, rebuilding,
overhaul or modification of the Aircraft);

(v)     caused solely by an event which occurs after the proper redelivery of the Aircraft
to Lessor hereunder and is not attributable to any act, omission, event or
circumstance occurring prior to such redelivery; or

(vi)    caused by or related to any transfer or disposition by an Indemnitee of the
Aircraft, title thereto or any interest therein, or in this Lease, other than as a result
of an Event of Default.

## 10.2    Duration

The indemnities contained in this Lease will continue in full force and effect following the Expiry
Date notwithstanding any termination of the leasing of the Aircraft under this Lease.

## 11.    EVENTS OF LOSS

### 11.1    Events of Loss

(a)     If an Event of Loss occurs prior to Delivery, this Lease will immediately terminate and
except as expressly stated in this Lease and/or under any Other Agreement, neither party
will have any further obligation other than pursuant to Section 5.19, except that Lessor
will return the Deposited Amounts to Lessee.

(b)     If an Event of Loss occurs after Delivery, Lessee will pay the Agreed Value to Lessor on
or prior to the earlier of (i) 90 days after the Event of Loss and (ii) the date of receipt of
insurance proceeds in respect of that Event of Loss.

2007-08-07
Prima Charters Sp. z o. o.

(c)   Subject to the rights of any insurers and reinsurers or other third party, upon irrevocable payment in full to Lessor of the Agreed Value and all other amounts which then may be due and owing to Lessor under this Lease, Lessor will, without recourse or warranty (except as to freedom from Lessor's Liens and other Security Interests attributable to the Lessor) transfer to Lessee all of Lessor's rights to the Aircraft, on an as-is where-is basis, and will at Lessee's expense, execute and deliver or will procure that Owner executes and delivers such bills of sale and other documents and instruments as Lessee may reasonably request to evidence (on the public record or otherwise) such transfer, free and clear of all rights of Lessor and Lessor Liens. Lessee shall indemnify Lessor for all fees, expenses and Taxes incurred by Lessor in connection with any such transfer.

## 11.2   Requisition

During any requisition for use or hire of the Aircraft, any Engine or Part, which does not constitute an Event of Loss:

(a)   the Rent and other charges payable under this Lease will not be suspended or abated either in whole or in part, and Lessee will not be released from any of its other obligations (other than operational obligations with which Lessee is unable to comply solely by virtue of the requisition); and

(b)   so long as no Event of Default has occurred and is continuing, Lessee will be entitled to any hire paid by the requisitioning authority in respect of the Term. Lessee will, as soon as practicable after the end of any such requisition, cause the Aircraft to be put into the condition required by this Lease. Lessor will be entitled to all compensation payable by the requisitioning authority in respect of any change in the structure, state or condition of the Aircraft arising during the period of requisition, and Lessor will apply such compensation in reimbursing Lessee for the cost of complying with its obligations under this Lease in respect of any such change, but, if any Event of Default has occurred and is continuing, Lessor may apply the compensation or hire in or towards settlement of any amounts owing by Lessee under this Lease and/or under any Other Agreement.

## 12.   RETURN OF AIRCRAFT

### 12.1   Return

On the Expiry Date or redelivery of the Aircraft pursuant to Section 13.2 or termination of the leasing of the Aircraft under this Lease, Lessee will, unless an Event of Loss has occurred, or Lessee has exercised its Purchase Option, redeliver the Aircraft and the Aircraft Documents and Records at Lessee's expense to Lessor at the Redelivery Location, in accordance with the procedures and in compliance with the conditions set out in **Schedule 6**, free and clear of all Security Interests (other than Lessor Liens) and in a condition suitable for immediate operation under FAR Part 121 or as otherwise agreed by Lessor and Lessee and, in any case, qualifying for and having a valid and fully effective certificate of airworthiness issued by the Air Authority. If requested by Lessor, Lessee shall thereupon cause the Aircraft to be deregistered by the Air Authority.

### 12.2   Non-Compliance

If at the time of Final Inspection Lessee has not fully complied with any of its obligations under this Lease (including **Schedule 6**), or Lessee fails to make the Aircraft available to Lessor on a

- 26 -

timely basis for inspection and redelivery pursuant to Section 12.1 and **Schedule 6** (whether such failure is due to any act or omission of Lessee or any other circumstance whatsoever), the Term shall be extended until the time when the Aircraft has been redelivered to Lessor in full compliance with this Lease, for the sole purpose of enabling such non-compliance or failure to be promptly rectified and during such extension period:

(a)     Lessee shall not use the Aircraft in flight operations except those related directly to the re-delivery of the Aircraft to Lessor;

(b)     all Lessee's obligations and covenants under this Lease will remain in full force until Lessee so redelivers the Aircraft; and

(c)     Lessee shall pay Rent to Lessor, calculated on a per diem basis based upon a rate per month equal to the amount of Rent payable in respect of the last scheduled Rental Period plus ten percent (10%).

Any such extension shall not prejudice Lessor's right to treat such non-compliance or failure as an Event of Default at any time, and to enforce such rights and remedies as may be available to Lessor in respect thereof under the terms of this Lease or applicable Law. Without limiting the generality of the foregoing, Lessee's Rent obligation under paragraph (c) above shall be without prejudice to Lessor's rights to terminate the letting of the Aircraft and to indemnification pursuant to Section 13.3.

Lessor may elect (either on first tender of the Aircraft by Lessee or at any time during the said extension period) to accept redelivery of the Aircraft notwithstanding non-compliance with Section 12.1 or **Schedule 6**, in which case Lessee will indemnify Lessor, and provide cash to Lessor (in an amount satisfactory to Lessor) as security for that indemnity in respect of the cost to Lessor of putting the Aircraft into the condition required by this Lease.

**12.3    Redelivery**

Upon redelivery Lessee will provide to Lessor all documents necessary to export the Aircraft from the Habitual Base and the State of Registry (including a valid and subsisting export license and certificate of airworthiness for export of the Aircraft to the U.S.A.) and required in relation to the deregistration of the Aircraft with the Air Authority.

**12.4    Acknowledgement**

Provided Lessee has complied with its obligations under Section 12 and **Schedule 6** of this Lease, following redelivery of the Aircraft by Lessee to Lessor at the Redelivery Location, Lessor will deliver to Lessee an acknowledgement confirming that Lessee has redelivered the Aircraft to Lessor in accordance with this Lease which acknowledgement shall be without prejudice to Lessor's accrued and continuing rights under this Lease, any Other Agreements or arising by Law.

**13.     DEFAULT**

**13.1    Events**

The occurrence of any of the Events of Default will constitute a repudiation (but not a termination) of this Lease by Lessee (whether the occurrence of any such Event of Default is

- 27 -



voluntary or involuntary or occurs by operation of Law or pursuant to or in compliance with any judgement, decree or order of any court or any order, rule or regulation of any Government Entity).

## 13.2    Rights and Remedies

If an Event of Default occurs, Lessor may at its option (and without prejudice to any of its other rights under this Lease and/or otherwise), at any time thereafter (without notice to Lessee except as required under applicable Law):

(a)    accept such repudiation and by notice to Lessee and with immediate effect terminate the leasing of the Aircraft (but without prejudice to the continuing obligations of Lessee under this Lease), whereupon all rights of Lessee under this Lease shall cease; and/or

(b)    proceed by appropriate court action or actions to enforce performance of this Lease or to recover damages for the breach of this Lease; and/or

(c)    either:

    (i)    take possession of the Aircraft, for which purpose Lessor may enter any premises belonging to or in the occupation of or under the control of Lessee where the Aircraft may be located, or cause the Aircraft to be redelivered to Lessor at the Redelivery Location (or such other location as Lessor may require), and Lessor is hereby irrevocably by way of security for Lessee's obligations under this Lease appointed attorney for Lessee in causing the redelivery or in directing the pilots of Lessee or other pilots to fly the Aircraft to that airport and will have all the powers and authorisations necessary for taking that action; or

    (ii)    by serving notice require Lessee to redeliver the Aircraft to Lessor at the Redelivery Location (or such other location as Lessor may require).

## 13.3    Default Indemnity

If an Event of Default occurs, or the Aircraft is not delivered on the proposed Delivery Date by reason of failure of Lessee to satisfy any conditions to that delivery, Lessee will indemnify Lessor on demand against any Loss which Lessor may sustain or incur directly or indirectly as a result of such Event of Default or non-delivery, including:

(a)    any loss of profit suffered by Lessor because of Lessor's inability to place the Aircraft on lease with another lessee on terms as favourable to Lessor as this Lease, or because whatever use, if any, to which Lessor is able to put the Aircraft upon its return to Lessor, or the funds arising upon a sale or other disposal of the Aircraft, is not as profitable to Lessor as this Lease;

(b)    any Loss which may be incurred in repaying funds raised to finance the Aircraft or in unwinding any swap, forward interest rate agreement or other financial instrument relating in whole or in part to Lessor's financing of the Aircraft; and

(c)    any Loss sustained or incurred by Lessor in or as a result of exercising any of its rights or remedies pursuant to Section 13.2 or as a result of Lessee's failure to redeliver the Aircraft on the date, at the place and in the condition required by this Lease.

2007-08-07
Prima Charters Sp. z o. o.

Lessor will use reasonable endeavours to mitigate such Losses, but (i) Lessor shall not be obliged to consult with Lessee concerning any proposed course of action or to notify Lessee of the taking of any particular action, and (ii) this provision is without prejudice to Lessor's rights under Section 13.4.

### 13.4    Sale or Re-lease of Aircraft

If an Event of Default occurs, Lessor may sell or re-lease or otherwise deal with the Aircraft at such time and in such manner and on such terms as Lessor considers appropriate in its absolute discretion, free and clear of any interest of Lessee, as if this Lease had never been entered into.

### 13.5    Deregistration

If an Event of Default occurs, Lessee will at the request of Lessor immediately take all steps necessary to effect deregistration of the Aircraft and its export from the country where the Aircraft is for the time being situated, and any other steps necessary to enable the Aircraft to be redelivered to Lessor in accordance with this Lease and Lessee hereby irrevocably and by way of security for its obligations under this Lease appoints (which appointment is coupled with an interest) Lessor as its attorney to execute and deliver any documentation and to do any act or thing required in connection with the foregoing.

## 14.    TRANSFER

### 14.1    Lessee

Lessee will not transfer any of its rights or obligations under this Lease, other than as expressly permitted herein or as Lessor may otherwise consent.

### 14.2    Lessor

Subject to Section 14.3, Lessor may, without the consent of Lessee, transfer any of its rights or obligations under this Lease or any of its right, title or interest in and to the Aircraft, including pursuant to:

(a)    a sale and leaseback; or

(b)    a novation of this Lease together with a sale of the Aircraft; or

(c)    a secured loan financing.

Lessee agrees promptly to execute and deliver in connection with any transfer such documents and assurances (including a consent to the transfer) and to take such further action as Lessor may reasonably request to establish or protect the rights and remedies created or intended to be created in favour of the transferees in connection with any transfer.

### 14.3    Conditions

In connection with any such transfer by Lessor, as a condition to such transfer becoming effective:

(a)    **Quiet Enjoyment:** As a condition precedent to such transfer becoming effective, Lessor will procure that the transferee or any new owner of the Aircraft (save where such new

2007-08-07
Prima Charters Sp. z o. o.

owner is also the "Lessor" hereunder in accordance with this Section 14.3) or any new holder of a mortgage over the Aircraft or any holder of an interest in the Aircraft (by way of security or otherwise), as the case may be, shall execute and deliver to Lessee a letter of quiet enjoyment in respect of Lessee's use and possession of the Aircraft in a form substantially similar to Lessor's covenant in Section 7.1 hereof and providing not less than 10 business days' written notification of any such transfer, and providing any necessary documentation required under this Section 14.3;

(b)     **Costs:** Lessor shall reimburse to Lessee its reasonable out-of-pocket expenses (including legal expenses) actually incurred in connection with co-operating with Lessor in relation to any such transfer referred to in this Section 14, provided that (i) such expenses are substantiated to Lessor's reasonable satisfaction and (ii) that no Event of Default has occurred and is continuing;

(c)     **No Additional Cost:** If at the time of any such assignment or transfer by Lessor there arises an obligation to make a payment to the assignee or transferee which exceeds the amount which Lessee would have been obliged to pay under the Lease to Lessor if no such assignment or transfer had taken place, then Lessee shall not be obliged to pay the amount of such excess; and

(d)     **No Alteration of Terms:** The assignment or transfer shall not alter the economic terms and conditions of the Lease in any respect without the prior consent of Lessee, and Lessee's financial and other obligations hereunder shall not be increased nor shall Lessee's rights be reduced as a result of such assignment or transfer.

(e)     **Assumption:** In the case of a proposed transferee lessor, it shall have entered into one or more legal, valid and enforceable agreements effective to confirm that such transferee shall be bound by all of the terms of this Lease and have all of the obligations of Lessor arising under this Lease, in each case arising after and attributable to the period after the effectiveness of such transfer and in which such transferee makes representations and warranties as of the date of such transfer substantially the same as those referenced in Section 2.2 of this Lease.

(f)     **Registration:** The proposed transfer shall not have any adverse impact on the continued registration of the Aircraft in the State of Registry.

(g)     **Net Worth:** In the case of a proposed transferee lessor, it shall have demonstrated to Lessee that it has a tangible net worth not less than that of Lessor as of the date of this Lease or shall have provided Lessee with a guarantee of all of such transferee's obligations under this Lease, in form and substance reasonably satisfactory to Lessee, by a guarantor having reasonably demonstrated to Lessee such required tangible net worth.

## 15.    MISCELLANEOUS

### 15.1    Illegality

Subject to Section 15.4, if it is or becomes unlawful in any jurisdiction for Lessor to give effect to any of its material obligations as contemplated by this Lease or to continue this Lease, Lessor may by notice in writing to Lessee terminate the leasing of the Aircraft under this Lease, such termination to take effect on the latest date (the "**Effective Date**") on which Lessor may continue such leasing and such obligations without being in breach of applicable Regulations, and Lessee

2007-08-07
Prima Charters Sp. z o. o.



will forthwith redeliver the Aircraft to Lessor in accordance with Section 12. Without prejudice to the foregoing, Lessor will consult in good faith with Lessee up to the Effective Date as to any steps which may be taken (at no material cost to Lessee) to restructure the transaction to avoid such unlawfulness and will take any such steps commercially reasonable to continue the effectiveness of this Lease.

**15.2    Waivers, Remedies Cumulative**

The rights of Lessor under this Lease may be exercised as often as necessary, are cumulative and not exclusive of its rights under any Law; and may be waived only in writing and specifically. Delay by Lessor in exercising, or non-exercise of, any such right will not constitute a waiver of that right.

**15.3    Delegation**

Lessor may delegate to any Person all or any of the rights, powers or discretions vested in it by this Lease, and any such delegation may be made upon such terms and conditions and subject to such regulations (including power to sub-delegate) as Lessor in its absolute discretion thinks fit.

**15.4    Severability**

If a provision of this Lease is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)     the legality, validity or enforceability in that jurisdiction of any other provision of this Lease; or

(b)     the legality, validity or enforceability in any other jurisdiction of that or any other provision of this Lease.

**15.5    Remedy**

If Lessee fails to comply with any provision of this Lease, Lessor may, without being in any way obliged to do so or responsible for so doing and without prejudice to the ability of Lessor to treat such non-compliance as a Default, effect compliance on behalf of Lessee, whereupon Lessee shall become liable to pay immediately any sums expended by Lessor together with all costs and expenses (including legal costs) in connection with the non-compliance.

**15.6    Time of Essence**

The time stipulated in this Lease for all payments payable by Lessee and the prompt, punctual performance of Lessee's other obligations under this Lease are of the essence of this Lease.

**15.7    Notices**

All notices and other communications under, or in connection with, this Lease will, unless otherwise stated, be given in writing by hand delivery, mail, overnight courier service, facsimile or email (where such address is available). Any such notice or other communication is deemed effectively given when received by the recipient (or if receipt is refused by the intended recipient, when so refused).



2007-08-07
Prima Charters Sp. z o. o.

The address, facsimile and email details for notices to Lessee and Lessor are as set out below or as otherwise advised by one party to the other in writing and in compliance with this Section 15.7 from time to time:

**If to Lessor:**

| | |
|---|---|
| Address: | **Alliance Continental Leasing, LLC**<br>Creekside Professional Center<br>6715 Tippecanoe Road<br>Building A, Suite 202<br>Canfield, Ohio 44406<br>USA |
| Attention: | John C. Green<br>Managing Director/CEO |
| Facsimile: | (330) 702-1938 |
| Email: | jcg@commercialaerospacecapitalcorporation.com |
| with a copy to: | **Edwards Angell Palmer & Dodge LLP**<br>919 North Market Street<br>15ᵗʰ Floor<br>Wilmington, DE<br>19801 |
| Attention: | |
| Facsimile: | |

**If to Lessee:**

| | |
|---|---|
| Address: | **Prima Charter Sp. z o. o.**<br>ul. 17 Stycznia 56<br>02-146 Warsaw, Poland |
| Attention: | Filip Cias<br>Chief Financial Officer |
| Facsimile: | 011 48 22 500 28 81 |
| E-mail: | fillip.cias@primacharter.pl |
| With copy to: | **Chapman & Cutler LLP**<br>111 West Monroe Street<br>Chicago, IL 60603 |
| Attention: | Thomas C. Lee Esq. |
| Facsimile: | (312) 516- 1880 |
| E-mail: | thomaslee@chapman.com |

### 15.8    Governing Law and Jurisdiction

(a)    This Lease in all respects shall be governed by, and construed in accordance with, the Laws of the State of New York.

2007-08-07
Prima Charters Sp. z o. o.



(b)    Each of Lessee and Lessor hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the City and County of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Lease and each of Lessee and Lessor hereby irrevocably and unconditionally agrees that all claims in respect of such action or proceeding may be heard and determined in such court in the State of New York or, to the extent permitted by law, in such federal court.

(c)    Without prejudice to any other mode of service, Lessee and Lessor each consent to the service of process relating to any such proceedings by delivery or prepaid mailing of a copy of the process to the address identified in Section 15.7 or by fax or prepaid mailing by air mail, certified or registered mail of a copy of the process to the fax number or address for notices.

(d)    Each party:

    (i)    waives to the fullest permitted by Law any objection which it may now or hereafter have to the courts referred to in Section 15.8(b) above on grounds of inconvenient forum or otherwise as regards proceedings in connection with this Lease;

    (ii)    waives to the fullest extent permitted by Law any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Lease brought in the courts referred to in Section 15.8(b); and

    (iii)    agrees that a judgment, award or order of any court referred to in Section 15.8(b) in connection with this Lease is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction as if made by the highest court in that other jurisdiction and accordingly it will not seek to, nor be entitled to, contest and/or delay and/or obstruct registration or enforcement of any such judgment and/or award and/or order on grounds of public policy or otherwise.

(e)    This Section 15 shall survive, continue to take full effect and not merge in any order or judgment and nothing in this Section 15.8 limits the right of each party to bring proceedings against the other party in connection with this Lease:

    (i)    in any other court of competent jurisdiction; or

    (ii)    concurrently in more than one jurisdiction.

(f)    Each party irrevocably and unconditionally:

    (i)    agrees that if the other party brings legal proceedings against it or its assets in relation to this Lease no immunity from such legal proceedings (which will be deemed to include suit, attachment prior to judgement, other attachment, the obtaining of judgement, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

    (ii)    waives any such right of immunity which it or its assets now has or may in the future acquire;

2007-08-07
Prima Charters Sp. z o. o.

(iii)   waives any requirement, of any kind whatsoever, for the other party to provide any form of security in respect of the payment of any damages, costs, expenses or any other financial obligation resulting from the commencement or prosecution of proceedings or the making of or service of any order and Lessee undertakes (x) not to challenge the validity of any proceedings or the making of any orders without any requirement for the provision of such security (y) to advise any court upon the other party's request that it requires no such security and (z) to provide security itself for any third party claims arising out of or in connection with such proceedings and/or orders; and

(iv)   consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgement which may be made or given in such proceedings.

## 15.9   Sole and Entire Agreement

This Lease is the sole and entire agreement between Lessor and Lessee in relation to the leasing of the Aircraft, and supersedes all previous agreements, representations and understandings in relation to that leasing. Any amendments to this Lease must be made in writing and signed on behalf of Lessor and Lessee.

## 15.10   Counterparts

This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Lease Agreement shall not be considered in effect until originally signed copies have been duly provided to the Lessor's escrow agent; Aero Space Reports, 6916 N.W. 112th Street, Oklahoma City OK 73172 (facsimile notification 405-728-2336 ).

## 15.11   Language

All notices to be given under this Lease will be in English. All documents delivered to Lessor pursuant to this Lease will be in English, or if not in English, will be accompanied by a certified English translation. If there is any inconsistency between the English version of this Lease and any version in any other language, the English version will prevail.

## 16.   DISCLAIMERS AND WAIVERS

LESSOR AND LESSEE AGREE THAT THE DISCLAIMERS, WAIVERS AND CONFIRMATIONS SET OUT IN SECTIONS 16.1 TO 16.4 SHALL APPLY AT ALL TIMES DURING THE TERM.  LESSEE'S ACCEPTANCE OF THE AIRCRAFT IN ACCORDANCE WITH SECTION 4.3 SHALL BE CONCLUSIVE EVIDENCE THAT LESSEE HAS FULLY INSPECTED THE AIRCRAFT, THE ENGINES AND EVERY PART THEREOF AND THAT THE AIRCRAFT, THE ENGINES, THE PARTS AND THE AIRCRAFT DOCUMENTS AND RECORDS ARE TECHNICALLY ACCEPTABLE TO LESSEE AND SATISFY THE DELIVERY CONDITION REQUIREMENTS AND ARE IN SUITABLE CONDITION FOR DELIVERY TO AND ACCEPTANCE BY LESSEE.

- 34 -

2007-08-07
Prima Charters Sp. z o. o.

**16.1   Exclusion**

THE AIRCRAFT IS TO BE LEASED AND DELIVERED HEREUNDER "AS IS, WHERE IS", AND LESSEE AGREES AND ACKNOWLEDGES THAT, SAVE AS EXPRESSLY STATED IN THE LEASE:

(A)   LESSOR WILL HAVE NO LIABILITY IN RELATION TO, AND LESSOR HAS NOT AND WILL NOT BE DEEMED TO HAVE ACCEPTED, MADE OR GIVEN (WHETHER BY VIRTUE OF HAVING DONE OR FAILED TO DO ANY ACT, OR HAVING ACQUIRED OR FAILED TO ACQUIRE ANY STATUS UNDER OR IN RELATION TO THE LEASE OR OTHERWISE), ANY CONDITIONS, WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO, THE AIRCRAFT OR ANY ENGINE OR PART OR ANY SERVICES PROVIDED BY LESSOR UNDER THE LEASE, INCLUDING THE DESCRIPTION, AIRWORTHINESS, COMPLIANCE WITH SPECIFICATIONS, OPERATION, MERCHANTABILITY, QUALITY, FREEDOM FROM INFRINGEMENT OF PATENT OR OTHER PROPRIETARY RIGHTS, FITNESS FOR ANY PARTICULAR USE OR PURPOSE, VALUE, DURABILITY, DATE PROCESSING, CONDITION, OR DESIGN, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP, THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR AS TO ANY OTHER MATTER WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE) WITH RESPECT TO THE AIRCRAFT, ANY ENGINE OR ANY PART OR ANY SERVICES PROVIDED BY LESSOR UNDER THE LEASE; AND

(B)   LESSOR SHALL NOT HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER TO LESSEE (WHETHER ARISING IN CONTRACT OR IN TORT, AND WHETHER ARISING BY REFERENCE TO NEGLIGENCE, MISREPRESENTATION OR STRICT LIABILITY OF LESSOR OR OTHERWISE) FOR:

(i)    ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY THE AIRCRAFT OR ANY ENGINE OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH;

(ii)   THE USE, OPERATION OR PERFORMANCE OF THE AIRCRAFT OR ANY RISKS RELATING THERETO;

(iii)  ANY INTERRUPTION OF SERVICE, LOSS OF BUSINESS OR ANTICIPATED PROFITS OR ANY OTHER DIRECT, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE; OR

(iv)   THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF THE AIRCRAFT, ANY ENGINE OR ANY PART.

- 35 -

2007-08-07
Prima Charters Sp. z o. o.

**16.2    Waiver**

LESSEE HEREBY WAIVES, AS BETWEEN ITSELF AND THE LESSOR, ALL ITS RIGHTS IN RESPECT OF ANY CONDITION, WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, ON THE PART OF LESSOR PERTAINING TO THE AIRCRAFT AND ALL CLAIMS AGAINST LESSOR HOWSOEVER AND WHENEVER ARISING AT ANY TIME IN RESPECT OF OR OUT OF ANY OF THE MATTERS REFERRED TO IN SECTION 16.1.

**16.3    Disclaimer Of Consequential Damages**

LESSEE AGREES THAT IT SHALL NOT BE ENTITLED TO RECOVER, AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER, LOST PROFITS OR REVENUES OR CONSEQUENTIAL DAMAGES AS A RESULT OF ANY BREACH OR ALLEGED BREACH BY LESSOR OF ANY OF THE AGREEMENTS CONTAINED IN THE LEASE.

**16.4    Confirmation**

LESSEE CONFIRMS THAT IT IS FULLY AWARE OF THE PROVISIONS OF THIS SECTION 16 AND ACKNOWLEDGES THAT RENT AND OTHER AMOUNTS PAYABLE UNDER THE LEASE HAVE BEEN CALCULATED BASED ON ITS PROVISIONS.

**17.    BROKERS AND OTHER THIRD PARTIES**

**17.1    No Brokers**

Each of the parties hereby represents and warrants to the other that it has not paid, agreed to pay or caused to be paid directly or indirectly in any form, any commission, percentage, contingent fee, brokerage or other similar payments of any kind, in connection with the establishment or operation of this Lease, to any Person (other than fees payable to legal advisers).

**17.2    Indemnity**

Each party agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including reasonable legal fees) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon this Lease or the Aircraft, if such claim, suit, damage, cost or expense arises out of any breach by the indemnifying party, its employees or agents of Section 17.1.

**18.    BENEFIT OF THIRD PARTIES**

**18.1**    Any Indemnitee may enforce the terms of Section 10 (*Indemnity*) in accordance with the provisions of this Lease.

**18.2**    Any Tax Indemnitee may enforce the terms of Section 5.7 (*Tax Indemnity*) in accordance with the provisions of this Lease.

- 36 -

2007-08-07
Prima Charters Sp. z o. o.

IN WITNESS whereof the parties hereto have executed this Lease on the date shown at the beginning of the document.

**ALLIANCE CONTINENTAL LEASING LLC**

By: _____

Name: _____

Title:   Managing Director & C.E.O.

**PRIMA CHARTER SP. Z O. O.**

By: _____

Name:   _ADRIAN WYCHOLOWIEC_

Title:   President & C.E.O.

By: _____

Name: _KRZYSZTOF SZYMANSKI_

Title:  Chief Financial Officer

2007-08-07
Prima Charters Sp. z o. o.

**EXHIBIT G**

EXECUTION VERSION

## AIRCRAFT LEASE AGREEMENT

DATED AS OF

AUGUST 8, 2007

BETWEEN

ALLIANCE CONTINENTAL LEASING LLC

AND

## PRIMA CHARTER SP. Z O. O.

Boeing B757-200ER
Manufacturers Serial No. 24121

Polish Registration No. SP-FVD

2007-08-07

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTERPRETATION | 1 |
| 2. | REPRESENTATIONS AND WARRANTIES | 1 |
| 3 | CONDITIONS PRECEDENT | 1 |
| 4. | COMMENCEMENT | 1 |
| 5. | PAYMENTS | 1 |
| 6. | MANUFACTURER'S WARRANTIES | 1 |
| 7. | LESSOR'S COVENANTS | 1 |
| 8. | LESSEE'S COVENANTS | 1 |
| 9. | INSURANCE | 1 |
| 10. | INDEMNITY | 1 |
| 11. | EVENTS OF LOSS | 1 |
| 12. | RETURN OF AIRCRAFT | 1 |
| 13. | DEFAULT | 1 |
| 14. | TRANSFER | 1 |
| 15. | MISCELLANEOUS | 1 |
| 16. | DISCLAIMERS AND WAIVERS | 1 |
| 17. | BROKERS AND OTHER THIRD PARTIES | 1 |
| 18. | BENEFIT OF THIRD PARTIES | 1 |



EXECUTION VERSION

## AIRCRAFT LEASE AGREEMENT MSN: 24121

**THIS AIRCRAFT LEASE AGREEMENT** is made as of August 8, 2007

**BETWEEN:**

(1)     **Alliance Continental Leasing LLC**, a limited liability company under the laws of the State of Delaware ("**Lessor**"); and

(2)     **Prima Charter Sp. z o. o.**, with its principal place of business at ul. 17 Stycznia 56, 02-146 Warsaw, Poland ("**Lessee**").

**WHEREAS:**

(A)     Lessor desires to lease the Aircraft to Lessee; and

(B)     Lessee desire to lease the Aircraft from Lessor,

**IT IS AGREED** as follows:

1.     **INTERPRETATION**

1.1     **Definitions**

In this Lease capitalised words and expressions have the meanings set out for them in Schedule 1.

1.2     **Construction**

(a)     In this Lease, unless otherwise stated, a reference to:

(i)     "Lessor," "Lessee," or any other Person includes any of their successors and assignees;

(ii)     plural concepts shall include the singular and vice versa;

(iii)     any document shall include any changes to that document and any replacement for it;

(iv)     a Section or a Schedule is a reference to a section of or a schedule to this Lease;

(v)     any Regulation shall include any changes to that Regulation and any replacement for it;

(vi)     an obligation of a Person refers to any obligation that Person has under or in relation to this Lease or any Other Agreement; and

(vii)     "includes," "including," "include" or similar terms shall not be construed as limiting and shall mean "including, without limitation,".

(b)     Headings to Sections in this Lease are not intended to affect their meaning

2007-08-07

## 2.   REPRESENTATIONS AND WARRANTIES

### 2.1   Lessee's Representations and Warranties

Lessee makes the representations and warranties set out in Section 1.1 of **Schedule 2**. Lessee understands that these statements must be true, both when this Lease is signed and on the Delivery Date.

### 2.2   Lessor's Representations and Warranties

Lessor makes the representations and warranties set out in Section 1.2 of **Schedule 2**. Lessor understands that these statements must be true, both when this Lease is signed and on the Delivery Date.

## 3.   CONDITIONS PRECEDENT

### 3.1   Conditions Precedent

Lessee will provide each of the Conditions Precedent in a timely fashion. Lessor need not deliver and start the leasing of the Aircraft under this Lease unless each of the Conditions Precedent is satisfied.

### 3.2   Waiver

If any Condition Precedent is not satisfied on the Delivery Date and Lessor (in its absolute discretion) nonetheless agrees to deliver the Aircraft to Lessee and to start the leasing of the Aircraft, Lessee will ensure that such Condition Precedent is fulfilled within 15 days after the Delivery Date, and Lessor may treat as an Event of Default the failure of Lessee to do so.

## 4.   COMMENCEMENT

### 4.1   Leasing

(a)   Lessor shall notify Lessee as soon as possible of the Scheduled Delivery Date. Subject to Section 4.4, Lessor will lease the Aircraft to Lessee and Lessee will take the Aircraft on lease for the Term.

(b)   If (i) Lessee is unwilling or unable to accept delivery of the Aircraft on the Rent Commencement Date, or Lessee fails to fulfill any Condition Precedent on or before such date, and (ii) the Aircraft meets the Delivery Condition Requirements, then Lessee shall be obliged to pay Rent on and from the Rent Commencement Date, but, subject to Section 3.2, Lessor shall have no obligation to deliver possession of the Aircraft to Lessee unless and until Lessee fulfils all Conditions Precedent and accepts delivery of the Aircraft under this Lease.

(c)   Lessee will be responsible for all risks associated with the use and operation of the Aircraft and any loss of or damage to the Aircraft from the Delivery Date until the Return Occasion.

### 4.2   Procedure before Delivery

Lessor and Lessee will follow the Pre-Delivery Procedure.

- 2 -

2007-08-07
Prima Charters Sp. z o. o.

### 4.3    Delivery and Acceptance

After the Pre-Delivery Procedure has been carried out and so long as the Aircraft meets the Delivery Condition Requirements:

(a)    Lessor will offer to deliver the Aircraft to Lessee at the Delivery Location;

(b)    **Lessee will accept the Aircraft. Lessee must also provide evidence of its acceptance by signing the Certificate of Acceptance and delivering it to Lessor; and**

(c)    **Lessee's acceptance of the Aircraft shall be regarded as absolute, unconditional and irrevocable.**

### 4.4    Delayed Delivery

If an Unforeseen Event happens and, as a result, Delivery takes place after the Scheduled Delivery Date or does not happen:

(a)    neither Lessor nor Lessee will be responsible for any Losses that the other party may suffer resulting from the delay or from the non-delivery of the Aircraft;

(b)    Lessee will not, except in the circumstances described in Section 4.4 (c), be entitled to terminate this Lease or to reject the Aircraft when it is offered for Delivery because of the delay; and

(c)    if the Aircraft has not been offered for Delivery, in accordance with Section 4.3, by the Final Delivery Date, either party may terminate this Lease by serving notice on the other party within ten days following that Final Delivery Date. **Upon delivery of that notice all obligations of each party under this Lease will end, except that Lessor will repay to Lessee an amount equal to the Deposited Amounts.**

## 5.    PAYMENTS

### 5.1    Deposit

Each of Lessee and Lessor acknowledges that Lessee was required to pay, and has previously paid, to Lessor: (a) ~~a security deposit equal to the Deposit,~~ and (b) a maintenance reserve deposit in the amount of $150,000.00 (collectively with the Deposit, the "**Deposited Amounts**").

### 5.2    Rental Periods

The first Rental Period will start 30 days after the Rent Commencement Date. Each subsequent Rental Period will start on the date immediately following the last day of the previous Rental Period. Each Rental Period will end on the date immediately before the numerically corresponding day in the next month, except that:

(a)    if there is no numerically corresponding day in that month, it will end on the last day of that month; and

(b)    if a Rental Period would otherwise overrun the Expiry Date, it will end on the Expiry Date.

2007-08-07
Prima Charters Sp. z o.

## 5.3    Rent

(a)    **Time of Payment:** Lessee will pay to Lessor or its order Rent in advance on each Rent Date. Lessor must receive value for the payment on the Rent Date. If a Rental Period begins on a non-Business Day, the Rent payable in respect of that Rental Period shall be paid on the Business Day immediately before that day.

(b)    **Amount:** The Rent payable in respect of each Rental Period during the Term will be $215,000.00 and will be payable monthly in advance.

### Supplemental Rent

(c)    **Amount** Lessee will pay Supplemental Rent, at the rates referred to below, to Lessor in relation to each calendar month (or part of a month) of the Term, on the fifteenth day following the end of that calendar month, (except that the last payment of Supplemental Rent during the Term shall be paid on the Expiry Date):

| | |
|---|---|
| Airframe Supplemental Rent: | (C) Check Rate: $28.00 for each Flight Hour |
| APU Supplemental Rent: | $35.00 for each Flight Hour |
| Engine Supplemental Rent: | $210.00 for each Engine Flight Hour |
| Engine LLP Supplemental Rent: | $145.00 for each Engine Cycle |
| Landing Gear Supplemental Rent: | $3,850.00 for each calendar month. |

(d)    **Adjustment:** The Supplemental Rent rates shall be adjusted after the Delivery Date not more frequently than annually (with any such adjustment having retroactive application as appropriate to reflect the provisions of paragraphs (ii) to (iv) below) based on the following:

   (i)    **Annual Supplemental Rent Adjustment:** by the Annual Supplemental Rent Adjustment, compounded annually commencing on the first anniversary of the Delivery Date, as an agreed inflation adjustment.

   (ii)    **Hour to Cycle Ratio Adjustment:** Lessor and Lessee acknowledge that the Engine Supplemental Rent rate and the Engine LLP Supplemental Rent rate are based upon the assumption that the Aircraft will operate on a 3 Flight Hours to one Cycle ratio (3:1) (the "**Assumed Ratio**"). If that assumption proves to be incorrect at any time during the Term based upon Lessee's actual operating experience during the previous 12 months, and the Flight Hour to Cycle ratio differs from the Assumed Ratio by more than 0.1 during such 12 month period, Lessor shall have the right, upon written notice to Lessee, to adjust the Engine Supplemental Rent Rate and the Engine LLP Supplemental Rent Rate (in the case of a decrease in the ratio below the Assumed Ratio) and Lessor, upon written request from Lessee, will make that adjustment (in the case of an increase in the ratio above the Assumed Ratio).

   Any adjustment shall be based on the following table. Actual Flight Hour to Cycle ratios may fall outside the ratios identified in that table. In that case, the actual values shall be determined by extrapolating the closest observed intervals in the table.

- 4 -

200⁷-08-07
Prima Charters Sp. z o.o.



| Assumed Ratio Adjustment table: | Flight Hour Cycle Ratio: | 2 | 2.5 | 3 | 3.5 | 4 |
|---|---|---|---|---|---|---|
| | Engine Supplemental Rent: | $220 | $215 | $210 | $205 | $200 |
| | Engine LLP Supplemental Rent: | $145 | $145 | $145 | $145 | $145 |

(iii) **Assumed Utilisation Adjustment:** Lessor and Lessee acknowledge that the Airframe Supplemental Rent rate, APU Supplemental Rent rate and Landing Gear Supplemental Rent rate are based upon the assumption that the Aircraft will operate on a utilisation of 3600 Flight Hours per 12 month period (the "**Assumed Utilisation**"). If that assumption proves to be incorrect at any time during the Term based upon Lessee's actual operating experience during the previous 12 months such that the Assumed Utilisation is 110% or greater than Lessee's actual utilisation of the Aircraft, Lessor may make, and notify Lessee of, such adjustment as Lessor determines is necessary in its reasonable discretion to maintain the rates of Airframe Supplemental Rent, APU Supplemental Rent and Landing Gear Supplemental Rent at levels which accurately reflect the costs associated with obtaining relevant maintenance services at prevailing industry rates.

(iv) **Material Revision to Maintenance Programme:** If Lessee's Maintenance Programme is materially revised, Lessor may make, and notify Lessee of, such adjustment as Lessor (in its discretion, acting reasonably) determines is necessary to maintain the Supplemental Rent at levels which accurately reflect the costs associated with obtaining relevant maintenance services at prevailing industry rates. Each notice shall specify the revised Supplemental Rent rates and the effective date of such revision and Lessee shall be bound by it. Lessee agrees to advise Lessor, in writing, promptly following any occurrence, which would result in the assumptions mentioned in paragraphs (ii) and (iii) above becoming incorrect at any time during the Term.

### 5.4 Payments

All payments by Lessee to Lessor under this Lease will be made for value on the due date in Dollars and in immediately available funds settled through the New York Clearing House System or such other funds as may for the time being be customary for the settlement in New York City of payments in Dollars by wire transfer to.

KEY Bank N.A., 5712 Market Street, Youngstown, Ohio 44512, ABA/ ROUTING Number: 041001039, SWIFT CODE: KEY BUS 33, Account Number: 352291003180, for the account of Robert J. Rohrbaugh II Esq. For Alliance Continental Leasing LLC, or such other account as

2007-08-07
Prima Charters Sp. z o. o.

Lessor designates in writing from time to time, with a minimum of 10 days' advance notice of any such change or revision.

## 5.5 Withholding and Tax Credit

(a) **Withholding**: Lessee must not deduct any amount from any of its payments under this Lease, for or on account of any Taxes, unless it is required by Law to do so, in which case Lessee must:

   (i)   deduct the minimum amount necessary to comply with the Law;

   (ii)  pay Lessor an extra amount so that Lessor receives a net amount on the relevant payment date, that is equal to the amount that it would have received if the deduction had not been made. The amount of any such payment by Lessee shall be made taking into account the principles of Section 5.9 so that Lessor shall be in no worse position than it would have been if the deduction had not applied in the first place;

   (iii) pay the Tax to the relevant taxing authority according to the relevant Law; and

   (iv)  obtain a receipt (if one is available) from the relevant taxing authority and give it to Lessor.

(b) **Tax Credit**: If Lessor, in good faith, determines that it has realised a tax benefit (by way of deduction, credit or otherwise) as a result of any payment for which Lessee is liable under Section 5.5(a), 5.6(a), or 5.7(b), Lessor shall pay to Lessee as soon as practicable after the tax benefit has been realised (but not before Lessee has made all payments and indemnities to Lessor required under this Section), an amount which will ensure that (after taking account of the payment itself) Lessor is in no better and no worse position than it would have been if the deduction had not applied.

   Nothing in this Section 5.5(b) shall:

   (i)   interfere with the right of Lessor to arrange its tax affairs in whatever manner it thinks fit; or

   (ii)  oblige Lessor to disclose any information relating to its tax affairs or any tax computations.

## 5.6 Tax Indemnity

(a) Lessee will indemnify each Tax Indemnitee against all Relevant Taxes.

(b) Lessee need not indemnify a Tax Indemnitee under this Section 5.6 to the extent that the Tax arises because of:

   (i)   the deliberate misconduct or reckless behaviour of any Tax Indemnitee;

   (ii)  a Tax liability any Tax Indemnitee would have had even if this Lease had not been entered into; or

2007-08-07
Prima Charters Sp. z o. o.

Case 2:08-cv-01027-JSR    Document 12-8    Filed 03/27/2008    Page 10 of 65

(iii)   a Tax liability charged on any Tax Indemnitee's income, profits or gains by any Government Entity, but excluding any Tax imposed by any Government Entity of any jurisdiction if and to the extent that such Tax results from (x) the use, operation, presence or registration of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax, or (y) the *situs* of organisation, any place of business or any activity of Lessee or any other Person having use, possession or custody of the Aircraft, the Airframe, any Engine or any Part in the jurisdiction imposing the Tax; or

(iv)    an imposition with respect to any period commencing or event occurring (x) prior to the Delivery Date or (y) after the Expiry Date and, in either case, unrelated to Lessor's dealings with Lessee or to the transactions contemplated by this Lease.

(c)     Lessee covenants that it will not take any action which would be contrary to the ownership of the aircraft by the Lessor.

## 5.7    Value Added Tax

(a)     For the purposes of this Section 5.8:

(i)     "VAT" means value added tax and any goods and services, sales or turnover tax, imposition or levy of a like nature;

(ii)    "supply" includes anything on or in respect of which VAT is chargeable.

(b)     Lessee will pay to Lessor or the relevant taxing authority and indemnify Lessor against the amount of any VAT chargeable in respect of any supply for VAT purposes under this Lease.  Lessee shall provide evidence to Lessor, if available, in respect of any payment it makes of such VAT.  The amount of any such payment to Lessor shall be made taking into account the principles of Section 5.9.

(c)     Each amount stated as payable by Lessee under this Lease is exclusive of VAT (if any).

## 5.8    Tax Contest

If Lessee disputes the payment of any Taxes payable by Lessor or any Tax Indemnitee for which Lessee is responsible under this Lease, Lessor will consider with Lessee the taking of such action as Lessee may reasonably request at Lessee's expense to contest that payment, but neither Lessor nor any Tax Indemnitee will be obliged to take any such action  (i) which Lessor or such Tax Indemnitee considers in its sole discretion may prejudice it; or (ii) which Lessor or such Tax Indemnitee considers does not have a reasonable prospect of success; or (iii) involves a sum of less than $10,000.

## 5.9    Indemnity Payments - After-Tax Basis

The amount of any payment made under Section 5.5(a) (ii) (*Withholding*), Section 5.6 (*Tax Indemnity*), Section 5.7 (*Value Added Tax*), Section 5.19 (*Expenses*), Section 8.13 (*Title on an Equipment Change*), Section 10 (*Indemnity*), Section 11.1(c) (*Events of Loss*), Section 12.2 (*Non-Compliance*) or Section 13 (*Default*) must take into account the Tax treatment of the payment and of the Loss in respect of which the payment is claimed so that the Indemnitee is fully

- 7 -

compensated, after that Tax treatment has been taken into account, for the Loss for which the relevant claim is made.

## 5.10    Lessor Obligations Following Expiry Date

Within five Business Days after:

(a)    redelivery of the Aircraft to Lessor in accordance with and in the condition required by this Lease; or

(b)    payment to Lessor of the Agreed Value following an Event of Loss after the Delivery Date;

(c)    termination of this Lease prior to the commencement of the Term in accordance with the provisions of this Lease; or in each case such later time as Lessor is satisfied that Lessee has irrevocably paid to Lessor all amounts which may then be due and owing under this Lease and the Other Agreements:

    (i)    Lessor will pay to Lessee the equivalent amount of the balance of the Deposit; and

    (ii)    Lessor will pay to Lessee the amount of any Rent received in respect of any period falling after the date of redelivery of the Aircraft or payment of the Agreed Value, as the case may be.

## 5.11    Net Lease

This Lease is a net lease. Lessee's obligation to pay Rent and to perform all of its other obligations is absolute and unconditional no matter what happens and no matter how fundamental or unforeseen the event. Lessee shall not regard its obligations as ended, suspended or altered in any way because of any defence, set-off, counterclaim, recoupment or other right of any kind or of any other circumstance.

Nothing in this Section 5.11 will be construed to limit Lessee's right to institute separate legal proceedings against Lessor in the event of Lessor's breach of this Lease or to limit Lessee's rights and remedies against any other Person.

## 5.12    Further Provisions regarding Deposit

(a)    Lessee agrees that Lessor shall be entitled to commingle the Deposit with Lessor's general or other funds, Lessor will not hold any such funds as agent or on trust for Lessee or in any similar fiduciary capacity and Lessee's right to a refund of the Deposit amount is limited as set out in this Lease.

(b)    If Lessee fails to comply with any provision of this Lease or the Other Agreements, or any Event of Default shall have occurred and be continuing, in addition to all rights and remedies accorded to Lessor elsewhere in this Lease or under Law in respect of the Deposit, Lessor may immediately or at any time thereafter, without prior notice to Lessee, apply all or part of the Deposit in or towards the payment or discharge of any matured obligation owed by Lessee or any Lessee Affiliate under this Lease or the Other

2007-08-07
Prima Charters Sp. z o. o.

Agreements, in such order as Lessor sees fit, and/or exercise any of the rights of set-off described in Section 5.18 against all or part of the Deposit.

(c)     If Lessor exercises the rights described in Section 5.12(b) above, Lessee shall, following a demand in writing from Lessor, immediately restore the Deposit to the level at which it stood immediately prior to such exercise.

## 5.13   [Reserved]

## 5.14   Late Payment Interest

If Lessee fails to pay any amount payable under this Lease on the due date, Lessee will pay on demand from time to time to Lessor interest (both before and after judgement) on that amount, from the due date to the date of payment in full by Lessee to Lessor, at the Interest Rate. All such interest will be calculated on the basis of the actual number of days elapsed in the month, assuming a 30 day month and a 360 day year.

## 5.15   Currency

(a)     Lessee must indemnify Lessor against any Loss Lessor suffers if:

   (i)      Lessor receives an amount relating to Lessee's obligations in a different currency from that in which payments should be made under this Lease; or

   (ii)     Lessee pays a judgment or claim in a different currency from that in which payments should be made under this Lease.

(b)     Lessee relinquishes any right to pay any amount under this Lease in a currency other than the currency shown in this Lease and the right of Lessor to be indemnified for currency loss shall survive and not merge into any judgment on the underlying claim.

## 5.16   Certificates

Save where expressly provided in this Lease, any certificate or determination by Lessor as to any rate of interest or as to any other amount payable under this Lease will, in the absence of manifest error, be presumed to be correct.

## 5.17   Appropriation

If any sum paid or recovered by Lessor in respect of the liabilities of Lessee under this Lease is less than the amount then due, Lessor may apply that sum to amounts due under this Lease in such proportions and order and generally in such manner as Lessor may determine at its sole discretion.

## 5.18   Set-off

(a)     In this sub-section, references to Lessee will also include Lessee Affiliates.

(b)     Lessor may set-off any debt owed by Lessee under this Lease or the Other Agreements against any debt Lessor owes Lessee, regardless of the place of payment or currency.

- 9 -

2007-08-07
Prima Charters Sp. z o. o.

If the debts are in different currencies, Lessor may convert either debt at the market rate of exchange available in New York. If the amount of a debt is unknown, Lessor may estimate the amount. Any difference between the estimated debt and the actual debt will be paid by either Lessor or Lessee, as appropriate, when the amount becomes known.

## 5.19    Expenses

Unless caused by a default by Lessor hereunder, whether or not the Aircraft is delivered to Lessee pursuant to this Lease, Lessee will pay to Lessor, on demand, all reasonable expenses (including professional fees and other costs) that Lessor has to pay:

(a)    to deal with any amendments, extensions, consents or waivers that are required in connection with this Lease (but excluding any expenses incurred by Lessor in connection with any change in the ownership or financing of the Aircraft or any amendment, extension, consent or waiver requested by Lessor other than when an Event of Default has occurred and is continuing);

(b)    to act upon any advice and obtain assistance to perfect this Lease whether necessary or advisable in the State of Registry and under the Cape Town Convention; and

(c)    in contemplation of, or otherwise in connection with, the enforcement or preservation of any of Lessor's rights under this Lease or in respect of the repossession of the Aircraft.

All amounts payable pursuant to this Section 5.19 will be paid in the currency in which they are incurred by Lessor.

## 5.20    Payment of Taxes

Lessee will promptly pay all Taxes, other than any Taxes described in Section 5.6(b), and other charges imposed by any Governmental Entity with respect to the Aircraft and/or this Lease, except to the extent that: (a) such Tax or other charge is being contested, in good faith, by appropriate proceedings promptly instituted and diligently conducted and if adequate reserves (as may be required for Lessee to be in conformity with any national accounting standards applicable to it under the laws of the Republic of Poland); and (b) the failure to pay such Tax or charge could not reasonably be expected to result in an Event of Default.

## 5.21    Purchase Option

(a)    **Purchase Option**: Lessor hereby grants to Lessee the option to purchase the Aircraft on the Scheduled Expiry Date or on the day that is 90 days after the Delivery Date on the terms and subject to the conditions hereinafter set forth (the "Purchase Option") for an amount equal to the Purchase Option Price (which the parties agree is their estimate of what will be the fair market value of the Aircraft as of the applicable date) (the "Option Date"); provided that the Purchase Option shall not be available if: (i) the Lease has previously been terminated; or (ii) Lessor has not received written notice (the "Notice") of Lessee's election to exercise the Purchase Option (A) in the case of the Purchase Option pertaining to the Option Date occurring on the Scheduled Expiry Date, not less than six months nor more than 24 months' written notice prior to the Scheduled Expiry Date, or (B) in the case of the Purchase Option pertaining to the Option Date occurring on the day that is 90 days after the Delivery Date, not later than 60 days after the Delivery Date. The failure of Lessee to exercise the Purchase Option with respect to the

- 10 -

2007-08-07
Prima Charters Sp. z o. o.

Option Date occurring on the day that is 90 days after the Delivery Date shall not, by itself, prevent Lessee from exercising the Purchase Option with respect to the Option Date occurring on the Scheduled Delivery Date. Once a Notice is given, Lessee's Purchase Option is irrevocable.

(b) **Purchase Option Exercised:**

   (i)   In the event a Notice is given, Lessee shall purchase the Aircraft and pay the Purchase Option Price to Lessor or as Lessor otherwise directs by wire transfer in immediately available Dollars on the Option Date. Upon Lessee making such payment on such date Lessor shall transfer to Lessee, pursuant to a bill of sale reasonably acceptable to Lessor and Lessee, full legal and beneficial title to the Aircraft free of all Lessor Liens at the time of such sale, but otherwise AS IS, WHERE IS and without recourse, representation or warranty of any kind (other than as to the absence of Lessor's Liens), and cooperate with Lessee's reasonable requests to deregister, terminate, cancel or rescind any registrations, recordations or filings previously made in relation to Lessor's title to the Aircraft or rights under the Lease; and

   (ii)  if the Purchase Option is exercised, Lessee need not comply with the return conditions required pursuant to Section 12 and Lessor's obligation to pay Maintenance Contributions pursuant to Section 7.2 shall continue in favour of Lessee.

(c) **Purchase Option Cancelled:**

   (i)   If Lessee does not exercise the Purchase Option in accordance with Section 5.21(a) of this Lease or once exercised Lessee does not comply with its obligations in respect thereof, including its obligation to pay the Purchase Option Price of the Aircraft as provided above; or

   (ii)  in the event of the occurrence of an Event of Loss; or of the occurrence of an Event of Default during the Term with respect to which Lessor exercises any remedy provided in Section 13 of this Lease or that exists at the time the Notice is given or that exists on the Option Date.

   then the Purchase Option shall forthwith be cancelled without liability of any kind to Lessor under this Section 5.21 and in the event Notice of the exercise of the Purchase Option shall have been given prior to such cancellation, the sale of the Aircraft pursuant to such exercise shall likewise forthwith be cancelled.

## 6.   MANUFACTURER'S WARRANTIES

(a)   So long as no Event of Default has occurred which is continuing, Lessor shall make available to Lessee during the Term the benefit of all manufacturers' warranties in relation to the repair or remedy of any defect in the Aircraft (including compensation for loss of use of the Aircraft) and other product support for the Aircraft to the extent that it is permitted to do so. Lessee will give Lessor prompt written notice of any warranty claim that is settled with Lessee on the basis of a cash payment.

- 11 -

2007-08-07
Prima Charters Sp zo. o.

(b)   If an Event of Default has occurred and is continuing, Lessor may immediately recover from Lessee the proceeds of any warranty claims previously paid to Lessee to the extent that such claims relate to any defect in the Aircraft not fully and completely rectified by Lessee before such Event of Default and Lessor may:

    (i)   retain for its own account any such proceeds previously paid to Lessor which would have been remitted to Lessee under this Section 6 in the absence of such Event of Default; and

    (ii)   cause any proceeds of any pending claims to be paid to Lessor, rather than Lessee.

(c)   Unless Lessee exercises the Purchase Option, Lessee will take all steps as are necessary at the end of the Term to ensure that the benefit of any and all warranties (including those from manufacturers) relating to the Aircraft which have not expired is vested in Lessor.

## 7.   LESSOR'S COVENANTS

### 7.1   Quiet Enjoyment

So long as no Event of Default has occurred and is continuing, Lessor will not interfere (and will not permit any Person claiming through Lessor to interfere) with Lessee's right to quiet use and possession of the Aircraft during the Term.

### 7.2   Maintenance Contributions

Provided that Lessor has received all Supplemental Rent due under this Lease and that no Event of Default has occurred and is continuing, Lessor will pay the following amounts to Lessee (by way of contribution to the cost of maintenance of the Aircraft) not later than 30 calendar days (but in any event prior to the Expiry Date) after delivery by Lessee to Lessor of an invoice and supporting documentation reasonably satisfactory to Lessor evidencing performance of the following work by the Maintenance Performer:

(a)   **Airframe:** With respect to the Airframe, the completion, in accordance with this Lease, of the Airframe Structural Check, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Airframe Supplemental Rent paid under this Lease at the date such invoice less the aggregate amount previously paid by Lessor under this sub-section;

(b)   **Engine Life-Limited Parts:** With respect to life-limited Parts within any Engine, the performance, in accordance with this Lease, of any replacement or repair of those Parts, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Engine LLP Supplemental Rent paid in respect of that Engine under this Lease at the date of such invoice less (aa) any credit granted by the maintenance performer to Lessee in respect of any repairable life-limited Part which has been replaced (with such credit being calculated by reference to the then remaining life of such life-limited Part) and (bb) the aggregate amount previously paid in respect of that Engine by Lessor under this sub-section; provided that, notwithstanding the foregoing, the cost of the maintenance with respect to life-limited Parts within any Engine shall be borne, in accordance with a cost-sharing formula previously agreed to between Lessor and Lessee, sixty percent (60%) by Lessor and forty percent (40%) by Lessee;

2007-08-07
Prima Charters Sp. z o. o.

(c)     **Engine Refurbishment**: With respect to any Engine, the performance, in accordance with this Lease, of Engine Refurbishment in respect of that Engine the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Engine Supplemental Rent paid under this Lease in respect of that Engine at the date of such invoice less the aggregate amount previously paid in respect of that Engine by Lessor under this sub-section; provided that, notwithstanding the foregoing, the cost of the Engine Refurbishment shall be borne, in accordance with a cost-sharing formula previously agreed to between Lessor and Lessee, sixty percent (60%) by Lessor and forty percent (40%) by Lessee;

(d)     APU: With respect to the APU, the performance, in accordance with this Lease, of all shop visits requiring APU removal and disassembly, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the APU Supplemental Rent paid under this Lease at the date of such invoice less the aggregate amount previously paid by Lessor under this sub-section; and

(e)     **Landing Gear**: With respect to the Landing Gear, the performance, in accordance with this Lease, of all work on the Landing Gear in the nature of overhaul and requiring removal and disassembly, the lesser of (i) the amount of that invoice and (ii) an amount equal to the aggregate amount of the Landing Gear Supplemental Rent paid under this Lease at the date of such invoice less the aggregate amount previously paid by Lessor under this sub-section;

**PROVIDED THAT** Lessor will not pay any contribution in respect of sub-paragraphs:

(A)     (a) to (e) above, for work arising as a result of accidents or incidents (whether or not eligible for recovery under Lessee's insurance), operational or maintenance mishandling or Airworthiness Directive work (unless otherwise entitled to Maintenance Contributions for scheduled maintenance as provided in (a) to (e) above); nor

(B)     (b) and (c) above, for work arising as a result of foreign object damage, the removal, installation, maintenance and repair of QEC and/or any elective parts replacement.

## 8     LESSEE'S COVENANTS

### 8.1    Duration

(a)     Lessee shall perform and comply with its undertakings and covenants in this Lease at all times during the Term.  All such undertakings and covenants shall, except where expressly otherwise stated, be performed at the expense of Lessee.

(b)     Lessee will take such steps as are necessary to ensure that no Lessee Affiliate acts in any manner inconsistent with Lessee's obligations under this Lease.

### 8.2    Information

Lessee will:

(a)     provide Lessor with a Technical Report for the Aircraft within seven days after the end of each calendar month throughout the Term.

- 13 -

2007-08-07
Prima Charters Sp. z o.o.

(b)    promptly provide Lessor with the Financial Information;

(c)    promptly notify Lessor of any Event of Loss or of any event which is likely to result in an insurance claim in excess of the Damage Notification Threshold and details of any negotiations with insurers or insurance brokers relating to such claim;

(d)    immediately notify Lessor of any Default;

(e)    provide Lessor, upon request, with evidence that all Taxes and charges incurred by Lessee in connection with the Aircraft, its location and its operations, including those invoiced by airports and air traffic control authorities, have been paid in full;

(f)    provide Lessor with such other information concerning the location, condition, use and operation of the Aircraft or concerning the business or financial affairs of Lessee, as Lessor may from time to time reasonably request;

(g)    give Lessor not less than 30 days prior written notice as to the time and location of all Major Checks; and

(h)    notify Lessor, promptly, of the removal of any Engine off wing for a period of more than 72 hours or for the purpose of Engine Refurbishment.

## 8.3    Lawful and Safe Operation

Lessee will operate the Aircraft for commercial purposes from the Delivery Date until the Return Occasion from a base within the State of Registry or from such other base outside the State of Registry pursuant to a Permitted Sub-Lease or a wet-lease complying with Section 8.4 provided always that Lessee must not use or operate the Aircraft or allow the Aircraft to be used or operated:

(a)    in violation of any applicable Regulations or in a manner causing Lessor to be in violation of any applicable Regulations;

(b)    for any purpose for which the Aircraft was not designed or which is illegal;

(c)    to carry cargo which could reasonably be expected to damage the Aircraft;

(d)    in any circumstances or place where the Aircraft is not covered by the Insurance; or

(e)    for purposes of training, qualifying or re-confirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel, except if the use of the Aircraft for such purpose is not disproportionate to the use for such purpose of other aircraft of the same type operated by Lessee

For the avoidance of doubt, as between Lessee and the Indemnitees, Lessee acknowledges and agrees that

(i)    Lessee is solely responsible for the determination and implementation of all security measures and systems necessary or appropriate for the proper protection of the Aircraft (whether on the ground or in flight) against (a) theft, vandalism, hijacking, destruction, bombing, terrorism or similar acts, directly or indirectly

- 14 -

affecting in any way the Aircraft or any part thereof, or any persons who (whether or not on board the Aircraft) may sustain any injury or damage as a result of any such acts, (b) the use of the Aircraft in any acts, including without limitation, those of destruction, bombing, terrorism or similar acts, and (c) the taking, theft or use of any products, chemicals, goods, or materials of any kind, form, or nature located on board the Aircraft or being transported via the Aircraft,

(ii) Lessee's implementation of such security measures and systems is a material obligation of Lessee under this Lease, and that Lessor shall have absolutely no responsibility therefor, and

(iii) Lessee, being in sole operational control of the Aircraft and being in the business of operating commercial aircraft, is uniquely in a position to identify and implement those maintenance and security measures as are necessary to comply with all applicable Regulations, and as are otherwise appropriate and that in doing so, Lessee has not relied upon, and shall not rely upon, any statement, act, or omission of Lessor.

## 8.4    Subleasing

(a) At no time prior to the Return Occasion will Lessee sub-lease, wet-lease or otherwise give possession of the Aircraft to any Person except:

(i) when the prior written consent of Lessor has been obtained, such consent not to be unreasonably withheld or delayed; or

(ii) where the Aircraft is delivered to a manufacturer or maintenance facility for work to be done on it as required or permitted under this Lease; or

(iii) pursuant to a sub-lease of the Aircraft to a sub-lessee to which Lessor consents in writing ("**Permitted Sub-Lessee**") pursuant to a sub-lease to which Lessor consents in writing (a "**Permitted Sub-Lease**"), which complies with the conditions set out in Section 8.4(b) and provided that no Default shall have occurred and be continuing at the commencement of such sub-lease; or

(iv) with respect to an Engine or Part as permitted under Section 8.11.

However, where no Event of Default has occurred and is continuing, Lessee may wet lease or charter (including a "dump lease" utilizing Lessee's pilots but not its cabin attendants) the Aircraft, provided that such wet lease or charter constitutes an arrangement whereby Lessee agrees to furnish the Aircraft to a third party pursuant to which the Aircraft (aa) shall be operated solely by regular employees of Lessee possessing all current certificates and licenses that are required by applicable Regulations, (bb) shall be subject to insurance coverage complying with this Lease, (cc) shall be maintained by Lessee in accordance with Lessee's Maintenance Programme and Lessee's normal maintenance practices, and (dd) shall not be subject to any change in its State of Registry, and provided always that such arrangement does not extend beyond the Expiry Date and is expressly subordinated to this Lease and the rights of Lessor, Owner and any Financing Parties.

- 15 -

2007-08-07
Prima Charters Sp z o. o.

(b)    Lessee shall be permitted to sublease the Aircraft to a Permitted Sub-Lessee pursuant to a Permitted Sub-Lease which is reasonably acceptable to Lessor and which complies to Lessor's reasonable satisfaction with the following conditions, each of which shall be required to be satisfied in relation to any Permitted Sub-Lease prior to any sub-leasing pursuant to this Section:

    (i)    **Notification**: upon execution hereof, provide a copy of the executed Permitted Sub-Lease in form acceptable to Lessor;

    (ii)    **Term**: the term of the Permitted Sub-Lease shall not be capable of extending beyond the date falling three months before the scheduled Expiry Date;

    (iii)    **Form**: the Permitted Sub-Lease shall, without limitation:

        (aa)    not contain provisions inconsistent with the provisions of this Lease (but may impose additional or more stringent obligations on Sub-Lessee than are imposed on Lessee under this Lease);

        (bb)    provide that no further subleases of the Aircraft by Permitted Sub-Lessee are permitted; and

        (cc)    include provisions substantially identical to or having substantially the same effect as Sections 2.1, 5.6, 5.7, 5.8, 5.10, 5.12, 5.15, 5.16, 8, 9, 10, 13, 15.1, 15.8 and 16 and **Schedules 2** (Section 1.1), **7** and **9** of this Lease (but the Permitted Sub-Lease may impose additional or more stringent obligations on Permitted Sub-Lessee than are imposed on Lessee under this Lease);

    (iv)    **Assignment and Subordination**: Lessee's rights under the Permitted Sub-Lease shall be assigned to Lessor as security for Lessee's obligations to Lessor. In any case the Permitted Sub-Lease shall provide that (aa) it is subject and subordinate to this Lease in all respects and the rights of Permitted Sub-Lessee thereunder are subject and subordinate in all respects to the rights of Lessor under this Lease; (bb) prior to delivery of the Aircraft to Permitted Sub-Lessee (as a condition precedent thereof), Permitted Sub-Lessee shall provide an acknowledgement to Lessor and Owner in a form reasonably satisfactory to Lessor, confirming its agreement to the assignment (if so required), this provision and that its rights to possession of the Aircraft under the Permitted Sub-Lease will terminate immediately upon the termination of this Lease, and that it will redeliver the Aircraft to Lessor, upon notification from Lessor that an Event of Default has occurred and that Lessor has, as a result thereof, terminated Lessee's right to possession of the Aircraft under this Lease ("**Subordination Acknowledgement**"); and (cc) Lessee may terminate the Permitted Sub-Lease following the occurrence of an Event of Default under this Lease where Lessor has terminated the leasing of the Aircraft under this Lease as a result thereof;

    (v)    **Quiet Enjoyment**: the Permitted Sub-Lease shall provide that Permitted Sub-Lessee shall have the right to quiet enjoyment of the Aircraft for so long as no Event of Default has occurred under this Lease and/or no event of default or termination event (howsoever described) has occurred under the Permitted Sub-Lease;

- 16 -

(vi)  **Obligations of Lessee**: Lessee shall remain primarily liable under this Lease for the performance and observance of all its obligations to the same extent as if no Permitted Sub-Lease had been entered into. To the extent that Permitted Sub-Lessee properly performs an obligation under the Permitted Sub-Lease, Lessor agrees that such performance shall be regarded as discharging (to such extent) Lessee's corresponding obligation;

(vii)  **Insurance**: all insurance requirements under this Lease shall be complied with either by Lessee or by Permitted Sub-Lessee as if references in the insurance provisions of this Lease to "Lessee" were references to "Permitted Sub-Lessee" (and Lessee shall provide or cause Permitted Sub-Lessee to provide the insurance certificate and brokers' letter of undertaking to Lessor at least seven Business Days prior to the commencement of the Permitted Sub-Lease);

(viii)  **Registration**: there shall be no change in the registration of the Aircraft from the State of Registry;

(ix)  **Repossession Insurance**: if required by Lessor, repossession insurance shall be obtained by Lessor at Lessee's cost, provided that repossession insurance will not be required if the Habitual Base and State of Registry are not being changed at any time during the term of the Permitted Sub-Lease or if the proposed new Habitual Base and State of Registry are both within states which are now members of the European Union, the United States or Canada. If repossession insurance is required, the Permitted Sub-Lease must provide that, if any such repossession insurance cannot be obtained or renewed, Lessor may in its discretion acting reasonably terminate the Permitted Sub-Lease may be terminated upon notice to Lessee or Permitted Sub-Lessee;

(x)  **Legal Opinions**: as a condition precedent to the effectiveness of a Permitted Sub-Lease, Lessee shall, at the request of Lessor (which request shall be made only if reasonable under the circumstances) provide to Lessor the following legal opinions (at Lessee's or Permitted Sub-Lessee's expense) addressed to Lessor from counsel reasonably acceptable to Lessor: (x) a legal opinion in relation to the Permitted Sub-Lease in form and substance satisfactory to, and containing such other matters set out in **Schedule 8** requested by, Lessor and confirming further that the Subordination Acknowledgement is valid, binding and (except as limited by any equitable principles and applicable bankruptcy, insolvency, reorganisation, moratorium or similar laws affecting creditors' or lessors' rights generally) enforceable against Permitted Sub-Lessee; and (y) (without prejudice to Lessor's right to refuse consent to a change in the State of Registry) in the case of a Permitted Sub-Lease for which at any time during its term it is proposed that the Habitual Base or the State of Registry of the Aircraft will be different from the Habitual Base or State of Registry prior to the commencement of such Permitted Sub-Lease, then Lessee shall provide to Lessor an opinion in a form and from counsel reasonably acceptable to Lessor in the proposed state of the Habitual Base and/or the State of Registry of the Aircraft. Such opinion shall be to the effect, among other things, that Lessor's and Owner's interests in the Aircraft will be recognised under the laws of such country or countries;

(xi)  **Delivery of Legal Opinions**: The foregoing opinion or opinions (x) shall be forwarded promptly to Lessor (and, to the extent practicable, at least five

- 17 -

Business Days prior to the effective date of the Permitted Sub-Lease), and (y) may, if different opinions are required hereunder, be made by a single counsel qualified to render opinions in each such country;

(xii)    **Filings**: Lessee shall co operate with Lessor (at no cost to Lessor) in connection with the execution and filing of any documents which are required or advisable to be executed and filed from time to time with any registry or authority in the Habitual Base, the State of Registry and State of Incorporation of Lessee or Permitted Sub-Lessee in order to protect the interests of Lessor and Owner in and to the Aircraft, this Lease or the Permitted Sub-Lease and/or to ensure the validity, enforcement or priority thereof; and

(xiii)    **Expenses**: Lessee will pay to Lessor on demand all reasonable out of pocket expenses (including legal, survey and other costs) payable or incurred by Lessor in connection with the review and approval of the documentation required pursuant to this Section.

#### 8.5    Access

(a)    Lessee will permit Lessor's representative access to the Aircraft at any reasonable time. Unless a Default has occurred and is continuing, Lessor will give Lessee reasonable prior notice and will seek to ensure that it does not result in unreasonable disruption to the scheduled operation of the Aircraft. Lessee shall comply with the reasonable requests of Lessor's representative, including any request to travel on the flight deck of the Aircraft as an observer, subject to any applicable Regulations.

(b)    The cost of a visit shall be borne by Lessor unless (i) an Event of Default has occurred and is continuing or (ii) as a result of that visit. Lessee is found to be materially in default of its obligations under this Lease, when the cost shall be borne by Lessee.

(c)    No liability or obligation will be incurred by Lessor solely by reason of non-exercise by it of the rights referred to in this Section. For the avoidance of doubt, any viewing of the Aircraft by Lessor shall be for Lessor's information purposes only and there shall be no inference or implication therefrom that Lessee is in compliance with its obligations under this Lease.

#### 8.6    Ownership; Property Interests; Related Matters

(a)    Lessee will:

(i)    fix and maintain Nameplates in a prominent position in the cockpit or cabin of the Aircraft and on each Engine stating:

"This Aircraft/Engine is owned by Alliance Continental Leasing, LLC and is leased to Prima Charter Sp. z o. o. and may not be or remain in the possession of or be operated by, any other person without the prior written consent of Alliance Continental Leasing, LLC"; and

(ii)    take all reasonable steps to make sure that other relevant Persons knew about the interests of Lessor as owner and lessor in the Aircraft.

- 18 -

(b)     Lessee will not:

    (i)     represent that it is the owner of the Aircraft or that it has an economic interest (equivalent to ownership) in the Aircraft for Tax treatment or other purposes;

    (ii)     take any action if it could put Lessor's rights at risk;

    (iii)     represent to others that Lessor is associated with or responsible for the business activities and/or flight operations of Lessee; or

    (iv)     allow the Aircraft or Lessor's interest in it to become or remain subject to any Security Interest (other than a Permitted Lien).

## 8.7     General

Lessee will:

(a)     preserve its corporate existence (other than in connection with a solvent merger acquisition reconstruction or reorganisation whereby the resulting entity will assume and be able to fully perform all of the Lessee's obligations under this Lease or otherwise on terms which shall have previously been approved in writing by Lessor);

(b)     maintain its business as a commercial airline or charter operator, and will maintain all rights, privileges, licenses and franchises material thereto or material to performing its obligations under this Lease.

(c)     ensure that the Habitual Base remains the habitual base of the Aircraft unless Lessor gives prior written consent to a change; and

(d)     not operate, maintain, insure or deal with the Aircraft in a manner which discriminates against the Aircraft, when compared with the manner in which Lessee operates, maintains, insures or deals with similar aircraft, engines or parts in Lessee's fleet.

## 8.8     Records

Lessee will keep the Aircraft Documents and Records:

(a)     in the English language;

(b)     according to best airline practice; and

(c)     so they meet the requirements of applicable Regulations, including FAR 91.417 (unless such standards conflict with Air Authority requirements) and Lessee's Maintenance Programme

## 8.9     Protection

Lessee will:

(a)     keep the Aircraft registered with the Air Authority and, where applicable, comply with the Geneva Convention;

2007-08-07
Prima Charters Sp. z o. o.

(b)     if permitted or advisable under the applicable Regulations of the State of Registry, record on each relevant register that Lessor is the owner of the Aircraft and, if such facilities exist (i) file this Lease (or particulars thereof) on the public record and (ii) file notices as to the interests of the Financing Parties;

(c)     make any changes to the registered particulars that may be necessary or advisable to take account of any change in the ownership or financing of the Aircraft, (to the extent consistent with this Lease), or of any modification to the Aircraft (such as the permanent replacement of any Engine or Part in accordance with this Lease) or of any change in applicable Regulations. Lessor will bear any costs incurred as a consequence of a change in ownership or financing of the Aircraft (unless such change follows a default on Lessee's part, when Lessee shall bear those costs) and Lessee will bear any other costs incurred in complying with this Section; and

(d)     as soon as practicable following the date on which there shall be brought into force in the State of Registry any legislation or other provisions (i) giving effect to the Cape Town Convention or (ii) otherwise relating to the recognition of rights in the Aircraft or the Engines under the Cape Town Convention (the "CTC Date"), then, to the extent necessary or reasonably advisable (A) registrations shall be made by Lessor, and consented to by Lessee, so as to permit the interests created hereunder to be perfected as "international interests" under the Cape Town Convention, and (B) Lessor and Lessee shall amend, restate, revise, or otherwise adapt this Lease in such a manner as to permit the interests created hereunder to constitute "international interests" under the Cape Town Convention.    The new transaction documents shall retain the commercial agreements set forth herein modified only to ensure that an international interest is constituted.  The new transaction documents shall contain such additional provisions as may be necessary to provide for the enforceability of the commercial agreements of the parties under the Cape Town Convention to the greatest extent permitted under the Cape Town Convention.  Lessor and Lessee intend that the priority of any security interest granted pursuant to this Agreement shall not be prejudiced by any change made pursuant to this Section 8.9(d).  In the event that Lessor, acting reasonably, shall determine that an unacceptable risk of such prejudice to any such security interest will or is reasonably likely to arise as a result of any change made pursuant to this Section 8.9(d), this Lease shall remain in full force and effect, subordinated as to enforcement only, to any new documents which the parties may execute and deliver in order to effect application of the Cape Town Convention to the Aircraft.  The parties further agree that each international interest arising under the Cape Town Convention as a result of actions taken pursuant to this Section shall be registered in the International Registry as soon as possible following the Cape Town Convention taking effect in the State of Registry, and that such registration(s) shall be made by, or with the consent of, Lessor, or any duly authorized agent thereof, and shall be consented to by Lessee.  All reasonable costs and expenses arising as a result of actions taken pursuant to this Section 8.9(d), including, but not limited to, reasonable attorney's fees and registration fees, shall be for the account of Lessee.

## 8.10    Maintenance and Repair

Lessee will maintain, overhaul and repair the Aircraft, so that:

(a)     the Aircraft is kept in as good operating condition and repair as the condition of the Aircraft as at Delivery subject to fair wear and tear;

- 20 -

(b)     Lessee has a current certificate of airworthiness (issued by the Air Authority in the appropriate public transport category) for the Aircraft;

(c)     the Aircraft complies with all applicable Regulations including the standard stipulated by the Air Authority (and FAR Part 121, if not in conflict with Air Authority requirements) and the requirements of all Airworthiness Directives and all service bulletins designated by the State of Design as "mandatory", and to be carried out before the Return Occasion or within the AD Compliance Period; and

(d)     all maintenance is carried out according to Lessee's Maintenance Programme through the Maintenance Performer in at least the same manner and with at least the same care, including maintenance scheduling, modification status and technical condition, as is the case with respect to similar aircraft owned or otherwise operated by Lessee. No change shall be made to Lessee's Maintenance Programme or the Maintenance Performer without first giving reasonable written notice to Lessor of such change.

## 8.11    Removal/Interchange of Engines and Parts

(a)     **General:** Lessee must replace any Engine that has suffered an Engine Event of Loss in accordance with Section 8.11 (b) and any Part which is permanently removed from the Aircraft must be replaced in accordance with Section 8.11 (b). Any Engine or Part may be installed on another aircraft Lessee owns or leases in accordance with Section 8.11 (c). Lessee may temporarily install an engine or part in accordance with Section 8.11 (d). Lessee will ensure that any Engine or Part not installed on the Aircraft (or an aircraft permitted by Section 8.11 (c)) is properly and safely stored and insured and kept free of Security Interests (other than Permitted Liens).

(b)     **Permanent Replacement:** If Lessee permanently replaces an Engine or Part;

(i)     in the case of an Engine, it must be a Replacement Engine;

(ii)    in the case of a Part, the replacement part must be an OEM approved Part, if available, be in good operating condition, be of the same (or better) value and utility, must not have been involved in an incident or accident, must not have been installed on an aircraft registered on a military aircraft register, must have as much useful life available until the next expected maintenance procedure and be of the same or a more advanced make and model and of the same interchangeable modification status as the Part it is replacing;

(iii)   the Replacement Engine or replacement part must have become and remain, until replaced in accordance with this Section, the property of Owner free from Security Interests (other than Permitted Liens); and

(iv)    Lessee must have full details of the source and maintenance records of the Replacement Engine or replacement part. In the case of replacement serialised parts, documentation shall have Back-To-Birth Traceability and in the case of serialised rotable parts, include a complete service history.

(c)     **Other Aircraft:** An Engine or Part may be installed on an aircraft which Lessee owns or leases, where that other aircraft is insured to Lessor's satisfaction, if:

- 21 -

2007-08-07
Prima Charters Sp. z o. o.

(i)    no Event of Default has occurred and is continuing;

(ii)    Lessee or a Permitted Sub-Lessee (if any) has operational control over the aircraft,

(iii)    Lessor keeps the ownership of the Engine or Part concerned until replaced in accordance with this Section;

(iv)    the Engine or Part does not become subject to a Security Interest (other than a Permitted Lien); and

(v)    the Engine or Part is removed from the aircraft as soon as practicable but not later than the Expiry Date.

(d)    **Temporary Replacement**:  Lessee may install any engine or part on the Aircraft as a temporary replacement if:

(i)    no Event of Default has occurred and is continuing;

(ii)    as soon as reasonably practicable after an engine or part is installed on the Aircraft, but before the earlier of 120 days after such temporary replacement and the Expiry Date, Lessee removes that engine or part and replaces it with the original Engine or Part (or, in the case of a Part, by a part which is allowed by Section 8.11(b)); and

(iii)    the Insurance for the Aircraft is not affected

(e)    **Title to Removed Engines or Parts**:  Any Engine or Part at any time removed from the Aircraft will remain the property of Lessor unless and until a replacement has been effected in accordance with Section 8.11 (b) and unless and until title in that replacement has passed to Lessor subject to this Lease, free of all Security Interests, whereupon title to the replaced Engine or Part will, provided no Event of Default has occurred and is continuing, pass to Lessee

## 8.12    Equipment Changes

Lessee will not make any material modification or addition to the Aircraft (each an "**Equipment Change**"), except for an Equipment Change which:

(a)    is expressly permitted or required by this Lease; or

(b)    has the prior written approval of Lessor and does not diminish the condition or value of the Aircraft

So long as no Event of Default has occurred and is continuing, Lessee may, subject to any applicable Regulation, remove or reverse any Equipment Change provided that this does not diminish the value or condition of the Aircraft assuming that such Equipment Change was never made.  Furthermore, Lessor may require Lessee to remove or reverse any Equipment Change prior to the Return Occasion so that, on the Expiry Date, the Aircraft is restored to the condition it was in prior to that Equipment Change.

- 22 -

2007-08-07
Prima Charters Sp. z o. o.

### 8.13    Title on an Equipment Change

Title to any equipment that becomes a Part or an Engine after the Delivery Date (whether by way of replacement, as the result of an Equipment Change or otherwise) that becomes vested in Lessor as contemplated by or otherwise in accordance with the provisions of this Lease shall then be subject to this Lease as if it were attached to the Aircraft at Delivery. If so requested by Lessor, Lessee will provide a properly executed bill of sale or similar instrument to evidence the vesting of title to any such equipment, free and clear of all Security Interests other than Permitted Liens, in Lessor. After Lessor has determined that Lessee has permanently replaced an Engine in accordance with Section 8.11(h) and this Section 8.13, or if Lessee is required to remove any Equipment Change as per Section 8.12, Lessor will, or will procure that Owner will, transfer to Lessee or will procure that Owner will transfer to Lessee all of Lessor's or Owner's, as the case may be, rights to the Engine that has been replaced or to the equipment that has been removed, and will provide or will procure that Owner provides a properly executed bill of sale or similar instrument to evidence the vesting of title to Lessee free and clear of all Lessor Liens.

### 9.    INSURANCE

### 9.1    Insurance

Lessee in accordance with this Lease will maintain the Insurance in full force during the Term, and thereafter as expressly required in this Lease, which shall be in line with best industry practice for comparable operators and shall be through such brokers and with such insurers and having such deductibles and subject to such exclusions as may be approved by Lessor from time to time. The Insurance shall in any event meet the requirements set out in **Schedule 7** which may be amended from time to time by Lessor with the consent of the Lessee not to be unreasonably withheld or delayed, so that the scope and level of cover is maintained in line with best industry practice and the interests of Lessor and each Indemnitee are prudently protected.

### 9.2    Change

If at any time Lessor wishes to revoke its approval of any insurer, reinsurer, insurance or reinsurance, Lessor and/or its brokers will consult with Lessee and Lessee's brokers (as for the time being approved by Lessor) regarding whether that approval should be revoked to protect the interests of the parties insured. If, following such consultation, Lessor reasonably considers that any change should be made, Lessee will then arrange or procure the arrangement of alternative cover reasonably satisfactory to Lessor.

### 9.3    Insurance Undertakings and Information:

Lessee will:

(a)    comply with the terms and conditions of each policy of Insurance and not do, consent or agree to any act or omission which:

    (i)    invalidates or may invalidate the Insurance; or

    (ii)    renders or may render void or voidable the whole or any part of any of the Insurance; or

      (iii)     brings any particular liability within the scope of an exclusion or exception to the Insurance;

(b)     not take out without the prior written approval of Lessor any insurance or reinsurance in respect of the Aircraft other than that which is required under this Lease unless relating solely to hull total loss, business interruption, profit commission and deductible risk,

(c)     commence renewal procedures at least 30 days prior to expiry of any of the Insurance and provide to Lessor:

      (i)     if requested by Lessor, a written status report of renewal negotiation 14 days prior to each expiry date;

      (ii)     written confirmation (which may be supplied by fax) of completion of renewal prior to each policy expiry date;

      (iii)     certificates of insurance (and where appropriate certificates of reinsurance), and broker's (and any reinsurance broker's) letter of undertaking in a form acceptable to Lessor in English, detailing the coverage and confirming the insurers' (and any reinsurers') agreement to the specified insurance requirements of this Lease within seven days after each renewal date;

(d)     on request, provide to Lessor copies of documents or other information evidencing the Insurance; and

(e)     provide any other insurance and reinsurance related information, or assistance, in respect of the Insurance as Lessor may reasonably require.

9.4     **Failure to Insure**

If Lessee fails to maintain the Insurance in compliance with this Lease, each of the Indemnitees will be entitled but not bound (without prejudice to any other rights of Lessor under this Lease):

(a)     to pay the premiums due or to effect and maintain insurance satisfactory to it or otherwise remedy Lessee's failure in such manner (including to effect and maintain an "owner's interest" policy) as it considers appropriate. Any sums so expended by it will become immediately due and payable by Lessee to Lessor together with interest thereon at the Interest Rate, from the date of expenditure by it up to the date of reimbursement by Lessee; and

(b)     at any time while such failure is continuing to require the Aircraft to remain at any airport or to proceed to and remain at any airport designated by it until the failure is remedied to its satisfaction.

10.     **INDEMNITY**

10.1     **General**

     (a)     Lessee agrees to assume liability for and indemnifies each of the Indemnitees against and agrees to pay on demand Losses which an Indemnitee may suffer at any time whether directly or indirectly as a result of any act or omission in relation to:

- 24 -

(i)     the ownership, operation, maintenance, repair, possession, transfer of ownership or possession, import, export, registration, storage, modification, leasing, insurance, inspection, testing, design, sub-leasing, use, condition or other matters relating to the Aircraft; or

(ii)    any breach by Lessee of its obligations under this Lease.

(b)     Lessee need not indemnify any particular Indemnitee under this Section, to the extent the Loss is:

(i)     caused solely by the deliberate misconduct or reckless behaviour of any Indemnitee;

(ii)    caused solely by Lessor's breach of this Lease which does not result from an Event of Default;

(iii)   a Tax or other Loss covered pursuant to another indemnity provision of this Lease;

(iv)    caused solely by an event which occurs before the commencement of the Term (except where the Loss is suffered during the Term as a result of a pre-Delivery defect or fault in the manufacture, design, maintenance, repair, rebuilding, overhaul or modification of the Aircraft);

(v)     caused solely by an event which occurs after the proper redelivery of the Aircraft to Lessor hereunder and is not attributable to any act, omission, event or circumstance occurring prior to such redelivery; or

(vi)    caused by or related to any transfer or disposition by an Indemnitee of the Aircraft, title thereto or any interest therein, or in this Lease, other than as a result of an Event of Default.

## 10.2   Duration

The indemnities contained in this Lease will continue in full force and effect following the Expiry Date notwithstanding any termination of the leasing of the Aircraft under this Lease.

## 11.    EVENTS OF LOSS

### 11.1   Events of Loss

(a)     If an Event of Loss occurs prior to Delivery, this Lease will immediately terminate and except as expressly stated in this Lease and/or under any Other Agreement, neither party will have any further obligation other than pursuant to Section 5.19, except that Lessor will return the Deposited Amounts to Lessee.

(b)     If an Event of Loss occurs after Delivery, Lessee will pay the Agreed Value to Lessor on or prior to the earlier of (i) 90 days after the Event of Loss and (ii) the date of receipt of insurance proceeds in respect of that Event of Loss.

- 25 -

2007-08-07
Prima Charters Sp. z o. o.

(c)     Subject to the rights of any insurers and reinsurers or other third party, upon irrevocable payment in full to Lessor of the Agreed Value and all other amounts which then may be due and owing to Lessor under this Lease, Lessor will, without recourse or warranty (except as to freedom from Lessor's Liens and other Security Interests attributable to the Lessor) transfer to Lessee all of Lessor's rights to the Aircraft, on an as-is where-is basis, and will at Lessee's expense, execute and deliver or will procure that Owner executes and delivers such bills of sale and other documents and instruments as Lessee may reasonably request to evidence (on the public record or otherwise) such transfer, free and clear of all rights of Lessor and Lessor Liens. Lessee shall indemnify Lessor for all fees, expenses and Taxes incurred by Lessor in connection with any such transfer.

## 11.2    Requisition

During any requisition for use or hire of the Aircraft, any Engine or Part, which does not constitute an Event of Loss:

(a)     the Rent and other charges payable under this Lease will not be suspended or abated either in whole or in part, and Lessee will not be released from any of its other obligations (other than operational obligations with which Lessee is unable to comply solely by virtue of the requisition); and

(b)     so long as no Event of Default has occurred and is continuing, Lessee will be entitled to any hire paid by the requisitioning authority in respect of the Term. Lessee will, as soon as practicable after the end of any such requisition, cause the Aircraft to be put into the condition required by this Lease. Lessor will be entitled to all compensation payable by the requisitioning authority in respect of any change in the structure, state or condition of the Aircraft arising during the period of requisition, and Lessor will apply such compensation in reimbursing Lessee for the cost of complying with its obligations under this Lease in respect of any such change, but, if any Event of Default has occurred and is continuing, Lessor may apply the compensation or hire in or towards settlement of any amounts owing by Lessee under this Lease and/or under any Other Agreement.

## 12.    RETURN OF AIRCRAFT

### 12.1    Return

On the Expiry Date or redelivery of the Aircraft pursuant to Section 13.2 or termination of the leasing of the Aircraft under this Lease, Lessee will, unless an Event of Loss has occurred, or Lessee has exercised its Purchase Option, redeliver the Aircraft and the Aircraft Documents and Records at Lessee's expense to Lessor at the Redelivery Location, in accordance with the procedures and in compliance with the conditions set out in **Schedule 6**, free and clear of all Security Interests (other than Lessor Liens) and in a condition suitable for immediate operation under FAR Part 121 or as otherwise agreed by Lessor and Lessee and, in any case, qualifying for and having a valid and fully effective certificate of airworthiness issued by the Air Authority. If requested by Lessor, Lessee shall thereupon cause the Aircraft to be deregistered by the Air Authority.

### 12.2    Non-Compliance

If at the time of Final Inspection Lessee has not fully complied with any of its obligations under this Lease (including **Schedule 6**), or Lessee fails to make the Aircraft available to Lessor on a

timely basis for inspection and redelivery pursuant to Section 12.1 and **Schedule 6** (whether such failure is due to any act or omission of Lessee or any other circumstance whatsoever), the Term shall be extended until the time when the Aircraft has been redelivered to Lessor in full compliance with this Lease, for the sole purpose of enabling such non-compliance or failure to be promptly rectified and during such extension period:

(a)     Lessee shall not use the Aircraft in flight operations except those related directly to the re-delivery of the Aircraft to Lessor;

(b)     all Lessee's obligations and covenants under this Lease will remain in full force until Lessee so redelivers the Aircraft; and

(c)     Lessee shall pay Rent to Lessor, calculated on a per diem basis based upon a rate per month equal to the amount of Rent payable in respect of the last scheduled Rental Period plus ten percent (10%).

Any such extension shall not prejudice Lessor's right to treat such non-compliance or failure as an Event of Default at any time, and to enforce such rights and remedies as may be available to Lessor in respect thereof under the terms of this Lease or applicable Law. Without limiting the generality of the foregoing, Lessee's Rent obligation under paragraph (c) above shall be without prejudice to Lessor's rights to terminate the letting of the Aircraft and to indemnification pursuant to Section 13.3.

Lessor may elect (either on first tender of the Aircraft by Lessee or at any time during the said extension period) to accept redelivery of the Aircraft notwithstanding non-compliance with Section 12.1 or Schedule 6, in which case Lessee will indemnify Lessor, and provide cash to Lessor (in an amount satisfactory to Lessor) as security for that indemnity in respect of the cost to Lessor of putting the Aircraft into the condition required by this Lease.

### 12.3   Redelivery

Upon redelivery Lessee will provide to Lessor all documents necessary to export the Aircraft from the Habitual Base and the State of Registry (including a valid and subsisting export license and certificate of airworthiness for export of the Aircraft to the U.S.A.) and required in relation to the deregistration of the Aircraft with the Air Authority.

### 12.4   Acknowledgement

Provided Lessee has complied with its obligations under Section 12 and **Schedule 6** of this Lease, following redelivery of the Aircraft by Lessee to Lessor at the Redelivery Location, Lessor will deliver to Lessee an acknowledgement confirming that Lessee has redelivered the Aircraft to Lessor in accordance with this Lease which acknowledgement shall be without prejudice to Lessor's accrued and continuing rights under this Lease, any Other Agreements or arising by Law.

### 13.   DEFAULT

### 13.1   Events

The occurrence of any of the Events of Default will constitute a repudiation (but not a termination) of this Lease by Lessee (whether the occurrence of any such Event of Default is

- 27 -

voluntary or involuntary or occurs by operation of Law or pursuant to or in compliance with any judgement, decree or order of any court or any order, rule or regulation of any Government Entity).

### 13.2   Rights and Remedies

If an Event of Default occurs. Lessor may at its option (and without prejudice to any of its other rights under this Lease and/or otherwise). at any time thereafter (without notice to Lessee except as required under applicable Law):

(a)   accept such repudiation and by notice to Lessee and with immediate effect terminate the leasing of the Aircraft (but without prejudice to the continuing obligations of Lessee under this Lease), whereupon all rights of Lessee under this Lease shall cease, and/or

(b)   proceed by appropriate court action or actions to enforce performance of this Lease or to recover damages for the breach of this Lease; and/or

(c)   either:

   (i)   take possession of the Aircraft, for which purpose Lessor may enter any premises belonging to or in the occupation of or under the control of Lessee where the Aircraft may be located, or cause the Aircraft to be redelivered to Lessor at the Redelivery Location (or such other location as Lessor may require), and Lessor is hereby irrevocably by way of security for Lessee's obligations under this Lease appointed attorney for Lessee in causing the redelivery or in directing the pilots of Lessee or other pilots to fly the Aircraft to that airport and will have all the powers and authorisations necessary for taking that action; or

   (ii)   by serving notice require Lessee to redeliver the Aircraft to Lessor at the Redelivery Location for such other location as Lessor may require).

### 13.3   Default Indemnity

If an Event of Default occurs, or the Aircraft is not delivered on the proposed Delivery Date by reason of failure of Lessee to satisfy any conditions to that delivery, Lessee will indemnify Lessor on demand against any Loss which Lessor may sustain or incur directly or indirectly as a result of such Event of Default or non-delivery, including:

(a)   any loss of profit suffered by Lessor because of Lessor's inability to place the Aircraft on lease with another lessee on terms as favourable to Lessor as this Lease, or because whatever use, if any, to which Lessor is able to put the Aircraft upon its return to Lessor, or the funds arising upon a sale or other disposal of the Aircraft is not as profitable to Lessor as this Lease;

(b)   any Loss which may be incurred in repaying funds raised to finance the Aircraft or in unwinding any swap, forward interest rate agreement or other financial instrument relating in whole or in part to Lessor's financing of the Aircraft; and

(c)   any Loss sustained or incurred by Lessor in or as a result of exercising any of its rights or remedies pursuant to Section 13.2 or as a result of Lessee's failure to redeliver the Aircraft on the date, at the place and in the condition required by this Lease.

2007-08-07
Prima Charters Sp. z o. o.

Lessor will use reasonable endeavours to mitigate such Losses, but (i) Lessor shall not be obliged to consult with Lessee concerning any proposed course of action or to notify Lessee of the taking of any particular action, and (ii) this provision is without prejudice to Lessor's rights under Section 13.4.

### 13.4  Sale or Re-lease of Aircraft

If an Event of Default occurs, Lessor may sell or re-lease or otherwise deal with the Aircraft at such time and in such manner and on such terms as Lessor considers appropriate in its absolute discretion, free and clear of any interest of Lessee, as if this Lease had never been entered into.

### 13.5  Deregistration

If an Event of Default occurs, Lessee will at the request of Lessor immediately take all steps necessary to effect deregistration of the Aircraft and its export from the country where the Aircraft is for the time being situated, and any other steps necessary to enable the Aircraft to be redelivered to Lessor in accordance with this Lease and Lessee hereby irrevocably and by way of security for its obligations under this Lease appoints (which appointment is coupled with an interest) Lessor as its attorney to execute and deliver any documentation and to do any act or thing required in connection with the foregoing.

## 14.  TRANSFER

### 14.1  Lessee

Lessee will not transfer any of its rights or obligations under this Lease, other than as expressly permitted herein or as Lessor may otherwise consent.

### 14.2  Lessor

Subject to Section 14.3, Lessor may, without the consent of Lessee, transfer any of its rights or obligations under this Lease or any of its right, title or interest in and to the Aircraft, including pursuant to:

(a)  a sale and leaseback; or

(b)  a novation of this Lease together with a sale of the Aircraft; or

(c)  a secured loan financing.

Lessee agrees promptly to execute and deliver in connection with any transfer such documents and assurances (including a consent to the transfer) and to take such further action as Lessor may reasonably request to establish or protect the rights and remedies created or intended to be created in favour of the transferees in connection with any transfer.

### 14.3  Conditions

In connection with any such transfer by Lessor, as a condition to such transfer becoming effective:

(a)  **Quiet Enjoyment.**  As a condition precedent to such transfer becoming effective, Lessor will procure that the transferee or any new owner of the Aircraft (save where such new

- 29 -

owner is also the "Lessor" hereunder in accordance with this Section 14.3) or any new holder of a mortgage over the Aircraft or any holder of an interest in the Aircraft (by way of security or otherwise), as the case may be, shall execute and deliver to Lessee a letter of quiet enjoyment in respect of Lessee's use and possession of the Aircraft in a form substantially similar to Lessor's covenant in Section 7.1 hereof and providing not less than 10 business days' written notification of any such transfer, and providing any necessary documentation required under this Section 14.3;

(b)   **Costs:** Lessor shall reimburse to Lessee its reasonable out-of-pocket expenses (including legal expenses) actually incurred in connection with co-operating with Lessor in relation to any such transfer referred to in this Section 14, provided that (i) such expenses are substantiated to Lessor's reasonable satisfaction and (ii) that no Event of Default has occurred and is continuing;

(c)   **No Additional Cost:** If at the time of any such assignment or transfer by Lessor there arises an obligation to make a payment to the assignee or transferee which exceeds the amount which Lessee would have been obliged to pay under the Lease to Lessor if no such assignment or transfer had taken place, then Lessee shall not be obliged to pay the amount of such excess; and

(d)   **No Alteration of Terms:** The assignment or transfer shall not alter the economic terms and conditions of the Lease in any respect without the prior consent of Lessee, and Lessee's financial and other obligations hereunder shall not be increased nor shall Lessee's rights be reduced as a result of such assignment or transfer.

(e)   **Assumption:** In the case of a proposed transferee lessor, it shall have entered into one or more legal, valid and enforceable agreements effective to confirm that such transferee shall be bound by all of the terms of this Lease and have all of the obligations of Lessor arising under this Lease, in each case arising after and attributable to the period after the effectiveness of such transfer and in which such transferee makes representations and warranties as of the date of such transfer substantially the same as those referenced in Section 2.2 of this Lease.

(f)   **Registration:** The proposed transfer shall not have any adverse impact on the continued registration of the Aircraft in the State of Registry.

(g)   **Net Worth:** In the case of a proposed transferee lessor, it shall have demonstrated to Lessee that it has a tangible net worth not less than that of Lessor as of the date of this Lease or shall have provided Lessee with a guarantee of all of such transferee's obligations under this Lease, in form and substance reasonably satisfactory to Lessee, by a guarantor having reasonably demonstrated to Lessee such required tangible net worth.

## 15.   MISCELLANEOUS

### 15.1   Illegality

Subject to Section 15.4, if it is or becomes unlawful in any jurisdiction for Lessor to give effect to any of its material obligations as contemplated by this Lease or to continue this Lease, Lessor may by notice in writing to Lessee terminate the leasing of the Aircraft under this Lease, such termination to take effect on the latest date (the "Effective Date") on which Lessor may continue such leasing and such obligations without being in breach of applicable Regulations, and Lessee

- 30 -

2007-08-07
Prima Charters Sp. z o. o.

will forthwith redeliver the Aircraft to Lessor in accordance with Section 12. Without prejudice to the foregoing, Lessor will consult in good faith with Lessee up to the Effective Date as to any steps which may be taken (at no material cost to Lessee) to restructure the transaction to avoid such unlawfulness and will take any such steps commercially reasonable to continue the effectiveness of this Lease.

## 15.2  Waivers, Remedies Cumulative

The rights of Lessor under this Lease may be exercised as often as necessary, are cumulative and not exclusive of its rights under any Law; and may be waived only in writing and specifically. Delay by Lessor in exercising, or non-exercise of, any such right will not constitute a waiver of that right.

## 15.3  Delegation

Lessor may delegate to any Person all or any of the rights, powers or discretions vested in it by this Lease, and any such delegation may be made upon such terms and conditions and subject to such regulations (including power to sub-delegate) as Lessor in its absolute discretion thinks fit.

## 15.4  Severability

If a provision of this Lease is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)     the legality, validity or enforceability in that jurisdiction of any other provision of this Lease; or

(b)     the legality, validity or enforceability in any other jurisdiction of that or any other provision of this Lease.

## 15.5  Remedy

If Lessee fails to comply with any provision of this Lease, Lessor may, without being in any way obliged to do so or responsible for so doing and without prejudice to the ability of Lessor to treat such non-compliance as a Default, effect compliance on behalf of Lessee, whereupon Lessee shall become liable to pay immediately any sums expended by Lessor together with all costs and expenses (including legal costs) in connection with the non-compliance.

## 15.6  Time of Essence

The time stipulated in this Lease for all payments payable by Lessee and the prompt, punctual performance of Lessee's other obligations under this Lease are of the essence of this Lease.

## 15.7  Notices

All notices and other communications under, or in connection with, this Lease will, unless otherwise stated, be given in writing by hand delivery, mail, overnight courier service, facsimile or email (where such address is available). Any such notice or other communication is deemed effectively given when received by the recipient (or if receipt is refused by the intended recipient, when so refused).

- 31 -

2007-08-07
Prima Charters Sp. z o. o.

The address, facsimile and email details for notices to Lessee and Lessor are as set out below or as otherwise advised by one party to the other in writing and in compliance with this Section 15.7 from time to time:

**If to Lessor:**

| | |
|---|---|
| Address: | **Alliance Continental Leasing, LLC**<br>Creekside Professional Center<br>6715 Tippecanoe Road<br>Building A, Suite 202<br>Canfield, Ohio 44406<br>USA |
| Attention: | John C. Green<br>**Managing Director/CEO** |
| Facsimile: | (330) 702-1938 |
| Email: | jcg@commercialaerospacecapitalcorporation.com |
| with a copy to: | **Edwards Angell Palmer & Dodge LLP**<br>919 North Market Street<br>15ᵗʰ Floor<br>Wilmington, DE<br>19801 |
| Attention: | |
| Facsimile: | |

**If to Lessee:**

| | |
|---|---|
| Address: | **Prima Charter Sp. z o. o.**<br>ul. 17 Stycznia 56<br>02-146 Warsaw, Poland |
| Attention: | **Filip Cias**<br>**Chief Financial Officer** |
| Facsimile: | 011 48 22 500 28 81 |
| E-mail: | fillip.cias@primacharter.pl |
| With copy to: | **Chapman & Cutler LLP**<br>111 West Monroe Street<br>Chicago, IL 60603 |
| Attention: | Thomas C. Lee Esq. |
| Facsimile: | (312) 516-1880 |
| E-mail: | thomaslee@chapman.com |

## 15.8    Governing Law and Jurisdiction

(a)    This Lease in all respects shall be governed by, and construed in accordance with, the Laws of the State of New York.

- 32 -

2007-08-07
Prima Charters Sp. z o. o.

(b)     Each of Lessee and Lessor hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the City and County of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Lease and each of Lessee and Lessor hereby irrevocably and unconditionally agrees that all claims in respect of such action or proceeding may be heard and determined in such court in the State of New York or, to the extent permitted by law, in such federal court.

(c)     Without prejudice to any other mode of service, Lessee and Lessor each consent to the service of process relating to any such proceedings by delivery or prepaid mailing of a copy of the process to the address identified in Section 15.7 or by fax or prepaid mailing by air mail, certified or registered mail of a copy of the process to the fax number or address for notices.

(d)     Each party:

    (i)     waives to the fullest permitted by Law any objection which it may now or hereafter have to the courts referred to in Section 15.8(b) above on grounds of inconvenient forum or otherwise as regards proceedings in connection with this Lease;

    (ii)    waives to the fullest extent permitted by Law any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Lease brought in the courts referred to in Section 15.8(b); and

    (iii)   agrees that a judgment, award or order of any court referred to in Section 15.8(b) in connection with this Lease is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction as if made by the highest court in that other jurisdiction and accordingly it will not seek to, nor be entitled to, contest and/or delay and/or obstruct registration or enforcement of any such judgment and/or award and/or order on grounds of public policy or otherwise.

(e)     This Section 15 shall survive, continue to take full effect and not merge in any order or judgment and nothing in this Section 15.8 limits the right of each party to bring proceedings against the other party in connection with this Lease:

    (i)     in any other court of competent jurisdiction; or

    (ii)    concurrently in more than one jurisdiction.

(f)     Each party irrevocably and unconditionally:

    (i)     agrees that if the other party brings legal proceedings against it or its assets in relation to this Lease no immunity from such legal proceedings (which will be deemed to include suit, attachment prior to judgement, other attachment, the obtaining of judgement, execution or other enforcement) will be claimed by or on behalf of itself or with respect to its assets;

    (ii)    waives any such right of immunity which it or its assets now has or may in the future acquire;

- 33 -

2007-08-07
Prima Charter Sp. z o. o.

(iii) waives any requirement, of any kind whatsoever, for the other party to provide any form of security in respect of the payment of any damages, costs, expenses or any other financial obligation resulting from the commencement or prosecution of proceedings or the making of or service of any order and Lessee undertakes (x) not to challenge the validity of any proceedings or the making of any orders without any requirement for the provision of such security (y) to advise any court upon the other party's request that it requires no such security and (z) to provide security itself for any third party claims arising out of or in connection with such proceedings and/or orders; and

(iv) consents generally in respect of any such proceedings to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgement which may be made or given in such proceedings.

## 15.9    Sole and Entire Agreement

This Lease is the sole and entire agreement between Lessor and Lessee in relation to the leasing of the Aircraft, and supersedes all previous agreements, representations and understandings in relation to that leasing. Any amendments to this Lease must be made in writing and signed on behalf of Lessor and Lessee.

## 15.10    Counterparts

This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Lease Agreement shall not be considered in effect until originally signed copies have been duly provided to the Lessor's escrow agent; Aero Space Reports, 6916 N.W. 112th Street, Oklahoma City OK 73172 (facsimile notification 405-728-2336 ).

## 15.11    Language

All notices to be given under this Lease will be in English. All documents delivered to Lessor pursuant to this Lease will be in English, or if not in English, will be accompanied by a certified English translation. If there is any inconsistency between the English version of this Lease and any version in any other language, the English version will prevail.

## 16.    DISCLAIMERS AND WAIVERS

LESSOR AND LESSEE AGREE THAT THE DISCLAIMERS, WAIVERS AND CONFIRMATIONS SET OUT IN SECTIONS 16.1 TO 16.4 SHALL APPLY AT ALL TIMES DURING THE TERM. LESSEE'S ACCEPTANCE OF THE AIRCRAFT IN ACCORDANCE WITH SECTION 4.3 SHALL BE CONCLUSIVE EVIDENCE THAT LESSEE HAS FULLY INSPECTED THE AIRCRAFT, THE ENGINES AND EVERY PART THEREOF AND THAT THE AIRCRAFT, THE ENGINES, THE PARTS AND THE AIRCRAFT DOCUMENTS AND RECORDS ARE TECHNICALLY ACCEPTABLE TO LESSEE AND SATISFY THE DELIVERY CONDITION REQUIREMENTS AND ARE IN SUITABLE CONDITION FOR DELIVERY TO AND ACCEPTANCE BY LESSEE.

- 34 -

2007-08-07
Prima Charters Sp z o.o.

**16.1    Exclusion**

THE AIRCRAFT IS TO BE LEASED AND DELIVERED HEREUNDER "AS IS, WHERE IS", AND LESSEE AGREES AND ACKNOWLEDGES THAT, SAVE AS EXPRESSLY STATED IN THE LEASE

(A)    LESSOR WILL HAVE NO LIABILITY IN RELATION TO, AND LESSOR HAS NOT AND WILL NOT BE DEEMED TO HAVE ACCEPTED, MADE OR GIVEN (WHETHER BY VIRTUE OF HAVING DONE OR FAILED TO DO ANY ACT, OR HAVING ACQUIRED OR FAILED TO ACQUIRE ANY STATUS UNDER OR IN RELATION TO THE LEASE OR OTHERWISE), ANY CONDITIONS, WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO, THE AIRCRAFT OR ANY ENGINE OR PART OR ANY SERVICES PROVIDED BY LESSOR UNDER THE LEASE, INCLUDING THE DESCRIPTION, AIRWORTHINESS, COMPLIANCE WITH SPECIFICATIONS, OPERATION, MERCHANTABILITY, QUALITY, FREEDOM FROM INFRINGEMENT OF PATENT OR OTHER PROPRIETARY RIGHTS, FITNESS FOR ANY PARTICULAR USE OR PURPOSE, VALUE, DURABILITY, DATE PROCESSING, CONDITION, OR DESIGN, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP, THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, OR AS TO ANY OTHER MATTER WHATSOEVER, EXPRESS OR IMPLIED (INCLUDING ANY IMPLIED WARRANTY ARISING FROM A COURSE OF PERFORMANCE OR DEALING OR USAGE OF TRADE) WITH RESPECT TO THE AIRCRAFT, ANY ENGINE OR ANY PART OR ANY SERVICES PROVIDED BY LESSOR UNDER THE LEASE; AND

(B)    LESSOR SHALL NOT HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER TO LESSEE (WHETHER ARISING IN CONTRACT OR IN TORT, AND WHETHER ARISING BY REFERENCE TO NEGLIGENCE, MISREPRESENTATION OR STRICT LIABILITY OF LESSOR OR OTHERWISE) FOR:

(i)    ANY LIABILITY, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY OR INDIRECTLY BY THE AIRCRAFT OR ANY ENGINE OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN OR BY ANY OTHER CIRCUMSTANCE IN CONNECTION THEREWITH;

(ii)    THE USE, OPERATION OR PERFORMANCE OF THE AIRCRAFT OR ANY RISKS RELATING THERETO;

(iii)    ANY INTERRUPTION OF SERVICE, LOSS OF BUSINESS OR ANTICIPATED PROFITS OR ANY OTHER DIRECT, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE, OR

(iv)    THE DELIVERY, OPERATION, SERVICING, MAINTENANCE, REPAIR, IMPROVEMENT OR REPLACEMENT OF THE AIRCRAFT, ANY ENGINE OR ANY PART

- 35 -

2007-08-07
Prima Charters Sp. z o.o.

#### 16.2   Waiver

LESSEE HEREBY WAIVES, AS BETWEEN ITSELF AND THE LESSOR, ALL ITS RIGHTS IN RESPECT OF ANY CONDITION, WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, ON THE PART OF LESSOR PERTAINING TO THE AIRCRAFT AND ALL CLAIMS AGAINST LESSOR HOWSOEVER AND WHENEVER ARISING AT ANY TIME IN RESPECT OF OR OUT OF ANY OF THE MATTERS REFERRED TO IN SECTION 16.1

#### 16.3   Disclaimer Of Consequential Damages

LESSEE AGREES THAT IT SHALL NOT BE ENTITLED TO RECOVER, AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER, LOST PROFITS OR REVENUES OR CONSEQUENTIAL DAMAGES AS A RESULT OF ANY BREACH OR ALLEGED BREACH BY LESSOR OF ANY OF THE AGREEMENTS CONTAINED IN THE LEASE.

#### 16.4   Confirmation

LESSEE CONFIRMS THAT IT IS FULLY AWARE OF THE PROVISIONS OF THIS SECTION 16 AND ACKNOWLEDGES THAT RENT AND OTHER AMOUNTS PAYABLE UNDER THE LEASE HAVE BEEN CALCULATED BASED ON ITS PROVISIONS.

### 17.   BROKERS AND OTHER THIRD PARTIES

#### 17.1   No Brokers

Each of the parties hereby represents and warrants to the other that it has not paid, agreed to pay or caused to be paid directly or indirectly in any form, any commission, percentage, contingent fee, brokerage or other similar payments of any kind, in connection with the establishment or operation of this Lease, to any Person (other than fees payable to legal advisers).

#### 17.2   Indemnity

Each party agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including reasonable legal fees) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon this Lease or the Aircraft, if such claim, suit, damage, cost or expense arises out of any breach by the indemnifying party, its employees or agents of Section 17.1.

### 18.   BENEFIT OF THIRD PARTIES

18.1   Any Indemnitee may enforce the terms of Section 10 (*Indemnity*) in accordance with the provisions of this Lease.

18.2   Any Tax Indemnitee may enforce the terms of Section 5.7 (*Tax Indemnity*) in accordance with the provisions of this Lease

- 36 -

IN WITNESS whereof the parties hereto have executed this Lease on the date shown at the beginning of the document.

ALLIANCE CONTINENTAL LEASING LLC

By:

Name: John C. Green

Title: Managing Director & C.E.O.    w/ Board approval

PRIMA CHARTER SP. Z O. O.

By:

Name: ADAM WYCHOWANIEC

Title: President & C.E.O.

By:

Name: KRZYSZTOF SZYMANSKI

Title: Chief Financial Officer

- 37 -

2007-08-07
Prima Charters Sp. z o. o.

EXECUTION VERSION

## SCHEDULE 1
## DEFINITIONS

The following words and expressions have the respective meanings set out below:

**AD Compliance Period** means the 60 days after the Return Occasion.

**Air Authority** means the civil aviation authority (howsoever described) of the State of Registry.

**Aircraft** means Aircraft and Engines identified in **Annex A** to this **Schedule 1** (which term includes, where the context admits, a separate reference to all Engines, Parts and Aircraft Documents and Records).

**Aircraft Documents and Records** means the documents, data and records identified in the list attached to the Certificate of Acceptance, and any other documents and records required in connection with Lessee's obligations under Section 8.8, and all additions, renewals, revisions and replacements from time to time made to any of the foregoing in accordance with this Lease.

**Airframe Structural Check** means a heavy maintenance visit which shall include but not be limited to accomplishment of a 4C Check, all greater or lesser checks, passenger cabin refurbishment (including lavatories and galleys) and strip and repainting of the complete fuselage, empennage, wings and pylons. Where relevant, the workscope and intervals (calendar and/or hourly) shall not be less than those prescribed by the then current Manufacturer's Maintenance Planning Document block maintenance program.

**Airframe Supplemental Rent** is defined in Section 5.3(c).

**Airframe** means the Aircraft, excluding the Engines and Aircraft Documents and Records.

**Airworthiness Directive** means an airworthiness directive issued by the State of Design or the State of Registry.

**Agreed Value** means $21,000,000.00; provided that such amount shall be reduced by $1,000,000.00 on each anniversary of the Delivery Date.

**Annual Supplemental Rent Adjustment** means 3.50%.

**APU** means the auxiliary power unit installed on the Aircraft on the Delivery Date and any replacement auxiliary power unit installed on the Aircraft and title to which is transferred to Owner in accordance with this Lease.

**APU Supplemental Rent** is defined in Section 5.3(c).

**Assumed Ratio** is defined in Section 5.3(d)(ii).

**Assumed Utilisation** is defined in Section 5.3(d)(iii).

**Back-To-Birth Traceability** means with certified documentation available identifying precisely where, when and with which aircraft operator the expired life and previous maintenance in relation to the relevant item occurred since that item was new.

**Bill of Sale** means the aircraft bill of sale conveying all right, title and interest in and to the Aircraft from Aero Turbine, Inc., as seller, to Lessor, as buyer, pursuant to the Purchase Agreement.

**Business Day** means any day other than a Saturday, Sunday or other day on which banking institutions in New York, New York or Warsaw, Poland or are authorized or required by Law to be closed.

**"C" Check** means a "C" check in accordance with Lessee's Maintenance Programme and the Manufacturer's Maintenance Planning Document each in effect on the relevant date.

**Cape Town Convention** means the *Convention on International Interests in Mobile Equipment* and *Protocol Thereto on Matters Specific to Aircraft Equipment*, concluded in Cape Town, South Africa on 16 November 2001.

**Certificate of Acceptance** means a certificate of acceptance to be mutually agreed upon between Lessor and Lessee prior to the Delivery Date, taking substantially the form of **Schedule 5**.

**Conditions Precedent** means the conditions specified in **Schedule 3**.

**CPCP** means corrosion prevention and control programme.

**CSO** means Cycles or Engine Cycles, as applicable, since overhaul.

**CTC Act** means the *International Interests in Mobile Equipment (Aircraft Equipment) Act*, S.C. 2005, Ch. 3.

**CTC Location** means the location where Lessee is "situated" for the purposes of the Cape Town Convention.

**Cycle** means one take-off and landing of the Aircraft.

**Damage Notification Threshold** means $250,000.00.

**Deductible Amount** means $100,000.00.

**Default** means any Event of Default or any event or circumstance which, with the giving of notice and/or lapse of time and/or determination of materiality and/or fulfilment of any other condition, would constitute an Event of Default.

**Defect** means any defect or non-conformity with the Delivery Condition Requirements notified by Lessee to Lessor during the Pre-Delivery Procedure.

**Delivery** means delivery of the Aircraft by Lessor to Lessee under this Lease.

**Delivery Condition Requirements** means the requirements identified in **Schedule 4** provided that such requirements are solely a description of the condition in which the Aircraft must be in order for Lessee to be obligated to accept the Aircraft under this Lease.

**Delivery Date** means the date on which Delivery occurs.

**Delivery Location** means over international waters or such other location as Lessor and Lessee may mutually agree in writing.

1-2

**Deposit** means $750,000.00.

**Deposited Amounts** is defined in Section 5.1.

**Dollars** and **$** means the lawful currency of the United States of America.

**Engine** means, whether or not installed on the Aircraft:

(a)     each engine of the manufacture and model specified in this Lease for the Aircraft which Lessor offers to Lessee for Delivery with the Airframe on the Delivery Date, such Engines being described as to serial numbers on the Certificate of Acceptance; and

(b)     any Replacement Engine, with effect from the time when title thereto has passed to Owner in accordance with this Lease;

and in each case includes all modules and Parts, including QEC, from time to time belonging to or installed in that engine but excludes any properly replaced engine title to which should have passed to Lessee pursuant to this Lease.

**Engine Cycle** means operation of an Engine on an aircraft from and including a take-off to and including the landing of that aircraft.

**Engine Event of Loss** means the occurrence, with respect to an Engine only, whether or not installed on the Airframe, of any of those events described in the definition of Event of Loss.

**Engine Flight Hour** means each hour or part thereof an Engine is operated, elapsing from the moment the wheels of an aircraft on which such Engine is installed leave the ground until the wheels of such aircraft next touch the ground.

**Engine LLP Supplemental Rent** is defined in Section 5.3(c).

**Engine Refurbishment** means, with respect to any Engine, the complete visual inspection and repair as necessary in accordance with the shop manual of the combustion section of such Engine in an engine repair/overhaul station, including, complete unstacking of the high pressure turbine and low pressure turbine (including both high and low compressors); complete visual inspection, de-blading of discs as required; visual inspections of all discs; verification that all snap diameters on discs are within limits; inspection of all blades for proper chord dimensions and cracking; repair or replacement of all blades below minimums; inspection and repair of stators as necessary; blade-up of discs using new lock plates; assembly of rotors in the turbine; balance of all rotors; and installation of rotors in the Engine.

**Engine Supplemental Rent** is defined in Section 5.3(c).

**Engine Thrust Setting** has the meaning set forth in the Certificate of Acceptance.

**Equipment Change** has the meaning given in Section 8.12.

**Eurocontrol** means the European Organisation for the Safety of Air Navigation.

**Event of Default** means any event or condition specified in **Schedule 9**.

**Event of Loss** means with respect to the Aircraft (including for the purposes of this definition the Airframe):

1-3

(a)     the actual or constructive, compromised, arranged or agreed total loss of the Aircraft;

(b)     the Aircraft being destroyed, damaged beyond economic repair or permanently rendered unfit for normal use for any reason whatsoever;

(c)     the Aircraft being requisitioned for title, or title to the Aircraft being otherwise compulsorily acquired by the government of the State of Registry or any other authority; or

(d)     the Aircraft being hijacked, stolen, confiscated, seized, detained or requisitioned for use or hire for (i) a period of more than 60 days (or 90 days in the case of requisition for use or hire by the government of the State of Registry) or (ii) if a shorter period, such number of days as ends on the Expiry Date.

**Expiry Date** means the Original Scheduled Expiry Date or if earlier (a) the date on which this Lease terminates as a result of (i) Lessor terminating this Lease in accordance with the provisions hereof or (ii) the consummation of a purchase of the Aircraft pursuant to a Purchase Option or (b) subject to the provisions of Section 11.1 and 11.2, the date when Lessor receives the Agreed Value together with any other amounts then due and unpaid under this Lease and the Other Agreements following an Event of Loss; provided that if, the Term is extended pursuant to Section 12.2, the Expiry Date shall be extended to the date when the Aircraft has been redelivered to Lessor in full compliance with this Lease;

**FAA** means the Federal Aviation Administration of the United States of America and any successor thereof

**FAA Location** means the location of Lessee's agent for the service of FAA process to it as a foreign air carrier.

**FAR** means the *Federal Aviation Regulations* set out in Title 14 of the *United States Code of Federal Regulations*, as amended and modified from time to time.

**FAR Part 121** means Part 121 of the FAR, as amended or modified from time to time.

**Final Delivery Date** means the date that is 7 days after the Scheduled Delivery Date.

**Financial Indebtedness** means any indebtedness in respect of:

(a)     moneys borrowed or raised;

(b)     any liability under any debenture, bond, note, loan stock, acceptance, documentary credit or other security;

(c)     the acquisition cost of any asset to the extent payable before or after the time of acquisition or possession; or

(d)     any guarantee, indemnity or similar assurance against financial loss of any person in respect of the above.

**Final Inspection** has the meaning given in Section 1.1 of **Schedule 6**.

**Financial Information** means:

1-4

(a)     if requested by Lessor, the consolidated management accounts of Lessee (in Dollars, and comprising a balance sheet and profit and loss statement and cash flow forecasts) in English prepared for the most recent previous financial quarter certified by a qualified financial officer of Lessee as being true and correct; and

(b)     as soon as available, but not in any event later than 120 days after the last day of each financial year of Lessee, its audited consolidated balance sheet in English as of such day and its audited consolidated profit and loss statement for the year ending on such day (each in Dollars).

**Financing Parties** means the Person or Persons from time to time notified by Lessor to Lessee as providing finance to Lessor or Owner in respect of its acquisition, ownership or leasing of the Aircraft, whether by way of superior lease, loan or otherwise.

**Flight Hour** means each hour or part thereof elapsing from the moment the wheels of the Aircraft leave the ground on take off until the wheels of the Aircraft next touch the ground.

**Geneva Convention** means the *Convention for the International Recognition of Rights in Aircraft*, signed (ad referendum) at Geneva, Switzerland, on June 19, 1948, and amended from time to time, but excluding the terms of any adhesion thereto or ratification thereof containing reservations to which the United States of America does not accede.

**Government Entity** means:   (a) any national government, political subdivision thereof, or local jurisdiction therein; (b) any instrumentality, board, commission, court, or agency of any of the above, however constituted; or (c) any association, organisation, or institution of which any of the above is a member or to whose jurisdiction any thereof is subject or in whose activities any of the above is a participant.

**Habitual Base** means the Republic of Poland or, subject to the prior written consent of Lessor, any other country or countries in which the Aircraft is for the time being habitually based.

**Indemnitee** means Lessor, the Financing Parties and each of their respective successors and assigns, shareholders, subsidiaries, affiliates, partners, contractors, directors, officers, representatives, servants, agents and employees.

**Insolvent** means in relation to any relevant Person that such Person:

(a)     cannot or is deemed by applicable Law to be insolvent or unable to pay its debts;

(b)     stops trading or threatens to stop trading;

(c)     goes into liquidation or is wound up in any jurisdiction (other than a solvent re organisation which Lessor approves in writing); or its directors or one or more creditors applies to the court for an administration order or winding up order;

(d)     goes into administrative receivership or administration, has a receiver appointed over any of its assets or is the subject of any similar proceedings in any country;

(e)     proposes a voluntary arrangement or scheme of arrangement to creditors; or

1-5

(f)     enters into any process or scheme for the benefit of creditors as a whole under which their rights are suspended or affected.

**Insurance** means insurance in respect of the Aircraft in form and substance satisfactory to Lessor, and includes any insurance and reinsurance required by Section 9 and **Schedule 7**.

**Interest Rate** means Citibank, N.A.'s prime rate plus five percent (5%) per annum.

**Landing Gear** means the landing gear assembly of the Aircraft excluding any rotable components.

**Landing Gear Supplemental Rent** is defined in Section 5.3(c).

**Law** means and includes (a) any statute, decree, constitution, regulation, order, judgement or other directive of any Government Entity; (b) any treaty, pact, compact or other agreement to which any Government Entity is a signatory or party; (c) any judicial or administrative interpretation or application of any Law described in (a) or (b) above; and (d) any amendment or revision of any Law described in (a), (b) or (c) above.

**Lease** means this Lease Agreement for the Aircraft and any Schedules, supplements, amendments, modifications or side letter agreements related to this Lease executed contemporaneously with or subsequently to this Lease

**Lessee Affiliate** means any Subsidiary of Lessee

**Lessee's Maintenance Programme** means the Maintenance Programme, as at the date of this Lease, specifically approved by the Air Authority for Lessee's maintenance of the Aircraft.

**Lessor Lien** means any Security Interest whatsoever in the Aircraft or this Lease from time to time created by Lessor in connection with the financing of the Aircraft and any other Security Interest in the Aircraft or this Lease which results from acts of or claims against Lessor not related to the transactions contemplated by or permitted under this Lease.

**Lessor Tax Jurisdiction** means the U.S.A.

**Losses** means any cost, expense (including the fees and expenses of professional advisers), financial liability, damage or financial loss of any kind, whether direct or indirect.

**Maintenance Contributions** means all amounts payable by Lessor pursuant to Section 7.2.

**Maintenance Performer** means Lessee or such Person as is approved and internationally recognised by the Air Authority and, until the Delivery Date, the FAA, to perform maintenance and/or modification services on commercial aircraft and/or commercial aircraft engines, which Person shall be agreed by Lessor and Lessee to ensure that such Person has recognised standing and experience, suitable facilities and suitable equipment to perform such services on aircraft and/or engines of the same model as the Aircraft or, in the case of engines, the Engines.

**Maintenance Programme** means an Air Authority approved maintenance programme for the Aircraft in accordance with the Manufacturer's and/or OEM's specifications, requirements, service bulletins, planning documents, maintenance manuals and documents and encompassing scheduled maintenance (including block maintenance), condition-monitored maintenance, and/or on-condition maintenance of the Airframe, Engines and Parts, including servicing, testing, preventive maintenance, repairs, structural

1-6

inspections, system checks, overhauls, approved modifications, service bulletins, engineering orders, Airworthiness Directives and corrosion control inspections and treatments.

**Major Checks** means any "C" Check, multiple "C" Check or heavier check (including structural inspections and CPCP) suggested for commercial aircraft of the same model as the Aircraft by Manufacturer (however denominated) as set out in Lessee's Maintenance Programme.

**Manufacturer** means The Boeing Company (or if the context requires, Rolls Royce for an Engine).

**Manufacturer's Maintenance Planning Document** means the recommended maintenance programme for the Aircraft issued by the Manufacturer.

**Minimum Airframe Life Limited Component Flight Hours** means 500 Flight Hours.

**Minimum Airframe Life Limited Component Cycles** means 500 Cycles.

**Minimum APU Limit** means 500 Cycles.

**Minimum Component Calendar Life** means six months.

**Minimum Component Cycles** means 500 Cycles.

**Minimum Component Flight Hours** means 500 Flight Hours.

**Minimum Engine Cycles** means 500 Cycles.

**Minimum Engine LLP Cycles** means 500 Cycles.

**Minimum Engine Flight Hours** means 500 Flight Hours.

**Minimum Landing Gear Calendar Time** means six months.

**Minimum Landing Gear Cycles** means 500 Cycles.

**Minimum Landing Gear Flight Hours** means 500 Flight Hours.

**Minimum Liability Coverage** means $50,000,000.

**Nameplates** means the fireproof plates to be installed on the Aircraft in accordance with Section 8.6(a).

**Notice** is defined in Section 5.21(a).

**OEM** means, in relation to any Part, the original equipment manufacturer of such Part.

**Option Date** is defined in Section 5.21(a).

**Original Scheduled Expiry Date** means the date which is 48 months after the Delivery Date. If such date does not fall on a day that is a Business Day, then the Original Scheduled Expiry Date shall be the immediately preceding Business Day

**Other Agreement** means any aircraft lease agreement or other agreement from time to time entered into between Lessor (or any Subsidiary, associate or affiliate of Lessor) and Lessee (or any Subsidiary, associate or affiliate of Lessee).

**Owner** means Lessor or any permitted transferee under this Lease from Lessor as notified to Lessee.

**Part** means, whether or not installed on the Aircraft:

    (a)    any component, module, furnishing or equipment (other than a complete Engine) furnished with the Aircraft on the Delivery Date; and

    (b)    any other component, module, furnishing or equipment (other than a complete Engine), with effect from the time when title thereto has passed to Owner pursuant to this Lease;

but excludes any such items title to which should have passed to Lessee pursuant to this Lease.

**Permitted Lien** means:

    (a)    any lien for Taxes not assessed or, if assessed, not yet due and payable, or being contested in good faith by appropriate proceedings;

    (b)    any lien of a repairer, mechanic, carrier, hangar-keeper or other similar lien arising in the ordinary course of business by operation of Law in respect of obligations which are not overdue or are being contested in good faith by appropriate proceedings;

    (c)    any judgment or Tax lien in respect of obligations that are not overdue or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted;

    (d)    any Lessor Lien; and

    (e)    the rights of others under any Permitted Sub-Lease to the extent expressly permitted under Section 8.4;

but only if (in the case of both (a) and (c)) (i) adequate reserves have been provided by Lessee for the payment of such Taxes or obligations; and (ii) such proceedings, or the continued existence of the lien, do not give rise to any risk of the sale, forfeiture, seizure, detention or other loss of the Aircraft or any interest therein or of criminal liability on Lessor or Owner.

**Permitted Sub-Lease** means the sub-lease of the Aircraft to a Permitted Sub-Lessee as provided for pursuant to Section 8.4.

**Person** means any individual person, any form of corporate or business association, trust, Government Entity, or organisation or association of which any of the above is a member or a participant.

**Pre-Delivery Procedure** means the procedure leading to Delivery as specified in **Schedule 4**.

**PPSA Location** means the "location" of Lessee for the purpose of registering Lessor's interest in the aircraft under any applicable aircraft legislation or personal property ownership or lien registration legislation in the State of Registry.

1-8

**Purchase Agreement** means the purchase and sale agreement entered into between Aero Turbine, Inc., as seller, and Lessor, as purchaser, with respect to the Aircraft (including the Engines, Parts and the Aircraft Documents and Records).

**Purchase Option** is defined in Section 5.21(a).

**Purchase Option Price** means (as applicable): (a) in respect of the Purchase Option pertaining to the Option Date that is 90 days following the Delivery Date, $17,350,000.00; or (b) in respect of the Purchase Option pertaining to the Option Date that is the Scheduled Expiry Date, $11,680,000.00.

**QEC** means quick engine change kit.

**Redelivery Check** means a heavy maintenance visit which shall include but not be limited to accomplishment of a block Check, all lesser checks, passenger cabin refurbishment (including lavatories and galleys) and strip and repainting of the complete fuselage, empennage, wings and pylons. Where relevant, the workscope and intervals (calendar and/or hourly) shall not be less than those prescribed by the then current Manufacturer's Maintenance Planning Document block maintenance program.

**Redelivery Location** means Dublin, Ireland or such other location as may be agreed in writing by Lessor and Lessee.

**Regulations** means any Law or regulation (including any internal corporate regulation), official directive or recommendation, mandatory requirement or contractual undertaking which applies to Lessee or the Aircraft and any Law or regulation, official directive or recommendation or mandatory requirement which applies to Lessor.

**Relevant Documents** means this Lease and any ancillary documents related thereto.

**Relevant Taxes** are those Taxes which any Tax Indemnitee may suffer or incur, whether directly or indirectly and which arise as a result of: (i) the ownership, operation maintenance, repair, possession, transfer of ownership or possession, import, export, registration, storage, modification, leasing, insurance, inspection, testing, design, sub leasing, use condition or other matters relating to or attributable to the Aircraft, Lessee or this Lease, or any rent, receipts, insurance proceeds, income or other amounts arising therefrom; or (ii) any breach by Lessee of its obligations.

**Rent** means all amounts payable pursuant to Section 5.3.

**Rental Period** means each period ascertained in accordance with Section 5.2.

**Rent Commencement Date** means the date on which Lessor properly offers the Aircraft for Delivery to Lessee under Section 4.3(a).

**Rent Date** means the first day of each Rental Period.

**Replacement Engine** means an engine of the same manufacturer and model, or at Lessee's option an engine of an improved model and having equivalent or better value, utility, modification status, time elapsed since hot section refurbishment, cold section refurbishment, reduction gear overhaul, life limited part utility and remaining equivalent warranty status as the Engine it replaces under Section 8.11, and is otherwise of an equivalent value and utility and suitable for installation and use on the Airframe without impairing the value or utility of the Airframe and compatible with the remaining installed Engine(s).

1-9

**Required EGT Margin** means sufficient EGT Margin to attain minimum hours and cycles on wing.

**Return Occasion** means the date on which the Aircraft is redelivered to Lessor in accordance with Section 12.

**Scheduled Delivery Date** means August 20, 2007.

**Security Interest** means any mortgage, charge, pledge, lien, encumbrance, assignment, hypothecation, right of seizure, right of detention, right of set-off or any other agreement or arrangement having the effect of conferring security.

**Short Form** means the short form lease agreement substantially in the form of **Schedule 12**.

**SLOATL** means sea level outside air temperature limit.

**SRM** means Manufacturer's structural repair manual.

**State of Design** means the state having jurisdiction over the Person responsible for the type design of the Aircraft or any Engine or Part.

**State of Incorporation** means Delaware, USA.

**State of Registry** means the Republic of Poland.

**Subsidiary** means:

    (a)    in relation to any reference to accounts, any company whose accounts are consolidated with the accounts of Lessee in accordance with accounting principles generally accepted under accounting standards of the State of Incorporation;

    (b)    for any other purpose, an entity from time to time:

        (i)    of which another has direct or indirect control or owns directly or indirectly more than 50 percent of the voting share capital; or

        (ii)    which is a direct or indirect subsidiary of another under the Laws of the jurisdiction of its incorporation.

**Supplemental Rent** means, as applicable, all amounts payable under this Lease in respect of each of Airframe Supplemental Rent, Engine Supplemental Rent, Engine LLP Supplemental Rent, APU Supplemental Rent and Landing Gear Supplemental Rent.

**Taxes** means any and all present and future taxes, duties, withholdings, levies, assessments, imposts, fees and other governmental charges of all kinds (including any value added, goods and services or similar tax and any stamp, documentary, license, registration or similar fees or tax), together with any penalties, fines, surcharges and interest thereon and any additions thereto.

**Tax Indemnitees** means Lessor and, from and after the date Lessor has provided written notice of the existence of any such Person to Lessee, any Financing Party.

**Technical Report** means a monthly report of the Flight Hours, Cycles, Engine Flight Hours and Engine Cycles operated by the Airframe and Engines in respect of each calendar month in the form required by Lessor.

**Term** means the period commencing on the Delivery Date and ending on the Expiry Date.

**TSO** means time (Flight Hours or Engine Flight Hours, as applicable) since overhaul.

**Unforeseen Event** means:

(a)   war, civil disturbance or act of any Government Entity;

(b)   natural disaster;

(c)   unexpected shortage of labour, materials or facilities affecting the Aircraft;

(d)   labour disputes;

(e)   breach of contract by any Person or other failure to deliver or redeliver the Aircraft by any Person (whether or not a breach) other than Lessor with possession or control of the Aircraft or any purchase agreement for the Aircraft terminating prior to Delivery;

(f)   delays Lessor cannot control in obtaining the Aircraft or any equipment or services for the Aircraft; or

(g)   any other cause beyond the control of Lessor.

ANNEX A TO SCHEDULE 1

**Aircraft:**          Boeing B757-200ER

**MSN:**               24121

**Registration No.:**  SP-FVD (N28AT) ————

**Engines:**           RB211-535E4-37

**ESNs:**              No. 1: 30646  No. 2: 30660

*to be registered to form U.S. prior to funding of Exit [illegible] funding [illegible]*

EXECUTION VERSION

## SCHEDULE 2
## REPRESENTATIONS AND WARRANTIES

### 1.1    Lessee's Representations and Warranties

Lessee's representations and warranties to Lessor are as follows:

(a)    **Status**: It has been properly formed as a company with limited liability and has since been maintained according to all Regulations applicable to Lessee.

(b)    **Non-Conflict.** In entering into this Lease and carrying out its obligations, it does not contravene or breach any Regulation applicable to Lessee.

(c)    **Power and Authority**: It has the authorisations it needs to enter into this Lease and to carry out its obligations, and it has the power to enter into the Relevant Documents.

(d)    **Legal Validity**: Its obligations under this Lease are legal, valid and binding and enforceable in accordance with their terms.

(e)    **No Event of Default**: No Event of Default has occurred and is continuing or would occur because of Delivery.

(f)    **Litigation**: It is not involved in any litigation or other dispute which could affect its financial condition or its ability to carry out its obligations in any material way.

(g)    Financial Statements:  Its financial statements most recently prepared and most recently delivered to Lessor fairly represent the financial condition of Lessee as at the date to which they were drawn up and since that date there has been no material change in Lessee's ability to carry out its obligations or its financial condition:

(h)    **Full Disclosure**: Neither its financial statements referred to in paragraph (g) nor any other document provided to Lessor by Lessee for the purposes of this Lease contains any untrue statement or leaves out any important fact which could make any of them materially misleading.

(i)    **Material Adverse Change**: There has been no material adverse change in the financial condition of Lessee and Lessee Affiliates since the date to which the financial statements referred to in paragraph (g) were drawn up.

(j)    **PPSA Location**:  Lessee's PPSA Location is in the Republic of Poland.

(k)    **FAA Location**:  Lessee's FAA Location is as separately provided by Lessee to Lessor in writing.

### 1.2.    Lessor's Representations and Warranties

Lessor's representations and warranties to Lessee are as follows:

(a)    Status:  It has been properly formed as a company with limited liability and has since been maintained according to all Regulations applicable to Lessor  The Lessor Tax Jurisdiction is the United States of America

2-1

(b)    **Non-Conflict**: In entering into this Lease and carrying out its obligations, it does not contravene or breach any Regulation applicable to Lessor.

(c)    **Power and Authority**: It has the authorisations it needs to enter into this Lease and to carry out its obligations, and it has the power to enter into the Relevant Documents.

(d)    **Legal Validity**: Its obligations under this Lease are legal, valid and binding and enforceable in accordance with their terms.

2-2

EXECUTION VERSION

## SCHEDULE 3
## CONDITIONS PRECEDENT

On or before the Scheduled Delivery Date, Lessee shall comply with the Conditions Precedent set out below by ensuring that Lessor receives the following documents and by taking the actions described below, in each case in a manner satisfactory to Lessor. All documents delivered to Lessor pursuant to this **Schedule 3** will be in English, or if not in English, will be accompanied by a certified English translation:

### 1.    Payments

All sums due to Lessor under this Lease on or before the Delivery Date, including the first payment of Rent, must have been received by Lessor;

### 2.    Documents

(a)    **Opinion**: an original, signed opinion substantially in the form of **Schedule 8** will be issued on the Delivery Date by independent legal counsel acceptable to Lessor in the State of Registry, the Habitual Base and the State of Incorporation;

(b)    **Approvals/ Filings**: evidence of the issue of the Aircraft certificate of registration, a copy of the Application for Registration for the Aircraft pursuant to this Lease, together with any other approvals, licenses and consents which may be required in relation to, or in connection with the performance by Lessee of any of its obligations under this Lease. In addition, Lessee shall satisfy Lessor that all filings, registrations, recordings and other actions have been or will be taken which are necessary or advisable to ensure Lessor, the validity, effectiveness and enforceability of this Lease and to protect the property rights of Lessor, Owner and any Financing Parties in the Aircraft, any Engine or any Part, and this Lease, if applicable;

(c)    **Import**: evidence that any required import license and all customs formalities relating to the import of the Aircraft into the Habitual Base have been obtained or complied with and that the import of the Aircraft into the Habitual Base is exempt from Taxes (it being acknowledged that some filings can only be made upon Lessee's import of the Aircraft into the State of Registry) or that such Taxes have been paid;

(d)    **Licenses**: copies of Lessee's air transport license, air operator's certificates for Aircraft of the type of the Aircraft, and all other licenses, certificates and permits required by Lessee in relation to, or in connection with, the operation of the Aircraft;

(e)    **Air Traffic Control**: a letter from Lessee addressed to Eurocontrol and each other relevant air traffic control or airport authority pursuant to which Lessee authorises the addressee to issue to Lessor from time to time, a statement of account of all sums due by Lessee to the authority in respect of all aircraft (including the Aircraft) operated by Lessee;

(f)    **Power of Attorney**: the Power of Attorney substantially in the form of **Schedule 10** duly executed by Lessee and notarised and legalised;

(g)    **Insurance**: certificates of insurance and an undertaking from Lessee's insurance broker and other evidence satisfactory to Lessor, that Lessee is taking the required steps to ensure due compliance with the provisions of this Lease as to Insurance with effect on and after the Delivery Date;



(h)     **Certificate of Acceptance:**   the Certificate of Acceptance, dated and fully completed, and executed by Lessor and Lessee;

(i)     **Short Form Lease:**   the Short Form, which shall be entered into by Lessee and Lessor solely for the purposes of registering the Aircraft with the Air Authority; and

(j)     **Purchase Agreement.**   The Purchase Agreement and Bill of Sale must have been duly executed and delivered and all right, title and interest in and to the Aircraft transferred to Lessor;

together with such other documents as Lessor may reasonably request.

**3.     Truthfulness and No Default**

(a)     **Representations/Warranties:** The representations and warranties of Lessee in Schedule 2 shall be correct, and would be correct if repeated on Delivery; and

(b)     No Default: No Default shall have occurred and be continuing on Delivery or might result from the leasing of the Aircraft to Lessee under this Lease.

3-2

## SCHEDULE 7
## INSURANCE REQUIREMENTS

### 1.1    Types of Insurance

The Insurance required to be maintained are as follows:

(a)    **Hull All Risks** of loss or damage while flying and on the ground with respect to the Aircraft on an agreed value basis for the Agreed Value and with a deductible not exceeding the Deductible Amount, or such other amount agreed by Lessor from time to time;

(b)    **Hull War and Allied Perils**, being such risks excluded from the Hull All Risks Policy to the fullest extent available from the leading international insurance markets, including confiscation and requisition by the State of Registry for the Agreed Value;

(c)    **All Risks (including War and Allied Risk** except when on the ground or in transit other than by air) property insurance on all Engines and Parts when not installed on the Aircraft on an "agreed value" basis for their full replacement value and including engine test and running risks;

(d)    **Aircraft Third Party, Property Damage, Passenger, Baggage, Cargo and Mail and Airline General Third Party (including Products) Legal Liability** for a combined single limit (bodily injury/property damage) of an amount not less than the Minimum Liability Coverage for the time being for any one occurrence (but in respect of products and personal injury liability, this limit may be an aggregate limit for any and all losses occurring during the currency of the policy). War and Allied Risks cover is to be maintained from leading international insurance markets in the scope provided by AVN 52D as in effect on the date of this Lease and shall be for an amount not less than the greater of (i) the Minimum Liability Coverage and (ii) the amount carried by Lessee in respect of similar aircraft owned or otherwise operated by Lessee

### 1.2    Terms of Hull and Spares Insurance

All required hull and spares insurance, so far as it relates to the Aircraft, will:

(a)    **Additional Insureds**: name Lessor, any intermediate lessor (if any), and Owner and their respective successors and assigns as additional insureds for their respective rights and interests;

(b)    **Settlement of Losses**: provide that any loss will be settled jointly with Lessor and Lessee, and will be payable in Dollars to Lessor, for the account of all interests;

(c)    **50/50 Provision**: if separate Hull "all risks" and "war risks" insurance are arranged, include a 50/50 provision in accordance with market practice (AVS. 103 is the current London market language);

(d)    **No Option to Replace**: confirm that the insurers are not entitled to replace the Aircraft in the event of an insured Event of Loss.

7-1



**1.3    Terms of Liability Insurance**

All required liability insurance will:

(a)    **Additional Insureds**: include each Indemnitee, as additional insureds for its respective rights and interests, warranted, each as to itself only, no operational interest;

(b)    **Severability**: include a severability of interests clause which provides that the insurance, except for the limit of liability, will operate to give each insured the same protection as if there was a separate policy issued to each insured; and

(c)    **Primary Policy**: contain a provision confirming that the policy is primary without right of contribution and the liability of the insurers will not be affected by any other insurance of which Lessor, each Indemnitee or Lessee have the benefit so as to reduce the amount payable to the additional insureds under such policies.

**1.4    Terms of All Insurance**

All Insurance will:

(a)    **Best Industry Practice**: be in accordance with best industry practice of persons operating similar aircraft in similar circumstances;

(b)    **Dollars**: provide cover denominated in Dollars and any other currencies that Lessor may reasonably require in relation to liability insurance;

(c)    **Worldwide**: operate on a worldwide basis subject to such limitations and exclusions as Lessor may agree;

(d)    **Breach of Warranty**: provide that, in relation to the interests of each of the additional assureds, the Insurance will not be invalidated by any act or omission by Lessee, or any other person other than the respective additional assureds seeking protection and shall insure the interests of each of the additional assureds regardless of any breach or violation by Lessee, or any other person other than the respective additional assured seeking protection of any warranty, declaration or condition, contained in such Insurance;

(e)    **Subrogation**: provide that the insurers will hold harmless and waive any rights of recourse or subrogation against the additional insureds. Upon indemnification of an additional insured under the Insurance, the insurers may, with the consent of such additional insured (such consent not to be unreasonably withheld) exercise subrogation rights;

(f)    **Premiums**: provide that the additional insureds will have no obligation or responsibility for the payment of any premiums due (but reserve the right to pay the same should any of them elect so to do) and that the insurers will not exercise any right of set-off or counter-claim in respect of any premium due against the respective interests of the additional insureds other than outstanding premiums relating to the Aircraft, any Engine or Part the subject of the relevant claim;

(g)    **Cancellation/Change**: provide that the Insurance will continue unaltered for the benefit of the additional insureds for at least 30 days after written notice by registered mail or

7-2



receipted fax transmission of any cancellation, change, event of non-payment of premium or instalment thereof has been sent by insurer(s) to Lessor, or where an insurance broker is appointed to the insurance broker who shall promptly send on such notice to Lessor, except in the case of war risks for which 7 days (or such lesser period as is or may be customarily available in respect of war risks or allied perils) will be given, or in the case of war between the 5 great powers or nuclear peril for which termination is automatic;

(h)   **Reinsurance**: if reinsurance is required for the Insurance to be acceptable under this Lease, including without limitation, the requirements of Section 9 and **Schedule 7**, such reinsurance will:

   (i)   be on the same terms as the original insurance and will include the provisions of this Schedule;

   (ii)   provide that notwithstanding any bankruptcy, insolvency, liquidation, dissolution or similar proceedings of or affecting the reinsured that the reinsurers' liability will be to make such payments as would have fallen due under the relevant policy of reinsurance if the reinsured had (immediately before such bankruptcy, insolvency, liquidation, dissolution or similar proceedings) discharged its obligations in full under the original insurance policies in respect of which the then relevant policy of reinsurance has been effected; and

   (iii)   contain a "cut-through" clause in the following form (or otherwise satisfactory to Lessor):

"The Reinsurers and the Reinsured hereby mutually agree that in the event of any claim arising under the reinsurance in respect of a total loss or other claim where as provided by the Aircraft Lease Agreement, dated August ___, 2007 and made between Alliance Continental Leasing LLC and Prima Charter Sp. z o. o., such claim is to be paid to the person named as sole loss payee under the primary insurance, the Reinsurers will in lieu of payment to the Reinsured, its successors in interest and assigns pay to the person named as sole loss payee under the primary insurance effected by the Reinsured that portion of any loss due for which the Reinsurers would otherwise be liable to pay the Reinsured (subject to proof of loss), it being understood and agreed that any such payment by the Reinsurers will (to the extent of such payment) fully discharge and release the Reinsurers from any and all further liability in connection therewith"; subject to such provisions not contravening any Law of the State of Incorporation; and

(i)   **Initiating Claims**: contain a provision entitling any Indemnitee to initiate a claim under any policy in the event of the refusal or failure of Lessee to do so; and

(j)   **Indemnities**: accept and insure the indemnity provisions of this Lease to the extent of the risks covered by the policies.

## 1.5   Deductibles

Lessee shall be responsible for any and all deductibles under the Insurance.

## 1.6   Application of Insurance Proceeds

The Insurance will be endorsed to provide for payment of proceeds as follows:

(a)     **Event of Loss**: all insurance payments received as the result of an Event of Loss occurring during the Term will be paid to Lessor, who will pay the balance of those amounts to Lessee after deduction of all amounts which may be or become payable by Lessee to Lessor under this Lease and the Other Agreements (including under Section 11.1(b));

(b)     **Exceeding Damage Notification Threshold**: all insurance proceeds related to any property, damage or loss to the Aircraft, any Engine or any Part occurring during the Term not constituting an Event of Loss and in excess of the Damage Notification Threshold will be paid to Lessor and applied in payment (or to reimburse Lessee) for repairs or replacement property upon Lessor being satisfied that the repairs or replacement have been effected in accordance with this Lease. Any balance remaining may be retained by Lessor;

(c)     **Below Damage Notification Threshold**: insurance proceeds in amounts below the Damage Notification Threshold may be paid by the insurer directly to Lessee;

(d)     **Liability Proceeds**: all insurance proceeds in respect of third party liability will, except to the extent paid by the insurers to the relevant third party, be paid to Lessor to be paid directly in satisfaction of the relevant liability or to Lessee in reimbursement of any payment so made; and

(e)     **Default**: notwithstanding the foregoing paragraphs, if at the time of the payment of any such insurance proceeds a Default has occurred and is continuing, all such proceeds will be paid to or retained by Lessor to be applied toward payment of any amounts which may be or become payable by Lessee in such order as Lessor may elect.

To the extent that insurance proceeds are paid to Lessee, Lessee agrees to comply with the foregoing provisions and apply or pay over such proceeds as so required, holding them in trust in the meantime.

**1.7     Government Support.**

(a)     Lessor temporarily waives the requirement of this Agreement to maintain third party war risks and allied perils legal liability insurance with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, but such waiver shall be effective only to the extent and for so long as (w) the Government of United States of America provides to Lessee the Government Indemnity (as defined below) with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, in form reasonably acceptable to Lessor, against the scope of risks covered under London Form AVN52C as it existed on September 1, 2001, (x) the amount of coverage under the Government Indemnity against such risks with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, when added to the amount of insurance against such risks maintained by Lessee in accordance with AVN52D or equivalent endorsements, with respect to the Aircraft, the Airframe and the Engines and other related equipment and components, shall be at least equal to the amount of such insurance against such risks that would be required by this Agreement in the absence of this waiver, (y) the insurance maintained by Lessee against such risks with respect to the Aircraft, the Airframe and the Engines and other related equipment and components otherwise complies with the provisions of this Agreement; and (z) prior to any termination of, or reduction in the scope of risks covered by, or reduction in the

7-4



amounts of coverage under, the Government Indemnity. Lessee provides to Lessor insurance certificates in form reasonably acceptable to Lessor demonstrating compliance with the requirements of this Agreement. Solely for purposes of section (w) of the preceding sentence, Lessor confirms that the Government Indemnity constitutes an indemnity reasonably acceptable to Lessor, but only if and for so long as the Government Indemnity remains in force and either:

    (i)    In accordance with the availability on commercially reasonable terms of the insurance product described in such Schedule (it being understood that any such variation shall be reasonably acceptable to Lessor and shall not modify the other requirements of this Agreement or Lessee's obligation to comply therewith); or

    (ii)    a declaration, reasonably acceptable to Lessor, on behalf of the Government of the United States of America, as contemplated by the definition of "commercially available" in the Schedule to the Government Indemnity remains in effect unvaried (except as to the amount).

    (b)    For the purposes of this Section 1.7 "**Government Indemnity**" means for the purposes of declaring the definition of "commercially available" respecting aviation war risk liability coverage.

### 1.8    Confiscation by State of Registry.

Lessor temporarily waives the requirement of this Agreement to maintain cover for confiscation and requisition by the State of Registry, but only if and for so long as the Aircraft remains registered in the State of Registry, the United States of America, Canada or a member state of the European Union and such cover is not available at commercially reasonable premium rates, in the opinion of Lessor acting reasonably.



EXECUTION VERSION

## SCHEDULE 9
## EVENTS OF DEFAULT

Each of the following events or conditions constitutes an Event of Default:

(a)    **Non-payment**: Lessee fails to make any payment under this Lease on the due date;

(b)    **Insurance**: Lessee fails to comply with any provision of Section 9 or Schedule 7, or any insurance required to be maintained under this Lease is cancelled or terminated, or a notice of cancellation is given in respect of any such insurance;

(c)    **Breach**: Lessee fails to comply with any other provision of this Lease not referenced in this **Schedule 9** (including, without limitation, the failure to maintain in full force and effect any consent, authorisation, license, certificate or approval of or registration with or declaration to any Government Entity required in connection with this Lease) and, if such failure is in the reasonable opinion of Lessor capable of remedy, the failure continues for 20 days after written notice from Lessor to Lessee;

(d)    **Representation**: any representation or warranty made (or deemed to be repeated) by Lessee in or pursuant to this Lease or in any document or certificate or statement is or proves to have been incorrect in any material respect when made or deemed to be repeated,

(e)    **Cross-Default**:

   (i)    any Financial Indebtedness of Lessee or any Lessee Affiliate in excess of $5,000,000.00 is not paid when due;

   (ii)   any such Financial Indebtedness in excess of $5,000,000.00 becomes due or capable of being declared due prior to the date when it would otherwise have become due;

   (iii)  the security for any such Financial Indebtedness in excess of $5,000,000.00 becomes enforceable; or

   (iv)   any event of default or termination event, howsoever described, occurs under any Other Agreement.

(f)    **Insolvency**:

   Lessee is or becomes Insolvent;

(g)    **Disposal**: Lessee disposes, conveys or transfers or threatens to dispose, convey or transfer all or a material part of its assets (other than a disposal or transfer in the ordinary course of business for full commercial value) and, in Lessor's reasonable opinion, such disposal, conveyance or transfer has or is likely to have a material adverse effect on Lessee's ability to perform its obligations under this Lease or Lessee liquidates or dissolves or consolidates or merges with any other Person (whether by one or a series of transactions, related or not);

9-1

(h) **Rights and Remedies**: Lessee or any other Person claiming by or through Lessee challenges the existence, validity, enforceability or priority of the rights of Lessor as lessor or of Owner as owner or the Financing Parties as financing parties in respect of the Aircraft;

(i) **Change of Control**: any single person, or group of persons acquires control of Lessee without the previous consent in writing of Lessor (not to be unreasonably withheld or delayed);

(j) **Delivery**: so long as Lessor has not breached its obligations under this Lease, Lessee fails to comply with its obligation under Section 4 to accept delivery of the Aircraft and/or fails to fulfil the Conditions Precedent to delivery of the Aircraft within the time periods allowed;

(k) **Material Adverse Change**: any event or series of events occurs which, in the reasonable opinion of Lessor, could reasonably be expected to a material adverse effect on the financial condition or operations of Lessee or on the ability of Lessee to comply with its obligations under this Lease;

(l) **Eurocontrol**: Eurocontrol (or any authority on their behalf) or any other authority notifies Lessor or Owner that there are Eurocontrol charges or other navigation, landing, airport or similar charges due from Lessee, and such charges remain outstanding for a period of 30 days from the date of such notice; provided that (i) no Event of Default shall arise under this paragraph (p) for so long as such charges are being contested in good faith and by appropriate proceedings, an adequate bond has been provided and such proceedings do not involve any danger of the seizure, detention, interference with use or operation or sale, forfeiture or loss of the Aircraft; and (ii) such 30 day period shall not apply if there is any risk of seizure, detention, interference with use or operation or sale, forfeiture or loss of the Aircraft;

(m) **Litigation**: a judgment of a court for the payment of money in an amount equal to $250,000 or more is rendered against Lessee and the same remains unpaid for a period of 30 days, unless during such period, execution of such judgment shall have been effectively stayed by agreement of the parties involved or by court order or such judgment shall have been adequately bonded;

(n) **Suspension of Payments**: Lessee announces generally or advises Lessor that Lessee (i) is declaring a moratorium on or suspension of any payments in respect of its Financial Indebtedness or aircraft or engine lease obligations or (ii) does not intend to pay all or any portion of a payment of Rent that is not yet due or which has become due but in respect of which the cure period has not expired under this Lease or of any rent or other amount payable under any Other Agreement that is not yet due or which has become due but in respect of which any applicable cure period has not expired under such Other Agreement. This Event of Default shall not in any way limit any and all rights or remedies otherwise available to Lessor under applicable Law in respect of any repudiation by Lessee of this Lease, or notification or declaration by Lessee that it does not intend to perform any or all of its obligations under this Lease

9-2

## SCHEDULE 12
## FORM OF SHORT FORM LEASE AGREEMENT

### AIRCRAFT LEASE AGREEMENT (SHORT FORM) MSN:24121

**THIS SHORT FORM LEASE** (this "Lease") is made as of August 8, 2007,

**BETWEEN:**

(1)     **Alliance Continental Leasing LLC**, a corporation existing under the laws of Delaware ("Lessor"); and

(2)     **Prima Charter Sp. z o. o.**, a corporation existing under the laws of the Republic of Poland ("Lessee").

**WHEREAS:**

(A)     The Aircraft (as defined below) is the subject of an Aircraft Lease Agreement entered into between Lessor and Lessee dated as of August 8, 2007 (the **"Aircraft Lease"**);

(B)     The Aircraft the subject of this Lease and the Aircraft Lease is as follows:

One Boeing B757-200ER

Manufacturer's Serial Number: 24121

Registration Marks: SP-FVD

(the **"Aircraft"**); and

(C)     The terms of the Aircraft Lease provide for the lease of the Aircraft to Lessee by Lessor in exchange for payments of rent and all other amounts due as specified in the Aircraft Lease;

**NOW, THEREFORE**, for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     The term of this Lease will commence on August, 20th 2007 and shall terminate on August, 20th 2010 or otherwise in accordance with the Aircraft Lease.

2.     The Aircraft shall be in the legal custody and control of Lessee during the term of this Lease except as otherwise permitted by the Aircraft Lease.

3.     Lessee shall be responsible for the airworthiness and maintenance of the Aircraft during the term of this Lease in accordance with the provisions of the Aircraft Lease.

4.     Lessor does not and will not provide, directly or indirectly, any flight crew to operate the Aircraft.

5.     Lessee shall be responsible for insuring the Aircraft for such limits and coverage as shall be required by law from time to time as provided by the terms of the Aircraft Lease.

6.     Subleasing of the Aircraft is permitted, subject to the provisions of the Aircraft Lease.

12-1

7.  This Lease may be cancelled prior to its scheduled termination date following the occurrence of an Event of Default (as defined in the Aircraft Lease) and Lessor providing a notice to Lessee terminating this Lease, or in other circumstances contemplated in the Aircraft Lease.

8.  This Lease is subject in all respects to the terms and conditions of the Aircraft Lease, it being acknowledged that the Aircraft Lease does not contradict the conditions contained in this Lease.

9.  This Lease is delivered pursuant to the requirements for registration of the Aircraft in the Polish Civil Aircraft Register in accordance with the terms and conditions of the Aircraft Lease.

**IN WITNESS** whereof, the parties hereto have executed this Lease as of the date first written above.

Alliance Continental Leasing LLC

By: _____

Name: _John C. Craven_

Title: _Vice. / CEO -_
_My Director_

Prima Charter Sp. z o. o.

By: _____

Name: _ADAM BUCKOWSKI_

Title: _PRESIDENT & CEO_

By: _____

Name: _KATTZINE SMAWA._

Title: _BOARD MEMBER_

Andrew P. Fishkin (AF7571)
Steven M. Lucks (SL2711)
EDWARDS ANGELL PALMER & DODGE LLP
750 Lexington Avenue
New York, New York 10022
(212) 308-4411
*Attorneys for Plaintiff Alliance Continental Leasing LLC*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------

| | |
|---|---|
| ALLIANCE CONTINENTAL LEASING LLC, | : Case No: 08 CV 1027 (JSR) |
| Plaintiff, | |
| v. | |
| PRIMA CHARTER Sp. z. o. o., | |
| Defendant. | |

-----------------------------------------

## CERTIFICATE OF SERVICE

I certify that I have on this 27th day of March 2008 served the attached Memorandum of

Law in Opposition to Defendant's Motion to Dismiss, Declaration of Steven M. Lucks dated

March 27, 2008 with exhibits thereto, and Affidavit of John C. Green in Opposition to

Defendant's Motion to Dismiss dated March 26, 2008, upon:

Paul D. Sarkozi, Esq.
Kim F. Bridges, Esq.
HOGAN & HARTSON LLP
875 Third Avenue
New York, New York 10022
Attorneys for Defendant Prima Charter Sp. z. o. o.

by causing true and correct copies to be delivered by hand.

Dated: New York, New York
        March 27, 2008

### EDWARDS ANGELL PALMER & DODGE LLP

/s/ Steven M. Lucks
Andrew P. Fishkin (AF7571)
Steven M. Lucks (SL2711)
750 Lexington Avenue
New York, NY 10022-1200
(212) 308-4411
(212) 308-4844

*Attorneys for Plaintiff Alliance Continental Leasing LLC*